Francisco J. Aldana (CSB #216388)
**THE ADVOCATES' LAW FIRM, LLP**
600 B Street, Suite 2130
San Diego, California 92101-4512
Telephone: (619) 236-8355
Facsimile:  (619) 239-5888


Attorneys for Plaintiffs
ROBERT H. ZAKAR
VALERIE ZAKAR

**THE ADVOCATES' LAW FIRM, LLP**
**www.theadvocateslaw.com**

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

## SAN DIEGO DIVISION

| | |
|---|---|
| ROBERT H. ZAKAR, VALERIE ZAKAR, <br><br> Plaintiff, <br><br> versus <br><br> CHL MORTGAGE PASS-THROUGH TRUST 2006-HYB3 MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-HYB3; CWMBS, INC.; BANK OF AMERICA N.A. for itself and as successor for COUNTRYWIDE BANK, N.A.; COUNTRYWIDE HOME LOANS, INC.; BAC HOME LOANS SERVICING, LP; AMERICA'S WHOLESALE LENDER; MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.; RECONTRUST COMPANY, N.A.; and DOES 1 through 500, inclusive, <br><br> Defendants, | Case Number: **11cv0457 AJB (WVG)** <br><br> **FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT, TEMPORARY RESTRAINING ORDER, INJUNCTIVE RELIEF, AND MONETARY DAMAGES** <br><br> COUNT 1 :  WRONGFUL FORECLOSURE BY A STRANGER <br> COUNT 2 : FRAUD – INTENTIONAL <br> COUNT 3 : FRAUD – FRAUDULENT CONCEALMENT <br> COUNT 4 : NEGLIGENCE <br> COUNT 5 : RICO <br> COUNT 6 : RESPA <br> COUNT 8 : UNFAIR DEBT COLLECTION PRACTICES <br> COUNT 9 : CIVIL CODE § 2923.5 <br> COUNT 10 : CIVIL CODE § 2923.6 <br> COUNT 11 : UNLAWFUL, UNFAIR OR DECEPTIVE PRACTICES <br><br> **REQUEST FOR JURY TRIAL** |

**FIRST AMENDED COMPLAINT**

Plaintiffs ROBERT H. ZAKAR and VALERIE ZAKAR (herein "Plaintiff"), complains and alleges as follows:

## I.   JURISDICTION AND VENUE

This Court has jurisdiction in this proceeding pursuant to 28 United States Code § 1331, pursuant to 12 United States Code § 2614 for Real Estate Settlement Practices Act ("RESPA") claims, and pursuant to 28 United States Code § 1367 for supplemental jurisdiction of Plaintiff's state law claims because all claims are so related to the claims within the court's original jurisdiction that they form part of the same case or controversy under Article 3 of the United States Constitution.   The Court has authority to issue a declaratory judgment by virtue of 28 United States Code § 2201.   Counts arising under contract, common law, and the law of conveyances in real property are properly asserted under this Court's pendent jurisdiction.   This Court also has subject matter jurisdiction over this action under 28 United States Code §§ 1331 and 1367 in that the Plaintiff is an intended, third-party beneficiary to a contract by or between the defendants or otherwise has standing.

1.   Venue is proper in this district pursuant to 28 United States Code § 1391 generally and whereby the real property and a substantial part of the events and claims, the subject of this suit, are situated here, purported communications notifying Plaintiff of foreclosure and election to sell under the security instrument conveyed and enforced by Defendants are in this district, and all of the Defendants actively conducted business within the forum state of California.

2.   Venue is proper in the County of San Diego because the Defendants, or some of them, reside in this county, and the injuries alleged herein occurred in this county.

## II.   INTRODUCTION

3.   This action involves an attempt to foreclose and take away forever Plaintiff's home by a stranger that has no authority and is not recognized as a legal party in any capacity having such a right – it is an attempted act of thievery the defendant(s) are about to complete unless this court stops them in their tracks.

**FIRST AMENDED COMPLAINT**

THE ADVOCATES' LAW FIRM, LLP
www.theadvocateslaw.com

4.    Additionally, Plaintiff herein alleges that defendants are not the owners of the mortgage on his property and hence do not have the right to foreclose.  On the other hand, if this Court finds that defendants are the owners and or have the right to foreclose on Plaintiff's property, defendants failed to comply with applicable laws, as set forth in this Complaint.

### III.    PARTIES

5.    Plaintiffs ROBERT H. ZAKAR and VALERIE ZAKAR are husband and wife who, at all relevant times during the events alleged herein, resided in the County of San Diego.

6.    Defendant CHL MORTGAGE PASS-THROUGH TRUST 2006-HYB3 MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-HYB3 (hereafter referred to as "CHL TRUST")  is a real estate investment conduit ("REMIC") trust as defined under 28 United States Code § 860D.

7.    Defendant CWMBS, INC. (hereafter referred to as "CWMBS") is a corporation, origin unknown, that is identified as the "Depositor" under the April 1, 2006, Pooling and Servicing Agreement for CHL TRUST.

8.    Defendant BANK OF AMERICA N.A. for itself and as successor for COUNTRYWIDE BANK, N.A. (hereafter referred to as "BOFA") is a national banking association established under the laws of the United States of America.

9.    Defendant COUNTRYWIDE HOME LOANS, INC. (hereafter referred to as "CHL") is a wholly owned subsidiary of BOFA acting at the direction of BOFA in various capacities.

10. Defendant BAC HOME LOANS SERVICING, LP (hereafter referred to as "BAC") is a wholly owned subsidiary of BOFA acting at the direction of BOFA in various capacities.

11. Defendant AMERICA'S WHOLESALE LENDER (hereafter referred to as "AWL") is a broker, mortgage lending, and servicing institution.

12. Defendant MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. (hereafter referred to as "MERS") is a corporation incorporated in Wilmington, Delaware,

**FIRST AMENDED COMPLAINT**

*THE ADVOCATES' LAW FIRM, LLP*
*www.theadvocateslaw.com*

THE ADVOCATES' LAW FIRM, LLP
www.theadvocateslaw.com

with its principal place of business in Reston, Virginia that operates an electronic registry and owns no property or has no interest in any matter set out in this Complaint.

13.  Defendant RECONTRUST COMPANY, N.A. (hereafter referred to as "RECON") is an unknown entity and a purported trustee under certain real estate document, as set forth in this Complaint.

14.  The specifically named defendants in paragraphs 6 through 13 will be referred to collectively as "Defendants."

15.  The true names and capacities, whether corporate, associate, individual or otherwise of Defendants DOES 1 through 500, inclusive, are unknown to Plaintiff, who therefore sues said Defendants by such fictitious names.  Each of the Defendants designated herein as a DOE is legally responsible in some manner for the events and happenings herein referred to and caused injuries and damages proximately thereby to Plaintiff, as herein alleged. Plaintiff will seek leave of court to amend this First Amended Complaint to show their names and capacities when the same have been ascertained.

16.  At all times mentioned in this First Amended Complaint, unless otherwise alleged, each Defendant was the agent, partner, or employee of every other Defendant, and in doing the acts alleged in this First Amended Complaint, was acting within the course, scope and authority of that agency, partnership, employment, joint venture, or conspiracy, and with the knowledge and consent of each of the other Defendants.

17.  Unless otherwise indicated in this First Amended Complaint, none of the Defendants are authorized to engage in business, are not licensed, cannot bring a legal action, and cannot defend a legal action in the state of California.

**IV.    FACTUAL ALLEGATIONS**

18. This First Amended Complaint is brought by a married couple seeking relief from the predatory mortgage lending practices and attempted theft by the Defendants.   The Defendants will complete the theft via a non-judicial foreclosure sale, unless this court intervenes.

19. On or about January 19, 2006, Plaintiff purchased residential real property located

**FIRST AMENDED COMPLAINT**

1  in the City of San Diego, County of San Diego, State of California commonly known and
2  described as 10451 Harvest View Way, San Diego, California 92128 (hereinafter
3  "Property"). Plaintiff has been the owner of said Subject Property since that time.

4  20. On or about January 24, 2006, a Grant Deed was recorded on the Property naming
5  Plaintiff as the "Grantee" in the Official Records of the San Diego County Recorder's
6  Office and assigned document number 2006-0053922.

7  21. On or about January 24, 2006, a Deed of Trust was recorded on the Property
8  identifying Plaintiff as "Borrower," identifying AWL as the "Lender," identifying RECON
9  as the "Trustee," and identifying MERS as the "a corporation that is acting solely as a
10 nominee for Lender and Lender's successors and assigns." Further, the Deed of Trust
11 states that "MERS is the beneficiary under this Security Instrument." The Deed of Trust
12 was recorded in the Official Records of the San Diego County Recorder's Office and
13 assigned document number 2006-0053923. Plaintiff attaches hereto a true and correct copy
14 of the Deed of Trust, as Exhibit "1."

15 22. On or about January 24, 2006, a Deed of Trust and Request for Notice of Default
16 was recorded on the Property identifying Plaintiff as "Borrower," identifying RECON as
17 the "Trustee," and "Beneficiary," and identifying BOFA's predecessor, Countrywide Bank,
18 N.A., as the "Lender." The Deed of Trust and Request for Notice of Default was recorded
19 in the Official Records of the San Diego County Recorder's Office and assigned document
20 number 2006-0053924. Plaintiff attaches hereto a true and correct copy of the Deed of
21 Trust and Request for Notice of Default, as Exhibit "2."

22 23. On or about March 27, 2007, a Substitution of Trustee and Full Reconveyance
23 recorded on the Property substituting the then current beneficiary, "Countrywide Bank,
24 FSB, fka Countrywide Bank, N.A., fka Countrywide Bank, a division of Treasury Bank,
25 N.A." for the then new trustee, "ReconTrust Company, N.A." The Substitution of Trustee
26 and Full Reconveyance was recorded in the Official Records of the San Diego County
27 Recorder's Office and assigned document number 2007-0204290. Plaintiff attaches hereto
28 a true and correct copy of the Substitution of Trustee and Full Reconveyance, as Exhibit

THE ADVOCATES' LAW FIRM, LLP
www.theadvocateslaw.com

**FIRST AMENDED COMPLAINT**

"3."

24. On or about July 6, 2010, a Corporation Assignment of Deed of Trust/Mortgage was recorded on the Property whereby MERS is granting to CHL TRUST and CWMBS "All BENEFICIAL INTEREST" set forth in document 2006-0053923, the Deed of Trust.  The Corporation Assignment of Deed of Trust/Mortgage was recorded in the Official Records of the San Diego County Recorder's Office and assigned document number 2010-0337719. Plaintiff attaches hereto a true and correct copy of the Corporation Assignment of Deed of Trust/Mortgage, as Exhibit "4."

25. On or about April 9, 2009, a Notice of Default and Election to Sell Under Deed of Trust was recorded on the Property by MERS, through its agent, RECON, in the Official Records of the San Diego County Recorder's Office and assigned document number 2009-0463598.  Plaintiff attaches hereto a true and correct copy of the Notice of Default and Election to Sell Under Deed of Trust, as Exhibit "5."

26. On or about April 5, 2010, a Notice of Trustee's Sale was recorded on the Property by RECON, in the Official Records of the San Diego County Recorder's Office and assigned document number 2010-0166307.  Plaintiff attaches hereto a true and correct copy of the Notice of Trustee's Sale, as Exhibit "6."

27. Plaintiff was not provided any loan related documents or required executed copies at or before the closing and Plaintiff was told such documents would be mailed at a later date. Such loan documents were not provided to Plaintiff despite Plaintiff requesting same.  It was not until a few months after the Notice of Default and Election to Sell Under the Deed of Trust that Plaintiff secured copies of aforementioned exhibits, exhibits 1 to 6.

28. On or about May 11, 2006, CHL TRUST and CWMBS filed an annual report, Form 8-K, pursuant to 15 United States Code § 78m or 78o(d) and was assigned file number 333-131662-06, and film number 06830219, with the United States Securities and Exchange Commission.  This Form 8-K contained and incorporated as an exhibit, Exhibit 99.1, the April 1, 2006, Pooling and Servicing Agreement (hereafter the "PSA") for CHL TRUST. The PSA is critical to the management of the CHL TRUST, if CHL TRUST is operable.

THE ADVOCATES' LAW FIRM, LLP
www.theadvocateslaw.com

Plaintiff attaches hereto a true and correct copy of the PSA, as Exhibit "7."

29. Plaintiff became delinquent on mortgage payments at the suggestion of BAC, who stated they could only get a loan modification if they were delinquent. Afterwards, Plaintiff attempted to contact BAC and BOFA without success. No Defendant contacted Plaintiff with 'due diligence' to provide any assistance related to the delinquency.

30. Defendant(s), preyed upon Plaintiff by manufacturing legal documents and using false officer and notary signatures on deeds of trust(s), assignment, notice of default, notice of trustee's sale, but not limited to. Plaintiff attaches hereto a true and correct copy of the summary of the varying signatures as compared to the notary's signature from various official and recorded documents was attached as Exhibit "8" to the Complaint (hereafter referred to as "Exhibit 8").

31. The actual documents referenced on Exhibit "8" are attached in the order listed hereto as a true and correct copy of the individual pages to Exhibit "8" as Exhibit "9" (hereafter referred to as "Exhibit 9").

**V.   CLAIMS FOR RELIEF**

**COUNT 1**

**WRONGFUL FORECLOSURE BY A STRANGER**

**(Against All Defendants)**

1.   Plaintiff incorporates here each and every allegation set forth above and in this First Amended Complaint.

2.   Plaintiff alleges that Defendants have ignored to follow California Civil Code § 2932.5 where it is stated:

> Where a power to sell real property is given to a mortgage, or other encumbrance, in an instrument intended to secure the payment of money, the power is part of the security and vest in any person who by assignment becomes entitled to payment of the money secured by the instrument. The power of sale may be exercised by the assignee if the assignment is duly acknowledged and recorded.

3.   Plaintiff alleges that nothing in the San Diego Recorder's office reflects the name of 'any' assignee (the one that has the legal right to foreclose).

THE ADVOCATES' LAW FIRM, LLP
www.theadvocateslaw.com

THE ADVOCATES' LAW FIRM, LLP
www.theadvocateslaw.com

4.   Plaintiff alleges that since California Civil Code § 2932.5 was not adhered to, the foreclosure attempt against Plaintiff's property is illegal and **void** as a matter of law.

5.   Defendants pooled and bundled up Plaintiff's loan with other mortgage documents and then sold them to the Secondary Market (Wall Street) as a REMIC, commonly referred to as Mortgage Backed Securities or "MBS".  Plaintiff further alleges that the securitization process requires the transfer of these mortgage documents with assignments (in recordable form) to the trust no later than 90 days after the closing date of the creation of the REMIC trust as stated in the PSA.  The closing date in this case is April 30, 2006 (Exhibit 8, Article I, Definitions of the PSA).  A purported assignment was recorded on July 6, 2010, over four years later (Exhibit 5), assigning the Property from MERS to CWMBS.   This assignment is not only void and is based on false documents and signatures, but more importantly, is prohibited from being part of the CHL TRUST pursuant to 26 United States Code § 860(G) because a REMIC trust does not have the power or authority to receive mortgages or notes more than ninety days after the closing specified in the CHL TRUST, which is set out in the PSA.  Assuming MERS had the authority to make an assignment of the Property, it needed to be made on or before July 30, 2006, to be valid.

6.   Under California Civil code §2924(a)(1), the Notice of Default may be recorded by the "trustee, or mortgage, or beneficiary or any of their authorized agents".  (This is opposed to the argument in the courts Order, *Doc. 35, page 4, pleading lines 20 & 21*, that incorrectly states that this code section identifies these parties as authorized to conduct the foreclosure proceedings). It is the power to invoke the conducting of the sale that is California Civil Code §2932.5 authority. Because the July 30, 2006 assignment was void, there is not, in recordable form, any assignment on the record that will satisfy the requirements of California Civil Code § 2932.5.   And, since a proper assignment is necessary to invoke the power of sale, the act of RECON as trustee was not proper or legal.

7.   It is impossible for a proper assignment to be recorded at this time because CHL Trust, in addition to 26 United States Code § 860(G), per the PSA, does not allow any transfer of anymore mortgage documents and assignments after the closing date.

8.   As a result it is uncertain who the investor and/or owner of the mortgage note is, but one thing is certain that there is no recorded assignment in the public record or in the world that shows that any of the Defendants are assignees of the deed of trust and note to the Property allowing them to foreclose.  Accordingly, Defendants' non-judicial foreclosure attempt is void as a matter of law and if Defendants are able to complete the foreclosure, they would be committing a theft of Plaintiff's property.

9.   Additionally, Defendants are not the real parties in interest and lack standing to foreclose under the "Power of Sale" clause of the Deed of Trust(s) (Exhibits 2 and 3).

10.  Plaintiff alleges that there is a defect in the chain of title of the Property in regard to the missing assignment and also there is a discrepancy as to who is the investor that bought Plaintiff's mortgage note.

11.  This Courts argument, in its Order *Document 35, page 5, pleading lines 1 and 2*, is that violations by asserting that non-judicial foreclosure proceedings in California are governed by Civil Code §2924, not Commercial Code.  Plaintiff shows here, however, that Commerical Code does apply, and that there is a distinction between the two in cases where the note is securitized, as is the case here.

12.  California Commercial Code § 3301 specifically identifies the persons who are entitled to enforce a security interest, such as instituting a foreclosure sale under a Deed of Trust.  The statute is exclusive rather than inclusive in nature, and those who are not identified do not have the right to enforce such an interest.  Furthermore, the general rule in California requires the secured party to take possession of the security instrument in order to perfect the security interest.  California Commercial Code § 9304(1).  *Neilson v. Chang* (In re First T.D. & Inv. Inc.), 253 F.3d 520, 526 (9th Cir. Cal. 2001).

13.  A directly pertinent authority on this issue is *In re Staff Mortgage*, 655 F.2d 967, (9th Cir. Cal 1981). Appellants in *Staff Mortgage* argued that recordation of the assignments should provide constructive possession of the trust deeds sufficient to perfect their security interests under California Commercial Code § 9304(1). Id. at 283. It was held, however, that California law at that time was clear: "Perfection of a security interest in an instrument

**FIRST AMENDED COMPLAINT**

[could] only occur with the actual possession of the instrument by the secured party or by an agent or bailee on his behalf." Id. *Neilson v. Chang* (In re First T.D. & Inv. Inc.), 253 F.3d 520, 529-530 (9th Cir. Cal. 2001).

14. None of the Defendants had or have standing to foreclose, or authorized to instruct another agent to foreclose, and are not otherwise entitled to payment. Moreover, Defendants are not "person[s] entitled to enforce" the security interest on the Subject Property, as that term is defined in California Commercial Code § 3301.

15. California Civil Code § 2924f(b)(1) states in pertinent part:
> A copy of the notice of sale shall also be posted in a conspicuous place on the property to be sold at least 20 days before the date of sale, where possible and where not restricted for any reason. If the property is a single-family residence the posting shall be on a door of the residence, but, if not possible or restricted, then the notice shall be posted in a conspicuous place on the property ... An inaccurate statement of this amount shall not affect the validity of any sale to a bona fide purchaser for value, nor shall the failure to post the notice of sale on a door as provided by this subdivision affect the validity of any sale to a bona fide purchaser for value.

16. Defendants' failure to comply with statutory notice requirements under California Civil Code §§ 2934a(a)(4)(e) and 2924f(b)(1), but not limited to these provisions, denied Plaintiff the opportunity to exercise the rights that the statutory notice is specifically designed to protect.

17. Defendants did not have the right to initiate foreclosure, instruct others to carry out foreclosure activity, or foreclose upon the Property under the law as they are strangers. Even assuming, arguendo, that Defendants did have some right to enforce the security interest, the procedures used violated statutory requirements governing non-judicial foreclosure sales.

18. Although not required to tender because the California Supreme Court has stated: "where a party has the right to avoid a sale, he is not bound to tender any payment in redemption," Plaintiff nonetheless offers to tender an undertaking as may be required by this Court, including but not limited to a bond, depositing equivalent mortgage payments with the Court, or placing the undertaking as part of reorganization under Chapter 13 of the

THE ADVOCATES' LAW FIRM, LLP
www.theadvocateslaw.com

1    Bankruptcy Code.  *Humboldt Sav. Bank v. McCleverty*, 161 Cal. 285, 291, 119 P. 82

2    (1911).

3        19.  As a direct and proximate result of said Defendants' wrongful actions, Plaintiff has

4    suffered damages, including, but not limited to, direct monetary loss, consequential

5    damages, and emotional distress.

6        20.  In committing the wrongful acts alleged herein, said Defendants acted with malice,

7    oppression and fraud. Said Defendants' willful conduct warrants an award of exemplary

8    damages in an amount sufficient to punish the wrongful conduct and deter such misconduct

9    in the future.

10                                    **COUNT 2**

11                          **FRAUD – INTENTIONAL**

12        **(Against CHL TRUST, CWMBS, BOFA, BAC, MERS, and RECON)**

13       21.  Plaintiff incorporates here each and every allegation set forth above.

14       22.  As of part of the purported July 6, 2010, assignment (Exhibit 5) of the Property, the

15    assignee, the beneficiary, and the foreclosing agents assert a right to foreclose.  However,

16    Defendants rely upon a forged or defective assignment because the notary signature is

17    forged, and this forgery alone, voids the purported assignment of the Property,

18    notwithstanding the claim that the purported assignment is void as a matter of law as set

19    forth in Count 1.

20       23.  Exhibit 9 has a series of 'cropped' signatures of the notary "Michelle I. Miller"

21    (hereafter "Miller").  The first signature at the top of Exhibit 9 reflects Miller's signature

22    on her Notary Public Bond application, which Plaintiff believes to be her true and correct

23    signature.  The cropped Miller signatures after reflect other public records where the Miller

24    signature is utilized – each is different.  The last Miller signature reflects the signature on

25    the July 6, 2010, assignment (Exhibit 5) in this case; it is completely different from them

26    all.  The stark differences in signatures place into question the true identity of the notary or

27    person that signed the Miller signature on the assignment rendering void for this reason

28    alone.

THE ADVOCATES' LAW FIRM, LLP
www.theadvocateslaw.com

**FIRST AMENDED COMPLAINT**

THE ADVOCATES' LAW FIRM, LLP
www.theadvocateslaw.com

1
2
24.  The Miller signature was submitted to assign documents, record the assignment, and to otherwise justify the ability to foreclose on the Property.

3
4
5
6
7
25.  The public and Plaintiff would not otherwise have known that the Miller signature is fraudulent and that the fraudulent nature of this Miller signature would render the assignment void.     In fact, Plaintiff did not know of the fraudulent act, and in turn relied upon the fact that the assignment was valid in its recordation.  The Plaintiff relied on this act to their detriment.

8
9
26. Defendants knew the Miller signature was false and proceeded to utilize to gain an advantage over others and Plaintiff.

10
11
27.  Defendants intended to deceive Plaintiff, and Plaintiff did not know or participate in the forging of the Miller signature.

12
13
14
15
16
28. Intentional Fraud has a 3 year statute of limitations, *Cal. Civ. Proc. §338 (d)*.  The fraudulent act is the act of creating and recording with the official records of the county of Kern the purported assignment (Exhibit 5).  Since this assignment was created and recorded in the month of July 2010, this cause of action is brought well within the statute of limitations.

17
18
29. As a proximate result of the Miller signature forgery, Defendants are going to foreclose on Plaintiff's home on March 8, 2011, and plaintiff will be forever damaged.

19
20
21
22
30.  Defendants acted outrageously and persistently with actual malice in performing the acts alleged herein and continue to do so.  Accordingly, Plaintiff is entitled to exemplary and punitive damages in a sum according to proof and to such other relief as is set forth below in the Prayer for Relief.

23
24
31. In the interim, an emergency order is being sought to stop Defendants' foreclosure of the Property on March 8, 2011.

25
**COUNT 3**

26
**FRAUD – FRAUDULENT CONCEALMENT**

27
**(Against All Defendants)**

28
32.  Plaintiff incorporates here each and every allegation set forth above.

**FIRST AMENDED COMPLAINT**

33. The Defendants had and continue to have exclusive knowledge not accessible to Plaintiff of material facts pertaining to mortgage lending activities, foreclosure activities, underwriting guidelines, investor directives, and the full history of the conveyances from the originating lender AWL.  Defendants failed to disclose such information to Plaintiff at the time of the purchase of the Property, and this fraudulent concealment continues to this day.

34. At the time of purchase of the Property by Plaintiff, Defendants knew that the loan would be "pooled," and that there would be a "securitized sale."  Defendants knowing this information failed to adhere to underwriting guidelines, falsified appraisals, placed Plaintiff in a loan product not suited for them in bad faith, and dealt unfairly while concurrently packaging a mortgage backed security portfolio, the REMIC, to maximized investor value at the expense of Plaintiff.  Defendants knew the scheme would result in a liquidity crisis at the time.

35. Defendants knew within a foreseeable period, its investors would discover that mortgagors, including Plaintiff, could not afford their loans and result in massive foreclosures and economic devastation.  We are now in the 'midst' of the greatest mortgage meltdown in history and Americans everywhere are going to pay for it.  Plaintiff is about this lose his home as a result of Defendants' fraudulent concealment.

36. Defendants were particularly aware of the deteriorating quality of loans it was writing, the poor performance over time of those loans, and its ability to sell those loans in the secondary mortgage market.  Defendants knew more than anyone that the loans were bad, would adjust with higher interest rates, and once adjusted, most borrowers would not be able to afford the loans, as is the case of Plaintiff.

37. Defendants knew Plaintiff would be misled by failing to disclose substantial negative information regarding its loan products, including:

a.   The increasingly lax underwriting guidelines used by Defendants in originating loans;

b.   Defendants' pursuit of a "matching strategy" in which it matched the terms of any

**FIRST AMENDED COMPLAINT**

loan being offered in the market, even loans offered by primarily subprime originators;

c.   Defendants' definition of "prime" loans included loans made to borrowers with FICO scores well below any industry standard definition of prime credit quality;

d.   The high percentage of Defendants' subprime originations that had a loan to value ratio of 100%; and

e.   The significant additional risk factors, beyond subprime credit history of the borrower, associated with increased default rates, including reduced documentation, stated income, and loan to value ratios in excess of 95% but not limited to.

38. Defendants knew this negative information from numerous reports they regularly received and from emails and presentations prepared by its chief credit risk officer. Defendants nevertheless hid this negative information from the public, including Plaintiff.

39. Plaintiff did not know the concealed facts.

40. Defendants intended to deceive Plaintiff.  As described herein, that deception was essential to their overall plan to raise the value of the REMICs and bulk investors, trade on inside information, and otherwise pump the value of the their stock price.

41. Defendants were once one of the Nation's leading providers of mortgages.  They were highly regarded and reliance was placed on various securities filings, press releases, web site and branch offices, and through television and radio for performance and quality underwriting.  As a result, Plaintiff reasonably relied upon the deception they imposed.

42. As a proximate result of the foregoing concealment by Defendants, and through their schemes, property values have significantly declined and continue to decline, gravely damaging Plaintiff by materially reducing the value of their primary residence, depriving them of access to equity lines, additional mortgages or other financings previously available based on ownership of a primary residence in California, in leading to payment in excess of the value of Plaintiffs' property, thereby resulting in payment with no consideration and often subjecting Plaintiff to reduced credit scores (increasing credit card and other borrowing costs), and reduced credit availability.

43. Defendants acquired the mortgage or rights related thereto with knowledge of the

**FIRST AMENDED COMPLAINT**

THE ADVOCATES' LAW FIRM, LLP
www.theadvocateslaw.com

fraudulent operations of each other.

44. Defendants can have no more rights in the Property than AWL, and have no rights appertaining or relating to Plaintiffs' Property as Defendants have represented to Plaintiff that Defendants have.  Defendants have continually concealed this fact from Plaintiff while concurrently demanding and accepting debt service payments from Plaintiff.

45. Without limiting the relief prayed in this Complaint, Plaintiff has lost equity in the Property, has incurred cost and expenses related to protecting itself, has suffered reduced credit scores, has suffered the unavailability of credit and reduced availability of goods and services tied to credit ratings, has incurred increased costs of those services, as well as fees and costs, including, without limitation, attorneys' fees and costs.

46. Although Defendants profess to help borrowers with loan modifications, they in fact, adhere to a secret plan to deprive Plaintiff of any assistance.

47. Defendants, knowing they have no right in or to the Property, now attempt to foreclose on the Property.

48. Defendants' concealments as to the pervasive mortgage fraud, and their concealment, both as to their scheme to profiteer from the mortgage meltdown and as to their purported efforts to resolve loan modifications with Plaintiff, are substantial factors in causing harm to Plaintiff described in this Complaint.  Defendants want to recover money from the insurance provided by the government on their mortgage, so it does not behoove them to effectuate a loan modification.

49. Fraud has a 3 year statute of limitations, *Cal. Civ. Proc. §338 (d)*.  The fraudulent act is the concealment of the information that would expose Plaintiffs the truth behind the poor quality and high risk loans that were produced, sold, and maintained by Defendants and also the deception behind the HAMP loan modification processing.   Since this concealment was not discovered until, at the very earliest, the time of recording of the Notice of Default (Exhibit 6) on April 9, 2009, this cause of action is brought well within the statute of limitations.

50. Defendants acted outrageously and persistently with actual malice in performing the

**FIRST AMENDED COMPLAINT**

acts alleged herein and continue to do so.  Accordingly, Plaintiff is entitled to exemplary and punitive damages in a sum according to proof and to such other relief as is set forth below in the Prayer for Relief.

51. In the interim, an emergency order is being sought to stop Defendants' foreclosure of the Property on March 8, 2011.

<div align="center">

**COUNT 4**

**NEGLIGENCE**

**(Against all Defendants)**

</div>

52. Plaintiff incorporates here each and every allegation set forth above.

53. At all times relevant herein, Defendants, and each of them, acting as Plaintiff's brokers and lenders, had a duty to exercise reasonable care and skill in performing their duties for the benefit of Plaintiff, their principal, in the loan transaction.

54. The duty to disclose generally presupposes a relationship grounded in **"some sort of transaction between the parties."** *LiMandri v. Judkins* ("Judkins") (1997) 52 Cal.App.4th 326, 336, quoting *Heliotis v. Schuman* (1986) 181 Cal.App.3d 646, 651. Thus, a duty to disclose may arise from the relationship between seller and buyer, ... or parties entering into any kind of contractual agreement. [Citation.]" *Judkins* 52 Cal.App.4th at 337. "All of these relationships are created by transactions between parties from which a duty to disclose facts material to the transaction arises under certain circumstances." *Wilkins v. National Broadcasting Co., Inc.* (1999) 71 Cal.App.4th 1066, 1082, citing *Judkins*, 52 Cal.App.4th at 336-337.

55. In taking the actions alleged in this Complaint, and in failing to take the actions alleged in this Complaint, Defendants, and each of them, breached their duty of care and skill to Plaintiff in the loan transactions, by among other things, 1) failing to supervise; 2) inducing Plaintiff to improperly sign documents by means of false representations; 3) suppressions and concealments; 4) failure to counsel; 5) failure to inform and explain; 6) charging excessive, unconscionable fees, and; 7) preparing false financial statements.

56. Defendants involved in the loan process exceeded their roles by failing to adhere to

<div align="center">

**FIRST AMENDED COMPLAINT**

</div>

underwriting guidelines and customs, by violating the law, specifically, those counts in this Complaint, but not limited to, by not acting in good faith and representing to Plaintiff that Plaintiff's could refinance his loan or seek equity lines of credit, that Plaintiff's home value would increase, that Plaintiff's credit worthiness would improve (all outside their roles), and more, and doing it on behalf of each other.

57. Negligence has a 2 year statute of limitations, *Cal. Civ. Proc. §339*. This is subject to equitable tolling. Since the negligent act of failing to supervise, counsel, and inform Plaintiffs was not discovered until, at the earliest, the time of the filing of the Notice of Default (Exhibit 5) on April 9, 2009, this cause of action is brought within the statute of limitations, subject to equitable tolling.

58. As a proximate result of the conduct of Defendants, as alleged in this complaint, Plaintiff was damaged in an amount to be proven at the time of trial.

**COUNT 5**

**RICO**

**(Against All Defendants)**

59. Plaintiff incorporates here each and every allegation set forth above.

60. Defendants are an enterprise engaged in and the activities of which affect interstate commerce.

61. It is this law firm's belief that the court system will be seeing this charge against many defendant banks. The enterprise needs to be stopped because its engine is fueled with the 'cover up' of the thousands of loan transactions generated through a 'fast and loose' business model during the peak of the real estate cycle. These transactions are now resulting in thousands of foreclosures just in Kern County alone, and millions nationwide. Now Defendant is being challenged and courts are asking questions like "Defendant [bank], where did you come from and where did you get the authority to foreclose if you are not in the chain of title?"

62. Defendants CHL TRUST, CWMBS, BOFA, BAC, AWL, MERS, and RECON are persons within the meaning of 18 U.S.C. § 1961(3), and as persons associated with CHL,

**FIRST AMENDED COMPLAINT**

conducted and participated, directly and indirectly, in the conduct of the affairs of said enterprise through a pattern of racketeering activity in violation of 18 United States Code § 1962(c). This conduct was ongoing and both direct and indirect with the purpose of lending money without complying or partially complying with applicable federal and state laws, underwriting guidelines, and customs in order to secure profits; knowing full well that the likelihood of foreclosures would increase in a high number of loan transactions. In many cases, loans were made quickly, resold, and eventually packaged as a mortgage-back securities, or as in this case, REMICS in violation of additional security laws, and the PSAs.

63. The predicate acts which constitute this pattern of racketeering activity were part of scheme engaged in prohibited activities under 18 United States Code §§ 1341, 1343, 1344, and 1348. Additionally, Defendants engaged in those acts set forth in the counts of this Complaint. For the purpose of executing this scheme, the Defendants, each of them, placed in post offices and/or in authorized repositories matter and things to be sent or delivered by the Postal Service, caused matter and things to be delivered by commercial interstate carrier, and received matter and things from the Postal service or commercial interstate carriers, including, but not limited to, loan applications, loan documents, collection notices, default and foreclosure notices, press releases, forward-looking statements, but not limited to, up to four years prior to the filing of the Complaint. These notices were false, misleading, and contrary to law, as described herein; and were deliberately designed to compel Plaintiff either to part with large sums of money or to abandon his property, for the profit of the enterprise.

64. For the purpose of executing this scheme to defraud Plaintiff and obtain money by means of false pretenses, Defendants also transmitted and received messages by wire, including but not limited to telephone and internet communications. In such communications, Defendants sought to convince Plaintiff either to part with large sums of money or to abandon his property, for the profit of the enterprise, asserting the falsehood that Defendants had the right to foreclose upon the security interest in the Property.

FIRST AMENDED COMPLAINT

65. These acts of racketeering, occurring within ten years of one another, constitute a pattern of racketeering activity within the meaning of 18 United States Code § 1961(5).

66. Plaintiff was injured by reason of this violation of 18 United States Code § 1962, in that, as a direct and proximate result of Defendants' complained of acts, Plaintiff has suffered and continues to suffer damages, including but not limited to, monetary damages and emotional distress, in an amount to be proven at trial.

67. The Supreme Court has held that civil RICO claims are subject to a four-year statute of limitations. *Agency Holding Corp. v. Malley-Duff & Associates, Inc*., 483 U.S. 143, (U.S. 1987). The statute of limitations begins running on a RICO claim according to the "injury discovery accrual rule" which ties accrual to the time when a plaintiff first knew or should have known of his injury.  Since Plaintiffs did not discover the injury, or should have discovered the injury at the earliest, the time of the filing of the Notice of Default (Exhibit 5) in April of 2009, this cause of action is brought before the court well within the recognized statute of limitations.

68. By reason of the Defendants' violation of 18 United States Code § 1962, Plaintiff is entitled, pursuant to 18 United States Code § 1964(c), to threefold the damages sustained, costs of suit, and reasonable attorneys fees.

## COUNT 6

## RESPA

### (Against Defendants CHL TRUST, CWMBS, BOFA, CHL, BAC, and AWL)

69. Plaintiff incorporates here each and every allegation set forth above.

70. The loan transaction between Plaintiff and Defendants is a mortgage loan covered by RESPA.

71. As part of the loans, Defendants obtained a security interest in the Property through a Deed of Trust.

72. *12 U.S.C. §2605(b)(1)* states: "Each servicer of any federally related mortgage loan shall notify the borrower in writing of any assignment, sale, or transfer of the servicing of the loan to any other person."  Defendants have not complied (see ¶72 below).

**FIRST AMENDED COMPLAINT**

THE ADVOCATES' LAW FIRM, LLP
www.theadvocateslaw.com

73. *12 U.S.C. §2605(c)(1)* states: "Each transferee servicer to whom the servicing of any federally related mortgage loan is assigned, sold, or transferred shall notify the borrower of any such assignment, sale, or transfer."  Defendants have not complied (see ¶72 below).

74. Plaintiff is not certain at this time exactly which of Defendants was actually the servicer of the loan at any given time, although he believed that each of the Defendants were a loan servicer at different times with the initial loan servicer being AWL.  However, due to the conspiratorial nature of the misdeeds alleged herein, and also due to Defendants' general failure to properly advise Plaintiff as to the roles and identities of the various entities that were purportedly handling his loan at any given time, these allegations are made as to all Defendants.

75. Defendants violated RESPA at the time of closing on the sale of the Subject Property by failing to correctly and accurately comply with multiple disclosure requirements.

76. Defendants also violated RESPA, specifically *12 U.S.C. § 2605(e)(2)* by failing and refusing to provide a written explanation or response to Plaintiff's Qualified Written Request not later than 60 days after receipt of the request.

77. Plaintiff is informed and believes, and thereon alleges, that Defendants have engaged in a pattern or practice of non-compliance with the requirements of the mortgage servicer provisions of RESPA as set forth in 12 United States Code § 2605.

78. Any action pursuant to the provisions of section 2605, 2607, or 2608 of this title (12 U.S.C.) may be brought in the United States district court or in any other court of competent jurisdiction, for the district in which the property involved is located, or where the violation is alleged to have occurred, within 3 years in the case of a violation of section 2605 *12 U.S.C. §2614*.  Since the Defendants initial violation of RESPA took place at the time of closing on the sale of the Subject Property in July of 2006, it would seem that this claim is time barred.  However, this claim should take into account two details: 1) equitable tolling, and 2) the multiple or pattern of acts of non-compliance with RESPA provisions.

**FIRST AMENDED COMPLAINT**

THE ADVOCATES' LAW FIRM, LLP
www.theadvocateslaw.com

THE ADVOCATES' LAW FIRM, LLP
www.theadvocateslaw.com

Equitable tolling should apply here because Plaintiffs did not discover the multiple acts of non-disclosure until Defendants made light of it by filing a Notice of Default (Exhibit 5) with the county recorder's office while simultaneously purporting to work with Plaintiffs on obtaining a HAMP modification.  Further, even if equitable tolling, arguendo, is not applicable, there was continuous acts of non-disclosure by Defendants within the three year time period prior to the initial filing of the Plaintiff's Complaint (see ¶ 72 above).

79. *12 U.S.C. §2605* states:

**(f) Damages and costs**

Whoever fails to comply with any provision of this section shall be liable to the borrower for each such failure in the following amounts:

**(1) Individuals**

In the case of any action by an individual, an amount equal to the sum of—

**(A)** any actual damages to the borrower as a result of the failure; and

**(B)** any additional damages, as the court may allow, in the case of a pattern or practice of noncompliance with the requirements of this section, in an amount not to exceed $1,000.

80.  As a result of Defendants' failure to comply with RESPA, Plaintiff has suffered and continues to suffer damages and costs of suit.  Plaintiff is entitled to recover statutory damages of $1,000.00, actual damages in an amount to be determined at trial, and costs and reasonable attorney's fees.

## COUNT 7

## CALIFORNIA FINANCIAL CODE

### (Against Defendants CHL TRUST, CWMBS, BOFA, CHL, BAC, and AWL)

81.  Plaintiff incorporates here each and every allegation set forth above.

82. A violation of RESPA is also made unlawful under California state law "by California Financial Code § 50505, which states: "Any person who violates any provision of [RESPA] or any regulation promulgated thereunder, violates this division [California Residential Mortgage Lending Act]."

83. As a result of Defendants' violations, Plaintiff is entitled to statutory damages in an

**FIRST AMENDED COMPLAINT**

amount to be determined at trial, actual damages according to proof, and costs and reasonable attorneys' fees.

## COUNT 8

### UNFAIR DEBT COLLECTION PRACTICES

#### (Against All Defendants)

84. Plaintiff incorporates here each and every allegation set forth above.

85. Plaintiff is informed and believes and thereupon alleges that the Defendants, and each of them, in taking the actions aforementioned, have violated provisions of the Rosenthal Act, including but not limited to California Civil Code § 1788 (e) and (f), and the FDCPA, 15 United States Code § 1692 et seq.

86. Under Article 1.1 of the California statute, a "debt collector" is "any person who, in the ordinary course of business, regularly, on behalf of himself or others, engages in the collection of consumer debts."  A "consumer debt" is a debt "incurred by a natural person in exchange for property, services or money acquired, on credit, for personal, family, or household purposes".  As indicated in this First Amended Complaint, Plaintiff purchased residential real property, and executed a Deed of Trust (Exhibit 1).  Upon examination of this Deed of Trust, it is clear on the face of the document that the Deed of Trust is security for a "note" also executed by Plaintiff.  This "note" is the consumer debt incurred by the Plaintiffs in exchange for property.  Thus, anyone who, in the ordinary course of business, regularly, on behalf of himself or others, engages in the collection of this note would be considered a 'debt collector'.

87. As specified in this First Amended Complaint, AWL is identified as the "Lender", RECON as the "Trustee", and MERS as "nominee for Lender" in the Deed of Trust.  AWL, BOFA, CHL, and BAC are each, at some point in time unknown to Plaintiff, servicer of the loan. A Notice of Default was recorded on the Plaintiffs' property by MERS through its agent RECON (Exhibit 6).  MERS assigned "all beneficial interest" under the Deed of Trust (such as monthly payments toward the note) to CHL TRUST and CWMBS (Exhibit 5). Each of these actions involving each defendant constitutes engaging in the collection of

THE ADVOCATES' LAW FIRM, LLP
www.theadvocateslaw.com

the note.  Thus, Defendants are in fact debt collectors.

88.  Defendants' actions constitute a violation of the Rosenthal Act section 1788.10 in that they threatened to take actions or did take actions not permitted by law, including but not limited to calling Plaintiff and threatening to take his home, falsely stating the amount of a debt; increasing the amount of a debt by including amounts that are not permitted by law or contract; and using unfair and unconscionable means in an attempt to collect a debt.

89.  Defendants' actions have caused Plaintiff actual damages, including, but not limited to: severe emotional distress, loss of appetite, frustration, fear, anger, helplessness, nervousness, anxiety, sleeplessness, sadness and depression.

90.  As a result of Defendants' violations, Plaintiff is entitled to statutory damages in an amount to be determined at trial, actual damages according to proof, and costs and reasonable attorneys' fees.

**COUNT 9**

**CIVIL CODE § 2923.5**

**(Against All Defendants)**

91.  Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

92.  In this Plaintiff's original Complaint, this cause of action was not alleged against defendant RECON.  The rationale behind this decision was that RECON is not a lender or servicer, and thus would not be a party required to take steps to provide alternatives to foreclosure. Upon reconsideration, Plaintiff would like to allege this cause of action against RECON, as it was RECON who filed the Notice of Default (Exhibit 6).  Although RECON is not a party required to take steps to provide alternatives to foreclosure, they are a party that is not allowed to record a Notice of Default unless and until thirty days after these steps are taken.  As such, RECON is now included with all Defendants in this cause of action.

93.  A private right of action lies for California Civil Code § 2923.5(a) under California Business & Professions § 17200, et. seq., even if the underlying statute confers no private right of action. *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.* (1998) 17 C4th 553, 561-

567, 71 CR2d 731,735-740; *Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 C3d 197, 210-211,197 CR 783, 792; *California Med. Assn. v. Aetna U.S. Healthcare of Cal., Inc.* (2001) 94 CA4th 151, 169, 114 CR2d 109, 123.

94. The application of this code section is clear as it is applied to the instant case. The purpose of this statute is to provide alternatives to foreclosure.

95. Pursuant to California Civil Code § 2923.5(a):

> [A] mortgagee, trustee, beneficiary, or authorized agent may not file a notice of default on an owner's principal residence for loans initiated between January 1, 2003 and December 31, 2007 pursuant to Civil Code § 2924 until 30 days after contact is made as required by §2923.5(a)(2) or 30 days after satisfying the due diligence requirements as described in subdivision (g).

96. Pursuant to subdivision (g), "due diligence" requires the Defendants to have done all the following affirmative actions prior to filing the Notice of Default and/or Notice of Sale:

> a.   Sending a first-class letter to the borrower that includes the toll-free telephone number made available by HUD to find a HUD-certified housing counseling agency;
> b.   Attempting to contact the borrower by telephone at least three times at different hours and on different days to discuss options to foreclosure.
> c.   If the borrower does not respond within two weeks after the telephone calls, sending a certified letter, with return receipt requested, advising the borrower to contact the lender to discuss alternatives to foreclosure.

97. Pursuant to California Civil Code § 2923.5(c), as part of the filing of the Notice of Sale, the lender is also required to file a declaration attesting to compliance with the due diligence requirements listed above.  California Civil Code § 2923.5(c) states in pertinent part:

> "if a mortgagee, trustee, beneficiary, or authorized agent had already filed the notice of default prior to the enactment of this section and did not subsequently file a notice of rescission, then the mortgagee, trustee, beneficiary, or authorized agent shall, as part of the notice of sale filed pursuant to Section 2924f, include a declaration that either: (1) States that the borrower was contacted to assess the borrower's financial situation and to explore options for the borrower to avoid foreclosure. (2) Lists the efforts made, if any, to contact the borrower in the event no contact was made."

98. As of the drafting of this complaint, Defendants have violated the following provisions of  § 2923.5 by:

> a.        Failing to contact the borrower in person or by telephone in order to assess

**FIRST AMENDED COMPLAINT**

THE ADVOCATES' LAW FIRM, LLP
www.theadvocateslaw.com

the borrower's financial situation and explore options for the borrower to avoid foreclosure, in violation of § 2923.5(a)(2).

99. Plaintiff asserts that inadequate measures were taken in order to suffice an obligation and procure some declaration on a Notice of Default, without actually enacting proper effort to fulfill the intent of the statute.

100. As a result of the aforementioned violations of § 2923.5, the Plaintiff seeks the following Declaratory Relief from the Court:

a. An order that the Notice of Default and Notice of Sale are void;

b. An order that the foreclosure sale should be postponed indefinitely until options to avoid foreclosure are explored with the borrower through counsel of record as required by §2923.5.

**COUNT 10**

**CIVIL CODE § 2923.6**

**(Against All Defendants Except Recon)**

101. Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

102. A private right of action lies for California Civil Code § 2923.6(a) under California Business & Professions § 17200, et. seq. as indicated in ¶ 90 of this First Amended Complaint.

103. Pursuant to California Civil Code § 2923.6 (a),

"The Legislature finds and declares that any duty servicers may have to maximize net present value under their pooling and servicing agreements is owed to all parties in a loan pool, not to any particular parties, and that a servicer acts in the best interests of all parties if it agrees to or implements a loan modification or workout plan for which both of the following apply:

(1) The loan is in payment default, or payment default is reasonably foreseeable.

(2) Anticipated recovery under the loan modification or workout plan exceeds the anticipated recovery through foreclosure on a net present value basis.

104. California Civil Code 2923.6(a) specifically creates to a **new duty** not previously addressed in pooling and servicing agreements. It then states that such

**FIRST AMENDED COMPLAINT**

THE ADVOCATES' LAW FIRM, LLP
www.theadvocateslaw.com

THE ADVOCATES' LAW FIRM, LLP
www.theadvocateslaw.com

a duty not only applies to the particular parties of the loan pool, but **all parties**. Since Plaintiffs are a borrower to a securitized loan, they have standing to pursue this claim.

105.      As alleged, the loan for the Property is in payment default.  In addition, the anticipated recovery, a loan modification in which the interest rate is reduced and the term is extended will likely result in a modification which is affordable to the Plaintiff and which exceeds the anticipated recovery through foreclosure on a net present value basis.

106.      As a result of the aforementioned violations of California Civil Code § 2923.6, the Plaintiff, in the alternative, an order from the Court that the Defendants should offer loan modification to Plaintiff which complies with California Civil Code § 2923.6 – one in which **"the anticipated recovery … exceeds the anticipated recovery through foreclosure on a net present value basis"**.   This loan modification must also be one which the Plaintiff can afford and which would not result in an inevitable foreclosure.

## COUNT 11

## UNLAWFUL, UNFAIR OR DECEPTIVE PRACTICES

### (Against All Defendants)

107.      Plaintiff incorporates here each and every allegation set forth above.

108.      Plaintiff informed and believes and thereon alleges that Defendants committed unlawful, unfair, and/or fraudulent business practices, as defined by California Business and Professions Code § 17200, by engaging in the unlawful, unfair, and fraudulent business practices alleged herein including violating the aforementioned statutes and common law as set forth in the Counts to this Complaint.  Further, these violations resulted in offending established public policy and were immoral, unethical, oppressive, unscrupulous, or substantially injured Plaintiff and other consumers.

109.      As a result of Defendants' wrongful conduct, Plaintiff has suffered various damages and injuries according to proof at trial.

110.      Plaintiff seeks injunctive relief enjoining Defendants from engaging in the unfair business practices described herein.

111.      Plaintiff further seeks restitution, disgorgement of sums wrongfully obtained,

costs of suit, reasonable attorneys' fees, and such other and further relief as the Court may deem just and proper.

112.        As a result of the acts of Defendants, and each of them, Plaintiff has been damaged in that he has suffered losses of money, and paid for higher loan costs and interest than is just, proper and legal.

113.        Plaintiff is entitled to an award of damages and disgorgement of profits in an amount to be proven at the time of trial.

<div align="center">**PRAYER**</div>

WHEREFORE, for reason of the foregoing, Plaintiff respectfully prays judgment as follows:

As to all Counts:

1. Actual and compensatory damages in an amount to be proven at the time of trial;

2. Any statutory penalties;

3. Attorney fees;

4. Costs of suit herein incurred;

5. Punitive damages in the sum of $1,000,000 pursuant to Civil Code section 1780(a)(4) to punish the Defendants, and each of them, and to deter others from the commission of like offenses;

6. That Defendants, and each of them, and each of their agents, attorneys, successors, and representatives, and all persons acting in concert or participating with them, be enjoined from proceeding with a foreclosure, or from removing, evicting, or in any way interfering with Plaintiffs' quiet and exclusive possession and occupancy of the Subject Property whether by an unlawful detainer court action, or otherwise;

7. Rescission of the transactions between Plaintiff and Defendants, and each of them, including a declaration that Plaintiff is not liable for any finance charges or other charges imposed by Defendants, and each of them;

8. Treble damages pursuant to Title 18, sections 1961, et seq., of the United States Code.

<div align="center">**FIRST AMENDED COMPLAINT**</div>

THE ADVOCATES' LAW FIRM, LLP
www.theadvocateslaw.com

9.  Termination of any security interest in Plaintiff's property created under the transactions between Plaintiff and Defendants, and each of them;

10. Return of any monies or property given by the Plaintiff to anyone, including all Defendants, in connection with the transactions between Plaintiff and Defendants, and each of them;

11. Declaratory relief providing for a Temporary Restraining Order against all Defendants, to stop any foreclosure activity, including a trustee's sale, until a hearing on a Preliminary Injunction can be had;

12. Civil penalties pursuant to Business and Professions Code section 17206(a) in an amount to be proven at the time of trial;

13. An order enjoining Defendants, and each of them, from engaging in the illegal, unfair and deceptive practices which are the subject of the complaint; and

14. Any such other and further relief as the court may deem just and proper.

November 14, 2011                          THE ADVOCATES' LAW FIRM, LLP


_____

FRANCISCO J. ALDANA
Attorney for Plaintiffs ROBERT H. ZAKAR
and VALERIE ZAKAR

FIRST AMENDED COMPLAINT

1

## VI.   **DEMAND FOR JURY TRIAL**

2          Pursuant to the Seventh Amendment to the Constitution of the United States of

3   America, Plaintiff is entitled to, and hereby demands, a trial by jury.

4

5   November 14, 2011                    THE ADVOCATES' LAW FIRM, LLP

6

7                                        _____

8                                        FRANCISCO J. ALDANA
                                         Attorney for Plaintiffs ROBERT H. ZAKAR
9                                        and VALERIE ZAKAR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FIRST AMENDED COMPLAINT**

THE ADVOCATES' LAW FIRM, LLP
www.theadvocateslaw.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

THE ADVOCATES' LAW FIRM, LLP
www.theadvocateslaw.com

# EXHIBIT "1"

**FIRST AMENDED COMPLAINT**

17997

**DOC #   2006-0053923**



JAN 24, 2006      4:36 PM
OFFICIAL RECORDS
SAN DIEGO COUNTY RECORDER'S OFFICE
GREGORY J. SMITH, COUNTY RECORDER
FEES:            81.00
PAGES:              25        DA:          1

Recording Requested By:
~~J. FOX~~

**RECORDING REQUESTED BY**
**NEW CENTURY TITLE COMPANY**

After Recording Return To:
COUNTRYWIDE HOME LOANS, INC.



MS SV-79 DOCUMENT PROCESSING
P.O.Box 10423
Van Nuys, CA 91410-0423

Prepared By:
CHRISTINA SANCHEZ

*1060024*

2006-0053923

_____ [Space Above This Line For Recording Data] _____

28060001-SM                         00012554958301006
[Escrow/Closing #]                          [Doc ID #]

# DEED OF TRUST

MIN 1001337-0001182706-3

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated   JANUARY 19, 2006        , together with all Riders to this document.

(B) "Borrower" is
VALERIE ZAKAR, AND ROBERT H ZAKAR, WIFE AND HUSBAND AS COMMUNITY PROPERTY WITH RIGHT OF            SURVIVORSHIP

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS

Page 1 of 16

-6A(CA) (0207)      CHL (08/05)(d)      VMP Mortgage Solutions, Inc. (800)521-7291                Form 3005  1/01
CONV/VA



*23991*



*1255495830000010 06A*

17998

DOC ID #: 00012554958301006

Borrower's address is
10880 IVY HILL DRIVE # 5, SAN DIEGO, CA 92131
Borrower is the trustor under this Security Instrument.
(C) "Lender" is
AMERICA'S WHOLESALE LENDER
Lender is a CORPORATION
organized and existing under the laws of NEW YORK
Lender's address is
4500 Park Granada MSN# SVB-314, Calabasas, CA 91302-1613
(D) "Trustee" is
ReconTrust Company, N.A
225 West Hillcrest Dr., MSN TO-02, Thousand Oaks, CA 91360
(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting
solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this
Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and
telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(F) "Note" means the promissory note signed by Borrower and dated JANUARY 19, 2006      . The
Note states that Borrower owes Lender
SEVEN HUNDRED NINETY TWO THOUSAND and 00/100

Dollars (U.S. $ 792,000.00      ) plus interest. Borrower has promised to pay this debt in regular
Periodic Payments and to pay the debt in full not later than   FEBRUARY 01, 2036  .
(G) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [X] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners association
or similar organization.
(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check,
draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument,
computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an
account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine
transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(M) "Escrow Items" means those items that are described in Section 3.
(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by
any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage
to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii)

**17999**

DOC ID #: 00012554958301006

conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the
COUNTY                              of                              SAN DIEGO                              :
[Type of Recording Jurisdiction]                              [Name of Recording Jurisdiction]
LOT 22 OF SABRE SPRINGS PARCEL 11, IN THE CITY OF SAN DIEGO, STATE OF
CALIFORNIA, ACCORDING TO MAP THEREOF NO. 13793, FILED IN THE OFFICE OF THE
COUNTY RECORDER OF SAN DIEGO COUNTY ON MAY 27, 1999. EXCEPT ALL OIL,
ASPHALTUM, PETROLEUM, NATURAL GAS AND OTHER HYDROCARBONS AND ANY OTHER
VALUABLE MINERAL SUBSTANCES AND PRODUCTS, AND ALL OTHER MINERALS, WHETHER
OR NOT OF THE SAME CHARACTER HEREINBEFORE GENERALLY DESCRIBED, IN OR UNDER
SAID LAND AND LYING AND BEING AT A VERTICAL DEPTH OF 500 OR MORE FEET
BELOW THE PRESENT NATURAL SURFACE OF THE GROUND, BUT WITHOUT RIGHT OF
ENTRY ON THE SURFACE OR WITHIN A VERTICAL DEPTH OF 500 FEET BELOW THE
PRESENT SURFACE OF THE GROUND.


Parcel ID Number: 31646112                              which currently has the address of
                              10451 HARVEST VIEW WAY, SAN DIEGO
                              [Street/City]
California 92128-4188 ("Property Address"):
                  [Zip Code]


TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including,

**18000**

DOC ID #: 0001255495830100<br>
but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**18001**

DOC ID #: 0001255495830106

   **3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.
   Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.
   The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.
   If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.
   Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**18002**

DOC ID #: 0001255495830 1006

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of

**18003**

DOC ID #: 0001255495830l006

paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

**18004**

DOC ID #: 0001255495830100б

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower

**18005**

DOC ID #: 0001255495830l006

shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) **Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security

18006

DOC ID #: 0001255495830 1006

Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

**18007**

DOC ID #: 0001255495830006

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18008**

DOC ID #: 0001255495830100006

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in

18009

DOC ID #: 0001255495830106

compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**18010**

DOC ID #: 00012554958301006

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. Substitute Trustee. Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. Statement of Obligation Fee. Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

**18011**

DOC ID #: 00012554958301006

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
VALERIE ZAKAR                                                 -Borrower

_____ (Seal)
ROBERT H. ZAKAR                                             -Borrower

_____ (Seal)
                                                                       -Borrower

_____ (Seal)
                                                                       -Borrower

18012

State of California
County of San Diego                          } ss.

DOC ID #: 00012554958301006

On January 19, 2006 before me, Krista Morrison, notary public
_____ personally appeared

Valerie Zakar and Robert H. Zakar
_____
_____
_____
_____, ~~personally known to me~~
(or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to
the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized
capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of
which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____ (Seal)

KRISTA MORRISON
Commission # 1829086
Notary Public - California
San Diego County
My Comm. Expires Nov 22, 2008

18013

# PLANNED UNIT DEVELOPMENT RIDER

**After Recording Return To:**
COUNTRYWIDE HOME LOANS, INC.
MS SV-79 DOCUMENT PROCESSING
P.O.Box 10423
Van Nuys, CA 91410-0423


**Prepared By:**
CHRISTINA SANCHEZ


                              28060001-SM                00012554958301006
                            [Escrow/Closing #]               [Doc ID #]

     THIS PLANNED UNIT DEVELOPMENT RIDER is made this NINETEENTH         day of
JANUARY, 2006       , and is incorporated into and shall be deemed to amend and supplement the
Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date, given by the

**MULTISTATE PUD RIDER** - Single Family - Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**

**-7R** (0411)      **CHL (11/04)(d)**      Page 1 of 4                    Initials:
                    VMP Mortgage Solutions, Inc. (800)521-7291            **Form 3150  1/01**





**18014**

DOC ID #: 0001255495830l006

undersigned (the "Borrower") to secure Borrower's Note to
AMERICA'S WHOLESALE LENDER

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

10451 HARVEST VIEW WAY
SAN DIEGO, CA 92128-4188
[Property Address]

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in
THE COVENANTS, CONDITIONS, AND RESTRICTIONS FILED OF RECORD
THAT AFFECT THE PROPERTY

(the "Declaration"). The Property is a part of a planned unit development known as
SAN DIEGO

[Name of Planned Unit Development]

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the uses, benefits and proceeds of Borrower's interest.

   **PUD COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

   **A. PUD Obligations.** Borrower shall perform all of Borrower's obligations under the PUD's Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii) articles of incorporation, trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

   **B. Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

Initials: _V2_ _____

18015

DOC ID #: 00012554958301006

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

Initials: _____

-7R (0411)        CHL (11/04)        Page 3 of 4        Form 3150  1/01

**18016**

DOC ID #: 00012554958301006

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this PUD Rider.

_____ (Seal)
VALERIE ZAKAR                                    - Borrower

_____ (Seal)
ROBERT H. ZAKAR                                  - Borrower

_____ (Seal)
                                                 - Borrower

_____ (Seal)
                                                 - Borrower

VMP®-7R (0411)        CHL (11/04)         Page 4 of 4                    Form 3150  1/01

18017

Assessor's Parcel Number:

After Recording Return To:
COUNTRYWIDE HOME LOANS, INC.


MS SV-79 DOCUMENT PROCESSING
P.O.Box 10423
Van Nuys, CA 91410-0423
Prepared By:
CHRISTINA SANCHEZ


Recording Requested By:

————————————————[Space Above This Line For Recording Data]————————————————

# FIXED/ADJUSTABLE RATE RIDER
### (LIBOR One-Year Index (As Published In *The Wall Street Journal*) - Rate Caps)

28060001-SM                    00012554958301006
[Escrow/Closing #]           [Doc ID #]

CONV
* MULTISTATE FIXED/ADJUSTABLE RATE RIDER - WSJ One-Year LIBOR - Single Family
  INTEREST ONLY
1U796-XX (06/04)(d)              Page 1 of 5                    Initials: _____

*23991*

*12554958300001U796*

18018

DOC ID #: 00012554958301006

THIS FIXED/ADJUSTABLE RATE RIDER is made this NINETEENTH        day of
JANUARY, 2006    , and is incorporated into and shall be deemed to amend and supplement the
Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the
undersigned ("Borrower") to secure Borrower's Fixed/Adjustable Rate Note (the "Note") to
AMERICA'S WHOLESALE LENDER

("Lender") of the same date and covering the property described in the Security Instrument and
located at:

10451 HARVEST VIEW WAY
SAN DIEGO, CA 92128-4188
[Property Address]

**THE NOTE PROVIDES FOR A CHANGE IN BORROWER'S FIXED INTEREST
RATE TO AN ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE
AMOUNT BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE AT
ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.**

   **ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:
**A. ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES**
   The Note provides for an initial fixed interest rate of        6.375 %. The Note also provides
for a change in the initial fixed rate to an adjustable interest rate, as follows:
**4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**
   **(A) Change Dates**
   The initial fixed interest rate I will pay will change to an adjustable interest rate on the
first            day of FEBRUARY, 2016   , and the adjustable interest rate I will pay
may change on that day every 12th month thereafter. The date on which my initial fixed interest rate
changes to an adjustable interest rate, and each date on which my adjustable interest rate could
change, is called a "Change Date."
   **(B) The Index**
   Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The
"Index" is the average of interbank offered rates for one year U.S. dollar-denominated deposits in the
London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure
available as of the date 45 days before each Change Date is called the "Current Index".
   If the Index is no longer available, the Note Holder will choose a new index that is based upon
comparable information. The Note Holder will give me notice of this choice.
   **(C) Calculation of Changes**
   Before each Change Date, the Note Holder will calculate my new interest rate by adding
TWO & ONE-QUARTER        percentage points (        2.250 %) to the Current Index.
the Note Holder will then round the result of this addition to the nearest one-eighth of one percentage
point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new
interest rate until the next Change Date.

CONV
• MULTISTATE FIXED/ADJUSTABLE RATE RIDER - WSJ One-Year LIBOR - Single Family
   INTEREST ONLY
1U796-XX (06/04)            **Page 2 of 5**            Initials:

**18019**

DOC ID #: 00012554958301006

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 11.375 % or less than 2.250 %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than 11.375 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

1. Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument shall read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

CONV
• MULTISTATE FIXED/ADJUSTABLE RATE RIDER - WSJ One-Year LIBOR - Single Family
  INTEREST ONLY
1U796-XX (06/04)            Page 3 of 5            Initials:

18020

DOC ID #: 0001255495B301006

2. When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument described in Section B1 above shall then cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

CONV
MULTISTATE FIXED/ADJUSTABLE RATE RIDER - WSJ One-Year LIBOR - Single Family
INTEREST ONLY
1U796-XX (06/04)                    Page 4 of 5                    Initials: _____

25

**18021**

DOC ID #: 0001255495830100б

   If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

   BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider.


_____ (Seal)
VALERIE ZAKAR                              -Borrower

_____ (Seal)
ROBERT H. ZAKAR                           -Borrower

_____ (Seal)
                                          -Borrower

_____ (Seal)
                                          -Borrower


CONV
• MULTISTATE FIXED/ADJUSTABLE RATE RIDER - WSJ One-Year LIBOR - Single Family
INTEREST ONLY
1U796-XX (06/04)              Page 5 of 5

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

THE ADVOCATES' LAW FIRM, LLP
www.theadvocateslaw.com

# EXHIBIT "2"

**FIRST AMENDED COMPLAINT**

**18022** DOC # 2006-0053924



Recording Requested By:
J. FOX

**RECORDING REQUESTED BY,**
**NEW CENTURY TITLE COMPANY**

JAN 24, 2006    4:36 PM
OFFICIAL RECORDS
SAN DIEGO COUNTY RECORDER'S OFFICE
GREGORY J. SMITH, COUNTY RECORDER
FEES:         45.00
PAGES:        13        DA:       1

After Recording Return To:
COUNTRYWIDE HOME LOANS, INC.

T71
13P

MS SV-79 DOCUMENT PROCESSING
P.O.Box 10423
Van Nuys, CA 91410-0423
Prepared By:

CHRISTINA SANCHEZ
10600024

**2006-0053924**

---

28060001-SM                     00012457855801006
[Escrow/Closing #]                  [Doc ID #]

# DEED OF TRUST AND REQUEST FOR NOTICE OF DEFAULT

    THIS DEED OF TRUST is made this NINETEENTH        day of  JANUARY, 2006    , among
the Trustor,
VALERIE ZAKAR, AND ROBERT H ZAKAR, WIFE AND HUSBAND AS COMMUNITY PROPERTY
WITH RIGHT OF          SURVIVORSHIP

whose address is
10880 IVY HILL DRIVE # 5, SAN DIEGO, CA 92131 .
(herein "Borrower"),
ReconTrust Company, N.A
225 West Hillcrest Dr., MSN TO-02 Thousand Oaks, CA 91360
(herein "Trustee"), and the Beneficiary,
Countrywide Bank, N.A.
A NATL. ASSN.                                                            organized
and existing under the laws of THE UNITED STATES        , whose address is
1199 North Fairfax St. Ste.500, Alexandria, VA 22314
(herein "Lender").

---

| CALIFORNIA - SECOND MORTGAGE - 1/80 - FNMA/FHLMC UNIFORM INSTRUMENT |
| --- |

Page 1 of 9

Form 3805
Amended 8/99

(VMP) -76(CA) (0207).01 CHL (12/02)(d)     VMP MORTGAGE FORMS - (800)521-7291     Initials: VZ



* 2 3 9 9 1 *



* 1 2 4 5 7 8 5 5 8 0 0 0 0 0 1 0 7 6 - *

**18023**

DOC ID #: 0001245785801006

BORROWER, in consideration of the indebtedness herein recited and the trust herein created, irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County of   SAN DIEGO                                        , State of California:
LOT 22 OF SABRE SPRINGS PARCEL 11, IN THE CITY OF SAN DIEGO, STATE OF CALIFORNIA, ACCORDING TO MAP THEREOF NO. 13793, FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY ON MAY 27, 1999. EXCEPT ALL OIL, ASPHALTUM, PETROLEUM, NATURAL GAS AND OTHER HYDROCARBONS AND ANY OTHER VALUABLE MINERAL SUBSTANCES AND PRODUCTS, AND ALL OTHER MINERALS, WHETHER OR NOT OF THE SAME CHARACTER HEREINBEFORE GENERALLY DESCRIBED, IN OR UNDER SAID LAND AND LYING AND BEING AT A VERTICAL DEPTH OF 500 OR MORE FEET BELOW THE PRESENT NATURAL SURFACE OF THE GROUND, BUT WITHOUT RIGHT OF ENTRY ON THE SURFACE OR WITHIN A VERTICAL DEPTH OF 500 FEET BELOW THE PRESENT SURFACE OF THE GROUND.


Parcel ID Number: 31646112
which has the address of  10451 HARVEST VIEW WAY                                        [Street],
SAN DIEGO                              [City], California 92128-4188  [ZIP Code]
(herein "Property Address");

TOGETHER with all the improvements now or hereafter erected on the property, and all easements, rights, appurtenances and rents (subject however to the rights and authorities given herein to Lender to collect and apply such rents), all of which shall be deemed to be and remain a part of the property covered by this Deed of Trust; and all of the foregoing, together with said property (or the leasehold estate if this Deed of Trust is on a leasehold) are hereinafter referred to as the "Property";

TO SECURE to Lender the repayment of the indebtedness evidenced by Borrower's note dated   JANUARY 19, 2006         and extensions and renewals thereof (herein "Note"), in the principal sum of U.S. $ 99,000.00          , with interest thereon, providing for monthly installments of principal and interest, with the balance of the indebtedness, if not sooner paid, due and payable on    FEBRUARY 01, 2021      ; the payment of all other sums, with interest thereon, advanced in accordance herewith to protect the security of this Deed of Trust; and the performance of the covenants and agreements of Borrower herein contained.

Borrower covenants that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property, and that the Property is unencumbered except for encumbrances of record. Borrower covenants that Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to encumbrances of record.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal and Interest.** Borrower shall promptly pay when due the principal and interest indebtedness evidenced by the Note and late charges as provided in the Note.

**2. Funds for Taxes and Insurance.** Subject to applicable law or a written waiver by Lender, Borrower shall pay to Lender on the day monthly payments of principal and interest are payable under the Note, until the Note is paid in full, a sum (herein "Funds") equal to one-twelfth of the yearly taxes and assessments (including condominium and planned unit development assessments, if any) which may attain priority over this Deed of Trust, and ground rents on the Property, if any, plus one-twelfth of yearly premium installments for hazard insurance, plus one-twelfth of yearly premium installments for mortgage insurance, if any, all as reasonably estimated initially and from time to time by Lender on the basis of assessments and bills and reasonable estimates thereof. Borrower shall not be obligated to make such payments of Funds to Lender to the extent that Borrower makes such payments to the holder of a prior mortgage or deed of trust if such holder is an institutional lender.

Initials: _____

**18024**

DOC ID #: 0001245785580106

If Borrower pays Funds to Lender, the Funds shall be held in an institution the deposits or accounts of which are insured or guaranteed by a federal or state agency (including Lender if Lender is such an institution). Lender shall apply the Funds to pay said taxes, assessments, insurance premiums and ground rents. Lender may not charge for so holding and applying the Funds, analyzing said account or verifying and compiling said assessments and bills, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. Borrower and Lender may agree in writing at the time of execution of this Deed of Trust that interest on the Funds shall be paid to Borrower, and unless such agreement is made or applicable law requires such interest to be paid, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for the sums secured by this Deed of Trust.

If the amount of the Funds held by Lender, together with the future monthly installments of Funds payable prior to the due dates of taxes, assessments, insurance premiums and ground rents, shall exceed the amount required to pay said taxes, assessments, insurance premiums and ground rents as they fall due, such excess shall be, at Borrower's option, either promptly repaid to Borrower or credited to Borrower on monthly installments of Funds. If the amount of the Funds held by Lender shall not be sufficient to pay taxes, assessments, insurance premiums and ground rents as they fall due, Borrower shall pay to Lender any amount necessary to make up the deficiency in one or more payments as Lender may require.

Upon payment in full of all sums secured by this Deed of Trust, Lender shall promptly refund to Borrower any Funds held by Lender. If under paragraph 17 hereof the Property is sold or the Property is otherwise acquired by Lender, Lender shall apply, no later than immediately prior to the sale of the Property or its acquisition by Lender, any Funds held by Lender at the time of application as a credit against the sums secured by this Deed of Trust.

**3. Application of Payments.** Unless applicable law provides otherwise, all payments received by Lender under the Note and paragraphs 1 and 2 hereof shall be applied by Lender first in payment of amounts payable to Lender by Borrower under paragraph 2 hereof, then to interest payable on the Note, and then to the principal of the Note.

**4. Prior Mortgages and Deeds of Trust; Charges; Liens.** Borrower shall perform all of Borrower's obligations under any mortgage, deed of trust or other security agreement with a lien which has priority over this Deed of Trust, including Borrower's covenants to make payments when due. Borrower shall pay or cause to be paid all taxes, assessments and other charges, fines and impositions attributable to the Property which may attain a priority over this Deed of Trust, and leasehold payments or ground rents, if any.

**5. Hazard Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and such other hazards as Lender may require and in such amounts and for such periods as Lender may require.

The insurance carrier providing the insurance shall be chosen by Borrower subject to approval by Lender; provided, that such approval shall not be unreasonably withheld. All insurance policies and renewals thereof shall be in a form acceptable to Lender and shall include a standard mortgage clause in favor of and in a form acceptable to Lender. Lender shall have the right to hold the policies and renewals thereof, subject to the terms of any mortgage, deed of trust or other security agreement with a lien which has priority over this Deed of Trust.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

If the Property is abandoned by Borrower, or if Borrower fails to respond to Lender within 30 days from the date notice is mailed by Lender to Borrower that the insurance carrier offers to settle a claim for insurance benefits, Lender is authorized to collect and apply the insurance proceeds at Lender's option either to restoration or repair of the Property or to the sums secured by this Deed of Trust.

Initials: ___

-76(CA) (0207).01   CHL (12/02)      Page 3 of 9      Form 3805

**18025**

DOC ID #: 0001245785801006

**6. Preservation and Maintenance of Property; Leaseholds; Condominiums; Planned Unit Developments.** Borrower shall keep the Property in good repair and shall not commit waste or permit impairment or deterioration of the Property and shall comply with the provisions of any lease if this Deed of Trust is on a leasehold. If this Deed of Trust is on a unit in a condominium or a planned unit development, Borrower shall perform all of Borrower's obligations under the declaration or covenants creating or governing the condominium or planned unit development, the by-laws and regulations of the condominium or planned unit development, and constituent documents.

**7. Protection of Lender's Security.** If Borrower fails to perform the covenants and agreements contained in this Deed of Trust, or if any action or proceeding is commenced which materially affects Lender's interest in the Property, then Lender, at Lender's option, upon notice to Borrower, may make such appearances, disburse such sums, including reasonable attorneys' fees, and take such action as is necessary to protect Lender's interest. If Lender required mortgage insurance as a condition of making the loan secured by this Deed of Trust, Borrower shall pay the premiums required to maintain such insurance in effect until such time as the requirement for such insurance terminates in accordance with Borrower's and Lender's written agreement or applicable law.

Any amounts disbursed by Lender pursuant to this paragraph 7, with interest thereon, at the Note rate, shall become additional indebtedness of Borrower secured by this Deed of Trust. Unless Borrower and Lender agree to other terms of payment, such amounts shall be payable upon notice from Lender to Borrower requesting payment thereof. Nothing contained in this paragraph 7 shall require Lender to incur any expense or take any action hereunder.

**8. Inspection.** Lender may make or cause to be made reasonable entries upon and inspections of the Property, provided that Lender shall give Borrower notice prior to any such inspection specifying reasonable cause therefor related to Lender's interest in the Property.

**9. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of the Property, or part thereof, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender, subject to the terms of any mortgage, deed of trust or other security agreement with a lien which has a priority over this Deed of Trust.

**10. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Deed of Trust granted by Lender to any successor in interest of Borrower shall not operate to release, in any manner, the liability of the original Borrower and Borrower's successors in interest. Lender shall not be required to commence proceedings against such successor or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Deed of Trust by reason of any demand made by the original Borrower and Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy hereunder, or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any such right or remedy.

**11. Successors and Assigns Bound; Joint and Several Liability; Co-signers.** The covenants and agreements herein contained shall bind, and the rights hereunder shall inure to, the respective successors and assigns of Lender and Borrower, subject to the provisions of paragraph 16 hereof. All covenants and agreements of Borrower shall be joint and several. Any Borrower who co-signs this Deed of Trust, but does not execute the Note, (a) is co-signing this Deed of Trust only to grant and convey that Borrower's interest in the Property to Trustee under the terms of this Deed of Trust, (b) is not personally liable on the Note or under this Deed of Trust, and (c) agrees that Lender and any other Borrower hereunder may agree to extend, modify, forbear, or make any other accommodations with regard to the terms of this Deed of Trust or the Note, without that Borrower's consent and without releasing that Borrower or modifying this Deed of Trust as to that Borrower's interest in the Property.

Initials:

18026

DOC ID #: 0001245785580l006

12. **Notice.** Except for any notice required under applicable law to be given in another manner, (a) any notice to Borrower provided for in this Deed of Trust shall be given by delivering it or by mailing such notice by certified mail addressed to Borrower at the Property Address or at such other address as Borrower may designate by notice to Lender as provided herein, and (b) any notice to Lender shall be given by certified mail to Lender's address stated herein or to such other address as Lender may designate by notice to Borrower as provided herein. Any notice provided for in this Deed of Trust shall be deemed to have been given to Borrower or Lender when given in the manner designated herein.

13. **Governing Law; Severability.** The state and local laws applicable to this Deed of Trust shall be the laws of the jurisdiction in which the Property is located. The foregoing sentence shall not limit the applicability of federal law to this Deed of Trust. In the event that any provision or clause of this Deed of Trust or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Deed of Trust or the Note which can be given effect without the conflicting provision, and to this end the provisions of this Deed of Trust and the Note are declared to be severable. As used herein, "costs," "expenses" and "attorneys' fees" include all sums to the extent not prohibited by applicable law or limited herein.

14. **Borrower's Copy.** Borrower shall be furnished a conformed copy of the Note and this Deed of Trust at the time of execution or after recordation hereof.

15. **Rehabilitation Loan Agreement.** Borrower shall fulfill all of Borrower's obligations under any home rehabilitation, improvement, repair, or other loan agreement which Borrower enters into with Lender. Lender, at Lender's option, may require Borrower to execute and deliver to Lender, in a form acceptable to Lender, an assignment of any rights, claims or defenses which Borrower may have against parties who supply labor, materials or services in connection with improvements made to the Property.

16. **Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Deed of Trust. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Deed of Trust.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Deed of Trust. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Deed of Trust without further notice or demand on Borrower.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

17. **Acceleration; Remedies. Except as provided in paragraph 16 hereof, upon Borrower's breach of any covenant or agreement of Borrower in this Deed of Trust, including the covenants to pay when due any sums secured by this Deed of Trust, Lender, prior to acceleration shall give notice to Borrower as provided in paragraph 12 hereof specifying: (1) the breach; (2) the action required to cure such breach; (3) a date, not less than 10 days from the date the notice is mailed to Borrower, by which such breach must be cured; and (4) that failure to cure such breach on or before the date specified in the notice may result in acceleration of the sums secured by this Deed of Trust and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the breach is not cured on or before the date specified in the notice, Lender, at Lender's option may declare all of the sums secured by this Deed of Trust to be immediately due and payable without further demand and may invoke the power of sale and any other remedies permitted by applicable law. Lender shall be entitled to collect all reasonable costs and expenses incurred in pursuing the remedies provided in this paragraph 17, including, but not limited to, reasonable attorneys' fees.**

Initials: V2

Form 3805

18027

DOC ID #: 0001245785801006

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold and shall cause such notice to be recorded in each county in which the Property or some part thereof is located. Lender or Trustee shall mail copies of such notice in the manner prescribed by applicable law. Trustee shall give public notice of sale to the persons and in the manner prescribed by applicable law. After the lapse of such time as may be required by applicable law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in such order as Trustee may determine. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or Lender's designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property so sold without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all reasonable costs and expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees and costs of title evidence; (b) to all sums secured by this Deed of Trust; and (c) the excess, if any, to the person or persons legally entitled thereto.

18. **Borrower's Right to Reinstate.** Notwithstanding Lender's acceleration of the sums secured by this Deed of Trust due to Borrower's breach, Borrower shall have the right to have any proceedings begun by Lender to enforce this Deed of Trust discontinued at any time prior to five days before sale of the Property pursuant to the power of sale contained in this Deed of Trust or at any time prior to entry of a judgment enforcing this Deed of Trust if: (a) Borrower pays Lender all sums which would be then due under this Deed of Trust and the Note had no acceleration occurred; (b) Borrower cures all breaches of any other covenants or agreements of Borrower contained in this Deed of Trust; (c) Borrower pays all reasonable expenses incurred by Lender and Trustee in enforcing the covenants and agreements of Borrower contained in this Deed of Trust, and in enforcing Lender's and Trustee's remedies as provided in paragraph 17 hereof, including, but not limited to, reasonable attorneys' fees; and (d) Borrower takes such action as Lender may reasonably require to assure that the lien of this Deed of Trust, Lender's interest in the Property and Borrower's obligation to pay the sums secured by this Deed of Trust shall continue unimpaired. Upon such payment and cure by Borrower, this Deed of Trust and the obligations secured hereby shall remain in full force and effect as if no acceleration had occurred.

19. **Assignment of Rents; Appointment of Receiver; Lender in Possession.** As additional security hereunder, Borrower hereby assigns to Lender the rents of the Property, provided that Borrower shall, prior to acceleration under paragraph 17 hereof or abandonment of the Property, have the right to collect and retain such rents as they become due and payable.

Upon acceleration under paragraph 17 hereof or abandonment of the Property, Lender, in person, by agent or by judicially appointed receiver shall be entitled to enter upon, take possession of and manage the Property and to collect the rents of the Property including those past due. All rents collected by Lender or the receiver shall be applied first to payment of the costs of management of the Property and collection of rents, including, but not limited to, receiver's fees, premiums on receiver's bonds and reasonable attorneys' fees, and then to the sums secured by this Deed of Trust. Lender and the receiver shall be liable to account only for those rents actually received.

20. **Reconveyance.** Upon payment of all sums secured by this Deed of Trust, Lender shall request Trustee to reconvey the Property and shall surrender this Deed of Trust and all notes evidencing indebtedness secured by this Deed of Trust to Trustee. Trustee shall reconvey the Property without warranty and to the person or persons legally entitled thereto. Such person or persons shall pay all costs of recordation, if any.

Initials: _V2_

**18028**

DOC ID #: 00012457855801006

**21. Substitute Trustee.** Lender, at Lender's option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county where the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Instrument is recorded and the name and address of the successor trustee. The successor trustee shall, without conveyance of the Property, succeed to all the title, powers and duties conferred upon the Trustee herein and by applicable law. The procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**22. Request for Notices.** Borrower requests that copies of the notice of default and notice of sale be sent to Borrower's address which is the Property Address. Lender requests that copies of notices of foreclosure from the holder of any lien which has priority over this Deed of Trust be sent to Lender's address, as set forth on page one of this Deed of Trust, as provided by Section 2924(b) of the Civil Code of California.

**23. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

## REQUEST FOR NOTICE OF DEFAULT
## AND FORECLOSURE UNDER SUPERIOR
## MORTGAGES OR DEEDS OF TRUST

Borrower and Lender request the holder of any mortgage, deed of trust or other encumbrance with a lien which has priority over this Deed of Trust to give Notice to Lender, at Lender's address set forth on page one of this Deed of Trust, of any default under the superior encumbrance and of any sale or other foreclosure action.

In accordance with Section 2924b, Civil Code, request is hereby made that a copy of any notice of default and a copy of any notice of sale under the deed of trust (or mortgage) recorded
in Book                         , Page                         , records of                                        County, or filed
for record with recorder's serial number                          ,                                                    County,
California, executed by
VALERIE ZAKAR, AND ROBERT H ZAKAR, WIFE AND HUSBAND AS COMMUNITY PROPERTY
WITH RIGHT OF          SURVIVORSHIP

as trustor (or mortgagor) in which
CHL
is named as beneficiary (or mortgagee) and
ReconTrust Company, N.A
as trustee be mailed to
Countrywide Bank, N.A.
at PO Box 10329, SV-225, Van Nuys, CA 91405

Initials: _____

18029

DOC ID #: 00012457855801006

NOTICE: A copy of any notice of default and of any notice of sale will be sent only to the address contained in this recorded request. If your address changes, a new request must be recorded.

State of California
County of
On _____ , before me
_____ , personally appeared

, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

IN WITNESS WHEREOF, Borrower has executed this Deed of Trust.

_____ (Seal)
VALERIE ZAKAR                                    -Borrower

_____ (Seal)
ROBERT H. ZAKAR                                  -Borrower

_____ (Seal)
                                                 -Borrower

_____ (Seal)
                                                 -Borrower

*(Sign Original Only)*

-76(CA) (0207).01    CHL (12/02)         Page 8 of 9                    Form 3805

18030

DOC ID #: 00012457855801006

State of California
County of San Diego                    } ss.

On _January 19, 2006_ before me, _Krista Morrison, Notary Public_
                                                    personally appeared

_Valerie Zakar and Robert H. Zakar_        , ~~personally known to me~~ (or
proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the
within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized
capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of
which the person(s) acted, executed the instrument.
WITNESS my hand and official seal.

(This area for official notarial seal)     _K Morrison_          (Seal)

```
KRISTA MORRISON
Commission # 1629085
Notary Public - California
San Diego County
My Comm. Expires Nov 22, 2008
```

18031

# PLANNED UNIT DEVELOPMENT RIDER

**Return To:**
COUNTRYWIDE HOME LOANS, INC.
MS SV-79 DOCUMENT PROCESSING
P.O.Box 10423
Van Nuys, CA 91410-0423


**Prepared By:**
CHRISTINA SANCHEZ


<table>
<tr><td>28060001-SM</td><td>00012457855801006</td></tr>
<tr><td>[Escrow/Closing #]</td><td>[Doc ID #]</td></tr>
</table>

**MULTISTATE PUD RIDER** - Single Family/Second Mortgage
Page 1 of 4

 -207R (0411)   CHL (11/04)(d)                                    Initials: _____
VMP Mortgage Solutions, Inc. (800)521-7291                                    3/99

* 2 3 9 9 1 *                          * 1 2 4 5 7 8 5 5 8 0 0 0 0 0 1 2 0 7 R *

18032

DOC ID #: 00012457855801006

THIS PLANNED UNIT DEVELOPMENT RIDER is made this NINETEENTH day of JANUARY, 2006   , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date, given by the undersigned (the "Borrower") to secure Borrower's Note to Countrywide Bank, N.A.

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

10451 HARVEST VIEW WAY, SAN DIEGO, CA 92128-4188

[Property Address]

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in

THE COVENANTS, CONDITIONS, AND RESTRICTIONS FILED OF RECORD THAT AFFECT THE PROPERTY

(the "Declaration"). The Property is a part of a planned unit development known as

SAN DIEGO

[Name of Planned Unit Development]

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the uses, benefits and proceeds of Borrower's interest.

PUD COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A. PUD Obligations. Borrower shall perform all of Borrower's obligations under the PUD's Constituent Documents. The "Constituent Documents" are the: (i) Declaration; (ii) articles of incorporation, trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

-207R (0411)   CHL (11/04)          Page 2 of 4                    Initials: ___

'18033

DOC ID #: 00012457855801006

**B. Hazard Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then: (i) Lender waives the provision in Uniform Covenant 2 for the monthly payment to Lender of the yearly premium installments for hazard insurance on the Property; and (ii) Borrower's obligation under Uniform Covenant 5 to maintain hazard insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan. Borrower shall give Lender prompt notice of any lapse in required hazard insurance coverage provided by the master or blanket policy.

In the event of a distribution of hazard insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Uniform Covenant 9.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

-207R (0411)   CHL (11/04)          Page 3 of 4                Initials: _____          3/99

13

18034

DOC ID #: 00012457855801006

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this PUD Rider.

_____ (Seal)
VALERIE ZAKAR                                                    - Borrower

_____ (Seal)
ROBERT H. ZAKAR                                                 - Borrower

_____ (Seal)
                                                                - Borrower

_____ (Seal)
                                                                - Borrower

-207R (0411)   CHL (11/04)          Page 4 of 4                    3/99

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

THE ADVOCATES' LAW FIRM, LLP
www.theadvocateslaw.com

# EXHIBIT "3"

**FIRST AMENDED COMPLAINT**

Recording Requested by:
ReconTrust Company, N.A.
1330 W. Southern Ave.
MS: TPSA-88
Tempe, AZ 85282-4545
(800) 540-2684

When recorded return to:
VALERIE ZAKAR
10451 Harvest View Way
San Diego, CA 92128



DOC #   2007-0204290

MAR 27, 2007   10:05 AM
OFFICIAL RECORDS
SAN DIEGO COUNTY RECORDER'S OFFICE
GREGORY J. SMITH, COUNTY RECORDER
FEES:      16.00    WAYS:         2
PAGES:       1      DA:           1



2007-0204290

**5752**



Above Space for Recorder's Use
DOCID#0001245785582005N

## SUBSTITUTION OF TRUSTEE AND FULL RECONVEYANCE

WHEREAS,    VALERIE ZAKAR
was the original Trustor, under that certain Deed of Trust dated 01/19/2006 and recorded 01/24/2006, as Instrument or Document No.
2006-0053924, in Book N/A, Page N/A, of Official Records of the County of SAN DIEGO, State of California.

WHEREAS, the undersigned, Countrywide Bank, FSB, fka Countrywide Bank, N.A. fka Countrywide Bank, a division of Treasury Bank,
N.A., as the present Beneficiary(s) under said Deed of Trust hereby substitutes a new Trustee, ReconTrust Company, N.A., under said
Deed of Trust, and ReconTrust Company, N.A. as Trustee under said Deed of Trust does hereby reconvey, without warranty, to the
person or persons legally entitled thereto, the estate now held by Trustee under said Deed of Trust.

Dated: 03/16/2007

New Trustee:                             Current Beneficiary:
  ReconTrust Company, N.A.                  Countrywide Bank, FSB, fka Countrywide Bank, N.A. fka Countrywide Bank, a
                                            division of Treasury Bank, N.A.


_____                   _____
Maria Robledo                             Roxanne Bermea
Assistant Secretary                       Assistant Secretary


STATE OF ARIZONA
COUNTY OF MARICOPA
On 03/16/2007, before me, Sharon Haus, Notary Public, personally appeared Maria Robledo and Roxanne Bermea, both personally
known to me (or proved to me on the basis of satisfactory evidence) to be the persons whose names are subscribed to the within
instrument and acknowledged to me that they executed the same in their authorized capacities, and that by their signatures on the
instrument the persons, or the entities upon behalf of which the persons acted, executed the instrument.

Witness my hand and official seal.

_____
Sharon Haus
Notary Public for said State and County
Expires: 10/13/2009



OFFICIAL SEAL
SHARON HAUS
NOTARY PUBLIC - ARIZONA
MARICOPA COUNTY
My Comm. Expires Oct. 13, 2009

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

THE ADVOCATES' LAW FIRM, LLP
www.theadvocateslaw.com

# EXHIBIT "4"

**FIRST AMENDED COMPLAINT**

θ

LANDSAFE TITLE

RECORDING REQUESTED BY:
RECONTRUST COMPANY
AND WHEN RECORDED MAIL DOCUMENT
AND TAX STATEMENTS TO:
RECONTRUST COMPANY
1800 Tapo Canyon Rd., CA6-914-01-94
SIMI VALLEY, CA  93063

DOC #  2010-0337719

JUL 06, 2010    8:00 AM
OFFICIAL RECORDS
SAN DIEGO COUNTY RECORDER'S OFFICE
DAVID L. BUTLER, COUNTY RECORDER    1465
FEES:        18.00
                                          DA:      1
                              PAGES:          1

TS No. 09-0122162

09-8-356963

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## CORPORATION ASSIGNMENT OF DEED OF TRUST/MORTGAGE

FOR VALUE RECEIVED, THE UNDERSIGNED HEREBY GRANTS, ASSIGNS AND TRANSFER TO:

**THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK AS TRUSTEE FOR THE
CERTIFICATEHOLDERS CWMBS,INC. CHL MORTGAGE PASS-THROUGH TRUST 2006-HYB 3
MORTGAGE PASS-THROUGH CERTIFICATES,SERIES 2006-HYB3**

ALL BENEFICIAL INTEREST UNDER THAT CERTAIN DEED OF TRUST DATED 01/19/2006, EXECUTED BY:
VALERIE ZAKAR, AND ROBERT H ZAKAR, WIFE AND HUSBAND AS COMMUNITY PROPERTY WITH RIGHT
OF SURVIVORSHIP,TRUSTOR: TO RECONTRUST COMPANY, N.A, TRUSTEE AND RECORDED AS
INSTRUMENT NO. 2006-0053923 ON 01/24/2006, PAGE 17997, OF OFFICIAL RECORDS IN THE COUNTY
RECORDER'S OFFICE OF SAN DIEGO  COUNTY, IN THE STATE OF CALIFORNIA.

DESCRIBING THE LAND THEREIN:  AS MORE FULLY DESCRIBED IN SAID DEED OF TRUST

TOGETHER WITH THE NOTE OR NOTES THEREIN DESCRIBED OR REFERRED TO, THE MONEY DUE AND
TO BECOME DUE THEREON WITH INTEREST, AND ALL RIGHTS ACCRUED OR TO ACCRUE UNDER SAID
DEED OF TRUST/MORTGAGE

DATED: August 18, 2009                **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.**

State of:    **CALIFORNIA**          )
County of:   **VENTURA**             )      BY:
On    JUL 0 1 2010        before me,    **MICHELLE L MILLER**        RANDOLYN LOGAN , Assistant Secretary
                                         , notary public, personally appeared
**RANDOLYN LOGAN**                  , who proved to me on the basis of satisfactory evidence to be the
person(s) whose name(s) is/are subscribed to within instrument and acknowledged to me that he/she/they executed the same in
his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon
behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.
WITNESS my hand and official seal.

Signature  _Michelle C___  (Seal)
           MICHELLE I. MILLER

MICHELLE I. MILLER
COMM. #1B36B33
Notary Public · California
Los Angeles County
My Comm. Expires Feb. 15, 2013

EXHIBIT A                                              *Form asgnmnt (01/09)*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

THE ADVOCATES' LAW FIRM, LLP
www.theadvocateslaw.com

# EXHIBIT "5"

**FIRST AMENDED COMPLAINT**

LANDSAFE TITLE
RECORDING REQUESTED BY:

WHEN RECORDED MAIL TO:

RECONTRUST COMPANY
1800 Tapo Canyon Rd., CA6-914-01-94
SIMI VALLEY, CA 93063

Attn: Ronald Montagna
TS No. 09-0122162
Title Order No. 09-8-356963          **1717**

DOC #   2009-0463598



AUG 19, 2009       8:00 AM
OFFICIAL RECORDS
SAN DIEGO COUNTY RECORDER'S OFFICE
DAVID L. BUTLER, COUNTY RECORDER
FEES:         18.00
                              DA:      1
**PAGES:          3**

---

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST

### IMPORTANT NOTICE

## IF YOUR PROPERTY IS IN FORECLOSURE BECAUSE YOU ARE BEHIND IN YOUR PAYMENTS, IT MAY BE SOLD WITHOUT ANY COURT ACTION,

and you may have the legal right to bring your account in good standing by paying all of your past due payments plus permitted costs and expenses within the time permitted by law for reinstatement of your account, which is normally five business days prior to the date set for the sale of your property. No sale date may be set until three months from the date this notice of default may be recorded ( which date of recordation appears on this notice).

**This amount is $26,629.29, as of 08/18/2009 and will increase until your account becomes current.**

While your property is in foreclosure, you still must pay other obligations ( such as insurance and taxes) required by your note and deed of trust or mortgage. If you fail to make future payments on the loan, pay taxes on the property, provide insurance on the property, or pay other obligations as required in the note and deed of trust or mortgage, the beneficiary or mortgagee may insist that you do so in order to reinstate your account in good standing. In addition, the beneficiary or mortgagee may require as a condition to reinstatement that you provide reliable written evidence that you paid all senior liens, property taxes, and hazard insurance premiums.

Upon your written request, the beneficiary or mortgagee will give you a written itemization of the entire amount you must pay. You may not have to pay the entire unpaid portion of your account, even though full payment was demanded, but you must pay all amounts in default at the time payment is made. However, you and your beneficiary or mortgagee may mutually agree in writing prior to the time the notice of sale is posted (which may not be earlier than the end of the three month period stated above) to, among other things, (1) provide additional time in which to cure the default by transfer of the property or otherwise; or (2) establish a schedule of payments in order to cure your default; or both (1) and (2).

Following the expiration of the time period referred to in the first paragraph of this notice, unless the obligation being foreclosed upon or a separate written agreement between you and your creditor permits a longer period, you have only the legal right to stop the sale of your property by paying the entire amount demanded by your creditor.

[Page 1 of 2 ]                                    *Form nod (09/01)*

**1718**

TS No. 09-0122162

   To find out the amount you must pay, or to arrange for payment to stop the foreclosure, or if your property is in foreclosure for any other reason, contact:

**THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK AS TRUSTEE FOR THE CERTIFICATEHOLDERS CWMBS,INC. CHL MORTGAGE PASS-THROUGH TRUST 2006-HYB 3 MORTGAGE PASS-THROUGH CERTIFICATES,SERIES 2006-HYB3**
**C/O BAC Home Loans Servicing, LP**
**400 COUNTRYWIDE WAY  SV-35**
**SIMI VALLEY,  CA  93065**
**FORECLOSURE DEPARTMENT (800) 669-6650**

   If you have any questions, you should contact a lawyer or the governmental agency which may have insured your loan.
   Notwithstanding the fact that your property is in foreclosure, you may offer your property for sale, provided the sale is concluded prior to the conclusion of the foreclosure.  Remember,

## YOU MAY LOSE LEGAL RIGHTS IF YOU DO NOT TAKE PROMPT ACTION.

NOTICE IS HEREBY GIVEN THAT: RECONTRUST COMPANY, N.A., is acting as an agent for the Beneficiary under a Deed of Trust dated 01/19/2006, executed by VALERIE ZAKAR, AND ROBERT H ZAKAR, WIFE AND HUSBAND AS COMMUNITY PROPERTY WITH RIGHT OF SURVIVORSHIP as Trustor, to secure certain obligations in favor of MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. as beneficiary recorded 01/24/2006, as Instrument No. 2006-0053923 (or Book , Page 17997) of Official Records in the Office of the County Recorder of San Diego County, California.
Said obligation including ONE NOTE FOR THE ORIGINAL sum of $ 792,000.00.
That a breach of, and default in, the obligations for which such Deed of Trust is security has occurred in that payment has not been made of : FAILURE TO PAY THE INSTALLMENT OF PRINCIPAL AND INTEREST  WHICH BECAME DUE ON  03/01/2009  AND ALL SUBSEQUENT INSTALLMENTS OF PRINCIPAL AND INTEREST, TOGETHER WITH ALL LATE CHARGES; PLUS ADVANCES MADE AND COSTS INCURRED BY THE BENEFICIARY INCLUDING FORECLOSURE FEES AND COSTS AND/OR ATTORNEYS' FEES.  IN ADDITION,  THE ENTIRE PRINCIPAL AMOUNT WILL BECOME DUE ON 02/01/2036 AS A RESULT OF THE MATURITY OF THE OBLIGATION ON THAT DATE.
That by reason thereof, the present beneficiary under such deed of trust has executed and delivered to RECONTRUST COMPANY, N.A. such deed of trust and all documents evidencing obligations secured  thereby, and has declared and does hereby declare all sums secured thereby immediately due and payable  and has elected and does hereby elect to cause the trust property to be sold to satisfy the obligations secured thereby.
If required by the provisions of  Section 2923.5 of the California Civil Code, the declaration from the mortgagee, beneficiary or authorized agent is attached to the Notice of Default duly recorded with the appropriate County Recorder's office.
Dated: August 18, 2009
RECONTRUST COMPANY, N.A., as agent for the Beneficiary
By LandSafe Title Corporation, as its Attorney in Fact
By _____

**KATIE Mc CLELLAND**

|Page 2 of 2 |

*Form nod (09/01)*

**Bank of America** 🇺🇸
Home Loans

**1719**

Notice Date: August 4, 2009
TS#09-0122162

Property Address:
10451 Harvest View Way
San Diego, CA  92128
Valerie Zakar
10451 Harvest View Way
San Diego, CA  92128

## CALIFORNIA DECLARATION

I, _Annette Kahlari_ , of BAC Home Loans Servicing, LP, declare under penalty of perjury, under the laws of the State of California, that the following is true and correct:

☐ BAC Home Loans Servicing, LP has contacted the borrower to assess the borrower's financial situation and explore options for the borrower to avoid foreclosure,

☒ BAC Home Loans Servicing, LP tried with due diligence to contact the borrower in accordance with California Civil Code Section 2923.5, or

☐ BAC Home Loans Servicing, LP verified that the borrower has surrendered the property.

☐ BAC Home Loans Servicing, LP has evidence and reasonably believes that the borrower has contracted with an organization, person, or entity whose primary business is advising people who have decided to leave their homes on how to extend the foreclosure process and to avoid their contractual obligations to beneficiaries.

☐ BAC Home Loans Servicing, LP has confirmed that the borrower(s) filed for bankruptcy and the proceedings have not been finalized to wit, there is no order on the court's docket closing or dismissing the bankruptcy case.

☐ The   provisions   of   California   Civil   Code   §2923.5   do   not   apply   because

_8|12|09_      _Fort Worth, Tx_
Date and Place
_T.A. Kahlari_                    _Collector II_
Name of Signor                    Title and/or Position

This communication is from BAC Home Loans Servicing, LP, a subsidiary of Bank of America, N.A.
CALDECLH 6652/9524 8/29/2008

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

THE ADVOCATES' LAW FIRM, LLP
www.theadvocateslaw.com

# EXHIBIT "6"

**FIRST AMENDED COMPLAINT**

**LANDSAFE TITLE**

RECORDING REQUESTED BY:
RECONTRUST COMPANY
1800 Tapo Canyon Rd., CA6-914-01-94
SIMI VALLEY, CA 93063

DOC #   2010-0166307



APR 05, 2010        8:00 AM
OFFICIAL RECORDS
SAN DIEGO COUNTY RECORDER'S OFFICE
DAVID L. BUTLER, COUNTY RECORDER
FEES:        15.00

5083

DA:        1

WHEN RECORDED MAIL TO:
RECONTRUST COMPANY
1800 Tapo Canyon Rd., CA6-914-01-94
SIMI VALLEY, CA 93063
TS No. 09-0122162
Title Order No. 09-8-356963

PAGES:        2



APN No. 316-461-12-00

## NOTICE OF TRUSTEE'S SALE

## YOU ARE IN DEFAULT UNDER A DEED OF TRUST, DATED 01/19/2006. UNLESS YOU TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE. IF YOU NEED AN EXPLANATION OF THE NATURE OF THE PROCEEDING AGAINST YOU, YOU SHOULD CONTACT A LAWYER.

Notice is hereby given that RECONTRUST COMPANY, N.A., as duly appointed trustee pursuant to the Deed of Trust executed by VALERIE ZAKAR, AND ROBERT H ZAKAR, WIFE AND HUSBAND AS COMMUNITY PROPERTY WITH RIGHT OF SURVIVORSHIP, dated 01/19/2006 and recorded 01/24/2006, as Instrument No. 2006-0053923, in Book , Page 17997 of Official Records in the office of the County Recorder of SAN DIEGO County, State of California, will sell on 04/16/2010 at 10:00 AM, At the South entrance to the County Courthouse, 220 West Broadway, San Diego, CA 92101
✱ SALE DATE IS 04-26-2010
at public auction, to the highest bidder for cash or check as described below, payable in full at time of sale, all right, title, and interest conveyed to and now held by it under said Deed of Trust, in the property situated in said County and State and as more fully described in the above referenced Deed of Trust. The street address and other common designation, if any, of the real property described above is purported to be:  10451 HARVEST VIEW WAY, SAN DIEGO, CA  92128-4188.  The undersigned Trustee disclaims any liability for any incorrectness of the street address and other common designation, if any, shown herein.

The total amount of the unpaid balance with interest thereon of the obligation secured by the property to be sold plus reasonable estimated costs, expenses and advances at the time of the initial publication of the Notice of Sale is $882,582.10. It is possible that at the time of sale the opening bid may be less than the total indebtedness due.

In addition to cash, the Trustee will accept cashier's checks drawn on a state or national bank, a check drawn by a state or federal credit union, or a check drawn by a state or federal savings and loan association, savings association, or savings bank specified in Section 5102 of the Financial Code and authorized to do business in this state.

Said sale will be made, in an "AS IS" condition, but without covenant or warranty, express or implied, regarding title, possession or encumbrances, to satisfy the indebtedness secured by said Deed of Trust, advances thereunder, with interest as provided, and the unpaid principal of the Note secured by said Deed of Trust with interest thereon as provided in said Note, plus fees, charges and expenses of the Trustee and of the trusts created by said Deed of Trust.
If required by the provisions of  Section 2923.5 of the California Civil Code, the declaration from the mortgagee, beneficiary or authorized agent is attached to the Notice of Trustee's Sale duly recorded with the appropriate County Recorder's office.

RECONTRUST COMPANY N.A.
1800 Tapo Canyon Rd., CA6-914-01-94
SIMI VALLEY, CA 93063
Phone/Sale Information: (800) 281-8219

By: _____
    Bertha A. Quezada,  Assistant Secretary

RECONTRUST COMPANY, N.A. is a debt collector attempting to collect a debt.  Any information obtained will be used for that purpose.

*Form nos (07/01)*

09-0122162

5084

Valerie Zakar
10451 Harvest View Way
San Diego, CA 92128

Property Address:
10451 Harvest View Way
San Diego, CA 92128

## CALIFORNIA DECLARATION

I, Michelle Cunningham, of BAC Home Loans Servicing, LP, declare under penalty of perjury, under the laws of the State of California, that the following is true and correct:

BAC Home Loans Servicing, LP, has obtained from the Commissioner of Corporations a final order of exemption pursuant to California Civil Code Section 2923.53 that is current and valid on the date the accompanying Notice of Sale is filed.

**AND**

The timeframe for giving Notice of Sale specified in subdivision (a) of Civil Code Section 2923.52 does not apply pursuant to Section 2923.52 (b).

11/03/2009   Simi Valley, CA
Date and Place

Michelle Cunningham
Name of Signor

Team Manager
Title and/or Position

Signature

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

THE ADVOCATES' LAW FIRM, LLP
www.theadvocateslaw.com

# EXHIBIT "7"

**FIRST AMENDED COMPLAINT**

```
<DOCUMENT>
<TYPE>EX-99.1
<SEQUENCE>2
<FILENAME>efc6-1496_exhibit991.txt
<TEXT>
```

EXHIBIT 99.1
------------

5

```
<PAGE>
```

===================

CWMBS, INC.,
Depositor

COUNTRYWIDE HOME LOANS, INC.,
Seller

PARK GRANADA LLC,
Seller

PARK MONACO INC.,
Seller

PARK SIENNA LLC,
Seller

COUNTRYWIDE HOME LOANS SERVICING LP,
Master Servicer

and

THE BANK OF NEW YORK,
Trustee
----------------------------------

POOLING AND SERVICING AGREEMENT

Dated as of April 1, 2006
----------------------------------

CHL MORTGAGE PASS-THROUGH TRUST 2006-HYB3

MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-HYB3

===================

```
<PAGE>

<TABLE>
<CAPTION>
                                        Table of Contents

Page

----

<S>          <C>
<C>
ARTICLE I DEFINITIONS
14


ARTICLE II CONVEYANCE OF MORTGAGE LOANS; REPRESENTATIONS AND WARRANTIES
46

          SECTION 2.01.    Conveyance of Mortgage
Loans.....................................................46
          SECTION 2.02.    Acceptance by Trustee of the Mortgage
Loans.....................................................50
          SECTION 2.03.    Representations, Warranties and Covenants of the Sellers
and Master Servicer.........52
          SECTION 2.04.    Representations and Warranties of the Depositor as to
the Mortgage Loans.............54
          SECTION 2.05.    Delivery of Opinion of Counsel in Connection with
Substitutions.......................55
          SECTION 2.06.    Execution and Delivery of
Certificates..............................................55
          SECTION 2.07.    REMIC
Matters.................................................................56
          SECTION 2.08.    Covenants of the Master
Servicer..................................................56

ARTICLE III ADMINISTRATION AND SERVICING OF MORTGAGE LOANS
57

          SECTION 3.01.    Master Servicer to Service Mortgage
Loans.........................................57
          SECTION 3.02.    Subservicing; Enforcement of the Obligations of
Subservicers.........................58
          SECTION 3.03.    Rights of the Depositor and the Trustee in Respect of
the Master Servicer............58
          SECTION 3.04.    Trustee to Act as Master
Servicer..................................................59
          SECTION 3.05.    Collection of Mortgage Loan Payments; Certificate
Account; Distribution Account.......59
          SECTION 3.06.    Collection of Taxes, Assessments and Similar Items;
Escrow Accounts...................62
          SECTION 3.07.    Access to Certain Documentation and Information
Regarding the Mortgage Loans.........63
          SECTION 3.08.    Permitted Withdrawals from the Certificate Account and
the Distribution Account.......63
```

SECTION 3.09.    Maintenance of Hazard Insurance; Maintenance of Primary Insurance Policies...........65
SECTION 3.10.    Enforcement of Due-on-Sale Clauses; Assumption Agreements.............................66
SECTION 3.11.    Realization Upon Defaulted Mortgage Loans; Repurchase of Certain Mortgage Loans.......67
SECTION 3.12.    Trustee to Cooperate; Release of Mortgage Files....................................71
SECTION 3.13.    Documents, Records and Funds in Possession of Master Servicer to be Held for the Trustee..........................................................71
SECTION 3.14.    Servicing Compensation..............................................................72

                                                              i

<PAGE>

SECTION 3.15.    Access to Certain Documentation....................................................72
SECTION 3.16.    Annual Statement as to Compliance....................................................73
SECTION 3.17.    Errors and Omissions Insurance; Fidelity Bonds.......................................73
SECTION 3.18.    Notification of Adjustments..........................................................73

ARTICLE IV DISTRIBUTIONS AND ADVANCES BY THE MASTER SERVICER                                         75

SECTION 4.01.    Advances..............................................................................75
SECTION 4.02.    Priorities of Distribution..........................................................76
SECTION 4.03.    [Reserved]............................................................................80
SECTION 4.04.    Allocation of Realized Losses........................................................80
SECTION 4.05.    Cross-Collateralization; Adjustments to Available Funds..............................81
SECTION 4.06.    Monthly Statements to Certificateholders.............................................82

ARTICLE V THE CERTIFICATES                                                                           84

SECTION 5.01.    The Certificates......................................................................84
SECTION 5.02.    Certificate Register; Registration of Transfer and Exchange of Certificates..........84
SECTION 5.03.    Mutilated, Destroyed, Lost or Stolen Certificates...................................89
SECTION 5.04.    Persons Deemed

Owners.................................................................89

           SECTION 5.05.    Access to List of Certificateholders' Names and
Addresses.....................89

           SECTION 5.06.    Maintenance of Office or
Agency....................................................90


ARTICLE VI THE DEPOSITOR AND THE MASTER SERVICER
91

           SECTION 6.01.    Respective Liabilities of the Depositor and the Master
Servicer.......................91

           SECTION 6.02.    Merger or Consolidation of the Depositor or the Master
Servicer.......................91

           SECTION 6.03.    Limitation on Liability of the Depositor, the Sellers,
the Master Servicer

                            and Others.
...................................................................91

           SECTION 6.04.    Limitation on Resignation of Master
Servicer........................................92


ARTICLE VII DEFAULT
93

           SECTION 7.01.    Events of
Default...............................................................93

           SECTION 7.02.    Trustee to Act; Appointment of
Successor..............................95

           SECTION 7.03.    Notification to
Certificateholders......................................................96


ARTICLE VIII CONCERNING THE TRUSTEE
97

           SECTION 8.01.    Duties of
Trustee................................................................97

           SECTION 8.02.    Certain Matters Affecting the
Trustee....................................98

           SECTION 8.03.    Trustee Not Liable for Certificates or Mortgage
Loans................................99

           SECTION 8.04.    Trustee May Own
Certificates..........................................................99

           SECTION 8.05.    Trustee's Fees and
Expenses.........................................................99

           SECTION 8.06.    Eligibility Requirements for
Trustee..................................100

           SECTION 8.07.    Resignation and Removal of
Trustee................................................100


                                                            ii


           SECTION 8.08.    Successor
Trustee...............................................................101

           SECTION 8.09.    Merger or Consolidation of
Trustee.................................................102

           SECTION 8.10.    Appointment of Co-Trustee or Separate
Trustee................................102

           SECTION 8.11.    Tax

Matters....................................................................104
          SECTION 8.12.    Monitoring of Significance
Percentage.................................................105

ARTICLE IX TERMINATION
107

          SECTION 9.01.    Termination upon Liquidation or Purchase of all Mortgage
Loans......................107
          SECTION 9.02.    Final Distribution on the
Certificates...........................................107
          SECTION 9.03.    Additional Termination
Requirements..........................................108

ARTICLE X MISCELLANEOUS PROVISIONS
110

          SECTION 10.01.
Amendment...................................................................
.110
          SECTION 10.02.    Recordation of Agreement;
Counterparts..........................................111
          SECTION 10.03.    Governing
Law........................................................112
          SECTION 10.04.    Intention of
Parties.....................................................112
          SECTION 10.05.
Notices....................................................................
.113
          SECTION 10.06.    Severability of
Provisions..............................................114
          SECTION 10.07.
Assignment.................................................................
.115
          SECTION 10.08.    Limitation on Rights of
Certificateholders...................................115
          SECTION 10.09.    Inspection and Audit
Rights.....................................................115
          SECTION 10.10.    Certificates Nonassessable and Fully
Paid......................................116
          SECTION 10.11.
[Reserved].................................................................
.116
          SECTION 10.12.    Protection of
Assets.....................................................116

ARTICLE XI EXCHANGE ACT REPORTING
116

          SECTION 11.01.    Filing
Obligations............................................116
          SECTION 11.02.    Form 10-D
Filings.....................................................117
          SECTION 11.03.    Form 8-K
Filings.....................................................118
          SECTION 11.04.    Form 10-K
Filings.....................................................118

```
            SECTION 11.05.   Sarbanes-Oxley
Certification.................................................119
            SECTION 11.06.   Form 15
Filing.......................................................119
            SECTION 11.07.   Report on Assessment of Compliance and
Attestation.................................119
            SECTION 11.08.   Use of Subservicers and
Subcontractors...............................................121
            SECTION 11.09.
Amendments...................................................
.122
```

```
</TABLE>
```

<center>iii</center>

```
<PAGE>


<TABLE>
<CAPTION>
                              SCHEDULES
<S>              <C>
<C>
```

```
Schedule I:      Mortgage Loan
Schedule..................................................S-I-1
Schedule II-A:   Representations and Warranties of
Countrywide.......................................S-II-A-1
Schedule II-B:   Representations and Warranties of Park
Granada...........................................S-II-B-1
Schedule II-C:   Representations and Warranties of Park
Monaco............................................S-II-C-1
Schedule II-D:   Representations and Warranties of Park
Sienna............................................S-II-D-1
Schedule III-A:  Representations and Warranties of Countrywide as to all of the
                 Mortgage
Loans.....................................................S-III-
A-1
Schedule III-B:  Representations and Warranties of Countrywide as to the
                 Countrywide Mortgage
Loans.....................................................S-III-B-1
Schedule III-C:  Representations and Warranties of Park Granada as to the
                 Park Granada Mortgage
Loans.....................................................S-III-C-1
Schedule III-D:  Representations and Warranties of Park Monaco as to the
                 Park Monaco Mortgage
Loans.....................................................S-III-D-1
Schedule III-E:  Representations and Warranties of Park Sienna as to the
                 Park Sienna Mortgage
Loans.....................................................S-III-E-1
Schedule IV:     Representations and Warranties of the Master
Servicer..................................S-IV-1
Schedule V:      Principal Balances Schedule [if
applicable].............................................S-V-1
Schedule VI:     Form of Monthly Master Servicer
Report................................................S-VI-1
```

EXHIBITS

Exhibit A:          Form of Senior Certificate (excluding Notional Amount
Certificates)...........................A-1
Exhibit B:          Form of Subordinated
Certificate......................................................B-1
Exhibit C:          Form of Class A-R
Certificate......................................................C-1
Exhibit D:          Form of Notional Amount
Certificate......................................................D-1
Exhibit E:          Form of Reverse of
Certificates....................................................E-1
Exhibit F:          Form of Initial Certification of
Trustee.....................................................F-1
Exhibit G:          Form of Delay Delivery Certification of
Trustee...................................................G-1
Exhibit H:          Form of Final Certification of
Trustee....................................................H-1
Exhibit I:          Form of Transfer
Affidavit.......................................................I-1
Exhibit J-1:        Form of Transferor Certificate
(Residual)...............................................J-1
Exhibit J-2:        Form of Transferor Certificate
(Private)...............................................J-2
Exhibit K:          Form of Investment Letter [Non-Rule
144A]....................................................K-1
Exhibit L:          Form of Rule 144A
Letter..........................................................L-1
Exhibit M:          Form of Request for Release (for
Trustee)..................................................M-1
Exhibit N:          Form of Request for Release (Mortgage Loan) Paid in Full,
Repurchased and Replaced).........N-1
Exhibit O:          Standard & Poor's LEVELS(R) Version 5.6 Glossary Revised,
Appendix E .......................O-1
Exhibit P:
[Reserved].....................................................
.......P-1
Exhibit Q           Monthly
Report..........................................................
Q-1
Exhibit R-1         Form of Performance Certification
(Subservicer)...........................................R-1
Exhibit R-2         Form of Performance Certification
(Trustee)...............................................R-2

iv

Exhibit S           Form of Servicing Criteria to be Addressed in Assessment of
Compliance Statement............S-1
Exhibit T           List of Item 1119
Parties.........................................................T-1
Exhibit U           Form of Sarbanes-Oxley Certification (Replacement Master
Servicer)..........................U-1
</TABLE>

<PAGE>


THIS POOLING AND SERVICING AGREEMENT, dated as of April 1, 2006, among CWMBS, INC., a Delaware corporation, as depositor (the "Depositor"), COUNTRYWIDE HOME LOANS, INC. ("Countrywide"), a New York corporation, as a seller (a "Seller"), PARK GRANADA LLC ("Park Granada"), a Delaware limited liability company, as a seller (a "Seller"), PARK MONACO INC. ("Park Monaco"), a Delaware corporation, as a seller (a "Seller"), PARK SIENNA LLC ("Park Sienna"), a Delaware limited liability company, as a seller (a "Seller"), COUNTRYWIDE HOME LOANS SERVICING LP, a Texas limited partnership, as master servicer (the "Master Servicer"), and THE BANK OF NEW YORK, a banking corporation organized under the laws of the State of New York, as trustee (the "Trustee").

                        WITNESSETH THAT

        In consideration of the mutual agreements contained in this Agreement, the parties to this Agreement agree as follows:

                      PRELIMINARY STATEMENT

        The Depositor is the owner of the Trust Fund that is hereby conveyed to the Trustee in return for the Certificates. For federal income tax purposes, the Trust Fund, will consist of three real estate mortgage investment conduits (each a "REMIC" or, in the alternative, the "Lower Tier REMIC," the "Middle Tier REMIC" and the "Master REMIC," respectively). Each Certificate, other than the Class A-R Certificate, will represent ownership of one or more regular interests in the Master REMIC for purposes of the REMIC Provisions. The Class A-R Certificate represents ownership of the sole class of residual interest in the Lower Tier REMIC, the Middle Tier REMIC and the Master REMIC. The Master REMIC will hold as assets the several classes of uncertificated Middle Tier REMIC Interests (other than the Class MT-A-R Interest). The Middle Tier REMIC will hold as assets the several classes of uncertificated Lower Tier REMIC Interests (other than the Class LT-A-R Interest). The Lower Tier REMIC will hold as assets all property of the Trust Fund. Each Middle Tier REMIC Interest (other than the Class MT-A-R Interest) is hereby designated as a regular interest in the Middle Tier REMIC. Each Lower Tier REMIC Interest (other than the Class LT-A-R Interest) is hereby designated as a regular interest in the Lower Tier REMIC. The latest possible maturity date of all REMIC regular interests created in this Agreement shall be the Latest Possible Maturity Date.

        The following table set forth characteristics of the Interests in the Lower Tier REMIC:

<TABLE>
<CAPTION>

|  | Initial | | Corresponding |
| The Lower Tier REMIC Interests | Principal Balance | Interest Rate | Loan Group |
| ------------------------------ | ----------------- | ------------- | --------- |
| <S> | <C> | <C> | |

```
<C>
LT-A-1................................        (1)              (2)
1
LT-B-1................................        (1)              (2)
1
LT-C-1................................        (1)              (2)
1
LT-A-2................................        (1)              (2)
2
LT-B-2................................        (1)              (2)
2
LT-C-2................................        (1)              (2)
2
LT-A-3................................        (1)              (2)
3
LT-B-3................................        (1)              (2)
3


<PAGE>


LT-C-3................................        (1)              (2)
3
LT-A-4................................        (1)              (2)
4
LT-B-4................................        (1)              (2)
4
LT-C-4................................        (1)              (2)
4
LT-A-R................................        (3)              (3)
N/A
</TABLE>
```

---------------

(1)     Each Class A Lower Tier REMIC Interest will have an Initial Principal
        Balance equal to 0.9% of the Subordinated Portion of its Corresponding
        Loan Group. Each Class B Lower Tier REMIC Interest will have an
        Initial Principal Balance equal to 0.1% of the Subordinated Portion of
        its Corresponding Loan Group. Each Class C Lower Tier REMIC Interest
        will have an Initial Principal Balance equal to the excess of its
        Corresponding Loan Group over the initial aggregate principal balances
        of the Class A and Class B Lower Tier REMIC Interests corresponding to
        such Loan Group.
(2)     This Lower Tier REMIC Interest will have an Interest Rate equal to the
        weighted average of the Adjusted Net Mortgage Rates of the Mortgage
        Loans in the Corresponding Loan Group.
(3)     The Class LT-A-R Lower Tier REMIC Interest is the sole class of
        residual interest in the Lower Tier REMIC. It has no principal balance
        and pays no principal or interest.

        On each Distribution Date, the Available Funds shall be distributed
with respect to the Lower Tier REMIC Interests in the following manner:

        (1) Interest. Interest is to be distributed with respect to each Lower
Tier REMIC Interest at the rate, or according to the formulas, described

3/3/2011   Case 3:11-cv-00457-AJB-WVG   Document 37   Filed 11/14/11   Page 91 of 316
www.gov/Archives/edgar/data/...
above;

        (2) Principal, if no Cross-Over Situation Exists. If no Cross-Over
Situation exists with respect to any Class of Lower Tier REMIC Interests,
Principal Amounts arising with respect to each Loan Group will be allocated:
first to cause the Loan Group's corresponding Class A and Class B Lower Tier
REMIC Interests to equal, respectively, 0.9% of the Subordinated Portion and
0.1% of the Subordinated Portion; and second to the Loan Group's corresponding
Class C Lower Tier REMIC Interest;

        (3) Principal, if a Cross-Over Situation Exists. If a Cross-Over
Situation exists with respect to the Class A and Class B Lower Tier REMIC
Interests:

        (a) If the Calculation Rate in respect of the outstanding Class A and
        Class B Lower Tier REMIC Interests is less than the Subordinate
        Pass-Through Rate, then Principal Relocation Payments will be made
        proportionately to the outstanding Class A Lower Tier REMIC Interests
        prior to any other principal distributions from each such Loan Group.

        (b) If the Calculation Rate in respect of the outstanding Class A and
        Class B Lower Tier REMIC Interests is greater than the Subordinate
        Pass-Through Rate, Principal Relocation Payments will be made to the
        outstanding Class B Lower Tier REMIC Interests prior to any other
        principal distributions from each such Loan Group.

        In each case, Principal Relocation Payments will be made so as to
cause the Calculation Rate in respect of the outstanding Class A and Class B
Lower Tier REMIC Interests to equal the Subordinate Pass-Through Rate. With
respect to each Loan Group, if (and to the extent that) the

                                    2

<PAGE>

sum of (a) the principal payments comprising the Principal Remittance Amount
received during the Due Period and (b) the Realized Losses, are insufficient
to make the necessary reductions of principal on the Class A and Class B Lower
Tier REMIC Interests, then interest will be added to the Loan Group's Class C
Lower Tier REMIC Interest.

        (c) Unless required to achieve the Calculation Rate, the outstanding
        aggregate Class A and Class B Tracking Interests for all Loan Groups
        will not be reduced below 1 percent of the excess of (i) the aggregate
        outstanding Principal Balances of all Loan Groups as of the end of any
        Due Period (reduced by principal prepayments received after the Due
        Period that are to to be distributed on the Disribution Date related
        to the Due Period) over (ii) the aggregate Class Certificate Balance
        of the Senior Certificates for all Loan Groups as of the related
        Distribution Date (after taking into account distributions of
        principal on such Distribution Date).

        If (and to the extent that) the limitation in paragraph (c) prevents
the distribution of principal to the Class A and Class B Lower Tier REMIC
Interests of a Loan Group, and if the Loan Group's Class C Lower Tier REMIC
Interest has already been reduced to zero, then the excess principal from that
Loan Group will be paid to the Class C Lower Tier REMIC Interests of the other

Loan Groups the aggregate Class A and Class B Lower Tier REMIC Interests of which are less than one percent of the Subordinated Portion. If the Loan Group corresponding to the Class C Lower Tier REMIC Interest that receives such payment has a Weighted Average Adjusted Net Mortgage Rate below the Weighted Average Adjusted Net Mortgage Rate of the Loan Group making the payment, then the payment will be treated by the Lower Tier REMIC as a Realized Loss. Conversely, if a Loan Group corresponding to the Class C Lower Tier REMIC Interest that receives such payment has a Weighted Average Adjusted Net Mortgage Rate above the Weighted Average Adjusted Net Mortgage Rate of the Loan Group making the payment, then the payment will be treated by the Lower Tier REMIC as a reimbursement for prior Realized Losses.

The following table sets forth characteristics of the Interests in the Middle Tier REMIC:

<TABLE>
<CAPTION>

| The Middle Tier REMIC Interests | Initial Principal Balance | Interest Rate | Corresponding Certificates |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| MT-1-A-1A | $35,000,000 | (1) | 1-A-1A, 1-A-IO(2) |
| MT-1-A-1B | $40,182,000 | (1) | 1-A-1B, 1-A-IO(2) |
| MT-1-A-2 | $8,354,000 | (1) | 1-A-2, 1-A-IO(2) |
| MT-2-A-1A | $141,112,000 | (1) | 2-A-1A, 2-A-IO(3) |
| MT-2-A-B-1 | $70,292,000 | (1) | 2-A-B-1 |
| MT-2-A-B-2 | $29,363,000 | (1) | 2-A-B-2, 2-A-IO(3) |
| MT-2-A-B-3 | $41,457,000 | (1) | 2-A-B-3, 2-A-IO(3) |
| MT-2-A-2 | $31,358,000 | (1) | 2-A-2, 2-A-IO(3) |

```
--------------------------------------------------------------------------------
-------------
    MT-1-$100                     $100                          (1)
A-R
--------------------------------------------------------------------------------
-------------
</TABLE>
```

```
                                           3

<PAGE>

<TABLE>
<CAPTION>
--------------------------------------------------------------------------------
-------------
```

| The Middle Tier REMIC Interests | Initial Principal Balance | Interest Rate | Corresponding Certificates |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| MT-3-A-1A | $40,000,000 | (1) | 3-A-1A |
| MT-3-A-1B | $218,684,000 | (1) | 3-A-1B, 3-A-IO(4) |
| MT-3-A-2 | $28,743,000 | (1) | 3-A-2, 3-A-IO(4) |
| MT-4-A-1A | $193,023,000 | (1) | 4-A-1A, 4-A-IO(5) |
| MT-4-A-1B | $20,000,000 | (1) | 4-A-1B, 4-A-IO(5) |
| MT-4-A-1C | $2,222,000 | (1) | 4-A-1C, 4-A-IO(5) |
| MT-4-A-2 | $23,916,000 | (1) | 4-A-2 |
| MT-M | $21,595,000 | (6) | M |
| MT-B-1 | $13,743,000 | (6) | |

B-1

```
          --------------------------------------------------------------------------
--------------
          MT-B-2              $7,853,000                    (6)
B-2
          --------------------------------------------------------------------------
--------------
          MT-B-3              $6,381,000                    (6)
B-3
          --------------------------------------------------------------------------
--------------
          MT-B-4              $4,908,000                    (6)
B-4
          --------------------------------------------------------------------------
--------------
          MT-B-5              $3,435,130.69                 (6)
B-5
          --------------------------------------------------------------------------
--------------
          MT-A-R                      (7)                   (7)
N/A
          --------------------------------------------------------------------------
--------------
```

</TABLE>

(1)    The interest rate with respect to any Distribution Date (and the
       related Interest Accrual Period) for this Middle Tier REMIC Interest
       is a per annum rate equal to the Weighted Average Adjusted Net
       Mortgage Rate of the Mortgage Loans in the related Loan Group which is
       signified by the first digit following "MT" in the interest
       designation.

(2)    For each Interest Accrual Period from the Interest Accrual Period
       related to the first Distribution Date to and including the Interest
       Accrual Period related to the Loan Group 1 Weighted Average Roll Date,
       the Class 1-A-IO Certificates are entitled to receive a specified
       portion of the interest payable on the MT-1-A-1A, MT-1-A-1B and
       MT-1-A-2 Middle Tier REMIC Interests. Specifically, for each such
       Interest Accrual Period, the Class 1-A-IO Certificates are entitled to
       interest accruals on the MT-1-A-1A, MT-1-A-1B and MT-1-A-2 Middle Tier
       REMIC Interests at a per annum rate equal to the Component Rate of the
       Class 1-A-1A IO, Class 1-A-1B IO and Class 1-A-2 IO Components,
       respectively. For each Interest Accrual Period related to a
       Distribution Date after the Weighted Average Roll Date, the Class
       1-A-IO Certificates will be entitled to 0% per annum.

(3)    For each Interest Accrual Period from the Interest Accrual Period
       related to the first Distribution Date to and including the Interest
       Accrual Period related to the Loan Group 2 Weighted Average Roll Date,
       the Class 2-A-IO Certificates are entitled to receive a specified
       portion of the interest payable on the MT-2-A-1A, MT-2-A-B-2,
       MT-2-A-B-3 and MT-2-A-2 Middle Tier REMIC Interests. Specifically, for
       each such Interest Accrual Period, the Class 2-A-IO Certificates are
       entitled to interest accruals on the MT-2-A-1A, MT-2-A-B-2, MT-2-A-B-3
       and MT-2-A-2 Middle Tier REMIC Interests at a

                                     4

<PAGE>

per annum rate equal to the Component Rate of the Class 2-A-1A IO, Class 2-A-B-2 IO, Class 2-A-B-3 IO and Class 2-A-2 IO Components, respectively. For each Interest Accrual Period related to a Distribution Date after the Weighted Average Roll Date, the Class 2-A-IO Certificates will be entitled to 0% per annum.

(4)    For each Interest Accrual Period from the Interest Accrual Period related to the first Distribution Date to and including the Interest Accrual Period related to the Loan Group 3 Weighted Average Roll Date, the Class 3-A-IO Certificates are entitled to receive a specified portion of the interest payable on the MT-3-A-1B and MT-3-A-2 Middle Tier REMIC Interests. Specifically, for each such Interest Accrual Period, the Class 3-A-IO Certificates are entitled to interest accruals on the MT-3-A-1B and MT-3-A-2 Middle Tier REMIC Interests at a per annum rate equal to the Component Rate of the Class 3-A-1B IO and Class 3-A-2 IO Components, respectively. For each Interest Accrual Period related to a Distribution Date after the Weighted Average Roll Date, the Class 3-A-IO Certificates will be entitled to 0% per annum.

(5)    For each Interest Accrual Period from the Interest Accrual Period related to the first Distribution Date to and including the Interest Accrual Period related to the Loan Group 4 Weighted Average Roll Date, the Class 4-A-IO Certificates are entitled to receive a specified portion of the interest payable on the MT-4-A-1A, MT-4-A-1B and MT-4-A-1C Middle Tier REMIC Interests. Specifically, for each such Interest Accrual Period, the Class 4-A-IO Certificates are entitled to interest accruals on the MT-4-A-1A, MT-4-A-1B and MT-4-A-1C Middle Tier REMIC Interests at a per annum rate equal to the Component Rate of the Class 4-A-1A IO, Class 4-A-1B IO and Class 4-A-1C IO Components, respectively. For each Interest Accrual Period related to a Distribution Date after the Weighted Average Roll Date, the Class 4-A-IO Certificates will be entitled to 0% per annum.

(6)    For each Interest Accrual Period, the interest rate for this Middle Tier REMIC Interest will be the Subordinate Pass-Through Rate.

(7)    The MT-A-R is the sole Class of residual interest in the Middle Tier REMIC.  It pays no interest or principal.

On each Distribution Date, the Available Funds shall be distributed with respect to the Middle Tier REMIC Interests in the following manner:

(1) Interest is to be distributed with respect to each Middle Tier REMIC Interest at the rate, or according to the formulas, described above; and

(2) Principal is to be distributed with respect to each Middle Tier REMIC Interest in the same manner and in the same amount as principal is distributed with respect to each Middle Tier REMIC Interest's Corresponding Class or Classes of Certificates.

On each Distribution Date, Realized Losses (and increases in Principal Balances attributable to Subsequent Recoveries) shall be allocated among the Middle Tier REMIC Interests in the same manner that Realized Losses (and increases in Class Certificate Balances attributable to Subsequent Recoveries) are allocated among each Middle Tier REMIC Interest's Corresponding Class or Classes of Certificates.

5

<PAGE>

        The following table sets forth characteristics of the Certificates,
together with minimum denominations and integral multiples in excess thereof
in which such Classes shall be issued (except that one Certificate of each
Class of Certificates may be issuable in a different amount and, in addition,
one Residual Certificate representing the Tax Matters Person Certificate may
be issued in a different amount for each class of REMIC Interest):


                                6

<PAGE>

<TABLE>
<CAPTION>
==========================================================================================
==============

| Class Designation | Initial Class Certificate Balance | Pass-Through Rate (per annum) | Minimum Denomination | Integral Multiples in Excess of Minimum |
|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> |
| Class 1-A-1A | $35,000,000 | (1) | $25,000.00 | $1,000.00 |
| ----------------- | ----------------- | ----------------- | ----------------- | ---- ------------- |
| Class 1-A-1B | $40,182,000 | (1) | $25,000.00 | $1,000.00 |
| ----------------- | ----------------- | ----------------- | ----------------- | ---- ------------- |
| Class 1-A-2 | $8,354,000 | (1) | $25,000.00 | $1,000.00 |
| ----------------- | ----------------- | ----------------- | ----------------- | ---- ------------- |
| Class 1-A-IO | $83,536,000 (2) | (3) | $25,000.00(4) | $1,000.00(4) |
| ----------------- | ----------------- | ----------------- | ----------------- | ---- ------------- |
| Class 2-A-1A | $141,112,000 | (5) | $25,000.00 | $1,000.00 |
| ----------------- | ----------------- | ----------------- | ----------------- | ---- ------------- |
| Class 2-A-B-1 | $70,292,000 | (6) | $25,000.00 | $1,000.00 |
| ----------------- | ----------------- | ----------------- | ----------------- | ---- ------------- |
| Class 2-A-B-2 | $29,363,000 | (5) | $25,000.00 | $1,000.00 |
| ----------------- | ----------------- | ----------------- | ----------------- | ---- ------------- |

| | | | | |
|---|---|---|---|---|
| Class 2-A-B-3<br>$1,000.00 | $41,457,000 | (5) | $25,000.00 | |
| Class 2-A-2<br>$1,000.00 | $31,358,000 | (5) | $25,000.00 | |
| Class 2-A-IO<br>$1,000.00(4) | $243,290,000 (7) | (8) | $25,000.00(4) | |
| Class 3-A-1A<br>$1,000.00 | $40,000,000 | (9) | $25,000.00 | |
| Class 3-A-1B<br>$1,000.00 | $218,684,000 | (10) | $25,000.00 | |
| Class 3-A-2<br>$1,000.00 | $28,743,000 | (10) | $25,000.00 | |
| Class 3-A-IO<br>$1,000.00(4) | $247,427,000 (11) | (12) | $25,000.00(4) | |
| Class 4-A-1A<br>$1,000.00 | $193,023,000 | (13) | $25,000.00 | |
| Class 4-A-1B<br>$1,000.00 | $20,000,000 | (13) | $25,000.00 | |
| Class 4-A-1C<br>$1,000.00 | $2,222,000 | (13) | $25,000.00 | |
| Class 4-A-2<br>$1,000.00 | $23,916,000 | (14) | $25,000.00 | |
| Class 4-A-IO<br>$1,000.00(4) | $215,245,000 (15) | (16) | $25,000.00(4) | |
| Class A-R<br>(18) | $100 | (17) | (18) | |
| Class M<br>$1,000.00 | $21,595,000 | (19) | $25,000.00 | |

| | | | |
|---|---|---|---|
| Class B-1 | $13,743,000 | (19) | $25,000.00 |
| $1,000.00 | | | |

---

| | | | |
|---|---|---|---|
| Class B-2 | $7,853,000 | (19) | $25,000.00 |
| $1,000.00 | | | |

---

| | | | |
|---|---|---|---|
| Class B-3 | $6,381,000 | (19) | $100,000.00 |
| $1,000.00 | | | |

---

| | | | |
|---|---|---|---|
| Class B-4 | $4,908,000 | (19) | $100,000.00 |
| $1,000.00 | | | |

---

| | | | |
|---|---|---|---|
| Class B-5 | $3,435,130.69 | (19) | $100,000.00 |
| $1,000.00 | | | |

===============================================================================================

</TABLE>

-------------------------------------------

(1)     For each Interest Accrual Period for any Distribution Date, the
        Pass-Through Rate for the Class 1-A-1A, Class 1-A-1B and Class 1-A-2
        Certificates will be a per annum rate equal to the Weighted Average
        Adjusted Net Mortgage Rate of the Group 1 Mortgage Loans, minus the
        Component Rate for the Class 1-A-1A IO, Class 1-A-1B IO and Class
        1-A-2 IO Components, respectively. The Pass-Through Rates for the
        Class 1-A-1A, Class 1-A-

                                     7

<PAGE>

        1B and Class 1-A-2 Certificates for the Interest Accrual Period
        related to the first Distribution Date will be 5.555573%, 5.637314%
        and 5.631184% per annum, respectively.
(2)     The Class 1-A-IO Certificates will be Notional Amount Certificates,
        will have no Class Certificate Balance and will bear interest on its
        Notional Amount (initially $83,536,000).
(3)     The Pass-Through Rate for the Class 1-A-IO Certificates for each
        Interest Accrual Period for any Distribution Date (x) on or prior to
        the related Weighted Average Roll Date will be a per annum rate equal
        to the Group 1 Weighted Average Component Rate and (y) after the
        related Weighted Average Roll Date, will be 0% per annum. The
        Pass-Through Rate for the Class 1-A-IO Certificates for the Interest
        Accrual Period for the first Distribution Date is 0.468552% per annum.
(4)     Based on the Notional Amount.
(5)     For each Interest Accrual Period for any Distribution Date, the
        Pass-Through Rate for the Class 2-A-1A, Class 2-A-B-2, Class 2-A-B-3
        and Class 2-A-2 Certificates will be a per annum rate equal to the
        Weighted Average Adjusted Net Mortgage Rate of the Group 2 Mortgage
        Loans, minus the Component Rate for the Class 2-A-1A IO, Class 2-A-B-2
        IO, Class 2-A-B-3 IO and Class 2-A-2 IO Components, respectively. The
        Pass-Through Rates for the Class 2-A-1A, Class 2-A-B-2, Class 2-A-B-3
        and Class 2-A-2 Certificates for the Interest Accrual Period related

to the first Distribution Date will be 5.804372%, 5.803417%, 5.662819%
and 5.917814% per annum, respectively.

(6)     For each Interest Accrual Period for any Distribution Date, the
        Pass-Through Rate for the Class 2-A-B-1 Certificates will be a per
        annum rate equal to the Weighted Average Adjusted Net Mortgage Rate of
        the Group 2 Mortgage Loans. The Pass-Through Rate for the Class
        2-A-B-1 Certificates for the Interest Accrual Period related to the
        first Distribution Date will be 5.927072% per annum.

(7)     The Class 2-A-IO Certificates will be Notional Amount Certificates,
        will have no Class Certificate Balance and will bear interest on its
        Notional Amount (initially $243,290,000).

(8)     The Pass-Through Rate for the Class 2-A-IO Certificates for each
        Interest Accrual Period for any Distribution Date (x) on or prior to
        the related Weighted Average Roll Date will be a per annum rate equal
        to the Group 2 Weighted Average Component Rate and (y) after the
        related Weighted Average Roll Date, will be 0% per annum. The
        Pass-Through Rate for the Class 2-A-IO Certificates for the Interest
        Accrual Period for the first Distribution Date is 0.132314% per annum.

(9)     For each Interest Accrual Period for any Distribution Date, the
        Pass-Through Rate for the Class 3-A-1A Certificates will be a per
        annum rate equal to the Weighted Average Adjusted Net Mortgage Rate of
        the Group 3 Mortgage Loans. The Pass-Through Rate for the Class 3-A-1A
        Certificates for the Interest Accrual Period related to the first
        Distribution Date will be 6.143099% per annum.

(10)    For each Interest Accrual Period for any Distribution Date, the
        Pass-Through Rate for the Class 3-A-1B and Class 3-A-2 Certificates
        will be a per annum rate equal to the Weighted Average Adjusted Net
        Mortgage Rate of the Group 3 Mortgage Loans, minus the Component Rate
        for the Class 3-A-1B IO and Class 3-A-2 IO Components, respectively.
        The Pass-Through Rates for the Class 3-A-1B and Class 3-A-2
        Certificates for the Interest Accrual Period related to the first
        Distribution Date will be 5.851420% and 6.024308% per annum,
        respectively.

                                       8

<PAGE>

(11)    The Class 3-A-IO Certificates will be Notional Amount Certificates,
        will have no Class Certificate Balance and will bear interest on its
        Notional Amount (initially $247,427,000).

(12)    The Pass-Through Rate for the Class 3-A-IO Certificates for each
        Interest Accrual Period for any Distribution Date (x) on or prior to
        the related Weighted Average Roll Date will be a per annum rate equal
        to the Group 3 Weighted Average Component Rate and (y) after the
        related Weighted Average Roll Date, will be 0% per annum. The
        Pass-Through Rate for the Class 3-A-IO Certificates for the Interest
        Accrual Period for the first Distribution Date is 0.271595% per annum.

(13)    For each Interest Accrual Period for any Distribution Date, the
        Pass-Through Rate for the Class 4-A-1A, Class 4-A-1B and Class 4-A-1C
        Certificates will be a per annum rate equal to the Weighted Average
        Adjusted Net Mortgage Rate of the Group 4 Mortgage Loans, minus the
        Component Rate for the Class 4-A-1A IO, Class 4-A-1B IO and Class
        4-A-1C IO Components, respectively. The Pass-Through Rates for the
        Class 4-A-1A, Class 4-A-1B and Class 4-A-1C Certificates for the
        Interest Accrual Period related to the first Distribution Date will be
        6.000000%, 6.000000% and 6.000000% per annum, respectively.

(14)    For each Interest Accrual Period for any Distribution Date, the
        Pass-Through Rate for the Class 4-A-2 Certificates will be a per annum
        rate equal to the Weighted Average Adjusted Net Mortgage Rate of the
        Group 4 Mortgage Loans. The Pass-Through Rate for the Class 4-A-2
        Certificates for the Interest Accrual Period related to the first
        Distribution Date will be 6.117249% per annum.

(15)    The Class 4-A-IO Certificates will be Notional Amount Certificates,
        will have no Class Certificate Balance and will bear interest on its
        Notional Amount (initially $215,245,000).

(16)    The Pass-Through Rate for the Class 4-A-IO Certificates for each
        Interest Accrual Period for any Distribution Date (x) on or prior to
        the related Weighted Average Roll Date will be a per annum rate equal
        to the Group 4 Weighted Average Component Rate and (y) after the
        related Weighted Average Roll Date, will be 0% per annum. The
        Pass-Through Rate for the Class 4-A-IO Certificates for the Interest
        Accrual Period for the first Distribution Date is 0.117249% per annum.

(17)    For each Interest Accrual Period for any Distribution Date, the
        Pass-Through Rate for the Class A-R Certificates will be a per annum
        rate equal to the Weighted Average Adjusted Net Mortgage Rate of the
        Group 1 Mortgage Loans. The Pass-Through Rate for the Class A-R
        Certificates for the Interest Accrual Period related to the first
        Distribution Date will be 6.071005% per annum.

(18)    The Class A-R Certificate will be issued as two separate certificates,
        one with an initial Certificate Balance of $99.99 and the Tax Matters
        Person Certificate with an initial Certificate Balance of $.01.

(19)    The Pass-Through Rate for each Class of Subordinated Certificates for
        each Interest Accrual Period for any Distribution Date will be a per
        annum rate equal to the Subordinate Pass-Through Rate. The
        Pass-Through Rate for the Subordinated Certificates for the Interest
        Accrual Period for the first Distribution Date is 6.056550% per annum.


                                    9

<PAGE>


        It is not intended that the Class A-R Certificates be entitled to any
cash flows pursuant to this Agreement except as provided in Sections
4.02(a)(1)(ii) and 4.02(1)(iv)(y) hereunder, (that is, the Class A-R
Certificates' entitlement to $100 plus interest thereon in the waterfall).


                                    10

<PAGE>


        Set forth below are designations of Classes or Components of
Certificates to the categories used in this Agreement:

<TABLE>
<CAPTION>
<S>                             <C>
Accretion Directed
Certificates.................    None.

Accrual Certificates.........    None.

Accrual Components...........    None.

Book-Entry Certificates......    All Classes of Certificates other than the
Physical Certificates.

COFI Certificates............    None.

Component Certificates.......    Class 1-A-IO, Class 2-A-IO, Class 3-A-IO and
Class 4-A-IO Certificates.

Components..................    Class 1-A-1A IO, Class 1-A-1B IO, Class 1-A-2
IO, Class 2-A-1A IO, Class 2-A-B-2   IO, Class 2-A-B-3 IO, Class 2-A-2 IO, Class 3-A-
1B IO, Class 3-A-2 IO, Class   4-A-1A IO, Class 4-A-1B IO and Class 4-A-1C IO
Components.

Delay Certificates..........    All interest-bearing Classes of Certificates
other than the Non-Delay   Certificates, if any.

ERISA-Restricted
Certificates................    The Residual Certificates, the Private
Certificates and, until they have   been the subject of an ERISA Qualifying
Underwriting, the Class 1-A-IO,   Class 2-A-IO, Class 3-A-IO and Class 4-A-
IO Certificates; and any   Certificate that does not have or no longer
has a rating of BBB- or its   equivalent or better from at least one Rating
Agency.

Group 1
Senior Certificates..........    Class 1-A-1A, Class 1-A-1B Class 1-A-2,
Class 1-A-IO and Class A-R   Certificates.

Group 2
Senior Certificates..........    Class 2-A-1A, Class 2-A-B-1, Class 2-A-B-2,
Class 2-A-B-3, Class 2-A-2   and Class 2-A-IO Certificates.

Group 3
Senior Certificates..........    Class 3-A-1A, Class 3-A-1B, Class 3-A-2 and
Class 3-A-IO Certificates.

Group 4

11

<PAGE>

Senior Certificates..........    Class 4-A-1A, Class 4-A-1B, Class 4-A-1C,
Class 4-A-2 and Class 4-A-IO

                                                    Certificates.

LIBOR Certificates...........          None.

Non-Delay Certificates.......          None.

Notional Amount
Certificates.................          Class 1-A-IO, Class 2-A-IO, Class 3-A-IO and
Class 4-A-IO Certificates.

Offered Certificates.........          All Classes of Certificates other than the
Private Certificates.

Physical Certificates........          Private Certificates and the Residual
Certificates.

Planned Principal Classes....          None.

Planned Principal
Components...................          None.

Private Certificates.........          Class B-3, Class B-4 and Class B-5 Certificates.

Rating Agencies..............          S&P and Moody's.

Regular Certificates.........          All Classes of Certificates, other than the
Residual Certificates.

Residual Certificates........          Class A-R Certificates.

Senior Certificate Group.....          Group 1 Senior Certificates,  Group 2 Senior
Certificates,  Group 3 Senior
                                       Certificates and Group 4 Senior Certificates, as
applicable.

Senior Certificates..........          Class 1-A-1A, Class  1-A-1B, Class 1-A-2, Class
1-A-IO, Class 2-A-1A,
                                       Class 2-A-B-1, Class 2-A-B-2, Class 2-A-B-3,
Class 2-A-2, Class 2-A-IO,
                                       Class 3-A-1A, Class 3-A-1B, Class 3-A-2, Class
3-A-IO, Class 4-A-1A, Class
                                       4-A-1B, Class 4-A-1C, Class 4-A-2, Class 4-A-IO
and Class A-R
                                       Certificates.

Subordinated Certificates ...          Class M, Class B-1, Class B-2, Class B-3, Class
B-4 and
                                       Class B-5 Certificates.

</TABLE>

        With respect to any of the foregoing designations as to which the
corresponding reference is "None," all defined terms and provisions in this
Agreement relating solely to such designations shall be of no force or effect,
and any calculations in this Agreement incorporating references to such
designations shall be interpreted without reference to such designations and

3/3/2011  Case 3:11-cv-00457-AJB-WVG  Document 87  Filed 11/14/11  Page 103 of 316
www.sec.gov/Archives/edgar/data/...

12

<PAGE>

amounts. Defined terms and provisions in this Agreement relating to
statistical rating agencies not designated above as Rating Agencies shall be
of no force or effect.


13

<PAGE>


ARTICLE I
DEFINITIONS

Whenever used in this Agreement, the following words and phrases, unless the
context otherwise requires, shall have the following meanings:

Accretion Directed Certificates: As specified in the Preliminary
Statement.

Accretion Direction Rule:  Not applicable.

Accrual Amount:  Not applicable.

Accrual Certificates:  As specified in the Preliminary Statement.

Accrual Components:  As specified in the Preliminary Statement.

Accrual Termination Date:  Not applicable.

Additional Designated Information:  As defined in Section 11.02.

Adjusted Mortgage Rate: As to each Mortgage Loan and at any time, the
per annum rate equal to the Mortgage Rate less the Master Servicing Fee Rate.

Adjusted Net Mortgage Rate: As to each Mortgage Loan and at any time,
the per annum rate equal to the Mortgage Rate less the Expense Fee Rate.

Adjustment Date: A date specified in each Mortgage Note as a date on
which the Mortgage Rate on the related Mortgage Loan will be adjusted.

Advance: As to a Loan Group, the payment required to be made by the
Master Servicer with respect to any Distribution Date pursuant to Section
4.01, the amount of any such payment being equal to the aggregate of payments
of principal and interest (net of the Master Servicing Fee) on the Mortgage
Loans in such Loan Group that were due on the related Due Date and not
received by the Master Servicer as of the close of business on the related
Determination Date, together with an amount equivalent to interest on each
Mortgage Loan as to which the related Mortgaged Property is an REO Property
net of any net income with respect to such REO Property, less the aggregate
amount of any such delinquent payments that the Master Servicer has determined
would constitute a Nonrecoverable Advance if advanced.

Aggregate Subordinated Percentage: As to any Distribution Date, the
fraction, expressed as a percentage, the numerator of which is equal to the
aggregate Class Certificate Balance of the Subordinated Certificates

immediately prior to such Distribution Date and the denominator of which is
the aggregate Stated Principal Balance of all the Mortgage Loans as of the Due
Date in the month preceding the month of such Distribution Date.

        Agreement: This Pooling and Servicing Agreement and all amendments or
supplements this Pooling and Servicing Agreement.


                                    14

<PAGE>

        Allocable Portion: As to any Distribution Date and (a) the Class
2-A-1A and Class 2-A-2 Certificates, the percentage equivalent of a fraction
the numerator of which is the aggregate Class Certificate Balance of the Class
2-A-1A and Class 2-A-2 Certificates immediately prior to such Distribution
Date and the denominator of which is the aggregate Class Certificate Balance
of the Group 2 Senior Certificates immediately prior to such Distribution
Date; and (b) the Class 2-A-B-1, Class 2-A-B-2 and Class 2-A-B-3 Certificates,
100% minus the Allocable Portion for the Class 2-A-1A and Class 2-A-2
Certificates for such Distribution Date.

        Allocable Share: As to any Distribution Date, any Loan Group and any
Class or Component of Certificates, the ratio that the amount calculated with
respect to such Distribution Date (A) with respect to the Senior Certificates
of the related Senior Certificate Group, pursuant to clause (i) of the
definition of Class Optimal Interest Distribution Amount (without giving
effect to any reduction of such amount pursuant to Section 4.02(d)) and (B)
with respect to the Subordinated Certificates, pursuant to the definition of
Assumed Interest Amount for such Class or after the third Senior Termination
Date pursuant to clause (i) of the definition of Class Optimal Interest
Distribution Amount (without giving effect to any reduction of such amount
pursuant to Section 4.02(d)) bears to the aggregate amount calculated with
respect to such Distribution Date for each such related Class of Certificates
pursuant to clause (i) of the definition of Class Optimal Interest
Distribution Amount (without giving effect to any reduction of such amounts
pursuant to Section 4.02(d)) or the definition of Assumed Interest Amount for
such Loan Group and Class, as applicable.

        Amount Held for Future Distribution: As to any Distribution Date and
Mortgage Loans in a Loan Group, the aggregate amount held in the Certificate
Account at the close of business on the related Determination Date on account
of (i) Principal Prepayments received after the related Prepayment Period and
Liquidation Proceeds and Subsequent Recoveries received in the month of such
Distribution Date relating to that Loan Group and (ii) all Scheduled Payments
due after the related Due Date relating to that Loan Group.

        Applicable Credit Support Percentage:  As defined in Section 4.02(e).

        Appraised Value: With respect to a Mortgage Loan other than a
Refinancing Mortgage Loan, the lesser of (a) the value of the Mortgaged
Property based upon the appraisal made at the time of the origination of such
Mortgage Loan and (b) the sales price of the Mortgaged Property at the time
of the origination of such Mortgage Loan. With respect to a Refinancing Mortgage
Loan other than a Streamlined Documentation Mortgage Loan, the value of the
Mortgaged Property based upon the appraisal made at the time of the
origination of such Refinancing Mortgage Loan. With respect to a Streamlined
Documentation Mortgage Loan, (a) if the loan-to-value ratio with respect to

the Original Mortgage Loan at the time of the origination thereof was 80% or less and the loan amount of the new mortgage loan is $650,000 or less, the value of the Mortgaged Property based upon the appraisal made at the time of the origination of the Original Mortgage Loan and (b) if the loan-to-value ratio with respect to the Original Mortgage Loan at the time of the origination thereof was greater than 80% or the loan amount of the new mortgage loan is greater than $650,000, the value of the Mortgaged Property based upon the appraisal (which may be a drive-by appraisal) made at the time of the origination of such Streamlined Documentation Mortgage Loan.

<div align="center">15</div>

<PAGE>

      Assumed Interest Amount: With respect to any Distribution Date, any Class of Subordinated Certificates and any Loan Group, one month's interest accrued during the related Interest Accrual Period at the Pass-Through Rate on the related Subordinated Portion immediately prior to that Distribution Date.

      Available Funds: As to any Distribution Date and each Loan Group, the sum of (a) the aggregate amount held in the Certificate Account at the close of business on the related Determination Date in respect of the related Mortgage Loans pursuant to Section 3.05(b) net of the related Amount Held for Future Distribution and net of amounts permitted to be withdrawn from the Certificate Account pursuant to clauses (i) - (viii), inclusive, of Section 3.08(a) in respect of the Mortgage Loans in that Loan Group and amounts permitted to be withdrawn from the Distribution Account pursuant to clauses (i) - (v), inclusive, of Section 3.08(b) in respect of the Mortgage Loans in that Loan Group, (b) the amount of the related Advance, (c) in connection with Defective Mortgage Loans in such Loan Group, as applicable, the aggregate of the Purchase Prices and Substitution Adjustment Amounts deposited on the related Distribution Account Deposit Date and (d) the Transfer Payment Received for such Loan Group less the Transfer Payment Made for such Loan Group; provided, however, that on the third Senior Termination Date, Available Funds with respect to the Loan Group relating to the remaining Senior Certificate Group shall include the Available Funds from the other Loan Groups after all distributions are made on the Senior Certificates of the other Senior Certificate Groups and on any Distribution Date thereafter, Available Funds shall be calculated based on all the Mortgage Loans in the Mortgage Pool, as opposed to the Mortgage Loans in the related Loan Group.

      Bankruptcy Code: Title 11 of the United States Code, as amended.

      Benefit Plan Opinion: As defined in Section 5.02(b).

      Book-Entry Certificates: As specified in the Preliminary Statement.

      Business Day: Any day other than (i) a Saturday or a Sunday or (ii) a day on which banking institutions in the City of New York, New York, or the States of California or Texas or the city in which the Corporate Trust Office of the Trustee is located are authorized or obligated by law or executive order to be closed.

      Calculation Rate: For each Distribution Date, in the case of the Class A and Class B Lower Tier REMIC Interests, the product of (i) 10 and (ii) the weighted average rate of the outstanding Class A and Class B Interests, treating each Class A Interest as having an interest rate of 0.00%.

Certificate: Any one of the Certificates executed by the Trustee in substantially the forms attached this Agreement as exhibits.

Certificate Account: The separate Eligible Account or Accounts created and maintained by the Master Servicer pursuant to Section 3.05 with a depository institution in the name of the Master Servicer for the benefit of the Trustee on behalf of Certificateholders and designated "Countrywide Home Loans Servicing LP in trust for the registered holders of CHL Mortgage Pass-Through Trust 2006-HYB3, Mortgage Pass-Through Certificates Series 2006-HYB3."

16

<PAGE>

Certificate Balance: With respect to any Certificate, other than a Notional Amount Certificate, at any date, the maximum dollar amount of principal to which the Holder thereof is then entitled under this Agreement, such amount being equal to the Denomination of that Certificate (A) plus any increase in the Certificate Balance of such Certificate pursuant to Section 4.02 due to the receipt of Subsequent Recoveries (B) minus the sum of (i) all distributions of principal previously made with respect to that Certificate and (ii) all Realized Losses allocated to that Certificate and, in the case of any Subordinated Certificates, all other reductions in Certificate Balance previously allocated to that Certificate pursuant to Section 4.04 without duplication. The Notional Amount Certificates have no Certificate Balances.

Certificate Owner: With respect to a Book-Entry Certificate, the Person who is the beneficial owner of such Book-Entry Certificate. For the purposes of this Agreement, in order for a Certificate Owner to enforce any of its rights under this Agreement, it shall first have to provide evidence of its beneficial ownership interest in a Certificate that is reasonably satisfactory to the Trustee, the Depositor, and/or the Master Servicer, as applicable.

Certificate Register:  The register maintained pursuant to Section 5.02.

Certificateholder or Holder: The person in whose name a Certificate is registered in the Certificate Register, except that, solely for the purpose of giving any consent pursuant to this Agreement, any Certificate registered in the name of the Depositor or any affiliate of the Depositor shall be deemed not to be Outstanding and the Percentage Interest evidenced thereby shall not be taken into account in determining whether the requisite amount of Percentage Interests necessary to effect such consent has been obtained; provided, however, that if any such Person (including the Depositor) owns 100% of the Percentage Interests evidenced by a Class of Certificates, such Certificates shall be deemed to be Outstanding for purposes of any provision of this Agreement (other than the second sentence of Section 10.01) that requires the consent of the Holders of Certificates of a particular Class as a condition to the taking of any action under this Agreement. The Trustee is entitled to rely conclusively on a certification of the Depositor or any affiliate of the Depositor in determining which Certificates are registered in the name of an affiliate of the Depositor.

Certification Party:  As defined in Section 11.05.

Certifying Person:  As defined in Section 11.05.

Class: All Certificates bearing the same class designation as set
forth in the Preliminary Statement.

Class Certificate Balance: With respect to any Class and as to any
date of determination, the aggregate of the Certificate Balances of all
Certificates of such Class as of such date.

Class Interest Shortfall: As to any Distribution Date and Class or
Component, the amount by which the amount described in clause (i) of the
definition of Class Optimal Interest Distribution Amount for such Class or
Component exceeds the amount of interest actually distributed on such Class or
Component on such Distribution Date pursuant to such clause (i).


                                  17
<PAGE>

Class Optimal Interest Distribution Amount: With respect to any
Distribution Date and interest-bearing Class or any interest-bearing
Component, the sum of (i) one month's interest accrued during the related
Interest Accrual Period at the Pass-Through Rate for such Class on the related
Class Certificate Balance or Notional Amount as of the last day of the related
Interest Accrual Period, subject to reduction as provided in Section 4.02(d)
and (ii) any Class Unpaid Interest Amounts for such Class or Component.

Class Subordination Percentage: With respect to any Distribution Date
and each Class of Subordinated Certificates, the quotient (expressed as a
percentage) of (a) the Class Certificate Balance of such Class of Certificates
immediately prior to such Distribution Date divided by (b) the aggregate of
the Class Certificate Balances of all Classes of Certificates immediately
prior to such Distribution Date.

Class Unpaid Interest Amounts: As to any Distribution Date and Class
or Component of interest-bearing Certificates, the amount by which the
aggregate Class Interest Shortfalls for such Class or Component on prior
Distribution Dates exceeds the amount distributed on such Class or Component
on prior Distribution Dates pursuant to clause (ii) of the definition of Class
Optimal Interest Distribution Amount.

Closing Date:  April 28, 2006.

Code: The Internal Revenue Code of 1986, including any successor or
amendatory provisions.

COFI: The Monthly Weighted Average Cost of Funds Index for the
Eleventh District Savings Institutions published by the Federal Home Loan Bank
of San Francisco.

COFI Certificates:  As specified in the Preliminary Statement.

Commission:  The U.S. Securities and Exchange Commission.

Compensating Interest: As to any Distribution Date and Loan Group, an
amount equal to one-half of the Master Servicing Fee for the related Loan
Group for such Distribution Date.

Component:  As specified in the Preliminary Statement.

Component Notional Amount: With respect to the Class 1-A-1A IO, Class 1-A-1B IO and Class 1-A-2 IO Components and any date (i) prior to and including the last day of the Interest Accrual Period for the related Weighted Average Roll Date, the Class Certificate Balances of the Class 1-A-1A, Class 1-A-1B and Class 1-A-2 Certificates, respectively, as of such date and (ii) after the last day of the Interest Accrual Period for the related Weighted Average Roll Date, $0. With respect to the Class 2-A-1A IO, Class 2-A-B-2 IO, Class 2-A-B-3 IO and Class 2-A-2 IO Components and any date (i) prior to and including the last day of the Interest Accrual Period for the related Weighted Average Roll Date, the Class Certificate Balances of the Class 2-A-1A, Class 2-A-B-2, Class 2-A-B-3 and Class 2-A-2 Certificates, respectively, as of such date and (ii) after the last day of the Interest Accrual Period for the related Weighted Average Roll Date, $0. With respect to the Class 3-A-1B IO and Class 3-A-2 IO Components and any date (i) prior to and including the last day of the Interest Accrual Period

                                    18
<PAGE>

for the related Weighted Average Roll Date, the Class Certificate Balances of the Class 3-A-1B and Class 3-A-2 Certificates, respectively, as of such date and (ii) after the last day of the Interest Accrual Period for the related Weighted Average Roll Date, $0. With respect to the Class 4-A-1A IO, Class 4-A-1B IO and Class 4-A-1C IO Components and any date (i) prior to and including the last day of the Interest Accrual Period for the related Weighted Average Roll Date, the Class Certificate Balances of the Class 4-A-1A, Class 4-A-1B and Class 4-A-1C Certificates, respectively, as of such date and (ii) after the last day of the Interest Accrual Period for the related Weighted Average Roll Date, $0.

Component Rate: For the Class 1-A-1A IO, Class 1-A-1B IO, Class 1-A-2 IO, Class 2-A-1A IO, Class 2-A-B-2 IO, Class 2-A-B-3 IO, Class 2-A-2 IO, Class 3-A-1B IO, Class 3-A-2 IO, Class 4-A-1A IO, Class 4-A-1B IO and Class 4-A-1C IO Components, for each Interest Accrual Period for any Distribution Date (x) on or prior to the related Weighted Average Roll Date, the per annum rate equal to the applicable Component Rate set forth in the table below and (y) after the related Weighted Average Roll Date, 0% per annum.

| Designation | Component Rate |
| --- | --- |
| Class 1-A-1A IO Component....... | 0.515432% |
| Class 1-A-1B IO Component....... | 0.433691% |
| Class 1-A-2 IO Component........ | 0.439821% |
| Class 2-A-1A IO Component....... | 0.122700% |
| Class 2-A-B-2 IO Component...... | 0.123655% |
| Class 2-A-B-3 IO Component...... | 0.264253% |
| Class 2-A-2 IO Component........ | 0.009258% |
| Class 3-A-1B IO Component....... | 0.291679% |
| Class 3-A-2 IO Component........ | 0.118791% |
| Class 4-A-1A IO Component....... | 0.117249% |
| Class 4-A-1B IO Component....... | 0.117249% |
| Class 4-A-1C IO Component....... | 0.117249% |

Coop Shares: Shares issued by a Cooperative Corporation.

Cooperative Corporation: The entity that holds title (fee or an acceptable leasehold estate) to the real property and improvements constituting the Cooperative Property and which governs the Cooperative Property, which Cooperative Corporation must qualify as a Cooperative Housing Corporation under section 216 of the Code.

Cooperative Loan: Any Mortgage Loan secured by Coop Shares and a Proprietary Lease.

Cooperative Property: The real property and improvements owned by the Cooperative Corporation, including the allocation of individual dwelling units to the holders of the Coop Shares of the Cooperative Corporation.

Cooperative Unit: A single family dwelling located in a Cooperative Property.


                              19

<PAGE>

Corporate Trust Office: The designated office of the Trustee in the State of New York at which at any particular time its corporate trust business with respect to this Agreement shall be administered, which office at the date of the execution of this Agreement is located at 101 Barclay Street, 8W, New York, New York 10286 (Attn: Mortgage-Backed Securities Group, CHL Mortgage Pass-Through Trust 2006-HYB3), facsimile no. (212) 815-3986, and which is the address to which notices to and correspondence with the Trustee should be directed.

Countrywide: Countrywide Home Loans, Inc., a New York corporation and its successors and assigns, in its capacity as the seller of the Countrywide Mortgage Loans to the Depositor.

Countrywide Mortgage Loans: The Mortgage Loans identified as such on the Mortgage Loan Schedule for which Countrywide is the applicable Seller.

Countrywide Servicing: Countrywide Home Loans Servicing LP, a Texas limited partnership and its successors and assigns.

Covered Certificates: Not applicable.

Cross-Over Situation: For any Distribution Date and for each Loan Group (after taking into account principal distributions on such Distribution Date) with respect to the Class A and Class B Lower Tier REMIC Interests, a situation in which the Class A and Class B Interests corresponding to any Loan Group are in the aggregate less than 1% of the Subordinate Component Balance of the Loan Group to which they correspond.

Cut-off Date: For each Mortgage Loan, the later of April 1, 2006 and the date of origination for that Mortgage Loan.

Cut-off Date Pool Principal Balance:  $981,621,231.

Cut-off Date Principal Balance: As to any Mortgage Loan, the Stated

Principal Balance thereof as of the close of business on the Cut-off Date.

Debt Service Reduction: With respect to any Mortgage Loan, a reduction by a court of competent jurisdiction in a proceeding under the Bankruptcy Code in the Scheduled Payment for such Mortgage Loan that became final and non-appealable, except such a reduction resulting from a Deficient Valuation or any reduction that results in a permanent forgiveness of principal.

Defective Mortgage Loan: Any Mortgage Loan that is required to be repurchased pursuant to Section 2.02 or 2.03.

Deficient Valuation: With respect to any Mortgage Loan, a valuation by a court of competent jurisdiction of the Mortgaged Property in an amount less than the then-outstanding indebtedness under the Mortgage Loan, or any reduction in the amount of principal to be paid in connection with any Scheduled Payment that results in a permanent forgiveness of principal, which valuation or reduction results from an order of such court which is final and non-appealable in a proceeding under the Bankruptcy Code.

                              20

<PAGE>

Definitive Certificates: Any Certificate evidenced by a Physical Certificate and any Certificate issued in lieu of a Book-Entry Certificate pursuant to Section 5.02(e).

Delay Certificates: As specified in the Preliminary Statement.

Delay Delivery Certification:  As defined in Section 2.02(a).

Delay Delivery Mortgage Loans: The Mortgage Loans for which all or a portion of a related Mortgage File is not delivered to Trustee on the Closing Date. With respect to up to 50% of the Mortgage Loans in each Loan Group, the Depositor may deliver all or a portion of each related Mortgage File to the Trustee not later than thirty days after the Closing Date. To the extent that Countrywide Servicing shall be in possession of any Mortgage Files with respect to any Delay Delivery Mortgage Loan, until delivery of such Mortgage File to the Trustee as provided in Section 2.01, Countrywide Servicing shall hold such files as Master Servicer hereunder, as agent and in trust for the Trustee.

Deleted Mortgage Loan:  As defined in Section 2.03(c).

Denomination: With respect to each Certificate, the amount set forth on the face of that Certificate as the "Initial Certificate Balance of this Certificate" or the "Initial Notional Amount of this Certificate" or, if neither of the foregoing, the Percentage Interest appearing on the face thereof.

Depositor: CWMBS, Inc., a Delaware corporation, or its successor in interest.

Depository: The initial Depository shall be The Depository Trust Company, the nominee of which is CEDE & Co., as the registered Holder of the Book-Entry Certificates. The Depository shall at all times be a "clearing corporation" as defined in Section 8-102(a)(5) of the Uniform Commercial Code

of the State of New York.

Depository Participant: A broker, dealer, bank or other financial
institution or other Person for whom from time to time a Depository effects
book-entry transfers and pledges of securities deposited with the Depository.

Determination Date: As to any Distribution Date, the 15th day of each
month or, if such 15th day is not a Business Day, the preceding Business Day;
provided, however, that if such 15th day or such Business Day, whichever is
applicable, is less than two Business Days prior to the related Distribution
Date, the Determination Date shall be the first Business Day that is two
Business Days preceding such Distribution Date.

Distribution Account: The separate Eligible Account created and
maintained by the Trustee pursuant to Section 3.05(d) in the name of the
Trustee for the benefit of the Certificateholders and designated "The Bank of
New York in trust for registered holders of CHL Mortgage Pass-Through Trust
2006-HYB3, Mortgage Pass-Through Certificates, Series 2006-HYB3." Funds in the
Distribution Account shall be held in trust for the Certificateholders for the
uses and purposes set forth in this Agreement.

                                      21

<PAGE>

Distribution Account Deposit Date: As to any Distribution Date, 12:30
p.m. Pacific time on the Business Day immediately preceding such Distribution
Date.

Distribution Date: The Business Day immediately following the Master
Servicer Remittance Date, commencing in May 2006.

Due Date: With respect to any Distribution Date, the first day of the
month in which that Distribution Date occurs.

Due Period: With respect to any Distribution Date, the period
beginning on the second day of the calendar month preceding the month in which
such Distribution Date occurs and ending on the first day of the calendar
month in which such Distribution Date occurs.

EDGAR: The Commission's Electronic Data Gathering, Analysis and
Retrieval system.

Eligible Account: Any of (i) an account or accounts maintained with a
federal or state chartered depository institution or trust company the
short-term unsecured debt obligations of which (or, in the case of a
depository institution or trust company that is the principal subsidiary of a
holding company, the debt obligations of such holding company) have the
highest short-term ratings of Moody's or Fitch and one of the two highest
short-term ratings of S&P, if S&P is a Rating Agency at the time any amounts
are held on deposit therein, or (ii) an account or accounts in a depository
institution or trust company in which such accounts are insured by the FDIC
(to the limits established by the FDIC) and the uninsured deposits in which
accounts are otherwise secured such that, as evidenced by an Opinion of
Counsel delivered to the Trustee and to each Rating Agency, the
Certificateholders have a claim with respect to the funds in such account or a
perfected first priority security interest against any collateral (which shall

be limited to Permitted Investments) securing such funds that is superior to claims of any other depositors or creditors of the depository institution or trust company in which such account is maintained, or (iii) a trust account or accounts maintained with (a) the trust department of a federal or state chartered depository institution or (b) a trust company, acting in its fiduciary capacity or (iv) any other account acceptable to each Rating Agency. Eligible Accounts may bear interest, and may include, if otherwise qualified under this definition, accounts maintained with the Trustee.

      Eligible Repurchase Month: As defined in Section 3.11.

      ERISA: The Employee Retirement Income Security Act of 1974, as amended.

      ERISA-Qualifying Underwriting: A best efforts or firm commitment underwriting or private placement that meets the requirements of an Underwriter's Exemption.

      ERISA-Restricted Certificate: As specified in the Preliminary Statement.

      Escrow Account: The Eligible Account or Accounts established and maintained pursuant to Section 3.06(a).

      Event of Default:  As defined in Section 7.01.

<div align="center">22</div>

<PAGE>

      Excess Proceeds: With respect to any Liquidated Mortgage Loan, the amount, if any, by which the sum of any Liquidation Proceeds of such Mortgage Loan received in the calendar month in which such Mortgage Loan became a Liquidated Mortgage Loan plus any Subsequent Recoveries received with respect to such Mortgage Loan, net of any amounts previously reimbursed to the Master Servicer as Nonrecoverable Advance(s) with respect to such Mortgage Loan pursuant to Section 3.08(a)(iii), exceeds (i) the unpaid principal balance of such Liquidated Mortgage Loan as of the Due Date in the month in which such Mortgage Loan became a Liquidated Mortgage Loan plus (ii) accrued interest at the Mortgage Rate from the Due Date as to which interest was last paid or advanced (and not reimbursed) to Certificateholders up to the Due Date applicable to the Distribution Date immediately following the calendar month during which such liquidation occurred.

      Exchange Act: The Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

      Exchange Act Reports: Any reports on Form 10-D, Form 8-K and Form 10-K required to be filed by the Depositor with respect to the Trust Fund under the Exchange Act.

      Expense Fee Rate: As to each Mortgage Loan and any date of determination, the sum of (a) the related Master Servicing Fee Rate and (b) the Trustee Fee Rate.

      FDIC: The Federal Deposit Insurance Corporation, or any successor

thereto.

FHLMC: The Federal Home Loan Mortgage Corporation, a corporate instrumentality of the United States created and existing under Title III of the Emergency Home Finance Act of 1970, as amended, or any successor to the Federal Home Loan Mortgage Corporation.

Final Certification:  As defined in Section 2.02(a).

FIRREA: The Financial Institutions Reform, Recovery, and Enforcement Act of 1989.

Fitch: Fitch, Inc., or any successor thereto. If Fitch is designated as a Rating Agency in the Preliminary Statement, for purposes of Section 10.05(b) the address for notices to Fitch shall be Fitch, Inc., One State Street Plaza, New York, New York 10004, Attention: Residential Mortgage Surveillance Group, or such other address as Fitch may hereafter furnish to the Depositor and the Master Servicer.

FNMA: The Federal National Mortgage Association, a federally chartered and privately owned corporation organized and existing under the Federal National Mortgage Association Charter Act, or any successor to the Federal National Mortgage Association.

Form 10-D Disclosure Item: With respect to any Person, any material litigation or governmental proceedings pending (a) against such Person, or (b) against any of the Trust Fund, the Depositor, the Trustee, any co-trustee, the Master Servicer or any Subservicer, if such Person has actual knowledge thereof.

Form 10-K Disclosure Item: With respect to any Person, (a) Form 10-D Disclosure Item, and (b) any affiliations or relationships between such Person and any Item 1119 Party.

23

<PAGE>

Gross Margin: With respect to each Mortgage Loan, the fixed percentage set forth in the related Mortgage Note that is added to the Mortgage Index on each Adjustment Date in accordance with the terms of the related Mortgage Note used to determine the Mortgage Rate for such Mortgage Loan.

Group 1 Senior Certificates: As specified in the Preliminary Statement.

Group 1 Weighted Average Component Rate: For each Interest Accrual Period for any Distribution Date, a per annum rate equal to the average of the Component Rates of the Class 1-A-1A IO, Class 1-A-1B IO and Class 1-A-2 IO Components, weighted on the basis of their respective Component Notional Amounts as of the last day of such Interest Accrual Period.

Group 2 Senior Certificates: As specified in the Preliminary Statement.

Group 2 Weighted Average Component Rate: For each Interest Accrual Period for any Distribution Date, a per annum rate equal to the average of the

Component Rates of the Class 2-A-1A IO, Class 2-A-B-2 IO, Class 2-A-B-3 IO and Class 2-A-2 IO Components, weighted on the basis of their respective Component Notional Amounts as of the last day of such Interest Accrual Period.

Group 3 Senior Certificates: As specified in the Preliminary Statement.

Group 3 Weighted Average Component Rate: For each Interest Accrual Period for any Distribution Date, a per annum rate equal to the average of the Component Rates of the Class 3-A-1B IO and Class 3-A-2 IO Components, weighted on the basis of their respective Component Notional Amounts as of the last day of such Interest Accrual Period.

Group 4 Senior Certificates: As specified in the Preliminary Statement.

Group 4 Weighted Average Component Rate: For each Interest Accrual Period for any Distribution Date, a per annum rate equal to the average of the Component Rates of the Class 4-A-1A IO, Class 4-A-1B IO and Class 4-A-1C IO Components, weighted on the basis of their respective Component Notional Amounts as of the last day of such Interest Accrual Period.

Indirect Participant: A broker, dealer, bank or other financial institution or other Person that clears through or maintains a custodial relationship with a Depository Participant.

Initial Certification: As defined in Section 2.02(a).

Insurance Policy: With respect to any Mortgage Loan included in the Trust Fund, any insurance policy, including all riders and endorsements thereto in effect, including any replacement policy or policies for any Insurance Policies.

Insurance Proceeds: Proceeds paid by an insurer pursuant to any Insurance Policy, in each case other than any amount included in such Insurance Proceeds in respect of Insured Expenses.

24

<PAGE>

Insured Expenses: Expenses covered by an Insurance Policy or any other insurance policy with respect to the Mortgage Loans.

Interest Accrual Period: With respect to any Distribution Date, the calendar month prior to the month of such Distribution Date.

Item 1119 Party: The Depositor, any Seller, the Master Servicer, the Trustee, any Subservicer, any originator identified in the Prospectus Supplement and any other material transaction party, as identified in Exhibit T hereto, as updated pursuant to Section 11.04.

Latest Possible Maturity Date: The Distribution Date following the third anniversary of the scheduled maturity date of the Mortgage Loan having the latest scheduled maturity date as of the Cut-off Date.

Lender PMI Mortgage Loan: Certain Mortgage Loans as to which the lender (rather than the Mortgagor) acquires the Primary Insurance Policy and

charges the related Mortgagor an interest premium.

        LIBOR Certificates:  As specified in the Preliminary Statement.

        Limited Exchange Act Reporting Obligations: The obligations of the
Master Servicer under Section 3.16(b), Section 6.02 and Section 6.04 with
respect to notice and information to be provided to the Depositor and Article
XI (except Section 11.07(a)(1) and (2)).

        Liquidated Mortgage Loan: With respect to any Distribution Date, a
defaulted Mortgage Loan (including any REO Property) that was liquidated in
the calendar month preceding the month of such Distribution Date and as to
which the Master Servicer has determined (in accordance with this Agreement)
that it has received all amounts it expects to receive in connection with the
liquidation of such Mortgage Loan, including the final disposition of an REO
Property.

        Liquidation Proceeds: Amounts, including Insurance Proceeds, received
in connection with the partial or complete liquidation of defaulted Mortgage
Loans, whether through trustee's sale, foreclosure sale or otherwise or
amounts received in connection with any condemnation or partial release of a
Mortgaged Property and any other proceeds received in connection with an REO
Property, less the sum of related unreimbursed Master Servicing Fees,
Servicing Advances and Advances.

        Loan Group: Any of Loan Group 1, Loan Group 2, Loan Group 3 or Loan
Group 4, as applicable.

        Loan Group 1: All Mortgage Loans identified as Loan Group 1 Mortgage
Loans on the Mortgage Loan Schedule.

        Loan Group 2: All Mortgage Loans identified as Loan Group 2 Mortgage
Loans on the Mortgage Loan Schedule.

                                    25

<PAGE>

        Loan Group 3: All Mortgage Loans identified as Loan Group 3 Mortgage
Loans on the Mortgage Loan Schedule.

        Loan Group 4: All Mortgage Loans identified as Loan Group 4 Mortgage
Loans on the Mortgage Loan Schedule.

        Loan-to-Value Ratio: With respect to any Mortgage Loan and as to any
date of determination, the fraction (expressed as a percentage) the numerator
of which is the principal balance of the related Mortgage Loan at that date of
determination and the denominator of which is the Appraised Value of the
related Mortgaged Property.

        Lost Mortgage Note: Any Mortgage Note the original of which was
permanently lost or destroyed and has not been replaced.

        Maintenance: With respect to any Cooperative Unit, the rent paid by
the Mortgagor to the Cooperative Corporation pursuant to the Proprietary
Lease.

Majority in Interest: As to any Class of Regular Certificates, the Holders of Certificates of such Class evidencing, in the aggregate, at least 51% of the Percentage Interests evidenced by all Certificates of such Class.

Master Servicer: Countrywide Servicing, and its successors and assigns, in its capacity as master servicer hereunder and, if a successor master servicer is appointed under this Agreement, such successor.

Master Servicer Advance Date: As to any Distribution Date, 12:30 p.m. Pacific time on the Business Day immediately preceding such Distribution Date.

Master Servicer Remittance Date: The 19th day of each calendar month, or if such 19th day is not a Business Day, the next succeeding Business Day, commencing in May 2006.

Master Servicing Fee: As to each Mortgage Loan and any Distribution Date, an amount payable out of each full payment of interest received on such Mortgage Loan and equal to one-twelfth of the Master Servicing Fee Rate multiplied by the Stated Principal Balance of such Mortgage Loan as of the Due Date in the month of such Distribution Date (prior to giving effect to any Scheduled Payments due on such Mortgage Loan on such Due Date), subject to reduction as provided in Section 3.14.

Master Servicing Fee Rate: With respect to each Mortgage Loan and Due Date, the amount set forth in the Mortgage Loan Schedule for such Due Date.

Maximum Mortgage Rate: With respect to each Mortgage Loan, the percentage set forth in the related Mortgage Note as the maximum Mortgage Rate thereunder.

MERS: Mortgage Electronic Registration Systems, Inc., a corporation organized and existing under the laws of the State of Delaware, or any successor to Mortgage Electronic Registration Systems, Inc.

26

<PAGE>

MERS Mortgage Loan: Any Mortgage Loan registered with MERS on the MERS(R) System.

MERS(R) System: The system of recording transfers of mortgages electronically maintained by MERS.

MIN:  The mortgage identification number for any MERS Mortgage Loan.

Minimum Mortgage Rate: With respect to each Mortgage Loan, the greater of (a) the Gross Margin set forth in the related Mortgage Note and (b) the percentage set forth in the related Mortgage Note as the minimum Mortgage Rate thereunder.

MOM Loan: Any Mortgage Loan as to which MERS is acting as mortgagee, solely as nominee for the originator of such Mortgage Loan and its successors and assigns.

Monthly Statement: The statement delivered to the Certificateholders pursuant to Section 4.06.

Moody's: Moody's Investors Service, Inc., or any successor thereto. If Moody's is designated as a Rating Agency in the Preliminary Statement, for purposes of Section 10.05(b) the address for notices to Moody's shall be Moody's Investors Service, Inc., 99 Church Street, New York, New York 10007, Attention: Residential Pass-Through Monitoring, or such other address as Moody's may hereafter furnish to the Depositor or the Master Servicer.

Mortgage: The mortgage, deed of trust or other instrument creating a first lien on an estate in fee simple or leasehold interest in real property securing a Mortgage Note.

Mortgage File: The mortgage documents listed in Section 2.01 pertaining to a particular Mortgage Loan and any additional documents delivered to the Trustee to be added to the Mortgage File pursuant to this Agreement.

Mortgage Index: As to each Mortgage Loan, the index from time to time in effect for adjustment of the Mortgage Rate as set forth as such on the related Mortgage Note.

Mortgage Loan Schedule: The list of Mortgage Loans (as from time to time amended by the Master Servicer to reflect the addition of Substitute Mortgage Loans, and the deletion of Deleted Mortgage Loans pursuant to the provisions of this Agreement) transferred to the Trustee as part of the Trust Fund and from time to time subject to this Agreement, attached to this Agreement as Schedule I, setting forth the following information with respect to each Mortgage Loan by Loan Group:

(i) the loan number;

(ii) the Mortgagor's name and the street address of the Mortgaged Property, including the zip code;

(iii) the maturity date;

27

<PAGE>

(iv) the original principal balance;

(v) the Cut-off Date Principal Balance;

(vi) the first payment date of the Mortgage Loan;

(vii) the Scheduled Payment in effect as of the Cut-off Date;

(viii) the Loan-to-Value Ratio at origination;

(ix) a code indicating whether the residential dwelling at the time of origination was represented to be owner-occupied;

(x) a code indicating whether the residential dwelling is either (a) a detached or attached single family dwelling, (b) a dwelling in a de minimis PUD, (c) a condominium unit or PUD (other than a de minimis PUD), (d) a two- to four-unit

residential property or (e) a Cooperative Unit;

(xi) the Mortgage Rate in effect as of the Cut-off Date;

(xii) the Master Servicing Fee Rate both before and after the initial Adjustment Date for each Mortgage Loan;

(xiii) a code indicating whether the Mortgage Loan is a Lender PMI Mortgage Loan and, in the case of any Lender PMI Mortgage Loan, a percentage representing the amount of the related interest premium charged to the borrower;

(xiv) the purpose for the Mortgage Loan;

(xv) the type of documentation program pursuant to which the Mortgage Loan was originated;

(xvi) the direct servicer of such Mortgage Loan as of the Cut-off Date;

(xvii) a code indicating whether the Mortgage Loan is a MERS Mortgage Loan; (xviii) a code indicating whether the Mortgage Loan is a Countrywide Mortgage Loan, a Park Granada Mortgage Loan, a Park Monaco Mortgage Loan or a Park Sienna Mortgage Loan; and

(xix) with respect to each Mortgage Loan, the Gross Margin, the Mortgage Index, the Maximum Mortgage Rate, the Minimum Mortgage Rate, the Periodic Rate Cap and the first Adjustment Date for such Mortgage Loan.

Such schedule shall also set forth the total of the amounts described under (iv) and (v) above for all of the Mortgage Loans and for each Loan Group.

Mortgage Loans: Such of the mortgage loans transferred and assigned to the Trustee pursuant to the provisions of this Agreement as from time to time are held as a part of the Trust

28

<PAGE>

Fund (including any REO Property), the mortgage loans so held being identified in the Mortgage Loan Schedule, notwithstanding foreclosure or other acquisition of title of the related Mortgaged Property.

Mortgage Note: The original executed note or other evidence of indebtedness evidencing the indebtedness of a Mortgagor under a Mortgage Loan.

Mortgage Rate: The annual rate of interest borne by a Mortgage Note from time to time, net of any interest premium charged by the mortgagee to obtain or maintain any Primary Insurance Policy.

Mortgaged Property: The underlying property securing a Mortgage Loan,

which, with respect to a Cooperative Loan, is the related Coop Shares and
Proprietary Lease.

    Mortgagor:  The obligor(s) on a Mortgage Note.

    National Cost of Funds Index: The National Monthly Median Cost of
Funds Ratio to SAIF-Insured Institutions published by the Office of Thrift
Supervision.

    Net Prepayment Interest Shortfalls: As to any Distribution Date and
Loan Group, the amount by which the aggregate of the Prepayment Interest
Shortfalls for such Loan Group during the related Prepayment Period exceeds an
amount equal to the sum of (a) the Compensating Interest for such Loan Group
and Distribution Date and (b) the excess, if any, of the Compensating Interest
for each other Loan Group for that Distribution Date over the Prepayment
Interest Shortfalls experienced by the Mortgage Loans in each such other Loan
Group during such Prepayment Period.

    Non-Delay Certificates:  As specified in the Preliminary Statement.

    Nonrecoverable Advance: Any portion of an Advance previously made or
proposed to be made by the Master Servicer that, in the good faith judgment of
the Master Servicer, will not be ultimately recoverable by the Master Servicer
from the related Mortgagor, related Liquidation Proceeds or otherwise.

    Notice of Final Distribution: The notice to be provided pursuant to
Section 9.02 to the effect that final distribution on any of the Certificates
shall be made only upon presentation and surrender thereof.

    Notional Amount: For the Class 1-A-IO, Class 2-A-IO, Class 3-A-IO and
Class 4-A-IO Certificates an amount equal to (i) for any date prior to and
including the last day of the Interest Accrual Period for the related Weighted
Average Roll Date, the aggregate Component Notional Amount of the Components
related to such Class of Certificates on such date and (ii) after the last day
of the Interest Accrual Period for the related Weighted Average Roll Date, $0.

    Notional Amount Certificates: As specified in the Preliminary
Statement.

    Offered Certificates: As specified in the Preliminary Statement.

                                  29
<PAGE>

    Officer's Certificate: A certificate (i) in the case of the Depositor,
signed by the Chairman of the Board, the Vice Chairman of the Board, the
President, a Managing Director, a Vice President (however denominated), an
Assistant Vice President, the Treasurer, the Secretary, or one of the
Assistant Treasurers or Assistant Secretaries of the Depositor, (ii) in the
case of the Master Servicer, signed by the President, an Executive Vice
President, a Vice President, an Assistant Vice President, the Treasurer, or
one of the Assistant Treasurers or Assistant Secretaries of Countrywide GP,
Inc. (its general partner), (iii) if provided for in this Agreement, signed by
a Servicing Officer, as the case may be, and delivered to the Depositor and
the Trustee, as the case may be, as required by this Agreement or (iv) in the
case of any other Person, signed by an authorized officer of such Person.

3/3/2011   Case 3:11-cv-00457-AJB-WVG   Document 87   Filed 11/14/11   Page 120 of 316

Opinion of Counsel: A written opinion of counsel, who may be counsel
for the Depositor, a Seller or the Master Servicer, including in-house
counsel, reasonably acceptable to the Trustee; provided, however, that with
respect to the interpretation or application of the REMIC Provisions, such
counsel must (i) in fact be independent of the Depositor, a Seller and the
Master Servicer, (ii) not have any direct financial interest in the Depositor,
a Seller or the Master Servicer or in any affiliate thereof, and (iii) not be
connected with the Depositor, a Seller or the Master Servicer as an officer,
employee, promoter, underwriter, trustee, partner, director or person
performing similar functions.

Optional Termination: The termination of the trust created under this
Agreement in connection with the purchase of the Mortgage Loans pursuant to
Section 9.01.

Original Applicable Credit Support Percentage: With respect to each of
the following Classes of Subordinated Certificates, the corresponding
percentage described below, as of the Closing Date:

| | |
|---|---|
| Class M | 5.90% |
| Class B-1 | 3.70% |
| Class B-2 | 2.30% |
| Class B-3 | 1.50% |
| Class B-4 | 0.85% |
| Class B-5 | 0.35% |

Original Mortgage Loan: The mortgage loan refinanced in connection
with the origination of a Refinancing Mortgage Loan.

Original Subordinate Principal Balance: On or prior to the third
Senior Termination Date, the Subordinated Percentage for a Loan Group of the
aggregate Stated Principal Balances of the Mortgage Loans in such Loan Group,
in each case as of the Cut-off Date or, if such date is after the third Senior
Termination Date, the aggregate of the Class Certificate Balances of the
Subordinated Certificates as of the Closing Date.

OTS:  The Office of Thrift Supervision.

Outstanding: With respect to the Certificates as of any date of
determination, all Certificates theretofore executed and authenticated under
this Agreement except:

30

<PAGE>

(i) Certificates theretofore canceled by the Trustee or
delivered to the Trustee for cancellation; and

(ii) Certificates in exchange for which or in lieu of which
other Certificates have been executed and delivered by the
Trustee pursuant to this Agreement.

Outstanding Mortgage Loan: As of any Due Date, a Mortgage Loan with a
Stated Principal Balance greater than zero, which was not the subject of a

Principal Prepayment in Full prior to such Due Date and which did not become a Liquidated Mortgage Loan prior to such Due Date.

Overcollateralized Group:  As defined in Section 4.05.

Ownership Interest: As to any Residual Certificate, any ownership interest in such Certificate including any interest in such Certificate as the Holder thereof and any other interest therein, whether direct or indirect, legal or beneficial.

Park Granada: Park Granada LLC, a Delaware limited liability company, and its successors and assigns, in its capacity as the seller of the Park Granada Mortgage Loans to the Depositor.

Park Granada Mortgage Loans: The Mortgage Loans identified as such on the Mortgage Loan Schedule for which Park Granada is the applicable Seller.

Park Monaco: Park Monaco Inc., a Delaware corporation, and its successors and assigns, in its capacity as the seller of the Park Monaco Mortgage Loans to the Depositor.

Park Monaco Mortgage Loans: The Mortgage Loans identified as such on the Mortgage Loan Schedule for which Park Monaco is the applicable Seller.

Park Sienna: Park Sienna LLC, a Delaware limited liability company, and its successors and assigns, in its capacity as the seller of the Park Sienna Mortgage Loans to the Depositor.

Park Sienna Mortgage Loans: The Mortgage Loans identified as such on the Mortgage Loan Schedule for which Park Sienna is the applicable Seller.

Pass-Through Rate: For any interest-bearing Class of Certificates or Component, the per annum rate set forth or calculated in the manner described in the Preliminary Statement.

Percentage Interest: As to any Certificate, the percentage interest evidenced thereby in distributions required to be made on the related Class, such percentage interest being set forth on the face thereof or equal to the percentage obtained by dividing the Denomination of such Certificate by the aggregate of the Denominations of all Certificates of the same Class.

Performance Certification:  As defined in Section 11.05.

Periodic Rate Cap: With respect to each Mortgage Loan and any Adjustment Date therefor, the fixed percentage set forth in the related Mortgage Note, which is the maximum

31

<PAGE>

amount by which the Mortgage Rate for such Mortgage Loan may increase or decrease (without regard to the Maximum Mortgage Rate or the Minimum Mortgage Rate) on such Adjustment Date from the Mortgage Rate in effect immediately prior to such Adjustment Date.

Permitted Investments: At any time, any one or more of the following

obligations and securities:

(i) obligations of the United States or any agency thereof, provided such obligations are backed by the full faith and credit of the United States;

(ii) general obligations of or obligations guaranteed by any state of the United States or the District of Columbia receiving the highest long-term debt rating of each Rating Agency, or such lower rating as will not result in the downgrading or withdrawal of the ratings then assigned to the Certificates by each Rating Agency;

(iii) commercial or finance company paper which is then receiving the highest commercial or finance company paper rating of each Rating Agency, or such lower rating as will not result in the downgrading or withdrawal of the ratings then assigned to the Certificates by each Rating Agency;

(iv) certificates of deposit, demand or time deposits, or bankers' acceptances issued by any depository institution or trust company incorporated under the laws of the United States or of any state thereof and subject to supervision and examination by federal and/or state banking authorities, provided that the commercial paper and/or long term unsecured debt obligations of such depository institution or trust company (or in the case of the principal depository institution in a holding company system, the commercial paper or long-term unsecured debt obligations of such holding company, but only if Moody's is not a Rating Agency) are then rated one of the two highest long-term and the highest short-term ratings of each Rating Agency for such securities, or such lower ratings as will not result in the downgrading or withdrawal of the rating then assigned to the Certificates by either Rating Agency;

(v) repurchase obligations with respect to any security described in clauses (i) and (ii) above, in either case entered into with a depository institution or trust company (acting as principal) described in clause (iv) above;

(vi) units of a taxable money-market portfolio having the highest rating assigned by each Rating Agency (except if Fitch is a Rating Agency and has not rated the portfolio, the highest rating assigned by Moody's) and restricted to obligations issued or guaranteed by the United States of America or entities whose obligations are backed by the full faith and credit of the United States of America and repurchase agreements collateralized by such obligations; and

(vii) such other relatively risk free investments bearing interest or sold at a discount acceptable to each Rating Agency as will not result in the downgrading or withdrawal of the rating then assigned to the Certificates by either Rating Agency, as evidenced by a signed writing delivered by each Rating Agency

<PAGE>

provided, that no such instrument shall be a Permitted Investment if such
instrument evidences the right to receive interest only payments with respect
to the obligations underlying such instrument.

        Permitted Transferee: Any person other than (i) the United States, any
State or political subdivision thereof, or any agency or instrumentality of
any of the foregoing, (ii) a foreign government, International Organization or
any agency or instrumentality of either of the foregoing, (iii) an
organization (except certain farmers' cooperatives described in section 521 of
the Code) which is exempt from tax imposed by Chapter 1 of the Code (including
the tax imposed by section 511 of the Code on unrelated business taxable
income) on any excess inclusions (as defined in section 860E(c)(1) of the
Code) with respect to any Residual Certificate, (iv) rural electric and
telephone cooperatives described in section 1381(a)(2)(C) of the Code, (v) an
"electing large partnership" as defined in section 775 of the Code, (vi) a
Person that is not a citizen or resident of the United States, a corporation,
partnership, or other entity created or organized in or under the laws of the
United States, any State thereof or the District of Columbia, or an estate or
trust whose income from sources without the United States is includible in
gross income for United States federal income tax purposes regardless of its
connection with the conduct of a trade or business within the United States or
a trust if a court within the United States is able to exercise primary
supervision over the administration of the trust and one or more United States
persons have the authority to control all substantial decisions of the trust
unless such Person has furnished the transferor and the Trustee with a duly
completed Internal Revenue Service Form W-8ECI or any applicable successor
form, and (vii) any other Person so designated by the Depositor based upon an
Opinion of Counsel that the Transfer of an Ownership Interest in a Residual
Certificate to such Person may cause any REMIC created under this Agreement to
fail to qualify as a REMIC at any time that the Certificates are outstanding.
The terms "United States," "State" and "International Organization" shall have
the meanings set forth in section 7701 of the Code or successor provisions. A
corporation will not be treated as an instrumentality of the United States or
of any State or political subdivision thereof for these purposes if all of its
activities are subject to tax and, with the exception of the Federal Home Loan
Mortgage Corporation, a majority of its board of directors is not selected by
such government unit.

        Person: Any individual, corporation, partnership, joint venture,
association, limited liability company, joint-stock company, trust,
unincorporated organization or government, or any agency or political
subdivision thereof.

        Physical Certificate:  As specified in the Preliminary Statement.

        Planned Balance: With respect to any Planned Principal Class or
Component and any Distribution Date appearing in Schedule V, the amount
appearing opposite such Distribution Date for such Class or Component.

        Planned Principal Classes: As specified in the Preliminary Statement.

        Planned Principal Components: As specified in the Preliminary
Statement.

33

&lt;PAGE&gt;

Pool Stated Principal Balance: As to any Distribution Date, the
aggregate of the Stated Principal Balances of the Mortgage Loans that were
Outstanding Mortgage Loans on the Due Date in the month preceding the month of
such Distribution Date and, as to any other date of determination, the
aggregate of the Stated Principal Balances of the Outstanding Mortgage Loans
as of such date.

Prepayment Interest Shortfall: As to any Distribution Date, any
Mortgage Loan and any Principal Prepayment received during the related
Prepayment Period, the amount, if any, by which one month's interest at the
related Mortgage Rate, net of the related Master Servicing Fee Rate, on such
Principal Prepayment exceeds the amount of interest paid in connection with
such Principal Prepayment.

Prepayment Period: As to any Distribution Date and Mortgage Loan, the
calendar month immediately preceding the month in which that Distribution Date
occurs.

Prepayment Shift Percentage:  Not applicable.

Primary Insurance Policy: Each policy of primary mortgage guaranty
insurance or any replacement policy therefor with respect to any Mortgage
Loan.

Prime Rate: The prime commercial lending rate of The Bank of New York,
as publicly announced to be in effect from time to time. The Prime Rate shall
be adjusted automatically, without notice, on the effective date of any change
in such prime commercial lending rate. The Prime Rate is not necessarily The
Bank of New York's lowest rate of interest.

Principal Amount: As to any Distribution Date and any Loan Group, the
sum of (a) the principal portion of each Scheduled Payment (without giving
effect to any reductions thereof caused by any Debt Service Reductions or
Deficient Valuations) due on each Mortgage Loan (other than a Liquidated
Mortgage Loan) in such Loan Group on the related Due Date, (b) the principal
portion of the Purchase Price of each Mortgage Loan in such Loan Group that
was repurchased by the applicable Seller or purchased by the Master Servicer
pursuant to this Agreement as of such Distribution Date, (c) the Substitution
Adjustment Amount in connection with any Deleted Mortgage Loan in such Loan
Group received with respect to such Distribution Date, (d) any Insurance
Proceeds or Liquidation Proceeds allocable to recoveries of principal of
Mortgage Loans in such Loan Group that are not yet Liquidated Mortgage Loans
received during the calendar month preceding the month of such Distribution
Date, (e) with respect to each Mortgage Loan in a Loan Group that became a
Liquidated Mortgage Loan during the calendar month preceding the month of such
Distribution Date, the amount of the Liquidation Proceeds allocable to
principal received during the calendar month preceding the month of such
Distribution Date with respect to such Mortgage Loan, (f) all Principal
Prepayments for such Loan Group received during the related Prepayment Period,
(g) the principal portion of any Transfer Payments Received for such Loan
Group, minus the principal portion of any Transfer Payments Made for such Loan
Group and Distribution Date in accordance with Section 4.05 and (h) any
Subsequent Recoveries on the Mortgage Loans in such Loan Group received during

the calendar month preceding the month of such Distribution Date.

                                    34
<PAGE>

          Principal Prepayment: Any payment of principal by a Mortgagor on a
Mortgage Loan that is received in advance of its scheduled Due Date and is not
accompanied by an amount representing scheduled interest due on any date or
dates in any month or months subsequent to the month of prepayment. Partial
Principal Prepayments shall be applied by the Master Servicer in accordance
with the terms of the related Mortgage Note.

          Principal Prepayment in Full: Any Principal Prepayment made by a
Mortgagor of the entire principal balance of a Mortgage Loan.

          Principal Relocation Payment: A payment from any Loan Group to a Lower
Tier REMIC Regular Interest other than a Regular Interest corresponding to
that Loan Group as provided in the Preliminary Statement. Principal Relocation
Payments from a Loan Group shall be made of the amounts in respect of
principal from the Mortgage Loans of the Loan Group and shall include a
proportionate allocation of the Realized Losses from the Mortgage Loans of the
Loan Group.

          Private Certificate:  As specified in the Preliminary Statement.

          Pro Rata Share: As to any Distribution Date, the Subordinated
Principal Distribution Amount and any Class of Subordinated Certificates, the
portion of the Subordinated Principal Distribution Amount allocable to such
Class, equal to the product of the Subordinated Principal Distribution Amount
on such Distribution Date and a fraction, the numerator of which is the
related Class Certificate Balance thereof and the denominator of which is the
aggregate of the Class Certificate Balances of the Subordinated Certificates.

          Pro Rata Subordinated Percentage: As to any Distribution Date and Loan
Group, 100% minus the related Senior Percentage for such Distribution Date.

          Proprietary Lease: With respect to any Cooperative Unit, a lease or
occupancy agreement between a Cooperative Corporation and a holder of related
Coop Shares.

          Prospectus: The prospectus dated March 28, 2006 generally relating to
mortgage-pass through certificates to be sold by the Depositor.

          Prospectus Supplement: The Prospectus Supplement dated April 26, 2006
relating to the Offered Certificates.

          PUD:  Planned unit development.

          Purchase Price: With respect to any Mortgage Loan required to be
purchased by a Seller pursuant to Section 2.02 or 2.03 of this Agreement or
purchased at the option of the Master Servicer pursuant to Section 3.11, an
amount equal to the sum of (i) 100% of the unpaid principal balance of the
Mortgage Loan on the date of such purchase, (ii) accrued interest thereon at
the applicable Mortgage Rate (or at the applicable Adjusted Mortgage Rate if
(x) the purchaser is the Master Servicer or (y) if the purchaser is
Countrywide and Countrywide is an affiliate of the Master Servicer) from the

date through which interest was last paid by the Mortgagor to the Due Date in
the month in which the Purchase Price is to be distributed to
Certificateholders and (iii) costs and damages incurred by the Trust Fund in
connection with a repurchase pursuant to

                                    35

<PAGE>

Section 2.03 of this Agreement that arises out of a violation of any predatory
or abusive lending law with respect to the related Mortgage Loan.

        Qualified Insurer: A mortgage guaranty insurance company duly
qualified as such under the laws of the state of its principal place of
business and each state having jurisdiction over such insurer in connection
with the insurance policy issued by such insurer, duly authorized and licensed
in such states to transact a mortgage guaranty insurance business in such
states and to write the insurance provided by the insurance policy issued by
it, approved as a FNMA-approved mortgage insurer and having a claims paying
ability rating of at least "AA" or equivalent rating by a nationally
recognized statistical rating organization. Any replacement insurer with
respect to a Mortgage Loan must have at least as high a claims paying ability
rating as the insurer it replaces had on the Closing Date.

        Rating Agency: Each of the Rating Agencies specified in the
Preliminary Statement. If any such organization or a successor is no longer in
existence, "Rating Agency" shall be such nationally recognized statistical
rating organization, or other comparable Person, identified as a "Rating
Agency" under the Underwriter's Exemption, as is designated by the Depositor,
notice of which designation shall be given to the Trustee. References in this
Agreement to a given rating category of a Rating Agency shall mean such rating
category without giving effect to any modifiers.

        Realized Loss: With respect to each Liquidated Mortgage Loan, an
amount (not less than zero or more than the Stated Principal Balance of the
Mortgage Loan) as of the date of such liquidation, equal to (i) the Stated
Principal Balance of the Liquidated Mortgage Loan as of the date of such
liquidation, plus (ii) interest at the Adjusted Net Mortgage Rate from the Due
Date as to which interest was last paid or advanced (and not reimbursed) to
Certificateholders up to the Due Date in the month in which Liquidation
Proceeds are required to be distributed on the Stated Principal Balance of
such Liquidated Mortgage Loan from time to time, minus (iii) the Liquidation
Proceeds, if any, received during the month in which such liquidation
occurred, to the extent applied as recoveries of interest at the Adjusted Net
Mortgage Rate and to principal of the Liquidated Mortgage Loan. With respect
to each Mortgage Loan that has become the subject of a Deficient Valuation, if
the principal amount due under the related Mortgage Note has been reduced, the
difference between the principal balance of the Mortgage Loan outstanding
immediately prior to such Deficient Valuation and the principal balance of the
Mortgage Loan as reduced by the Deficient Valuation. With respect to each
Mortgage Loan that has become the subject of a Debt Service Reduction and any
Distribution Date, the amount, if any, by which the principal portion of the
related Scheduled Payment has been reduced.

        To the extent the Master Servicer receives Subsequent Recoveries with
respect to any Mortgage Loan, the amount of Realized Losses with respect to
that Mortgage Loan will be reduced by the amount of those Subsequent

Recoveries.

     Recognition Agreement: With respect to any Cooperative Loan, an
agreement between the Cooperative Corporation and the originator of such
Mortgage Loan which establishes the rights of such originator in the
Cooperative Property.


                                   36
<PAGE>

     Record Date: With respect to any Distribution Date, the close of
business on the last Business Day of the month preceding the month in which
such Distribution Date occurs.

     Refinancing Mortgage Loan: Any Mortgage Loan originated in connection
with the refinancing of an existing mortgage loan.

     Regular Certificates:  As specified in the Preliminary Statement.

     Regulation AB: Subpart 229.1100 - Asset Backed Securities (Regulation
AB), 17 C.F.R. ss.ss.229.1100-229.1123, as such may be amended from time to
time, and subject to such clarification and interpretation as have been
provided by the Commission in the adopting release (Asset-Backed Securities,
Securities Act Release No. 33-8518, 70 Fed. Reg. 1,506, 1,531 (Jan. 7, 2005))
or by the staff of the Commission, or as may be provided by the Commission or
its staff from time to time.

     Relief Act:  The Servicemembers Civil Relief Act.

     Relief Act Reductions: With respect to any Distribution Date and any
Mortgage Loan as to which there has been a reduction in the amount of interest
collectible thereon for the most recently ended calendar month as a result of
the application of the Relief Act or any similar law, the amount, if any, by
which (i) interest collectible on such Mortgage Loan for the most recently
ended calendar month is less than (ii) interest accrued thereon for such month
pursuant to the Mortgage Note.

     REMIC: A "real estate mortgage investment conduit" within the meaning
of section 860D of the Code.

     REMIC Change of Law: Any proposed, temporary or final regulation,
revenue ruling, revenue procedure or other official announcement or
interpretation relating to REMICs and the REMIC Provisions issued after the
Closing Date.

     REMIC Provisions: Provisions of the federal income tax law relating to
real estate mortgage investment conduits, which appear at sections 860A
through 860G of Subchapter M of Chapter 1 of the Code, and related provisions,
and regulations promulgated thereunder, as the foregoing may be in effect from
time to time as well as provisions of applicable state laws.

     REO Property: A Mortgaged Property acquired by the Trust Fund through
foreclosure or deed-in-lieu of foreclosure in connection with a defaulted
Mortgage Loan.

     Reportable Event: Any event required to be reported on Form 8-K, and

in any event, the following:

        (a)    entry into a definitive agreement related to the Trust Fund, the Certificates or the Mortgage Loans, or an amendment to a Transaction Document, even if the Depositor is not a party to such agreement (e.g., a servicing agreement with a servicer contemplated by Item 1108(a)(3) of Regulation AB);

<div align="center">37</div>

&lt;PAGE&gt;

        (b)    termination of a Transaction Document (other than by expiration of the agreement on its stated termination date or as a result of all parties completing their obligations under such agreement), even if the Depositor is not a party to such agreement (e.g., a servicing agreement with a servicer contemplated by Item 1108(a)(3) of Regulation AB);

        (c)    with respect to the Master Servicer only, if the Master Servicer becomes aware of any bankruptcy or receivership with respect to Countrywide, the Depositor, the Master Servicer, any Subservicer, the Trustee, any enhancement or support provider contemplated by Items 1114(b) or 1115 of Regulation AB, or any other material party contemplated by Item 1101(d)(1) of Regulation AB;

        (d)    with respect to the Trustee, the Master Servicer and the Depositor only, the occurrence of an early amortization, performance trigger or other event, including an Event of Default under this Agreement;

        (e)    the resignation, removal, replacement, substitution of the Master Servicer, any Subservicer or the Trustee;

        (f)    with respect to the Master Servicer only, if the Master Servicer becomes aware that (i) any material enhancement or support specified in Item 1114(a)(1) through (3) of Regulation AB or Item 1115 of Regulation AB that was previously applicable regarding one or more classes of the Certificates has terminated other than by expiration of the contract on its stated termination date or as a result of all parties completing their obligations under such agreement; (ii) any material enhancement specified in Item 1114(a)(1) through (3) of Regulation AB or Item 1115 of Regulation AB has been added with respect to one or more Classes of the Certificates; or (iii) any existing material enhancement or support specified in Item 1114(a)(1) through (3) of Regulation AB or Item 1115 of Regulation AB with respect to one or more Classes of the Certificates has been materially amended or modified; and

        (g)    with respect to the Trustee, the Master Servicer and the Depositor only, a required distribution to Holders of the Certificates is not made as of the required Distribution Date under this Agreement.

    Reporting Subcontractor: With respect to the Master Servicer or the Trustee, any Subcontractor determined by such Person pursuant to Section 11.08(b) to be "participating in the servicing function" within the meaning of Item 1122 of Regulation AB. References to a Reporting Subcontractor shall refer only to the Subcontractor of such Person and shall not refer to Subcontractors generally.

Request for Release: The Request for Release submitted by the Master Servicer to the Trustee, substantially in the form of Exhibits M and N to this Agreement, as appropriate.

Required Insurance Policy: With respect to any Mortgage Loan, any insurance policy that is required to be maintained from time to time under this Agreement.

Residual Certificates:  As specified in the Preliminary Statement.

38

<PAGE>

Responsible Officer: When used with respect to the Trustee, any Vice President, any Assistant Vice President, the Secretary, any Assistant Secretary, any Trust Officer or any other officer of the Trustee customarily performing functions similar to those performed by any of the above designated officers and also to whom, with respect to a particular matter, such matter is referred because of such officer's knowledge of and familiarity with the particular subject.

Restricted Classes:  As defined in Section 4.02(e).

Sarbanes-Oxley Certification:  As defined in Section 11.05.

Scheduled Payment: The scheduled monthly payment on a Mortgage Loan due on any Due Date allocable to principal and/or interest on such Mortgage Loan which, unless otherwise specified in this Agreement, shall give effect to any related Debt Service Reduction and any Deficient Valuation that affects the amount of the monthly payment due on such Mortgage Loan.

Securities Act:  The Securities Act of 1933, as amended.

Seller: Countrywide, Park Granada, Park Monaco or Park Sienna, as applicable.

Senior Certificates:  As specified in the Preliminary Statement.

Senior Certificate Group:  As specified in the Preliminary Statement.

Senior Credit Support Depletion Date: The date on which the Class Certificate Balance of each Class of Subordinated Certificates has been reduced to zero.

Senior Percentage: As to any Senior Certificate Group and Distribution Date, the percentage equivalent of a fraction the numerator of which is the aggregate of the Class Certificate Balances of each Class of Senior Certificates of such Senior Certificate Group (other than the Notional Amount Certificates) immediately prior to such Distribution Date and the denominator of which is the aggregate Stated Principal Balance of Mortgage Loans in the related Loan Group as of the Due Date in the month preceding the month of such Distribution Date; provided, however, that on any Distribution Date after the third Senior Termination Date, the Senior Percentage for the Senior Certificates of the remaining Senior Certificate Group is the percentage equivalent of a fraction, the numerator of which is the aggregate of the Class

Certificate Balances of each such Class of Senior Certificates (other than the
Notional Amount Certificates) immediately prior to such Distribution Date and
the denominator of which is the aggregate of the Class Certificate Balances of
all Classes of Certificates (other than the Notional Amount Certificates)
immediately prior to such Distribution Date. In no event will any Senior
Percentage be greater than 100%.

     Senior Prepayment Percentage: As to a Senior Certificate Group and any
Distribution Date during the ten years beginning on the first Distribution
Date, 100%. The related Senior Prepayment Percentage for any Distribution Date
occurring on or after the tenth anniversary of the first Distribution Date
will, except as provided in this Agreement, be as follows: for any
Distribution Date in the first year thereafter, the related Senior Percentage
plus 70% of the related Subordinated Percentage for such Distribution Date;
for any Distribution Date in the second year thereafter, the related Senior
Percentage plus 60% of the related Subordinated

<div align="center">39</div>

<PAGE>

Percentage for such Distribution Date; for any Distribution Date in the third
year thereafter, the related Senior Percentage plus 40% of the related
Subordinated Percentage for such Distribution Date; for any Distribution Date
in the fourth year thereafter, the related Senior Percentage plus 20% of the
related Subordinated Percentage for such Distribution Date; and for any
Distribution Date thereafter, the related Senior Percentage for such
Distribution Date (unless on any Distribution Date the related Senior
Percentage exceeds the Senior Percentage of such Senior Certificate Group as
of the Closing Date, in which case the Senior Prepayment Percentage for each
Senior Certificate Group for such Distribution Date will once again equal
100%). Notwithstanding the foregoing, no decrease in the related Senior
Prepayment Percentage will occur unless both of the Senior Step Down
Conditions are satisfied with respect to all Loan Groups. Notwithstanding the
foregoing, if the Two Times Test is satisfied on a Distribution Date, the
Senior Prepayment Percentage for each Senior Certificate Group will equal (x)
if such Distribution Date is on or prior to the Distribution Date in April
2009, the related Senior Percentage for such Distribution Date plus 50% of the
related Subordinated Percentage for that Distribution Date and (y) if such
Distribution Date is after the Distribution Date in April 2009, the related
Senior Percentage.

     Senior Principal Distribution Amount: As to any Distribution Date and
Senior Certificate Group, the sum of (i) the related Senior Percentage of all
amounts described in clauses (a) through (d) of the definition of "Principal
Amount" with respect to the related Loan Group for such Distribution Date,
(ii) with respect to any Mortgage Loan in the related Loan Group that became a
Liquidated Mortgage Loan during the calendar month preceding the month of such
Distribution Date, the lesser of (x) the related Senior Percentage of the
Stated Principal Balance of such Mortgage Loan as of the Due Date in the month
preceding the month of that Distribution Date and (y) the related Senior
Prepayment Percentage of the amount of the Liquidation Proceeds allocable to
principal received on the Mortgage Loan, (iii) the related Senior Prepayment
Percentage of the amounts described in clauses (f) and (h) of the definition
of "Principal Amount" with respect to the related Loan Group for such
Distribution Date; (iv) the principal portion of any Transfer Payments
Received for that Loan Group and Distribution Date; provided, however, on any

Distribution Date after the third Senior Termination Date, the Senior
Principal Distribution Amount for the remaining Senior Certificate Group will
be calculated pursuant to the above formula based on all the Mortgage Loans,
as opposed to the Mortgage Loans in the related Loan Group.

        Senior Step Down Conditions: On or prior to the third Senior
Termination Date, with respect to the Mortgage Loans in a Loan Group and after
the third Senior Termination Date, with respect to all Mortgage Loans: (i) the
aggregate Stated Principal Balance of such Mortgage Loans delinquent 60 days
or more (including Mortgage Loans in foreclosure, REO Property and Mortgage
Loans, the Mortgagors of which are in bankruptcy) (averaged over the preceding
six month period), does not equal or exceed 50% of (1) on or prior to the
third Senior Termination Date, the Subordinated Percentage for such Loan Group
of the aggregate Stated Principal Balance of the Mortgage Loans in such Loan
Group or (2) after the third Senior Termination Date, the aggregate Class
Certificate Balance of the Subordinated Certificates on the Distribution Date
and (ii) cumulative Realized Losses on such Mortgage Loans do not exceed: (a)
commencing with the Distribution Date on the tenth anniversary of the first
Distribution Date, 30% of the Original Subordinate Principal Balance, (b)
commencing with the Distribution Date on the eleventh anniversary of the first
Distribution Date, 35% of the Original Subordinate

                                    40

<PAGE>

Principal Balance, (c) commencing with the Distribution Date on the twelfth
anniversary of the first Distribution Date, 40% of the Original Subordinate
Principal Balance, (d) commencing the Distribution Date on the thirteenth
anniversary of the first Distribution Date, 45% of the Original Subordinate
Principal Balance and (e) commencing with the Distribution Date on the
fourteenth anniversary of the first Distribution Date, 50% of the Original
Subordinate Principal Balance.

        Senior Termination Date: For each Senior Certificate Group, the
Distribution Date on which the aggregate Class Certificate Balance of the
related Classes of Senior Certificates have been reduced to zero.

        Servicing Advances: All customary, reasonable and necessary "out of
pocket" costs and expenses incurred in the performance by the Master Servicer
of its servicing obligations, including, but not limited to, the cost of (i)
the preservation, restoration and protection of a Mortgaged Property, (ii) any
expenses reimbursable to the Master Servicer pursuant to Section 3.11 and any
enforcement or judicial proceedings, including foreclosures, (iii) the
management and liquidation of any REO Property and (iv) compliance with the
obligations under Section 3.09.

        Servicing Criteria: The "servicing criteria" set forth in Item 1122(d)
of Regulation AB.

        Servicing Officer: Any officer of the Master Servicer involved in, or
responsible for, the administration and servicing of the Mortgage Loans whose
name and facsimile signature appear on a list of servicing officers furnished
to the Trustee by the Master Servicer on the Closing Date pursuant to this
Agreement, as such list may from time to time be amended.

S&P: Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. If S&P is designated as a Rating Agency in the Preliminary Statement, for purposes of Section 10.05(b) the address for notices to S&P shall be Standard & Poor's Ratings Services, 55 Water Street, New York, New York 10041, Attention: Mortgage Surveillance Monitoring, or such other address as S&P may hereafter furnish to the Depositor and the Master Servicer.

Startup Day:  The Closing Date.

Stated Principal Balance: As to any Mortgage Loan and Due Date, the unpaid principal balance of such Mortgage Loan as of such Due Date as specified in the amortization schedule at the time relating thereto (before any adjustment to such amortization schedule by reason of any moratorium or similar waiver or grace period) after giving effect to the sum of (i) the payment of principal due on such Due Date, irrespective of any delinquency in payment by the related Mortgagor and (ii) Liquidation Proceeds allocable to principal (other than with respect to any Liquidated Mortgage Loan) received in the prior calendar month and Principal Prepayments received through the last day of the related Prepayment Period, in each case, with respect to that Mortgage Loan.

Streamlined Documentation Mortgage Loan: Any Mortgage Loan originated pursuant to Countrywide Home Loan Inc.'s Streamlined Loan Documentation Program then in effect. For the purposes of this Agreement, a Mortgagor is eligible for a mortgage pursuant to Countrywide's Streamlined Loan Documentation Program if that Mortgagor is refinancing an existing mortgage loan that was originated or acquired by Countrywide where, among other

41

<PAGE>

things, the mortgage loan has not been more than 30 days delinquent in payment during the previous twelve month period.

Subcontractor: Any vendor, subcontractor or other Person that is not responsible for the overall servicing (as "servicing" is commonly understood by participants in the mortgage-backed securities market) of Mortgage Loans but performs one or more discrete functions identified in Item 1122(d) of Regulation AB with respect to the Mortgage Loans under the direction or authority of the Master Servicer or a Subservicer or the Trustee, as the case may be.

Subordinate Pass-Through Rate: For the Interest Accrual Period related to each Distribution Date, a per annum rate equal to (1) the sum of the following for each Loan Group: the product of (x) the Weighted Average Adjusted Net Mortgage Rate of the related Mortgage Loans and (y) the related Subordinated Portion immediately prior to that Distribution Date, divided by (2) the aggregate Class Certificate Balance of the Subordinated Certificates immediately prior to that Distribution Date.

Subordinated Certificates:  As specified in the Preliminary Statement.

Subordinated Percentage: As to any Distribution Date on or prior to the third Senior Termination Date and Loan Group, 100% minus the Senior Percentage for the Senior Certificate Group relating to such Loan Group for such Distribution Date. As to any Distribution Date after the third Senior

Termination Date, 100% minus the Senior Percentage for such Distribution Date.

     Subordinated Portion: For any Distribution Date and Loan Group, an
amount equal to the aggregate Stated Principal Balance of the Mortgage Loans
in that Loan Group as of the Due Date in the month prior to the month of such
Distribution Date, minus the aggregate Class Certificate Balance of the
related Senior Certificates immediately prior to such Distribution Date.

     Subordinated Prepayment Percentage: As to any Distribution Date and
Loan Group, 100% minus the related Senior Prepayment Percentage for such
Distribution Date.

     Subordinated Principal Distribution Amount: With respect to any
Distribution Date and Loan Group, an amount equal to the excess of (A) the
sum, not less than zero, of the sum of (i) the Subordinated Percentage of all
amounts described in clauses (a) through (d) of the definition of "Principal
Amount" for that Loan Group and that Distribution Date, (ii) with respect to
each Mortgage Loan in that Loan Group that became a Liquidated Mortgage Loan
during the calendar month preceding the month of such Distribution Date, the
Liquidation Proceeds allocated to principal received with respect thereto
remaining after application thereof pursuant to clause (ii) of the definition
of "Senior Principal Distribution Amount", up to the Subordinated Percentage
for such Loan Group of the Stated Principal Balance of that Mortgage Loan, and
(iii) the sum of the Subordinated Prepayment Percentage for that Loan Group of
all amounts described in clauses (f) and (h) of the definition of "Principal
Amount" for such Loan Group and Distribution Date over (B) the principal
portion of any Transfer Payments Made for such Loan Group; provided, however,
that on any Distribution Date after the third Senior Termination Date, the
Subordinated Principal Distribution Amount will not be calculated by Loan
Group but will equal the amount calculated pursuant to the formula set forth
above based on the applicable

                                   42

<PAGE>

Subordinated Percentage and Subordinated Prepayment Percentage for the
Subordinated Certificates for such Distribution Date with respect to all of
the Mortgage Loans as opposed to the Mortgage Loans only in the related Loan
Group.

     Subsequent Recoveries: As to any Distribution Date, with respect to a
Liquidated Mortgage Loan that resulted in a Realized Loss in a prior calendar
month, unexpected amounts received by the Master Servicer (net of any related
expenses permitted to be reimbursed pursuant to Section 3.08) specifically
related to such Liquidated Mortgage Loan.

     Subservicer: Any person to whom the Master Servicer has contracted for
the servicing of all or a portion of the Mortgage Loans pursuant to Section
3.02.

     Substitute Mortgage Loan: A Mortgage Loan substituted by the
applicable Seller for a Deleted Mortgage Loan which must, on the date of such
substitution, as confirmed in a Request for Release, substantially in the form
of Exhibit M, (i) have a Stated Principal Balance, after deduction of the
principal portion of the Scheduled Payment due in the month of substitution,

not in excess of, and not more than 10% less than the Stated Principal Balance
of the Deleted Mortgage Loan; (ii) be accruing interest at a rate no lower
than and not more than 1% per annum higher than, that of the Deleted Mortgage
Loan; (iii) have a Loan-to-Value Ratio no higher than that of the Deleted
Mortgage Loan; (iv) have a remaining term to maturity no greater than (and not
more than one year less than that of) the Deleted Mortgage Loan; (v) have a
Maximum Mortgage Rate not more than 1% per annum higher or lower than, that of
the Deleted Mortgage Loan; (vi) have a Minimum Mortgage Rate specified in its
related mortgage note not more than 1% per annum higher or lower than the
Minimum Mortgage Rate of the Deleted Mortgage Loan; (vii) have the same
Mortgage Index, Mortgage Index reset period and Periodic Rate Cap as the
Deleted Mortgage Loan and a Gross Margin not more than 1% per annum higher or
lower than that of the Deleted Mortgage Loan; (viii) not be a Cooperative Loan
unless the Deleted Mortgage Loan was a Cooperative Loan; and (ix) comply with
each representation and warranty set forth in Section 2.03.

     Substitution Adjustment Amount: The meaning ascribed to such term
pursuant to Section 2.03.

     Tax Matters Person: The person designated as "tax matters person" in
the manner provided under Treasury regulation ss. 1.860F-4(d) and Treasury
regulation ss. 301.6231(a)(7)-1. Initially, the Tax Matters Person shall be
the Trustee.

     Tax Matters Person Certificate: The Class A-R Certificate with a
Denomination of $0.01.

     Transfer: Any direct or indirect transfer or sale of any Ownership
Interest in a Residual Certificate.

     Transfer Payment Made: As defined in Section 4.05.

     Transaction Documents: This Agreement and any other document or
agreement entered into in connection with the Trust Fund, the Certificates or
the Mortgage Loans.


                                   43
<PAGE>

     Transfer Payment Received:  As defined in Section 4.05.

     Trust Fund: The corpus of the trust created under this Agreement
consisting of (i) the Mortgage Loans and all interest and principal received
on or with respect thereto after the Cut-off Date to the extent not applied in
computing the Cut-off Date Principal Balance of the Mortgage Loans; (ii) the
Certificate Account and the Distribution Account and all amounts deposited
therein pursuant to the applicable provisions of this Agreement; (iii)
property that secured a Mortgage Loan and has been acquired by foreclosure,
deed-in-lieu of foreclosure or otherwise; and (iv) all proceeds of the
conversion, voluntary or involuntary, of any of the foregoing.

     Trustee: The Bank of New York and its successors and, if a successor
trustee is appointed under this Agreement, such successor.

     Trustee Advance Rate: With respect to any Advance made by the Trustee
pursuant to Section 4.01(b), a per annum rate of interest determined as of the

date of such Advance equal to the Prime Rate in effect on such date plus 5.00%.

Trustee Fee: As to any Distribution Date, an amount equal to one-twelfth of the Trustee Fee Rate multiplied by the Pool Stated Principal Balance with respect to such Distribution Date.

Trustee Fee Rate: With respect to each Mortgage Loan, 0.009% per annum.

Two Times Test: As to any Distribution Date, if (i) the Aggregate Subordinated Percentage is at least 200% of the Aggregate Subordinated Percentage as of the Closing Date, (ii) clause (i) of the Senior Step Down Conditions is satisfied and (iii) the cumulative Realized Losses on all the Mortgage Loans do not exceed (x) with respect to any Distribution Date on or prior to April 2009, 20% of the aggregate Class Certificate Balance of the Subordinated Certificates as of the Closing Date or (y) with respect to any Distribution Date after April 2009, 30% of the aggregate Class Certificate Balance of the Subordinated Certificates as of the Closing Date.

Undercollateralized Group: As defined in Section 4.05.

Underwriter's Exemption: Prohibited Transaction Exemption 2002-41, 67 Fed. Reg. 54487 (2002), as amended (or any successor thereto), or any substantially similar administrative exemption granted by the U.S. Department of Labor.

Voting Rights: The portion of the voting rights of all of the Certificates which is allocated to any Certificate. As of any date of determination, (a) 1% of all Voting Rights shall be allocated to each Class of Notional Amount Certificates, if any (such Voting Rights to be allocated among the holders of Certificates of each such Class in accordance with their respective Percentage Interests), and (b) the remaining Voting Rights (or 100% of the Voting Rights if there is no Class of Notional Amount Certificates) shall be allocated among Holders of the remaining Classes of Certificates in proportion to the Certificate Balances of their respective Certificates on such date.

44

<PAGE>

Weighted Average Adjusted Net Mortgage Rate: For each Loan Group, the average of the Adjusted Net Mortgage Rate of each Mortgage Loan in that Loan Group, weighted on the basis of its Stated Principal Balance.

Weighted Average Roll Date: For each Loan Group and related Class of Notional Amount Certificates and Components, the Distribution Date in the month set forth below:

| Loan Group | Weighted Average Roll Date |
| ------------ | ---------------------- |
| 1 | January 2009 |
| 2 | February 2011 |
| 3 | February 2013 |
| 4 | February 2016 |

45

<PAGE>

ARTICLE II
CONVEYANCE OF MORTGAGE LOANS;
REPRESENTATIONS AND WARRANTIES

SECTION 2.01. Conveyance of Mortgage Loans

(a) Each Seller, concurrently with the execution and delivery of this
Agreement, hereby sells, transfers, assigns, sets over and otherwise conveys
to the Depositor, without recourse, all its respective right, title and
interest in and to the related Mortgage Loans, including all interest and
principal received or receivable by such Seller, on or with respect to the
applicable Mortgage Loans after the Cut-off Date and all interest and
principal payments on the related Mortgage Loans received prior to the Cut-off
Date in respect of installments of interest and principal due thereafter, but
not including payments of principal and interest due and payable on such
Mortgage Loans on or before the Cut-off Date. On or prior to the Closing Date,
Countrywide shall deliver to the Depositor or, at the Depositor's direction,
to the Trustee or other designee of the Depositor, the Mortgage File for each
Mortgage Loan listed in the Mortgage Loan Schedule (except that, in the case
of the Delay Delivery Mortgage Loans (which may include Countrywide Mortgage
Loans, Park Granada Mortgage Loans, Park Monaco Mortgage Loans and Park Sienna
Mortgage Loans), such delivery may take place within thirty (30) days
following the Closing Date). Such delivery of the Mortgage Files shall be made
against payment by the Depositor of the purchase price, previously agreed to
by the Sellers and Depositor, for the Mortgage Loans. With respect to any
Mortgage Loan that does not have a first payment date on or before the Due
Date in the month of the first Distribution Date, Countrywide shall deposit
into the Distribution Account on or before the Distribution Account Deposit
Date relating to the first Distribution Date, an amount equal to one month's
interest at the related Adjusted Mortgage Rate on the Cut-off Date Principal
Balance of such Mortgage Loan.

(b) Immediately upon the conveyance of the Mortgage Loans referred to
in clause (a), the Depositor sells, transfers, assigns, sets over and
otherwise conveys to the Trustee for the benefit of the Certificateholders,
without recourse, all the right, title and interest of the Depositor in and to
the Trust Fund together with the Depositor's right to require each Seller to
cure any breach of a representation or warranty made in this Agreement by such
Seller or to repurchase or substitute for any affected Mortgage Loan in
accordance herewith.

(c) In connection with the transfer and assignment set forth in clause
(b) above, the Depositor has delivered or caused to be delivered to the
Trustee (or, in the case of the Delay Delivery Mortgage Loans, will deliver or
cause to be delivered to the Trustee) within thirty (30) days following the
Closing Date for the benefit of the Certificateholders the following documents
or instruments with respect to each Mortgage Loan so assigned:

(i) (A) the original Mortgage Note endorsed by manual or
facsimile signature in blank in the following form: "Pay to the order
of _____ without recourse," with all intervening endorsements

showing a complete chain of endorsement from the originator to the
Person endorsing the Mortgage Note (each such endorsement being
sufficient to transfer all right, title and interest of the party so
endorsing, as noteholder or assignee thereof, in and to that Mortgage
Note); or

                                   46

<PAGE>

          (B) with respect to any Lost Mortgage Note, a lost note
affidavit from Countrywide stating that the original Mortgage Note was
lost or destroyed, together with a copy of such Mortgage Note;

          (ii) except as provided below and for each Mortgage Loan that
is not a MERS Mortgage Loan, the original recorded Mortgage or a copy
of such Mortgage certified by Countrywide as being a true and complete
copy of the Mortgage (or, in the case of a Mortgage for which the
related Mortgaged Property is located in the Commonwealth of Puerto
Rico, a true copy of the Mortgage certified as such by the applicable
notary) and in the case of each MERS Mortgage Loan, the original
Mortgage, noting the presence of the MIN of the Mortgage Loans and
either language indicating that the Mortgage Loan is a MOM Loan if the
Mortgage Loan is a MOM Loan or if the Mortgage Loan was not a MOM Loan
at origination, the original Mortgage and the assignment thereof to
MERS, with evidence of recording indicated thereon, or a copy of the
Mortgage certified by the public recording office in which such
Mortgage has been recorded;

          (iii) in the case of each Mortgage Loan that is not a MERS
Mortgage Loan, a duly executed assignment of the Mortgage (which may
be included in a blanket assignment or assignments), together with,
except as provided below, all interim recorded assignments of such
mortgage (each such assignment, when duly and validly completed, to be
in recordable form and sufficient to effect the assignment of and
transfer to the assignee thereof, under the Mortgage to which the
assignment relates); provided that, if the related Mortgage has not
been returned from the applicable public recording office, such
assignment of the Mortgage may exclude the information to be provided
by the recording office; provided, further, that such assignment of
Mortgage need not be delivered in the case of a Mortgage for which the
related Mortgaged Property is located in the Commonwealth of Puerto
Rico;

          (iv) the original or copies of each assumption, modification,
written assurance or substitution agreement, if any;

          (v) except as provided below, the original or duplicate
original lender's title policy or a printout of the electronic
equivalent and all riders thereto; and

          (vi) in the case of a Cooperative Loan, the originals of the
following documents or instruments:

                    (A) The Coop Shares, together with a stock power in
          blank;

        (B) The executed Security Agreement;

        (C) The executed Proprietary Lease;

        (D) The executed Recognition Agreement;

47

<PAGE>

        (E) The executed UCC-1 financing statement with
evidence of recording thereon which have been filed in all
places required to perfect the Seller's interest in the Coop
Shares and the Proprietary Lease; and

        (F) The executed UCC-3 financing statements or other
appropriate UCC financing statements required by state law,
evidencing a complete and unbroken line from the mortgagee to
the Trustee with evidence of recording thereon (or in a form
suitable for recordation).

        In addition, in connection with the assignment of any MERS Mortgage
Loan, each Seller agrees that it will cause, at the Trustee's expense, the
MERS(R) System to indicate that the Mortgage Loans sold by such Seller to the
Depositor have been assigned by that Seller to the Trustee in accordance with
this Agreement for the benefit of the Certificateholders by including (or
deleting, in the case of Mortgage Loans which are repurchased in accordance
with this Agreement) in such computer files the information required by the
MERS(R) System to identify the series of the Certificates issued in connection
with such Mortgage Loans. Each Seller further agrees that it will not, and
will not permit the Master Servicer to, and the Master Servicer agrees that it
will not, alter the information referenced in this paragraph with respect to
any Mortgage Loan sold by such Seller to the Depositor during the term of this
Agreement unless and until such Mortgage Loan is repurchased in accordance
with the terms of this Agreement.

        In the event that in connection with any Mortgage Loan that is not a
MERS Mortgage Loan the Depositor cannot deliver (a) the original recorded
Mortgage, (b) all interim recorded assignments or (c) the lender's title
policy (together with all riders thereto) satisfying the requirements of
clause (ii), (iii) or (v) above, respectively, concurrently with the execution
and delivery of this Agreement because such document or documents have not
been returned from the applicable public recording office in the case of
clause (ii) or (iii) above, or because the title policy has not been delivered
to either the Master Servicer or the Depositor by the applicable title insurer
in the case of clause (v) above, the Depositor shall promptly deliver to the
Trustee, in the case of clause (ii) or (iii) above, such original Mortgage or
such interim assignment, as the case may be, with evidence of recording
indicated thereon upon receipt thereof from the public recording office, or a
copy thereof, certified, if appropriate, by the relevant recording office, but
in no event shall any such delivery of the original Mortgage and each such
interim assignment or a copy thereof, certified, if appropriate, by the
relevant recording office, be made later than one year following the Closing
Date, or, in the case of clause (v) above, no later than 120 days following
the Closing Date; provided, however, in the event the Depositor is unable to
deliver by such date each Mortgage and each such interim assignment by reason
of the fact that any such documents have not been returned by the appropriate

recording office, or, in the case of each such interim assignment, because the
related Mortgage has not been returned by the appropriate recording office,
the Depositor shall deliver such documents to the Trustee as promptly as
possible upon receipt thereof and, in any event, within 720 days following the
Closing Date. The Depositor shall forward or cause to be forwarded to the
Trustee (a) from time to time additional original documents evidencing an
assumption or modification of a Mortgage Loan and (b) any other documents
required to be delivered by the Depositor or the Master Servicer to the
Trustee. In the event that the original Mortgage is not delivered and in
connection with the payment in full of the related Mortgage Loan and the
public recording office requires the presentation of a "lost instruments
affidavit and indemnity" or any equivalent document, because only a copy of

48

<PAGE>

the Mortgage can be delivered with the instrument of satisfaction or
reconveyance, the Master Servicer shall execute and deliver or cause to be
executed and delivered such a document to the public recording office. In the
case where a public recording office retains the original recorded Mortgage or
in the case where a Mortgage is lost after recordation in a public recording
office, Countrywide shall deliver to the Trustee a copy of such Mortgage
certified by such public recording office to be a true and complete copy of
the original recorded Mortgage.

        As promptly as practicable subsequent to such transfer and assignment,
and in any event, within thirty (30) days after such transfer and assignment,
the Trustee shall (i) as the assignee thereof, affix the following language to
each assignment of Mortgage: "CWMBS Series 2006-HYB3, The Bank of New York as
trustee", (ii) cause such assignment to be in proper form for recording in the
appropriate public office for real property records and (iii) cause to be
delivered for recording in the appropriate public office for real property
records the assignments of the Mortgages to the Trustee, except that, with
respect to any assignments of Mortgage as to which the Trustee has not
received the information required to prepare such assignment in recordable
form, the Trustee's obligation to do so and to deliver the same for such
recording shall be as soon as practicable after receipt of such information
and in any event within thirty (30) days after receipt thereof and that the
Trustee need not cause to be recorded any assignment which relates to a
Mortgage Loan (a) the Mortgaged Property and Mortgage File relating to which
are located in California or (b) in any other jurisdiction (including Puerto
Rico) under the laws of which in the opinion of counsel the recordation of
such assignment is not necessary to protect the Trustee's and the
Certificateholders' interest in the related Mortgage Loan.

        In the case of Mortgage Loans that have been prepaid in full as of the
Closing Date, the Depositor, in lieu of delivering the above documents to the
Trustee, will deposit in the Certificate Account the portion of such payment
that is required to be deposited in the Certificate Account pursuant to
Section 3.05.

        Notwithstanding anything to the contrary in this Agreement, within
thirty (30) days after the Closing Date with respect to the Mortgage Loans,
Countrywide (on its own behalf and on behalf of Park Granada, Park Monaco and
Park Sienna) shall either (i) deliver to the Depositor, or at the Depositor's

direction, to the Trustee or other designee of the Depositor the Mortgage File
as required pursuant to this Section 2.01 for each Delay Delivery Mortgage
Loan or (ii) either (A) substitute a Substitute Mortgage Loan for the Delay
Delivery Mortgage Loan or (B) repurchase the Delay Delivery Mortgage Loan,
which substitution or repurchase shall be accomplished in the manner and
subject to the conditions set forth in Section 2.03 (treating each Delay
Delivery Mortgage Loan as a Deleted Mortgage Loan for purposes of such Section
2.03); provided, however, that if Countrywide fails to deliver a Mortgage File
for any Delay Delivery Mortgage Loan within the thirty (30)-day period
provided in the prior sentence, Countrywide (on its own behalf and on behalf
of Park Granada, Park Monaco and Park Sienna) shall use its best reasonable
efforts to effect a substitution, rather than a repurchase of, such Deleted
Mortgage Loan and provided further that the cure period provided for in
Section 2.02 or in Section 2.03 shall not apply to the initial delivery of the
Mortgage File for such Delay Delivery Mortgage Loan, but rather Countrywide
(on its own behalf and on behalf of Park Granada, Park Monaco and Park Sienna)
shall have five (5) Business Days to cure such failure to deliver. At the end
of such thirty (30)-day period the Trustee shall send a Delay Delivery
Certification for the Delay

49

<PAGE>

Delivery Mortgage Loans delivered during such thirty (30)-day period in
accordance with the provisions of Section 2.02.

        (d) Neither the Depositor nor the Trust will acquire or hold any
Mortgage Loan that would violate the representations made by Countrywide set
forth in clauses (49) and (50) of Schedule III-A hereto.

        SECTION 2.02. Acceptance by Trustee of the Mortgage Loans.

        (a) The Trustee acknowledges receipt of the documents identified in
the Initial Certification in the form annexed hereto as Exhibit F (an "Initial
Certification") and declares that it holds and will hold such documents and
the other documents delivered to it constituting the Mortgage Files, and that
it holds or will hold such other assets as are included in the Trust Fund, in
trust for the exclusive use and benefit of all present and future
Certificateholders. The Trustee acknowledges that it will maintain possession
of the Mortgage Notes in the State of California, unless otherwise permitted
by the Rating Agencies.

        The Trustee agrees to execute and deliver on the Closing Date to the
Depositor, the Master Servicer and Countrywide (on its own behalf and on
behalf of Park Granada, Park Monaco and Park Sienna) an Initial Certification
in the form annexed to this Agreement as Exhibit F. Based on its review and
examination, and only as to the documents identified in such Initial
Certification, the Trustee acknowledges that such documents appear regular on
their face and relate to the Mortgage Loans. The Trustee shall be under no
duty or obligation to inspect, review or examine said documents, instruments,
certificates or other papers to determine that the same are genuine,
enforceable or appropriate for the represented purpose or that they have
actually been recorded in the real estate records or that they are other than
what they purport to be on their face.

        On or about the thirtieth (30th) day after the Closing Date, the

Trustee shall deliver to the Depositor, the Master Servicer and Countrywide
(on its own behalf and on behalf of Park Granada, Park Monaco and Park Sienna)
a Delay Delivery Certification with respect to the Mortgage Loans in the form
annexed hereto as Exhibit G (a "Delay Delivery Certification"), with any
applicable exceptions noted thereon.

     Not later than 90 days after the Closing Date, the Trustee shall
deliver to the Depositor, the Master Servicer and Countrywide (on its own
behalf and on behalf of Park Granada, Park Monaco and Park Sienna) a Final
Certification with respect to the Mortgage Loans in the form annexed hereto as
Exhibit H (a "Final Certification"), with any applicable exceptions noted
thereon.

     If, in the course of such review, the Trustee finds any document
constituting a part of a Mortgage File that does not meet the requirements of
Section 2.01, the Trustee shall list such as an exception in the Final
Certification; provided, however that the Trustee shall not make any
determination as to whether (i) any endorsement is sufficient to transfer all
right, title and interest of the party so endorsing, as noteholder or assignee
thereof, in and to that Mortgage Note or (ii) any assignment is in recordable
form or is sufficient to effect the assignment of and transfer to the assignee
thereof under the mortgage to which the assignment relates. Countrywide (on its

                                   50

<PAGE>

own behalf and on behalf of Park Granada, Park Monaco and Park Sienna) shall
promptly correct or cure such defect within 90 days from the date it was so
notified of such defect and, if Countrywide does not correct or cure such
defect within such period, Countrywide (on its own behalf and on behalf of
Park Granada, Park Monaco and Park Sienna) shall either (a) substitute for the
related Mortgage Loan a Substitute Mortgage Loan, which substitution shall be
accomplished in the manner and subject to the conditions set forth in Section
2.03, or (b) purchase such Mortgage Loan from the Trustee within 90 days from
the date Countrywide (on its own behalf and on behalf of Park Granada, Park
Monaco and Park Sienna) was notified of such defect in writing at the Purchase
Price of such Mortgage Loan; provided, however, that in no event shall such
substitution or purchase occur more than 540 days from the Closing Date,
except that if the substitution or purchase of a Mortgage Loan pursuant to
this provision is required by reason of a delay in delivery of any documents
by the appropriate recording office, and there is a dispute between either the
Master Servicer or Countrywide (on its own behalf and on behalf of Park
Granada, Park Monaco and Park Sienna) and the Trustee over the location or
status of the recorded document, then such substitution or purchase shall
occur within 720 days from the Closing Date. The Trustee shall deliver written
notice to each Rating Agency within 270 days from the Closing Date indicating
each Mortgage Loan (a) that has not been returned by the appropriate recording
office or (b) as to which there is a dispute as to location or status of such
Mortgage Loan. Such notice shall be delivered every 90 days thereafter until
the related Mortgage Loan is returned to the Trustee. Any such substitution
pursuant to (a) above or purchase pursuant to (b) above shall not be effected
prior to the delivery to the Trustee of the Opinion of Counsel required by
Section 2.05, if any, and any substitution pursuant to (a) above shall not be
effected prior to the additional delivery to the Trustee of a Request for
Release substantially in the form of Exhibit N. No substitution is permitted
to be made in any calendar month after the Determination Date for such month.

The Purchase Price for any such Mortgage Loan shall be deposited by
Countrywide (on its own behalf and on behalf of Park Granada, Park Monaco and
Park Sienna) in the Certificate Account on or prior to the Distribution
Account Deposit Date for the Distribution Date in the month following the
month of repurchase and, upon receipt of such deposit and certification with
respect thereto in the form of Exhibit N hereto, the Trustee shall release the
related Mortgage File to Countrywide (on its own behalf and on behalf of Park
Granada, Park Monaco and Park Sienna) and shall execute and deliver at
Countrywide's (on its own behalf and on behalf of Park Granada, Park Monaco
and Park Sienna) request such instruments of transfer or assignment prepared
by Countrywide, in each case without recourse, as shall be necessary to vest
in Countrywide (on its own behalf and on behalf of Park Granada, Park Monaco
and Park Sienna), or its designee, the Trustee's interest in any Mortgage Loan
released pursuant hereto. If pursuant to the foregoing provisions Countrywide
(on its own behalf and on behalf of Park Granada, Park Monaco and Park Sienna)
repurchases a Mortgage Loan that is a MERS Mortgage Loan, the Master Servicer
shall either (i) cause MERS to execute and deliver an assignment of the
Mortgage in recordable form to transfer the Mortgage from MERS to Countrywide
(on its own behalf and on behalf of Park Granada, Park Monaco and Park Sienna)
or its designee and shall cause such Mortgage to be removed from registration
on the MERS(R) System in accordance with MERS' rules and regulations or (ii)
cause MERS to designate on the MERS(R) System Countrywide (on its own behalf
and on behalf of Park Granada, Park Monaco and Park Sienna) or its designee as
the beneficial holder of such Mortgage Loan.

          (b) [Reserved].



                                    51

<PAGE>

          (c) [Reserved].

          (d) The Trustee shall retain possession and custody of each Mortgage
File in accordance with and subject to the terms and conditions set forth in
this Agreement. The Master Servicer shall promptly deliver to the Trustee,
upon the execution or receipt thereof, the originals of such other documents
or instruments constituting the Mortgage File as come into the possession of
the Master Servicer from time to time.

          (e) It is understood and agreed that the respective obligations of
each Seller to substitute for or to purchase any Mortgage Loan sold to the
Depositor by it which does not meet the requirements of Section 2.01 above
shall constitute the sole remedy respecting such defect available to the
Trustee, the Depositor and any Certificateholder against that Seller.

          SECTION 2.03. Representations, Warranties and Covenants of the Sellers
and Master Servicer.

          (a) Countrywide hereby makes the representations and warranties set
forth in (i) Schedule II-A, Schedule II-B, Schedule II-C and Schedule II-D
hereto, and by this reference incorporated herein, to the Depositor, the
Master Servicer and the Trustee, as of the Closing Date, (ii) Schedule III-A
hereto, and by this reference incorporated herein, to the Depositor, the
Master Servicer and the Trustee, as of the Closing Date, or if so specified
therein, as of the Cut-off Date with respect to the Mortgage Loans, and (iii)

Schedule III-B hereto, and by this reference incorporated herein, to the
Depositor, the Master Servicer and the Trustee, as of the Closing Date, or if
so specified therein, as of the Cut-off Date with respect to the Mortgage
Loans that are Countrywide Mortgage Loans. Park Granada hereby makes the
representations and warranties set forth in (i) Schedule II-B hereto, and by
this reference incorporated herein, to the Depositor, the Master Servicer and
the Trustee, as of the Closing Date and (ii) Schedule III-C hereto, and by
this reference incorporated herein, to the Depositor, the Master Servicer and
the Trustee, as of the Closing Date, or if so specified therein, as of the
Cut-off Date with respect to the Mortgage Loans that are Park Granada Mortgage
Loans. Park Monaco hereby makes the representations and warranties set forth
in (i) Schedule II-C hereto, and by this reference incorporated herein, to the
Depositor, the Master Servicer and the Trustee, as of the Closing Date and
(ii) Schedule III-D hereto, and by this reference incorporated herein, to the
Depositor, the Master Servicer and the Trustee, as of the Closing Date, or if
so specified therein, as of the Cut-off Date with respect to the Mortgage
Loans that are Park Monaco Mortgage Loans. Park Sienna hereby makes the
representations and warranties set forth in (i) Schedule II-D hereto, and by
this reference incorporated herein, to the Depositor, the Master Servicer and
the Trustee, as of the Closing Date and (ii) Schedule III-E hereto, and by
this reference incorporated herein, to the Depositor, the Master Servicer and
the Trustee, as of the Closing Date, or if so specified therein, as of the
Cut-off Date with respect to the Mortgage Loans that are Park Sienna Mortgage
Loans.

       (b) The Master Servicer hereby makes the representations and
warranties set forth in Schedule IV hereto, and by this reference incorporated
herein, to the Depositor and the Trustee, as of the Closing Date.

       (c) Upon discovery by any of the parties hereto of a breach of a
representation or warranty with respect to a Mortgage Loan made pursuant to
Section 2.03(a) that materially and

                                    52

<PAGE>

adversely affects the interests of the Certificateholders in that Mortgage
Loan, the party discovering such breach shall give prompt notice thereof to
the other parties. Each Seller hereby covenants that within 90 days of the
earlier of its discovery or its receipt of written notice from any party of a
breach of any representation or warranty with respect to a Mortgage Loan sold
by it pursuant to Section 2.03(a) that materially and adversely affects the
interests of the Certificateholders in that Mortgage Loan, it shall cure such
breach in all material respects, and if such breach is not so cured, shall,
(i) if such 90-day period expires prior to the second anniversary of the
Closing Date, remove such Mortgage Loan (a "Deleted Mortgage Loan") from the
Trust Fund and substitute in its place a Substitute Mortgage Loan, in the
manner and subject to the conditions set forth in this Section; or (ii)
repurchase the affected Mortgage Loan or Mortgage Loans from the Trustee at
the Purchase Price in the manner set forth below; provided, however, that any
such substitution pursuant to (i) above shall not be effected prior to the
delivery to the Trustee of the Opinion of Counsel required by Section 2.05, if
any, and any such substitution pursuant to (i) above shall not be effected
prior to the additional delivery to the Trustee of a Request for Release
substantially in the form of Exhibit N and the Mortgage File for any such
Substitute Mortgage Loan. The Seller repurchasing a Mortgage Loan pursuant to

this Section 2.03(c) shall promptly reimburse the Master Servicer and the
Trustee for any expenses reasonably incurred by the Master Servicer or the
Trustee in respect of enforcing the remedies for such breach. With respect to
the representations and warranties described in this Section which are made to
the best of a Seller's knowledge, if it is discovered by either the Depositor,
a Seller or the Trustee that the substance of such representation and warranty
is inaccurate and such inaccuracy materially and adversely affects the value
of the related Mortgage Loan or the interests of the Certificateholders
therein, notwithstanding that Seller's lack of knowledge with respect to the
substance of such representation or warranty, such inaccuracy shall be deemed
a breach of the applicable representation or warranty.

     With respect to any Substitute Mortgage Loan or Loans sold to the
Depositor by a Seller, Countrywide (on its own behalf and on behalf of Park
Granada, Park Monaco and Park Sienna) shall deliver to the Trustee for the
benefit of the Certificateholders the Mortgage Note, the Mortgage, the related
assignment of the Mortgage, and such other documents and agreements as are
required by Section 2.01, with the Mortgage Note endorsed and the Mortgage
assigned as required by Section 2.01. No substitution is permitted to be made
in any calendar month after the Determination Date for such month. Scheduled
Payments due with respect to Substitute Mortgage Loans in the month of
substitution shall not be part of the Trust Fund and will be retained by the
related Seller on the next succeeding Distribution Date. For the month of
substitution, distributions to Certificateholders will include the monthly
payment due on any Deleted Mortgage Loan for such month and thereafter that
Seller shall be entitled to retain all amounts received in respect of such
Deleted Mortgage Loan. The Master Servicer shall amend the Mortgage Loan
Schedule for the benefit of the Certificateholders to reflect the removal of
such Deleted Mortgage Loan and the substitution of the Substitute Mortgage
Loan or Loans and the Master Servicer shall deliver the amended Mortgage Loan
Schedule to the Trustee. Upon such substitution, the Substitute Mortgage Loan
or Loans shall be subject to the terms of this Agreement in all respects, and
the related Seller shall be deemed to have made with respect to such
Substitute Mortgage Loan or Loans, as of the date of substitution, the
representations and warranties made pursuant to Section 2.03(a) with respect
to such Mortgage Loan. Upon any such substitution and the deposit to the
Certificate Account of the amount required to be deposited therein in
connection with such substitution as described in the following paragraph,

                                    53

<PAGE>

the Trustee shall release the Mortgage File held for the benefit of the
Certificateholders relating to such Deleted Mortgage Loan to the related
Seller and shall execute and deliver at such Seller's direction such
instruments of transfer or assignment prepared by Countrywide (on its own
behalf and on behalf of Park Granada, Park Monaco and Park Sienna), in each
case without recourse, as shall be necessary to vest title in that Seller, or
its designee, the Trustee's interest in any Deleted Mortgage Loan substituted
for pursuant to this Section 2.03.

     For any month in which a Seller substitutes one or more Substitute
Mortgage Loans for one or more Deleted Mortgage Loans, the Master Servicer
will determine the amount (if any) by which the aggregate principal balance of
all Substitute Mortgage Loans sold to the Depositor by that Seller as of the
date of substitution is less than the aggregate Stated Principal Balance of

all Deleted Mortgage Loans repurchased by that Seller (after application of
the scheduled principal portion of the monthly payments due in the month of
substitution). The amount of such shortage (the "Substitution Adjustment
Amount") plus an amount equal to the aggregate of any unreimbursed Advances
with respect to such Deleted Mortgage Loans shall be deposited in the
Certificate Account by Countrywide (on its own behalf and on behalf of Park
Granada, Park Monaco and Park Sienna) on or before the Distribution Account
Deposit Date for the Distribution Date in the month succeeding the calendar
month during which the related Mortgage Loan became required to be purchased
or replaced hereunder.

        In the event that a Seller shall have repurchased a Mortgage Loan, the
Purchase Price therefor shall be deposited in the Certificate Account pursuant
to Section 3.05 on or before the Distribution Account Deposit Date for the
Distribution Date in the month following the month during which that Seller
became obligated hereunder to repurchase or replace such Mortgage Loan and
upon such deposit of the Purchase Price, the delivery of the Opinion of
Counsel required by Section 2.05 and receipt of a Request for Release in the
form of Exhibit N hereto, the Trustee shall release the related Mortgage File
held for the benefit of the Certificateholders to such Person, and the Trustee
shall execute and deliver at such Person's direction such instruments of
transfer or assignment prepared by such Person, in each case without recourse,
as shall be necessary to transfer title from the Trustee. It is understood and
agreed that the obligation under this Agreement of any Person to cure,
repurchase or replace any Mortgage Loan as to which a breach has occurred and
is continuing shall constitute the sole remedy against such Persons respecting
such breach available to Certificateholders, the Depositor or the Trustee on
their behalf.

        The representations and warranties made pursuant to this Section 2.03
shall survive delivery of the respective Mortgage Files to the Trustee for the
benefit of the Certificateholders.

        SECTION 2.04. Representations and Warranties of the Depositor as to
the Mortgage Loans.

        The Depositor hereby represents and warrants to the Trustee with
respect to each Mortgage Loan as of the date of this Agreement or such other
date set forth in this Agreement that as of the Closing Date, and following
the transfer of the Mortgage Loans to it by each Seller, the Depositor had
good title to the Mortgage Loans and the Mortgage Notes were subject to no
offsets, defenses or counterclaims.

                                      54

<PAGE>

        The Depositor hereby assigns, transfers and conveys to the Trustee all
of its rights with respect to the Mortgage Loans including, without
limitation, the representations and warranties of each Seller made pursuant to
Section 2.03(a), together with all rights of the Depositor to require a Seller
to cure any breach thereof or to repurchase or substitute for any affected
Mortgage Loan in accordance with this Agreement.

        It is understood and agreed that the representations and warranties
set forth in this Section 2.04 shall survive delivery of the Mortgage Files to

the Trustee. Upon discovery by the Depositor or the Trustee of a breach of any
of the foregoing representations and warranties set forth in this Section 2.04
(referred to herein as a "breach"), which breach materially and adversely
affects the interest of the Certificateholders, the party discovering such
breach shall give prompt written notice to the others and to each Rating
Agency.

        SECTION 2.05. Delivery of Opinion of Counsel in Connection with
Substitutions.

        (a) Notwithstanding any contrary provision of this Agreement, no
substitution pursuant to Section 2.02 or Section 2.03 shall be made more than
90 days after the Closing Date unless Countrywide delivers to the Trustee an
Opinion of Counsel, which Opinion of Counsel shall not be at the expense of
either the Trustee or the Trust Fund, addressed to the Trustee, to the effect
that such substitution will not (i) result in the imposition of the tax on
"prohibited transactions" on the Trust Fund or contributions after the Startup
Date, as defined in Sections 860F(a)(2) and 860G(d) of the Code, respectively,
or (ii) cause any REMIC created under this Agreement to fail to qualify as a
REMIC at any time that any Certificates are outstanding.

        Upon discovery by the Depositor, a Seller, the Master Servicer, or the
Trustee that any Mortgage Loan does not constitute a "qualified mortgage"
within the meaning of Section 860G(a)(3) of the Code, the party discovering
such fact shall promptly (and in any event within five (5) Business Days of
discovery) give written notice thereof to the other parties. In connection
therewith, the Trustee shall require Countrywide (on its own behalf and on
behalf of Park Granada, Park Monaco and Park Sienna) at its option, to either
(i) substitute, if the conditions in Section 2.03(c) with respect to
substitutions are satisfied, a Substitute Mortgage Loan for the affected
Mortgage Loan, or (ii) repurchase the affected Mortgage Loan within 90 days of
such discovery in the same manner as it would a Mortgage Loan for a breach of
representation or warranty made pursuant to Section 2.03. The Trustee shall
reconvey to Countrywide the Mortgage Loan to be released pursuant to this
Section in the same manner, and on the same terms and conditions, as it would
a Mortgage Loan repurchased for breach of a representation or warranty
contained in Section 2.03.

        SECTION 2.06. Execution and Delivery of Certificates.

        The Trustee acknowledges the transfer and assignment to it of the
Trust Fund and, concurrently with such transfer and assignment, has executed
and delivered to or upon the order of the Depositor, the Certificates in
authorized denominations evidencing directly or indirectly the entire
ownership of the Trust Fund. The Trustee agrees to hold the Trust Fund and
exercise the rights referred to above for the benefit of all present and
future Holders of the Certificates and to perform the duties set forth in this
Agreement.

                                    55

<PAGE>

        SECTION 2.07. REMIC Matters.

        The Preliminary Statement sets forth the designations and "latest

possible maturity date" for federal income tax purposes of all interests
created hereby. The "Startup Day" for purposes of the REMIC Provisions shall
be the Closing Date. The "tax matters person" with respect to each REMIC
hereunder shall be the Trustee and the Trustee shall hold the Tax Matters
Person Certificate. Each REMIC's fiscal year shall be the calendar year.

SECTION 2.08. Covenants of the Master Servicer.

The Master Servicer covenants to the Depositor and the Trustee as
follows:

(a) the Master Servicer shall comply in the performance of its
obligations under this Agreement with all reasonable rules and requirements of
the insurer under each Required Insurance Policy; and

(b) no written information, certificate of an officer, statement
furnished in writing or written report delivered to the Depositor, any
affiliate of the Depositor or the Trustee and prepared by the Master Servicer
pursuant to this Agreement will contain any untrue statement of a material
fact or omit to state a material fact necessary to make such information,
certificate, statement or report not misleading.

56

<PAGE>

ARTICLE III
ADMINISTRATION AND SERVICING
OF MORTGAGE LOANS

SECTION 3.01. Master Servicer to Service Mortgage Loans.

For and on behalf of the Certificateholders, the Master Servicer shall
service and administer the Mortgage Loans in accordance with the terms of this
Agreement and customary and usual standards of practice of prudent mortgage
loan servicers. In connection with such servicing and administration, the
Master Servicer shall have full power and authority, acting alone and/or
through Subservicers as provided in Section 3.02, subject to the terms of this
Agreement (i) to execute and deliver, on behalf of the Certificateholders and
the Trustee, customary consents or waivers and other instruments and
documents, (ii) to consent to transfers of any Mortgaged Property and
assumptions of the Mortgage Notes and related Mortgages (but only in the
manner provided in this Agreement), (iii) to collect any Insurance Proceeds
and other Liquidation Proceeds (which for the purpose of this Section 3.01
includes any Subsequent Recoveries) and (iv) to effectuate foreclosure or
other conversion of the ownership of the Mortgaged Property securing any
Mortgage Loan; provided that the Master Servicer shall not take any action
that is inconsistent with or prejudices the interests of the Trust Fund or the
Certificateholders in any Mortgage Loan or the rights and interests of the
Depositor, the Trustee and the Certificateholders under this Agreement. The
Master Servicer shall represent and protect the interests of the Trust Fund in
the same manner as it protects its own interests in mortgage loans in its own
portfolio in any claim, proceeding or litigation regarding a Mortgage Loan,
and shall not make or permit any modification, waiver or amendment of any
Mortgage Loan which would cause any REMIC created under this Agreement to fail
to qualify as a REMIC or result in the imposition of any tax under section
860F(a) or section 860G(d) of the Code. Without limiting the generality of the

foregoing, the Master Servicer, in its own name or in the name of the
Depositor and the Trustee, is hereby authorized and empowered by the Depositor
and the Trustee, when the Master Servicer believes it appropriate in its
reasonable judgment, to execute and deliver, on behalf of the Trustee, the
Depositor, the Certificateholders or any of them, any and all instruments of
satisfaction or cancellation, or of partial or full release or discharge and
all other comparable instruments, with respect to the Mortgage Loans, and with
respect to the Mortgaged Properties held for the benefit of the
Certificateholders. The Master Servicer shall prepare and deliver to the
Depositor and/or the Trustee such documents requiring execution and delivery
by either or both of them as are necessary or appropriate to enable the Master
Servicer to service and administer the Mortgage Loans to the extent that the
Master Servicer is not permitted to execute and deliver such documents
pursuant to the preceding sentence. Upon receipt of such documents, the
Depositor and/or the Trustee shall execute such documents and deliver them to
the Master Servicer. The Master Servicer further is authorized and empowered
by the Trustee, on behalf of the Certificateholders and the Trustee, in its
own name or in the name of the Subservicer, when the Master Servicer or the
Subservicer, as the case may be, believes it appropriate in its best judgment
to register any Mortgage Loan on the MERS(R) System, or cause the removal from
the registration of any Mortgage Loan on the MERS(R) System, to execute and
deliver, on behalf of the Trustee and the Certificateholders or any of them,
any and all instruments of assignment and other comparable instruments with
respect to such assignment or re-recording of a Mortgage in the name of MERS,
solely as nominee for the Trustee and its successors and assigns.


                                      57

<PAGE>

        In accordance with the standards of the preceding paragraph, the
Master Servicer shall advance or cause to be advanced funds as necessary for
the purpose of effecting the payment of taxes and assessments on the Mortgaged
Properties, which advances shall be reimbursable in the first instance from
related collections from the Mortgagors pursuant to Section 3.06, and further
as provided in Section 3.08. The costs incurred by the Master Servicer, if
any, in effecting the timely payments of taxes and assessments on the
Mortgaged Properties and related insurance premiums shall not, for the purpose
of calculating monthly distributions to the Certificateholders, be added to
the Stated Principal Balances of the related Mortgage Loans, notwithstanding
that the terms of such Mortgage Loans so permit.

        SECTION 3.02. Subservicing; Enforcement of the Obligations of
Subservicers.

        (a) The Master Servicer may arrange for the subservicing of any
Mortgage Loan by a Subservicer pursuant to a subservicing agreement; provided,
however, that such subservicing arrangement and the terms of the related
subservicing agreement must provide for the servicing of such Mortgage Loans
in a manner consistent with the servicing arrangements contemplated under this
Agreement. Unless the context otherwise requires, references in this Agreement
to actions taken or to be taken by the Master Servicer in servicing the
Mortgage Loans include actions taken or to be taken by a Subservicer on behalf
of the Master Servicer. Notwithstanding the provisions of any subservicing
agreement, any of the provisions of this Agreement relating to agreements or
arrangements between the Master Servicer and a Subservicer or reference to
actions taken through a Subservicer or otherwise, the Master Servicer shall

remain obligated and liable to the Depositor, the Trustee and the
Certificateholders for the servicing and administration of the Mortgage Loans
in accordance with the provisions of this Agreement without diminution of such
obligation or liability by virtue of such subservicing agreements or
arrangements or by virtue of indemnification from the Subservicer and to the
same extent and under the same terms and conditions as if the Master Servicer
alone were servicing and administering the Mortgage Loans. All actions of each
Subservicer performed pursuant to the related subservicing agreement shall be
performed as an agent of the Master Servicer with the same force and effect as
if performed directly by the Master Servicer.

        (b) For purposes of this Agreement, the Master Servicer shall be
deemed to have received any collections, recoveries or payments with respect
to the Mortgage Loans that are received by a Subservicer regardless of whether
such payments are remitted by the Subservicer to the Master Servicer.

        SECTION 3.03. Rights of the Depositor and the Trustee in Respect of
the Master Servicer.

        The Depositor may, but is not obligated to, enforce the obligations of
the Master Servicer hereunder and may, but is not obligated to, perform, or
cause a designee to perform, any defaulted obligation of the Master Servicer
hereunder and in connection with any such defaulted obligation to exercise the
related rights of the Master Servicer hereunder; provided that the Master
Servicer shall not be relieved of any of its obligations hereunder by virtue
of such performance by the Depositor or its designee. Neither the Trustee nor
the Depositor shall have any responsibility or liability for any action or
failure to act by the Master Servicer nor shall the

                                      58

<PAGE>

Trustee or the Depositor be obligated to supervise the performance of the
Master Servicer under this Agreement or otherwise.

        SECTION 3.04. Trustee to Act as Master Servicer.

        In the event that the Master Servicer shall for any reason no longer
be the Master Servicer hereunder (including by reason of an Event of Default
or termination by the Depositor), the Trustee or its successor shall then
assume all of the rights and obligations of the Master Servicer hereunder
arising thereafter (except that the Trustee shall not be (i) liable for losses
of the Master Servicer pursuant to Section 3.09 or any acts or omissions of
the predecessor Master Servicer under this Agreement), (ii) obligated to make
Advances if it is prohibited from doing so by applicable law, (iii) obligated
to effectuate repurchases or substitutions of Mortgage Loans hereunder
including, but not limited to, repurchases or substitutions of Mortgage Loans
pursuant to Section 2.02 or 2.03, (iv) responsible for expenses of the Master
Servicer pursuant to Section 2.03 or (v) deemed to have made any
representations and warranties of the Master Servicer under this Agreement).
Any such assumption shall be subject to Section 7.02. If the Master Servicer
shall for any reason no longer be the Master Servicer (including by reason of
any Event of Default or termination by the Depositor), the Trustee or its
successor shall succeed to any rights and obligations of the Master Servicer
under each subservicing agreement.

The Master Servicer shall, upon request of the Trustee, but at the expense of the Master Servicer, deliver to the assuming party all documents and records relating to each subservicing agreement or substitute subservicing agreement and the Mortgage Loans then being serviced thereunder and an accounting of amounts collected or held by it and otherwise use its best efforts to effect the orderly and efficient transfer of the substitute subservicing agreement to the assuming party.

SECTION 3.05. Collection of Mortgage Loan Payments; Certificate Account; Distribution Account.

(a) The Master Servicer shall make reasonable efforts in accordance with the customary and usual standards of practice of prudent mortgage servicers to collect all payments called for under the terms and provisions of the Mortgage Loans to the extent such procedures shall be consistent with this Agreement and the terms and provisions of any related Required Insurance Policy. Consistent with the foregoing, the Master Servicer may in its discretion (i) waive any late payment charge or any prepayment charge or penalty interest in connection with the prepayment of a Mortgage Loan and (ii) extend the due dates for payments due on a Mortgage Note for a period not greater than 180 days; provided, however, that the Master Servicer cannot extend the maturity of any such Mortgage Loan past the date on which the final payment is due on the latest maturing Mortgage Loan as of the Cut-off Date. In the event of any such arrangement, the Master Servicer shall make Advances on the related Mortgage Loan in accordance with the provisions of Section 4.01 during the scheduled period in accordance with the amortization schedule of such Mortgage Loan without modification thereof by reason of such arrangements. The Master Servicer shall not be required to institute or join in litigation with respect to collection of any payment (whether under a Mortgage, Mortgage Note or otherwise or against any public or governmental authority with respect to a taking or condemnation) if it

59

<PAGE>

reasonably believes that enforcing the provision of the Mortgage or other instrument pursuant to which such payment is required is prohibited by applicable law.

(b) The Master Servicer shall establish and maintain a Certificate Account into which the Master Servicer shall deposit or cause to be deposited no later than two Business Days after receipt (or, if the current long-term credit rating of Countrywide Home Loans, Inc. is reduced below "A-" by S&P or "A3" by Moody's, the Master Servicer shall deposit or cause to be deposited on a daily basis within one Business Day of receipt), except as otherwise specifically provided in this Agreement, the following payments and collections remitted by Subservicers or received by it in respect of Mortgage Loans subsequent to the Cut-off Date (other than in respect of principal and interest due on the Mortgage Loans on or before the Cut-off Date) and the following amounts required to be deposited hereunder:

(i) all payments on account of principal on the Mortgage Loans, including Principal Prepayments;

(ii) all payments on account of interest on the Mortgage

3/3/2011

Loans, net of the related Master Servicing Fee and any lender paid mortgage insurance premiums;

        (iii) all Insurance Proceeds, Subsequent Recoveries and Liquidation Proceeds, other than proceeds to be applied to the restoration or repair of a Mortgaged Property or released to the Mortgagor in accordance with the Master Servicer's normal servicing procedures;

        (iv) any amount required to be deposited by the Master Servicer pursuant to Section 3.05(e) in connection with any losses on Permitted Investments;

        (v) any amounts required to be deposited by the Master Servicer pursuant to Section 3.09(c) and in respect of net monthly rental income from REO Property pursuant to Section 3.11;

        (vi) all Substitution Adjustment Amounts;

        (vii) all Advances made by the Master Servicer pursuant to Section 4.01; and

        (viii) any other amounts required to be deposited under this Agreement.

        In addition, with respect to any Mortgage Loan that is subject to a buydown agreement, on each Due Date for such Mortgage Loan, in addition to the monthly payment remitted by the Mortgagor, the Master Servicer shall cause funds to be deposited into the Certificate Account in an amount required to cause an amount of interest to be paid with respect to such Mortgage Loan equal to the amount of interest that has accrued on such Mortgage Loan from the preceding Due Date at the Mortgage Rate net of the related Master Servicing Fee.

        The foregoing requirements for remittance by the Master Servicer shall be exclusive, it being understood and agreed that, without limiting the generality of the foregoing, payments in the nature of prepayment penalties, late payment charges or assumption fees, if collected, need not be remitted by the Master Servicer. In the event that the Master Servicer shall remit any

60

<PAGE>

amount not required to be remitted, it may at any time withdraw or direct the institution maintaining the Certificate Account to withdraw such amount from the Certificate Account, any provision in this Agreement to the contrary notwithstanding. Such withdrawal or direction may be accomplished by delivering written notice thereof to the Trustee or such other institution maintaining the Certificate Account which describes the amounts deposited in error in the Certificate Account. The Master Servicer shall maintain adequate records with respect to all withdrawals made pursuant to this Section. All funds deposited in the Certificate Account shall be held in trust for the Certificateholders until withdrawn in accordance with Section 3.08.

        (c) [Reserved].

(d) The Trustee shall establish and maintain, on behalf of the Certificateholders, the Distribution Account. The Trustee shall, promptly upon receipt, deposit in the Distribution Account and retain in the Distribution Account the following:

      (i) the aggregate amount remitted by the Master Servicer to the Trustee pursuant to Section 3.08(a)(ix);

      (ii) any amount deposited by the Master Servicer pursuant to Section 3.05(e) in connection with any losses on Permitted Investments; and

      (iii) any other amounts deposited hereunder which are required to be deposited in the Distribution Account.

In the event that the Master Servicer shall remit any amount not required to be remitted, it may at any time direct the Trustee to withdraw such amount from the Distribution Account, any provision in this Agreement to the contrary notwithstanding. Such direction may be accomplished by delivering an Officer's Certificate to the Trustee which describes the amounts deposited in error in the Distribution Account. All funds deposited in the Distribution Account shall be held by the Trustee in trust for the Certificateholders until disbursed in accordance with this Agreement or withdrawn in accordance with Section 3.08. In no event shall the Trustee incur liability for withdrawals from the Distribution Account at the direction of the Master Servicer.

(e) Each institution at which the Certificate Account or the Distribution Account is maintained shall invest the funds in such account as directed in writing by the Master Servicer in Permitted Investments, which shall mature not later than (i) in the case of the Certificate Account, the second Business Day next preceding the related Distribution Account Deposit Date (except that if such Permitted Investment is an obligation of the institution that maintains such account, then such Permitted Investment shall mature not later than the Business Day next preceding such Distribution Account Deposit Date) and (ii) in the case of the Distribution Account, the Business Day next preceding the Distribution Date (except that if such Permitted Investment is an obligation of the institution that maintains such fund or account, then such Permitted Investment shall mature not later than such Distribution Date) and, in each case, shall not be sold or disposed of prior to its maturity. All such Permitted Investments shall be made in the name of the Trustee, for the benefit of the Certificateholders. All income and gain net of any losses realized from any such investment of funds on deposit in the Certificate Account or the

<div align="center">61</div>

<PAGE>

Distribution Account shall be for the benefit of the Master Servicer as servicing compensation and shall be remitted to it monthly as provided in this Agreement. The amount of any realized losses in the Certificate Account or the Distribution Account incurred in any such account in respect of any such investments shall promptly be deposited by the Master Servicer in the Certificate Account or paid to the Trustee for deposit into the Distribution Account, as applicable. The Trustee in its fiduciary capacity shall not be liable for the amount of any loss incurred in respect of any investment or

lack of investment of funds held in the Certificate Account or the
Distribution Account and made in accordance with this Section 3.05.

(f) The Master Servicer shall give notice to the Trustee, each Seller,
each Rating Agency and the Depositor of any proposed change of the location of
the Certificate Account prior to any change thereof. The Trustee shall give
notice to the Master Servicer, each Seller, each Rating Agency and the
Depositor of any proposed change of the location of the Distribution Account
prior to any change thereof.

(g) Reserved.

(h) Reserved.

SECTION 3.06. Collection of Taxes, Assessments and Similar Items;
Escrow Accounts.

(a) To the extent required by the related Mortgage Note and not
violative of current law, the Master Servicer shall establish and maintain one
or more accounts (each, an "Escrow Account") and deposit and retain in such
accounts all collections from the Mortgagors (or advances by the Master
Servicer) for the payment of taxes, assessments, hazard insurance premiums or
comparable items for the account of the Mortgagors. Nothing in this Agreement
shall require the Master Servicer to compel a Mortgagor to establish an Escrow
Account in violation of applicable law.

(b) Withdrawals of amounts so collected from the Escrow Accounts may
be made only to effect timely payment of taxes, assessments, hazard insurance
premiums, condominium or PUD association dues, or comparable items, to
reimburse the Master Servicer out of related collections for any payments made
pursuant to Sections 3.01 (with respect to taxes and assessments and insurance
premiums) and 3.09 (with respect to hazard insurance), to refund to any
Mortgagors any sums determined to be overages, to pay interest, if required by
law or the terms of the related Mortgage or Mortgage Note, to Mortgagors on
balances in the Escrow Account or to clear and terminate the Escrow Account at
the termination of this Agreement in accordance with Section 9.01. The Escrow
Accounts shall not be a part of the Trust Fund.

(c) The Master Servicer shall advance any payments referred to in
Section 3.06(a) that are not timely paid by the Mortgagors on the date when
the tax, premium or other cost for which such payment is intended is due, but
the Master Servicer shall be required so to advance only to the extent that
such advances, in the good faith judgment of the Master Servicer will be
recoverable by the Master Servicer out of Insurance Proceeds, Liquidation
Proceeds or otherwise.

<center>62</center>

<PAGE>

SECTION 3.07. Access to Certain Documentation and Information
Regarding the Mortgage Loans.

The Master Servicer shall afford each Seller, the Depositor and the
Trustee reasonable access to all records and documentation regarding the
Mortgage Loans and all accounts, insurance information and other matters
relating to this Agreement, such access being afforded without charge, but

only upon reasonable request and during normal business hours at the office designated by the Master Servicer.

    Upon reasonable advance notice in writing, the Master Servicer will provide to each Certificateholder and/or Certificate Owner which is a savings and loan association, bank or insurance company certain reports and reasonable access to information and documentation regarding the Mortgage Loans sufficient to permit such Certificateholder and/or Certificate Owner to comply with applicable regulations of the OTS or other regulatory authorities with respect to investment in the Certificates; provided that the Master Servicer shall be entitled to be reimbursed by each such Certificateholder and/or Certificate Owner for actual expenses incurred by the Master Servicer in providing such reports and access.

    SECTION 3.08. Permitted Withdrawals from the Certificate Account and the Distribution Account.

    (a) The Master Servicer may from time to time make withdrawals from the Certificate Account for the following purposes:

        (i) to pay to the Master Servicer (to the extent not previously retained by the Master Servicer), the servicing compensation to which it is entitled pursuant to Section 3.14 and to pay to the Master Servicer, as additional servicing compensation, earnings on or investment income with respect to funds in or credited to the Certificate Account;

        (ii) to reimburse each of the Master Servicer and the Trustee for unreimbursed Advances made by it, such right of reimbursement pursuant to this subclause (ii) being limited to amounts received on the Mortgage Loan(s) in respect of which any such Advance was made;

        (iii) to reimburse each of the Master Servicer and the Trustee for any Nonrecoverable Advance previously made by it;

        (iv) to reimburse the Master Servicer for Insured Expenses from the related Insurance Proceeds;

        (v) to reimburse the Master Servicer for (a) unreimbursed Servicing Advances, the Master Servicer's right to reimbursement pursuant to this clause (a) with respect to any Mortgage Loan being limited to amounts received on such Mortgage Loan(s) that represent late recoveries of the payments for which such advances were made pursuant to Section 3.01 or Section 3.06 and (b) for unpaid Master Servicing Fees as provided in Section 3.11;

63

<PAGE>

        (vi) to pay to the purchaser, with respect to each Mortgage Loan or property acquired in respect thereof that has been purchased pursuant to Section 2.02, 2.03 or 3.11, all amounts received on such Mortgage Loan after the date of such purchase;

        (vii) to reimburse the Sellers, the Master Servicer or the Depositor for expenses incurred by any of them and reimbursable

pursuant to Section 6.03;

        (viii) to withdraw any amount deposited in the Certificate Account and not required to be deposited in the Certificate Account;

        (ix) on or prior to the Distribution Account Deposit Date, to withdraw an amount equal to the related Available Funds and the applicable portion of the Trustee Fee for such Distribution Date and remit such amount to the Trustee for deposit in the Distribution Account; and

        (x) to clear and terminate the Certificate Account upon termination of this Agreement pursuant to Section 9.01.

The Master Servicer shall keep and maintain separate accounting, on a Mortgage Loan by Mortgage Loan basis, for the purpose of justifying any withdrawal from the Certificate Account pursuant to such subclauses (i), (ii), (iv), (v) and (vi). Prior to making any withdrawal from the Certificate Account pursuant to subclause (iii), the Master Servicer shall deliver to the Trustee an Officer's Certificate of a Servicing Officer indicating the amount of any previous Advance determined by the Master Servicer to be a Nonrecoverable Advance and identifying the related Mortgage Loans(s), and their respective portions of such Nonrecoverable Advance.

(b) The Trustee shall withdraw funds from the Distribution Account for distributions to Certificateholders, in the manner specified in this Agreement (and to withhold from the amounts so withdrawn, the amount of any taxes that it is authorized to withhold pursuant to the last paragraph of Section 8.11). In addition, the Trustee may from time to time make withdrawals from the Distribution Account for the following purposes:

        (i) to pay to itself the Trustee Fee for the related Distribution Date;

        (ii) to pay to the Master Servicer as additional servicing compensation earnings on or investment income with respect to funds in the Distribution Account;

        (iii) to withdraw and return to the Master Servicer any amount deposited in the Distribution Account and not required to be deposited therein;

        (iv) to reimburse the Trustee for any unreimbursed Advances made by it pursuant to Section 4.01(b) hereof, such right of reimbursement pursuant to this subclause (iv) being limited to (x) amounts received on the related Mortgage Loan(s) in respect of which any such Advance was made and (y) amounts not otherwise reimbursed to the Trustee pursuant to Section 3.08(a)(ii) hereof;

        (v) to reimburse the Trustee for any Nonrecoverable Advance previously made by the Trustee pursuant to Section 4.01(b) hereof, such right of reimbursement

64

&lt;PAGE&gt;

pursuant to this subclause (v) being limited to amounts not otherwise reimbursed to the Trustee pursuant to Section 3.08(a)(iii) hereof; and

(vi) to clear and terminate the Distribution Account upon termination of the Agreement pursuant to Section 9.01.

SECTION 3.09. Maintenance of Hazard Insurance; Maintenance of Primary Insurance Policies.

(a) The Master Servicer shall cause to be maintained, for each Mortgage Loan, hazard insurance with extended coverage in an amount that is at least equal to the lesser of (i) the maximum insurable value of the improvements securing such Mortgage Loan or (ii) the greater of (y) the outstanding principal balance of the Mortgage Loan and (z) an amount such that the proceeds of such policy shall be sufficient to prevent the Mortgagor and/or the mortgagee from becoming a co-insurer. Each such policy of standard hazard insurance shall contain, or have an accompanying endorsement that contains, a standard mortgagee clause. Any amounts collected by the Master Servicer under any such policies (other than the amounts to be applied to the restoration or repair of the related Mortgaged Property or amounts released to the Mortgagor in accordance with the Master Servicer's normal servicing procedures) shall be deposited in the Certificate Account. Any cost incurred by the Master Servicer in maintaining any such insurance shall not, for the purpose of calculating monthly distributions to the Certificateholders or remittances to the Trustee for their benefit, be added to the principal balance of the Mortgage Loan, notwithstanding that the terms of the Mortgage Loan so permit. Such costs shall be recoverable by the Master Servicer out of late payments by the related Mortgagor or out of the proceeds of liquidation of the Mortgage Loan or Subsequent Recoveries to the extent permitted by Section 3.08. It is understood and agreed that no earthquake or other additional insurance is to be required of any Mortgagor or maintained on property acquired in respect of a Mortgage other than pursuant to such applicable laws and regulations as shall at any time be in force and as shall require such additional insurance. If the Mortgaged Property is located at the time of origination of the Mortgage Loan in a federally designated special flood hazard area and such area is participating in the national flood insurance program, the Master Servicer shall cause flood insurance to be maintained with respect to such Mortgage Loan. Such flood insurance shall be in an amount equal to the least of (i) the outstanding principal balance of the related Mortgage Loan, (ii) the replacement value of the improvements which are part of such Mortgaged Property, and (iii) the maximum amount of such insurance available for the related Mortgaged Property under the national flood insurance program.

(b) The Master Servicer shall not take any action which would result in non-coverage under any applicable Primary Insurance Policy of any loss which, but for the actions of the Master Servicer, would have been covered thereunder. The Master Servicer shall not cancel or refuse to renew any such Primary Insurance Policy that is in effect at the date of the initial issuance of the Certificates and is required to be kept in force hereunder unless the replacement Primary Insurance Policy for such canceled or non-renewed policy is maintained with a Qualified Insurer.

Except with respect to any Lender PMI Mortgage Loans, the Master Servicer shall not be required to maintain any Primary Insurance Policy (i) with respect to any Mortgage Loan with a

65

&lt;PAGE&gt;

Loan-to-Value Ratio less than or equal to 80% as of any date of determination
or, based on a new appraisal, the principal balance of such Mortgage Loan
represents 80% or less of the new appraised value or (ii) if maintaining such
Primary Insurance Policy is prohibited by applicable law. With respect to the
Lender PMI Mortgage Loans, the Master Servicer shall maintain the Primary
Insurance Policy for the life of such Mortgage Loans, unless otherwise
provided for in the related Mortgage Note or prohibited by law.

     The Master Servicer agrees to effect the timely payment of the
premiums on each Primary Insurance Policy, and such costs not otherwise
recoverable shall be recoverable by the Master Servicer from the related
proceeds of liquidation and Subsequent Recoveries.

     (c) In connection with its activities as Master Servicer of the
Mortgage Loans, the Master Servicer agrees to present on behalf of itself, the
Trustee and Certificateholders, claims to the insurer under any Primary
Insurance Policies and, in this regard, to take such reasonable action as
shall be necessary to permit recovery under any Primary Insurance Policies
respecting defaulted Mortgage Loans. Any amounts collected by the Master
Servicer under any Primary Insurance Policies shall be deposited in the
Certificate Account.

     SECTION 3.10. Enforcement of Due-on-Sale Clauses; Assumption
Agreements.

     (a) Except as otherwise provided in this Section, when any property
subject to a Mortgage has been conveyed by the Mortgagor, the Master Servicer
shall to the extent that it has knowledge of such conveyance, enforce any
due-on-sale clause contained in any Mortgage Note or Mortgage, to the extent
permitted under applicable law and governmental regulations, but only to the
extent that such enforcement will not adversely affect or jeopardize coverage
under any Required Insurance Policy. Notwithstanding the foregoing, the Master
Servicer is not required to exercise such rights with respect to a Mortgage
Loan if the Person to whom the related Mortgaged Property has been conveyed or
is proposed to be conveyed satisfies the terms and conditions contained in the
Mortgage Note and Mortgage related thereto and the consent of the mortgagee
under such Mortgage Note or Mortgage is not otherwise so required under such
Mortgage Note or Mortgage as a condition to such transfer. In the event that
the Master Servicer is prohibited by law from enforcing any such due-on-sale
clause, or if coverage under any Required Insurance Policy would be adversely
affected, or if nonenforcement is otherwise permitted hereunder, the Master
Servicer is authorized, subject to Section 3.10(b), to take or enter into an
assumption and modification agreement from or with the person to whom such
property has been or is about to be conveyed, pursuant to which such person
becomes liable under the Mortgage Note and, unless prohibited by applicable
state law, the Mortgagor remains liable thereon, provided that the Mortgage
Loan shall continue to be covered (if so covered before the Master Servicer
enters such agreement) by the applicable Required Insurance Policies. The
Master Servicer, subject to Section 3.10(b), is also authorized with the prior
approval of the insurers under any Required Insurance Policies to enter into a
substitution of liability agreement with such Person, pursuant to which the
original Mortgagor is released from liability and such Person is substituted

as Mortgagor and becomes liable under the Mortgage Note. Notwithstanding the
foregoing, the Master Servicer shall not be deemed to be in default under this
Section by reason of any transfer or assumption which the Master Servicer
reasonably believes it is restricted by law from preventing, for any reason
whatsoever.

<div align="center">66</div>

<PAGE>

        (b) Subject to the Master Servicer's duty to enforce any due-on-sale
clause to the extent set forth in Section 3.10(a), in any case in which a
Mortgaged Property has been conveyed to a Person by a Mortgagor, and such
Person is to enter into an assumption agreement or modification agreement or
supplement to the Mortgage Note or Mortgage that requires the signature of the
Trustee, or if an instrument of release signed by the Trustee is required
releasing the Mortgagor from liability on the Mortgage Loan, the Master
Servicer shall prepare and deliver or cause to be prepared and delivered to
the Trustee for signature and shall direct, in writing, the Trustee to execute
the assumption agreement with the Person to whom the Mortgaged Property is to
be conveyed and such modification agreement or supplement to the Mortgage Note
or Mortgage or other instruments as are reasonable or necessary to carry out
the terms of the Mortgage Note or Mortgage or otherwise to comply with any
applicable laws regarding assumptions or the transfer of the Mortgaged
Property to such Person. In connection with any such assumption, no material
term of the Mortgage Note may be changed. In addition, the substitute
Mortgagor and the Mortgaged Property must be acceptable to the Master Servicer
in accordance with its underwriting standards as then in effect. Together with
each such substitution, assumption or other agreement or instrument delivered
to the Trustee for execution by it, the Master Servicer shall deliver an
Officer's Certificate signed by a Servicing Officer stating that the
requirements of this subsection have been met in connection therewith. The
Master Servicer shall notify the Trustee that any such substitution or
assumption agreement has been completed by forwarding to the Trustee the
original of such substitution or assumption agreement, which in the case of
the original shall be added to the related Mortgage File and shall, for all
purposes, be considered a part of such Mortgage File to the same extent as all
other documents and instruments constituting a part thereof. Any fee collected
by the Master Servicer for entering into an assumption or substitution of
liability agreement will be retained by the Master Servicer as additional
servicing compensation.

        SECTION 3.11. Realization Upon Defaulted Mortgage Loans; Repurchase of
Certain Mortgage Loans.

        (a) The Master Servicer shall use reasonable efforts to foreclose upon
or otherwise comparably convert the ownership of properties securing such of
the Mortgage Loans as come into and continue in default and as to which no
satisfactory arrangements can be made for collection of delinquent payments.
In connection with any foreclosure or other conversion, the Master Servicer
shall follow such practices and procedures as it shall deem necessary or
advisable and as shall be normal and usual in its general mortgage servicing
activities and meet the requirements of the insurer under any Required
Insurance Policy; provided, however, that the Master Servicer shall not be
required to expend its own funds in connection with any foreclosure or towards
the restoration of any property unless it shall determine (i) that such
restoration and/or foreclosure will increase the proceeds of liquidation of

the Mortgage Loan after reimbursement to itself of such expenses and (ii) that
such expenses will be recoverable to it through the proceeds of liquidation of
the Mortgage Loan and Subsequent Recoveries (respecting which it shall have
priority for purposes of withdrawals from the Certificate Account). The Master
Servicer shall be responsible for all other costs and expenses incurred by it
in any such proceedings; provided, however, that it shall be entitled to
reimbursement thereof from the proceeds of liquidation of the Mortgage Loan
and Subsequent Recoveries with respect to the related Mortgaged Property, as
provided in the definition of Liquidation Proceeds. If the Master Servicer has
knowledge that a Mortgaged Property which the Master Servicer is contemplating

67

<PAGE>

acquiring in foreclosure or by deed in lieu of foreclosure is located within a
one mile radius of any site listed in the Expenditure Plan for the Hazardous
Substance Clean Up Bond Act of 1984 or other site with environmental or
hazardous waste risks known to the Master Servicer, the Master Servicer will,
prior to acquiring the Mortgaged Property, consider such risks and only take
action in accordance with its established environmental review procedures.

With respect to any REO Property, the deed or certificate of sale
shall be taken in the name of the Trustee for the benefit of the
Certificateholders, or its nominee, on behalf of the Certificateholders. The
Trustee's name shall be placed on the title to such REO Property solely as the
Trustee hereunder and not in its individual capacity. The Master Servicer
shall ensure that the title to such REO Property references the Pooling and
Servicing Agreement and the Trustee's capacity thereunder. Pursuant to its
efforts to sell such REO Property, the Master Servicer shall either itself or
through an agent selected by the Master Servicer protect and conserve such REO
Property in the same manner and to such extent as is customary in the locality
where such REO Property is located and may, incident to its conservation and
protection of the interests of the Certificateholders, rent the same, or any
part thereof, as the Master Servicer deems to be in the best interest of the
Certificateholders for the period prior to the sale of such REO Property. The
Master Servicer shall prepare for and deliver to the Trustee a statement with
respect to each REO Property that has been rented showing the aggregate rental
income received and all expenses incurred in connection with the maintenance
of such REO Property at such times as is necessary to enable the Trustee to
comply with the reporting requirements of the REMIC Provisions. The net
monthly rental income, if any, from such REO Property shall be deposited in
the Certificate Account no later than the close of business on each
Determination Date. The Master Servicer shall perform the tax reporting and
withholding required by sections 1445 and 6050J of the Code with respect to
foreclosures and abandonments, the tax reporting required by section 6050H of
the Code with respect to the receipt of mortgage interest from individuals and
any tax reporting required by section 6050P of the Code with respect to the
cancellation of indebtedness by certain financial entities, by preparing such
tax and information returns as may be required, in the form required, and
delivering the same to the Trustee for filing.

In the event that the Trust Fund acquires any Mortgaged Property as
aforesaid or otherwise in connection with a default or imminent default on a
Mortgage Loan, the Master Servicer shall dispose of such Mortgaged Property as
soon as practicable in a manner that maximizes the Liquidation Proceeds

thereof, but in no event later than three years after its acquisition by the Trust Fund. In that event, the Trustee shall have been supplied with an Opinion of Counsel to the effect that the holding by the Trust Fund of such Mortgaged Property subsequent to a three-year period, if applicable, will not result in the imposition of taxes on "prohibited transactions" of any REMIC hereunder as defined in section 860F of the Code or cause any REMIC hereunder to fail to qualify as a REMIC at any time that any Certificates are outstanding, and that the Trust Fund may continue to hold such Mortgaged Property (subject to any conditions contained in such Opinion of Counsel) after the expiration of such three-year period. Notwithstanding any other provision of this Agreement, no Mortgaged Property acquired by the Trust Fund shall be rented (or allowed to continue to be rented) or otherwise used for the production of income by or on behalf of the Trust Fund in such a manner or pursuant to any terms that would (i) cause such Mortgaged Property to fail to qualify as "foreclosure property" within the meaning of section 860G(a)(8) of the Code or (ii) subject any REMIC hereunder to the imposition of any federal, state or local income taxes on the income earned from such

68

<PAGE>

Mortgaged Property under section 860G(c) of the Code or otherwise, unless the Master Servicer has agreed to indemnify and hold harmless the Trust Fund with respect to the imposition of any such taxes.

In the event of a default on a Mortgage Loan one or more of whose obligor is not a United States Person, as that term is defined in section 7701(a)(30) of the Code, in connection with any foreclosure or acquisition of a deed in lieu of foreclosure (together, "foreclosure") in respect of such Mortgage Loan, the Master Servicer will cause compliance with the provisions of Treasury Regulation Section 1.1445-2(d)(3) (or any successor thereto) necessary to assure that no withholding tax obligation arises with respect to the proceeds of such foreclosure except to the extent, if any, that proceeds of such foreclosure are required to be remitted to the obligors on such Mortgage Loan.

The decision of the Master Servicer to foreclose on a defaulted Mortgage Loan shall be subject to a determination by the Master Servicer that the proceeds of such foreclosure would exceed the costs and expenses of bringing such a proceeding. The income earned from the management of any REO Properties, net of reimbursement to the Master Servicer for expenses incurred (including any property or other taxes) in connection with such management and net of unreimbursed Master Servicing Fees, Advances and Servicing Advances, shall be applied to the payment of principal of and interest on the related defaulted Mortgage Loans (with interest accruing as though such Mortgage Loans were still current) and all such income shall be deemed, for all purposes in this Agreement, to be payments on account of principal and interest on the related Mortgage Notes and shall be deposited into the Certificate Account. To the extent the net income received during any calendar month is in excess of the amount attributable to amortizing principal and accrued interest at the related Mortgage Rate on the related Mortgage Loan for such calendar month, such excess shall be considered to be a partial prepayment of principal of the related Mortgage Loan.

The proceeds from any liquidation of a Mortgage Loan, as well as any income from an REO Property, will be applied in the following order of

priority: first, to reimburse the Master Servicer for any related unreimbursed
Servicing Advances and Master Servicing Fees; second, to reimburse the Master
Servicer or the Trustee for any unreimbursed Advances; third, to reimburse the
Certificate Account for any Nonrecoverable Advances (or portions thereof) that
were previously withdrawn by the Master Servicer or the Trustee pursuant to
Section 3.08(a)(iii) that related to such Mortgage Loan; fourth, to accrued
and unpaid interest (to the extent no Advance has been made for such amount or
any such Advance has been reimbursed) on the Mortgage Loan or related REO
Property, at the Adjusted Net Mortgage Rate to the Due Date occurring in the
month in which such amounts are required to be distributed; and fifth, as a
recovery of principal of the Mortgage Loan. Excess Proceeds, if any, from the
liquidation of a Liquidated Mortgage Loan will be retained by the Master
Servicer as additional servicing compensation pursuant to Section 3.14.

     The Master Servicer, in its sole discretion, shall have the right to
purchase for its own account from the Trust Fund any Mortgage Loan which is
151 days or more delinquent at a price equal to the Purchase Price; provided,
however, that the Master Servicer may only exercise this right on or before
the next to the last day of the calendar month in which such Mortgage Loan
became 151 days delinquent (such month, the "Eligible Repurchase Month");
provided further,

                                   69

<PAGE>

that any such Mortgage Loan which becomes current but thereafter becomes
delinquent may be purchased by the Master Servicer pursuant to this Section in
any ensuing Eligible Repurchase Month. The Purchase Price for any Mortgage
Loan purchased under this Section 3.11 shall be deposited in the Certificate
Account and the Trustee, upon receipt of a certificate from the Master
Servicer in the form of Exhibit N to this Agreement, shall release or cause to
be released to the purchaser of such Mortgage Loan the related Mortgage File
and shall execute and deliver such instruments of transfer or assignment
prepared by the purchaser of such Mortgage Loan, in each case without
recourse, as shall be necessary to vest in the purchaser of such Mortgage Loan
any Mortgage Loan released pursuant hereto and the purchaser of such Mortgage
Loan shall succeed to all the Trustee's right, title and interest in and to
such Mortgage Loan and all security and documents related thereto. Such
assignment shall be an assignment outright and not for security. The purchaser
of such Mortgage Loan shall thereupon own such Mortgage Loan, and all security
and documents, free of any further obligation to the Trustee or the
Certificateholders with respect thereto.

     (b) Countrywide may agree to a modification of any Mortgage Loan (the
"Modified Mortgage Loan") if (i) the modification is in lieu of a refinancing,
(ii) the Mortgage Rate on the Modified Mortgage Loan is approximately a
prevailing market rate for newly-originated mortgage loans having similar
terms and (iii) Countrywide purchases the Modified Mortgage Loan from the
Trust Fund as described below. Effective immediately after the modification,
and, in any event, on the same Business Day on which the modification occurs,
all interest of the Trustee in the Modified Mortgage Loan shall automatically
be deemed transferred and assigned to Countrywide and all benefits and burdens
of ownership thereof, including the right to accrued interest thereon from the
date of modification and the risk of default thereon, shall pass to
Countrywide. The Master Servicer shall promptly deliver to the Trustee a
certification of a Servicing Officer to the effect that all requirements of

this paragraph have been satisfied with respect to the Modified Mortgage Loan.
For federal income tax purposes, the Trustee shall account for such purchase
as a prepayment in full of the Modified Mortgage Loan.

       Countrywide shall pay to the Master Servicer, and the Master Servicer
shall deposit the Purchase Price for any Modified Mortgage Loan in the
Certificate Account pursuant to Section 3.05 within one Business Day after the
purchase of the Modified Mortgage Loan. Upon receipt by the Trustee of written
notification of any such deposit signed by a Servicing Officer, the Trustee
shall release to Countrywide the related Mortgage File and shall execute and
deliver such instruments of transfer or assignment, in each case without
recourse, as shall be necessary to vest in Countrywide any Modified Mortgage
Loan previously transferred and assigned pursuant to this Agreement.
Countrywide covenants and agrees to indemnify the Trust Fund against any
liability for any "prohibited transaction" taxes and any related interest,
additions, and penalties imposed on the Trust Fund established hereunder as a
result of any modification of a Mortgage Loan effected pursuant to this
subsection (b), any holding of a Modified Mortgage Loan by the Trust Fund or
any purchase of a Modified Mortgage Loan by Countrywide (but such obligation
shall not prevent Countrywide or any other appropriate Person from in good
faith contesting any such tax in appropriate proceedings and shall not prevent
Countrywide from withholding payment of such tax, if permitted by law, pending
the outcome of such proceedings). Countrywide shall have no right of
reimbursement for any amount paid pursuant to the foregoing indemnification,
except to the extent that the amount of any tax, interest, and penalties,
together with interest thereon, is refunded to the Trust Fund or Countrywide.

                                      70

<PAGE>

       SECTION 3.12. Trustee to Cooperate; Release of Mortgage Files.

            Upon the payment in full of any Mortgage Loan, or the receipt
by the Master Servicer of a notification that payment in full will be escrowed
in a manner customary for such purposes, the Master Servicer will immediately
notify the Trustee by delivering, or causing to be delivered a Request for
Release substantially in the form of Exhibit N. Upon receipt of such request,
the Trustee shall promptly release the related Mortgage File to the Master
Servicer, and the Trustee shall at the Master Servicer's direction execute and
deliver to the Master Servicer the request for reconveyance, deed of
reconveyance or release or satisfaction of mortgage or such instrument
releasing the lien of the Mortgage in each case provided by the Master
Servicer, together with the Mortgage Note with written evidence of
cancellation thereon. The Master Servicer is authorized to cause the removal
from the registration on the MERS System of such Mortgage and to execute and
deliver, on behalf of the Trustee and the Certificateholders or any of them,
any and all instruments of satisfaction or cancellation or of partial or full
release. Expenses incurred in connection with any instrument of satisfaction
or deed of reconveyance shall be chargeable to the related Mortgagor. From
time to time and as shall be appropriate for the servicing or foreclosure of
any Mortgage Loan, including for such purpose, collection under any policy of
flood insurance, any fidelity bond or errors or omissions policy, or for the
purposes of effecting a partial release of any Mortgaged Property from the
lien of the Mortgage or the making of any corrections to the Mortgage Note or
the Mortgage or any of the other documents included in the Mortgage File, the
Trustee shall, upon delivery to the Trustee of a Request for Release in the

www.sec.gov/Archives/edgar/data/...

form of Exhibit M signed by a Servicing Officer, release the Mortgage File to
the Master Servicer. Subject to the further limitations set forth below, the
Master Servicer shall cause the Mortgage File or documents so released to be
returned to the Trustee when the need therefor by the Master Servicer no
longer exists, unless the Mortgage Loan is liquidated and the proceeds thereof
are deposited in the Certificate Account, in which case the Master Servicer
shall deliver to the Trustee a Request for Release in the form of Exhibit N,
signed by a Servicing Officer.

      If the Master Servicer at any time seeks to initiate a foreclosure
proceeding in respect of any Mortgaged Property as authorized by this
Agreement, the Master Servicer shall deliver or cause to be delivered to the
Trustee, for signature, as appropriate, any court pleadings, requests for
trustee's sale or other documents necessary to effectuate such foreclosure or
any legal action brought to obtain judgment against the Mortgagor on the
Mortgage Note or the Mortgage or to obtain a deficiency judgment or to enforce
any other remedies or rights provided by the Mortgage Note or the Mortgage or
otherwise available at law or in equity.

      SECTION 3.13. Documents, Records and Funds in Possession of Master
Servicer to be Held for the Trustee.

      Notwithstanding any other provisions of this Agreement, the Master
Servicer shall transmit to the Trustee as required by this Agreement all
documents and instruments in respect of a Mortgage Loan coming into the
possession of the Master Servicer from time to time and shall account fully to
the Trustee for any funds received by the Master Servicer or which otherwise
are collected by the Master Servicer as Liquidation Proceeds, Insurance
Proceeds or Subsequent Recoveries in respect of any Mortgage Loan. All
Mortgage Files and funds collected or held by, or under the control of, the
Master Servicer in respect of any Mortgage Loans, whether from the

                                      71

<PAGE>


collection of principal and interest payments or from Liquidation Proceeds and
any Subsequent Recoveries, including but not limited to, any funds on deposit
in the Certificate Account, shall be held by the Master Servicer for and on
behalf of the Trustee and shall be and remain the sole and exclusive property
of the Trustee, subject to the applicable provisions of this Agreement. The
Master Servicer also agrees that it shall not create, incur or subject any
Mortgage File or any funds that are deposited in the Certificate Account,
Distribution Account or any Escrow Account, or any funds that otherwise are or
may become due or payable to the Trustee for the benefit of the
Certificateholders, to any claim, lien, security interest, judgment, levy,
writ of attachment or other encumbrance, or assert by legal action or
otherwise any claim or right of setoff against any Mortgage File or any funds
collected on, or in connection with, a Mortgage Loan, except, however, that
the Master Servicer shall be entitled to set off against and deduct from any
such funds any amounts that are properly due and payable to the Master
Servicer under this Agreement.

      SECTION 3.14. Servicing Compensation.

      As compensation for its activities hereunder, the Master Servicer

shall be entitled to retain or withdraw from the Certificate Account an amount equal to the Master Servicing Fee; provided, that the aggregate Master Servicing Fee with respect to any Distribution Date shall be reduced (i) by an amount equal to the aggregate of the Prepayment Interest Shortfalls on all of the Mortgage Loans, if any, with respect to such Distribution Date, but not to exceed the Compensating Interest for such Distribution Date, and (ii) with respect to the first Distribution Date, an amount equal to any amount to be deposited into the Distribution Account by the Depositor pursuant to Section 2.01(a) and not so deposited.

Additional servicing compensation in the form of Excess Proceeds, prepayment penalties, assumption fees, late payment charges and all income and gain net of any losses realized from Permitted Investments shall be retained by the Master Servicer to the extent not required to be deposited in the Certificate Account pursuant to Section 3.05. The Master Servicer shall be required to pay all expenses incurred by it in connection with its master servicing activities hereunder (including payment of any premiums for hazard insurance and any Primary Insurance Policy and maintenance of the other forms of insurance coverage required by this Agreement) and shall not be entitled to reimbursement therefor except as specifically provided in this Agreement.

SECTION 3.15. Access to Certain Documentation.

The Master Servicer shall provide to the OTS and the FDIC and to comparable regulatory authorities supervising Certificateholders or Certificate Owners and the examiners and supervisory agents of the OTS, the FDIC and such other authorities, access to the documentation regarding the Mortgage Loans required by applicable regulations of the OTS and the FDIC. Such access shall be afforded without charge, but only upon reasonable and prior written request and during normal business hours at the offices designated by the Master Servicer. Nothing in this Section shall limit the obligation of the Master Servicer to observe any applicable law prohibiting disclosure of information regarding the Mortgagors and the failure of the Master Servicer to provide access as provided in this Section as a result of such obligation shall not constitute a breach of this Section.

72

<PAGE>

SECTION 3.16. Annual Statement as to Compliance.

(a) The Master Servicer shall deliver to the Depositor and the Trustee on or before March 15 of each year, commencing with its 2007 fiscal year, an Officer's Certificate stating, as to the signer thereof, that (i) a review of the activities of the Master Servicer during the preceding calendar year (or applicable portion thereof) and of the performance of the Master Servicer under this Agreement has been made under such officer's supervision and (ii) to the best of such officer's knowledge, based on such review, the Master Servicer has fulfilled all its obligations under this Agreement in all material respects throughout such year (or applicable portion thereof), or, if there has been a failure to fulfill any such obligation in any material respect, specifying each such failure known to such officer and the nature and status thereof.

(b) The Master Servicer shall cause each Subservicer to deliver to the

Depositor and the Trustee on or before March 15 of each year, commencing with
its 2007 fiscal year, an Officer's Certificate stating, as to the signer
thereof, that (i) a review of the activities of such Subservicer during the
preceding calendar year (or applicable portion thereof) and of the performance
of the Subservicer under the applicable Subservicing Agreement or primary
servicing agreement, has been made under such officer's supervision and (ii)
to the best of such officer's knowledge, based on such review, such
Subservicer has fulfilled all its obligations under the applicable
Subservicing Agreement or primary servicing agreement, in all material
respects throughout such year (or applicable portion thereof), or, if there
has been a failure to fulfill any such obligation in any material respect,
specifying each such failure known to such officer and the nature and status
thereof.

      (c) The Trustee shall forward a copy of each such statement to each
Rating Agency.

      SECTION 3.17. Errors and Omissions Insurance; Fidelity Bonds.

      The Master Servicer shall for so long as it acts as master servicer
under this Agreement, obtain and maintain in force (a) a policy or policies of
insurance covering errors and omissions in the performance of its obligations
as Master Servicer hereunder and (b) a fidelity bond in respect of its
officers, employees and agents. Each such policy or policies and bond shall,
together, comply with the requirements from time to time of FNMA or FHLMC for
persons performing servicing for mortgage loans purchased by FNMA or FHLMC. In
the event that any such policy or bond ceases to be in effect, the Master
Servicer shall obtain a comparable replacement policy or bond from an insurer
or issuer, meeting the requirements set forth above as of the date of such
replacement.

      SECTION 3.18. Notification of Adjustments.

      On each Adjustment Date, the Master Servicer shall make interest rate
and scheduled payment adjustments for each Mortgage Loan in compliance with
the requirements of the related Mortgage and Mortgage Note and applicable
regulations. The Master Servicer shall execute and deliver the notices
required by each Mortgage and Mortgage Note and applicable regulations
regarding interest rate adjustments. The Master Servicer also shall provide
timely notification to the Trustee of all applicable data and information
regarding such interest rate adjustments and the Master Servicer's methods of
implementing such interest rate adjustments. Upon the

           73

<PAGE>

discovery by the Master Servicer or the Trustee that the Master Servicer has
failed to adjust or has incorrectly adjusted a Mortgage Rate or a monthly
payment pursuant to the terms of the related Mortgage Note and Mortgage, the
Master Servicer shall immediately deposit in the Certificate Account from its
own funds the amount of any interest loss caused thereby without reimbursement
therefor; provided, however, the Master Servicer shall be held harmless with
respect to any interest rate adjustments made by any servicer prior to the
Master Servicer.

&lt;PAGE&gt;

ARTICLE IV
DISTRIBUTIONS AND
ADVANCES BY THE MASTER SERVICER

SECTION 4.01. Advances.

(a) The Master Servicer shall determine on or before each Master
Servicer Advance Date whether it is required to make an Advance pursuant to
the definition thereof. If the Master Servicer determines it is required to
make an Advance, it shall, on or before the Master Servicer Advance Date,
either (i) deposit into the Certificate Account an amount equal to the Advance
or (ii) make an appropriate entry in its records relating to the Certificate
Account that any Amount Held for Future Distribution has been used by the
Master Servicer in discharge of its obligation to make any such Advance. Any
funds so applied shall be replaced by the Master Servicer by deposit in the
Certificate Account no later than the close of business on the next Master
Servicer Advance Date. The Master Servicer shall be entitled to be reimbursed
from the Certificate Account for all Advances of its own funds made pursuant
to this Section as provided in Section 3.08. The obligation to make Advances
with respect to any Mortgage Loan shall continue if such Mortgage Loan has
been foreclosed or otherwise terminated and the related Mortgaged Property has
not been liquidated.

(b) If the Master Servicer determines that it will be unable to comply
with its obligation to make the Advances as and when described in the second
sentence of Section 4.01(a), the Master Servicer shall use its best efforts to
give written notice thereof to the Trustee (each such notice a "Trustee
Advance Notice"; and such notice may be given by telecopy), not later than
3:00 P.M., New York time, on the Business Day immediately preceding the
related Master Servicer Advance Date, specifying the amount that will not be
deposited by the Master Servicer (each such amount an "Advance Deficiency")
and certifying that such Advance Deficiency constitutes an Advance hereunder
and is not a Nonrecoverable Advance. If the Trustee receives a Trustee Advance
Notice on or before 3:30 P.M., New York time on a Master Servicer Advance
Date, the Trustee shall, not later than 3:00 P.M., New York time, on the
related Distribution Date, deposit in the Distribution Account an amount equal
to the Advance Deficiency identified in such Trustee Advance Notice unless it
is prohibited from so doing by applicable law. Notwithstanding the foregoing,
the Trustee shall not be required to make such deposit if the Trustee shall
have received written notification from the Master Servicer that the Master
Servicer has deposited or caused to be deposited in the Certificate Account an
amount equal to such Advance Deficiency. All Advances made by the Trustee
pursuant to this Section 4.01(b) shall accrue interest on behalf of the
Trustee at the Trustee Advance Rate from and including the date such Advances
are made to but excluding the date of repayment, with such interest being an
obligation of the Master Servicer and not the Trust Fund. The Master Servicer
shall reimburse the Trustee for the amount of any Advance made by the Trustee
pursuant to this Section 4.01(b) together with accrued interest, not later
than the fifth day following the related Master Servicer Advance Date. In the
event that the Master Servicer does not reimburse the Trustee in accordance
with the requirements of the preceding sentence, the Trustee shall have the
right, but not the obligation, to immediately (a) terminate all of the rights
and obligations of the Master Servicer under this Agreement in accordance with
Section 7.01 and (b) subject to the limitations set forth in Section 3.04,

assume all of the rights and obligations of the Master Servicer hereunder.

75

<PAGE>

     (c) The Master Servicer shall, not later than the close of business on the second Business Day immediately preceding each Distribution Date, deliver to the Trustee a report (in form and substance reasonably satisfactory to the Trustee) that indicates (i) the Mortgage Loans with respect to which the Master Servicer has determined that the related Scheduled Payments should be advanced and (ii) the amount of the related Scheduled Payments. The Master Servicer shall deliver to the Trustee on the related Master Servicer Advance Date an Officer's Certificate of a Servicing Officer indicating the amount of any proposed Advance determined by the Master Servicer to be a Nonrecoverable Advance.

     SECTION 4.02. Priorities of Distribution.

     (a) (1) With respect to the Available Funds for Loan Group 1, on each Distribution Date, the Trustee shall withdraw such Available Funds from the Distribution Account and apply such funds to distributions on the specified Classes of Group 1 Senior Certificates in the following order and priority and, in each case, to the extent of such funds remaining:

          (i) [Reserved];

          (ii) concurrently, to each interest-bearing Class of the Group 1 Senior Certificates, an amount allocable to interest equal to the related Class Optimal Interest Distribution Amount for such Distribution Date, any shortfall being allocated among such Classes in proportion to the amount of the Class Optimal Interest Distribution Amount that would have been distributed in the absence of such shortfall;

          (iii) [Reserved];

          (iv) to each Class of Group 1 Senior Certificates, concurrently as follows:

               (x) [Reserved]; and

               (y) the related Principal Amount, up to the amount of the Senior Principal Distribution Amount for Loan Group 1 for such Distribution Date will be distributed, sequentially, as follows:

                    (1) to the Class A-R Certificates, until its Class Certificate Balance is reduced to zero;

                    (2) concurrently, to the Class 1-A-1A, Class 1-A-1B and Class 1-A-2 Certificates, pro rata, until their respective Class Certificate Balances are reduced to zero;

     (2) With respect to the Available Funds for Loan Group 2, on each Distribution Date, the Trustee shall withdraw such Available Funds from the

Distribution Account and apply such funds to distributions on the specified
Classes of Group 2 Senior Certificates in the following order and priority
and, in each case, to the extent of such funds remaining:

   (i) [Reserved];

      76

<PAGE>

   (ii) concurrently, to each interest-bearing Class of Group 2
Senior Certificates, an amount allocable to interest equal to the
related Class Optimal Interest Distribution Amount for such
Distribution Date, any shortfall being allocated among such Classes in
proportion to the amount of the Class Optimal Interest Distribution
Amount that would have been distributed in the absence of such
shortfall;

   (iii) [Reserved];

   (iv) to each Class of Group 2 Senior Certificates,
concurrently as follows:

     (x) [Reserved]; and

     (y) the related Principal Amount, up to the amount of
the Senior Principal Distribution Amount for Loan Group 2 for
such Distribution Date will be distributed concurrently,

      (i) concurrently, to the Class 2-A-1A and Class
2-A-2 Certificates, pro rata, the related Allocable Portion,
until their respective Class Certificate Balances are reduced
to zero; and

      (ii) sequentially, to the Class 2-A-B-1, Class
2-A-B-2 and Class 2-A-B-3 Certificates, in that order, the
related Allocable Portion, until their respective Class
Certificate Balances are reduced to zero.

  (3) With respect to the Available Funds for Loan Group 3, on each
Distribution Date, the Trustee shall withdraw such Available Funds from the
Distribution Account and apply such funds to distributions on the specified
Classes of Group 3 Senior Certificates in the following order and priority
and, in each case, to the extent of such funds remaining:

   (i) [Reserved];

   (ii) concurrently, to each interest-bearing Class of Group 3
Senior Certificates, an amount allocable to interest equal to the
related Class Optimal Interest Distribution Amount for such
Distribution Date, any shortfall being allocated among such Classes in
proportion to the amount of the Class Optimal Interest Distribution
Amount that would have been distributed in the absence of such
shortfall;

   (iii) [Reserved];

          (iv) to each Class of Group 3 Senior Certificates,
concurrently as follows:

               (x) [Reserved]; and

               (y) the related Principal Amount, up to the amount of
     the Senior Principal Distribution Amount for Loan Group 3 for
     such Distribution Date will be distributed, concurrently, to
     the Class 3-A-1A, Class 3-A-1B and Class 3-A-2 Certificates,
     pro rata, until their respective Class Certificate Balances
     are reduced to zero.


                              77
<PAGE>

     (4) With respect to the Available Funds for Loan Group 4, on each
Distribution Date, the Trustee shall withdraw such Available Funds from the
Distribution Account and apply such funds to distributions on the specified
Classes of Group 4 Senior Certificates in the following order and priority
and, in each case, to the extent of such funds remaining:

          (i) [Reserved];

          (ii) concurrently, to each interest-bearing Class of Group 4
     Senior Certificates, an amount allocable to interest equal to the
     related Class Optimal Interest Distribution Amount for such
     Distribution Date, any shortfall being allocated among such Classes in
     proportion to the amount of the Class Optimal Interest Distribution
     Amount that would have been distributed in the absence of such
     shortfall;

          (iii) [Reserved];

          (iv) to each Class of Group 4 Senior Certificates,
concurrently as follows:

               (x) [Reserved]; and

               (y) the related Principal Amount, up to the amount of
     the Senior Principal Distribution Amount for Loan Group 4 for
     such Distribution Date will be distributed, concurrently, to
     the Class 4-A-1A, Class 4-A-1B, Class 4-A-1C and Class 4-A-2
     Certificates, pro rata, until their respective Class
     Certificate Balances are reduced to zero.

     (5) On each Distribution Date, Available Funds from all Loan Groups
remaining after making the distributions described in Section 4.02(a)(1)
through Section 4.02(a)(4), shall be distributed to the Senior Certificates to
the extent provided in Section 4.05.

     (6) On each Distribution Date, Available Funds from all Loan Groups
remaining after making the distributions described in Section 4.02(a)(1)
through Section 4.02(a)(5) above, shall be distributed to the Subordinated
Certificates and the Class A-R Certificates in the following order and
priority and, in each case, to the extent of such funds remaining:

(A) to the Class M Certificates, an amount allocable to interest equal to the Class Optimal Interest Distribution Amount for such Class for such Distribution Date;

(B) to the Class M Certificates, an amount allocable to principal equal to its Pro Rata Share for such Distribution Date until the Class Certificate Balance thereof is reduced to zero;

(C) to the Class B-1 Certificates, an amount allocable to interest equal to the Class Optimal Interest Distribution Amount for such Class for such Distribution Date;

78

<PAGE>

(D) to the Class B-1 Certificates, an amount allocable to principal equal to its Pro Rata Share for such Distribution Date until the Class Certificate Balance thereof is reduced to zero;

(E) to the Class B-2 Certificates, an amount allocable to interest equal to the Class Optimal Interest Distribution Amount for such Class for such Distribution Date;

(F) to the Class B-2 Certificates, an amount allocable to principal equal to its Pro Rata Share for such Distribution Date until the Class Certificate Balance thereof is reduced to zero;

(G) to the Class B-3 Certificates, an amount allocable to interest equal to the amount of the Class Optimal Interest Distribution Amount for such Class for such Distribution Date;

(H) to the Class B-3 Certificates, an amount allocable to principal equal to its Pro Rata Share for such Distribution Date until the Class Certificate Balance thereof is reduced to zero;

(I) to the Class B-4 Certificates, an amount allocable to interest equal to the amount of the Class Optimal Interest Distribution Amount for such Class for such Distribution Date;

(J) to the Class B-4 Certificates, an amount allocable to principal equal to its Pro Rata Share for such Distribution Date until the Class Certificate Balance thereof is reduced to zero;

(K) to the Class B-5 Certificates, an amount allocable to interest equal to the Class Optimal Interest Distribution Amount for such Class for such

Distribution Date; and

        (L) to the Class B-5 Certificates, an amount allocable to principal equal to its Pro Rata Share for such Distribution Date until the Class Certificate Balance thereof is reduced to zero;

        (M) [Reserved]; and

        (N) to the Class A-R Certificates, any remaining funds in the Trust Fund.

    (b) [Reserved]

    (c) [Reserved]

    (d) On each Distribution Date, the amount referred to in clause (i) of the definition of Class Optimal Interest Distribution Amount for each Class of Certificates for such Distribution Date shall be reduced for each Class of Senior Certificates of a Senior Certificate Group and

<PAGE>

each Class of Subordinated Certificates by the related Class' Allocable Share of (A) the Net Prepayment Interest Shortfalls for the related Loan Group, (B) with respect to each Mortgage Loan in the related Loan Group (or after the Senior Credit Support Depletion Date, any Mortgage Loan) that became subject to a Debt Service Reduction during the calendar month preceding the month of such Distribution Date, the interest portion of the related Debt Service Reduction and (C) each Relief Act Reduction for the Mortgage Loans in the related Loan Group (or after the Senior Credit Support Depletion Date, any Mortgage Loan) incurred during the calendar month preceding the month of such Distribution Date.

    (e) Notwithstanding the priority and allocation contained in Section 4.02(a)(6), if with respect to any Class of Subordinated Certificates on any Distribution Date (other than the Class of Subordinated Certificates then outstanding with the highest priority of distribution) the sum of the related Class Subordination Percentages of such Class and of all Classes of Subordinated Certificates which have a higher numerical Class designation than such Class (the "Applicable Credit Support Percentage") is less than the Original Applicable Credit Support Percentage for such Class, no distribution of Principal Prepayments will be made to any such Classes (the "Restricted Classes") and the amount of such Principal Prepayments otherwise distributable to the Restricted Classes shall be distributed to any Classes of Subordinated Certificates having lower numerical Class designations than such Class, pro rata, based on their respective Class Certificate Balances immediately prior to such Distribution Date and shall be distributed in the sequential order provided in Section 4.02(a)(6).

    (f) If Subsequent Recoveries have been received with respect to a Liquidated Mortgage Loan in a Loan Group, the amount of such Subsequent Recoveries will be applied sequentially, in the order of payment priority to increase the Class Certificate Balance of each Class of related Certificates

to which Realized Losses have been allocated, but in each case by not more
than the amount of Realized Losses previously allocated to that Class of
Certificates pursuant to Section 4.04. Holders of such Certificates will not
be entitled to any payment in respect of the Class Optimal Interest
Distribution Amount on the amount of such increases for any Interest Accrual
Period preceding the Distribution Date on which such increase occurs. Any such
increases shall be applied pro rata to the Certificate Balance of each
Certificate of such Class.

        SECTION 4.03. [Reserved].

        SECTION 4.04. Allocation of Realized Losses.

        (a) On or prior to each Determination Date, the Trustee shall
determine the total amount of Realized Losses, with respect to the related
Distribution Date. For purposes of allocating losses to the Subordinated
Certificates, the Class M Certificates will be deemed to have a lower
numerical Class designation, and to be of a higher relative payment priority,
than each other Class of Subordinated Certificates.

        Realized Losses with respect to any Distribution Date shall be
allocated as follows:

                (i) [Reserved].

                (ii) Any Realized Loss on the Mortgage Loans in a Loan Group
        shall be allocated first to the Subordinated Certificates in reverse
        order of their respective

                                    80

<PAGE>

        numerical Class designations (beginning with the Class of Subordinated
        Certificates then outstanding with the highest numerical Class
        designation) until the respective Class Certificate Balance of each
        such Class is reduced to zero, and second to the Senior Certificates
        of the related Senior Certificate Group (other than any Notional
        Amount Certificates), if applicable, pro rata, on the basis of their
        respective Class Certificate Balances, in each case immediately prior
        to the related Distribution Date until the respective Class
        Certificate Balance of each such Class has been reduced to zero;
        provided, however, that (i) any Realized Losses otherwise allocable to
        the Class 1-A-1A and Class 1-A-1B Certificates shall be allocated
        instead to the Class 1-A-2 Certificates, until its Class Certificate
        Balance is reduced to zero, (ii) any Realized Losses otherwise
        allocable to the Class 2-A-1A, Class 2-A-B-1, Class 2-A-B-2 and Class
        2-A-B-3 Certificates shall be allocated instead to the Class 2-A-2
        Certificates, until its Class Certificate Balance is reduced to zero,
        (iii) any Realized Losses otherwise allocable to the Class 3-A-1A and
        Class 3-A-1B Certificates shall be allocated instead to the Class
        3-A-2 Certificates, until its Class Certificate Balance is reduced to
        zero, (iv) any Realized Losses otherwise allocable to the Class
        4-A-1A, Class 4-A-1B and Class 4-A-1C Certificates shall be allocated
        instead to the Class 4-A-2 Certificates, until its Class Certificate
        Balance is reduced to zero and (v) any Realized Losses otherwise
        allocable to the Class 4-A-1B Certificates shall be allocated instead

to the Class 4-A-1C Certificates, until its Class Certificate Balance
is reduced to zero.

(b) The Class Certificate Balance of the Class of Subordinated
Certificates then outstanding with the highest numerical Class designation
shall be reduced on each Distribution Date by the amount, if any, by which the
aggregate of the Class Certificate Balances of all outstanding Classes of
Certificates (after giving effect to the distribution of principal and the
allocation of Realized Losses on such Distribution Date) exceeds the Pool
Stated Principal Balance as of the Due Date in the month of such Distribution
Date.

(c) Any Realized Loss allocated to a Class of Certificates or any
reduction in the Class Certificate Balance of a Class of Certificates pursuant
to Section 4.04(b) above shall be allocated among the Certificates of such
Class in proportion to their respective Certificate Balances.

(d) Any allocation of Realized Losses to a Certificate or to any
Component or any reduction in the Certificate Balance of a Certificate,
pursuant to Section 4.04(b) above shall be accomplished by reducing the
Certificate Balance, Component Balance or Subordinated Portion thereof, as
applicable, immediately following the distributions made on the related
Distribution Date in accordance with the definition of "Certificate Balance,"
"Component Balance" or "Subordinated Portion," as the case may be.

SECTION 4.05. Cross-Collateralization; Adjustments to Available Funds

On each Distribution Date prior to the earlier of the Senior Credit
Support Depletion Date and the third Senior Termination Date, but after a
Senior Termination Date, the Trustee shall distribute the principal portion of
Available Funds on the Mortgage Loans relating to the Senior Certificates that
will have been paid in full to the holders of the Senior Certificates of the
other Senior Certificate Groups, pro rata, based on Class Certificate
Balances, provided, however, that the Trustee shall not make such distribution
on such Distribution Date if (a) the Aggregate

81

<PAGE>

Subordinated Percentage for such Distribution Date is greater than or equal to
200% of such Aggregate Subordinated Percentage as of the Closing Date and (b)
the average aggregate Stated Principal Balance of the Mortgage Loans
delinquent 60 days or more over the last six months, as a percentage of the
aggregate Class Certificate Balance of the Subordinated Certificates, is less
than 50%.

If on any Distribution Date the Class Certificate Balance of Senior
Certificates in a Senior Certificate Group immediately prior to each
Distribution Date is greater than the aggregate Stated Principal Balance of
the Mortgage Loans in the related Loan Group (the "Undercollateralized
Group"), then the Trustee shall apply the Available Funds of the other Loan
Group(s) that are not undercollateralized (each, an "Overcollateralized
Group"), as follows:

(1) to add to the Available Funds of the Undercollateralized Groups an
amount equal to the lesser of (a) one month's interest on the Transfer Payment

Received of the Undercollateralized Group at the Weighted Average Adjusted Net Mortgage Rate applicable to the Undercollateralized Group and (b) Available Funds of the Overcollateralized Group(s) remaining after making distributions to the Certificates of the Overcollateralized Group(s) on such Distribution Date pursuant to Section 4.02; and

(2) to the Senior Certificates of the Undercollateralized Groups, to the extent of the principal portion of Available Funds of the Overcollateralized Groups remaining after making distributions to the Senior Certificates of the Overcollateralized Groups on such Distribution Date pursuant to Section 4.02, until the Class Certificate Balance of the Senior Certificates of such Undercollateralized Groups equals the aggregate Stated Principal Balance of the Mortgage Loans in the related Loan Group.

If more than one Overcollateralized Group exists on any Distribution Date, reductions in the Available Funds of such groups to make the payments required to be made pursuant to this Section 4.05 on such Distribution Date shall be made pro rata, based on the amount of remaining Available Funds for each such Overcollateralized Group. If more than one Undercollateralized Group exists on any Distribution Date, the payments required to be made pursuant to this Section 4.05 on such Distribution Date shall be made pro rata, based on the amount of payments required to be made to the Undercollateralized Groups.

The payment received by the Undercollateralized Group (including the interest thereon as provided in (1) above) is referred to as a "Transfer Payment Received." The payment made by the Overcollateralized Group (including the interest thereon as provided in (1) above) is referred to as a "Transfer Payment Made."

SECTION 4.06. Monthly Statements to Certificateholders.

(a) Concurrently with each distribution on a Distribution Date, the Trustee will forward by mail to each Rating Agency and make available to Certificateholders on the Trustee's website (http://www.bnyinvestorreporting.com) a statement generally setting forth the information contained in Exhibit Q hereto.

82

<PAGE>

(b) The Trustee's responsibility for disbursing the above information to the Certificateholders is limited to the availability, timeliness and accuracy of the information provided by the Master Servicer.

(c) On or before the fifth Business Day following the end of each Prepayment Period (but in no event later than the third Business Day prior to the related Distribution Date), the Master Servicer shall deliver to the Trustee (which delivery may be by electronic data transmission) a report in substantially the form set forth as Schedule VI to this Agreement.

(d) Within a reasonable period of time after the end of each calendar year, the Trustee shall cause to be furnished to each Person who at any time during the calendar year was a Certificateholder, a statement containing the aggregate principal distributions, aggregate interest distributions and aggregate Master Servicing Fees paid to or retained by the Master Servicer for such calendar year or applicable portion thereof during which such Person was

www.sec.gov/Archives/edgar/data/...

a Certificateholder. Such obligation of the Trustee shall be deemed to have
been satisfied to the extent that substantially comparable information shall
be provided by the Trustee pursuant to any requirements of the Code as from
time to time in effect.


<div align="center">83</div>

<PAGE>

<div align="center">ARTICLE V
THE CERTIFICATES</div>

SECTION 5.01. The Certificates.

    The Certificates shall be substantially in the forms attached hereto
as exhibits. The Certificates shall be issuable in registered form, in the
minimum denominations, integral multiples in excess thereof (except that one
Certificate in each Class may be issued in a different amount which must be in
excess of the applicable minimum denomination) and aggregate denominations per
Class set forth in the Preliminary Statement.

    Subject to Section 9.02 respecting the final distribution on the
Certificates, on each Distribution Date the Trustee shall make distributions
to each Certificateholder of record on the preceding Record Date either (x) by
wire transfer in immediately available funds to the account of such holder at
a bank or other entity having appropriate facilities therefor, if (i) such
Holder has so notified the Trustee at least five Business Days prior to the
related Record Date and (ii) such Holder shall hold (A) a Notional Amount
Certificate, (B) 100% of the Class Certificate Balance of any Class of
Certificates or (C) Certificates of any Class with aggregate principal
Denominations of not less than $1,000,000 or (y) by check mailed by first
class mail to such Certificateholder at the address of such holder appearing
in the Certificate Register.

    The Certificates shall be executed by manual or facsimile signature on
behalf of the Trustee by an authorized officer. Certificates bearing the
manual or facsimile signatures of individuals who were, at the time when such
signatures were affixed, authorized to sign on behalf of the Trustee shall
bind the Trustee, notwithstanding that such individuals or any of them have
ceased to be so authorized prior to the countersignature and delivery of such
Certificates or did not hold such offices at the date of such Certificate. No
Certificate shall be entitled to any benefit under this Agreement, or be valid
for any purpose, unless countersigned by the Trustee by manual signature, and
such countersignature upon any Certificate shall be conclusive evidence, and
the only evidence, that such Certificate has been duly executed and delivered
hereunder. All Certificates shall be dated the date of their countersignature.
On the Closing Date, the Trustee shall countersign the Certificates to be
issued at the direction of the Depositor, or any affiliate of the Depositor.

    The Depositor shall provide, or cause to be provided, to the Trustee
on a continuous basis, an adequate inventory of Certificates to facilitate
transfers.

    SECTION 5.02. Certificate Register; Registration of Transfer and
Exchange of Certificates.

    (a) The Trustee shall maintain, or cause to be maintained in

accordance with the provisions of Section 5.06, a Certificate Register for the Trust Fund in which, subject to the provisions of subsections (b) and (c) below and to such reasonable regulations as it may prescribe, the Trustee shall provide for the registration of Certificates and of transfers and exchanges of Certificates as provided in this Agreement. Upon surrender for registration of transfer of any Certificate, the Trustee shall execute and deliver, in the name of the designated

84

<PAGE>

transferee or transferees, one or more new Certificates of the same Class and aggregate Percentage Interest.

At the option of a Certificateholder, Certificates may be exchanged for other Certificates of the same Class in authorized denominations and evidencing the same aggregate Percentage Interest upon surrender of the Certificates to be exchanged at the office or agency of the Trustee. Whenever any Certificates are so surrendered for exchange, the Trustee shall execute, authenticate, and deliver the Certificates which the Certificateholder making the exchange is entitled to receive. Every Certificate presented or surrendered for registration of transfer or exchange shall be accompanied by a written instrument of transfer in form satisfactory to the Trustee duly executed by the holder thereof or his attorney duly authorized in writing.

No service charge to the Certificateholders shall be made for any registration of transfer or exchange of Certificates, but payment of a sum sufficient to cover any tax or governmental charge that may be imposed in connection with any transfer or exchange of Certificates may be required.

All Certificates surrendered for registration of transfer or exchange shall be cancelled and subsequently destroyed by the Trustee in accordance with the Trustee's customary procedures.

(b) No transfer of a Private Certificate shall be made unless such transfer is made pursuant to an effective registration statement under the Securities Act and any applicable state securities laws or is exempt from the registration requirements under said Act and such state securities laws. In the event that a transfer is to be made in reliance upon an exemption from the Securities Act and such laws, in order to assure compliance with the Securities Act and such laws, the Certificateholder desiring to effect such transfer and such Certificateholder's prospective transferee shall each certify to the Trustee in writing the facts surrounding the transfer in substantially the forms set forth in Exhibit J-2 (the "Transferor Certificate") and (i) deliver a letter in substantially the form of either Exhibit K (the "Investment Letter") or Exhibit L (the "Rule 144A Letter") or (ii) there shall be delivered to the Trustee at the expense of the transferor an Opinion of Counsel that such transfer may be made pursuant to an exemption from the Securities Act. The Depositor shall provide to any Holder of a Private Certificate and any prospective transferee designated by any such Holder, information regarding the related Certificates and the Mortgage Loans and such other information as shall be necessary to satisfy the condition to eligibility set forth in Rule 144A(d)(4) for transfer of any such Certificate without registration thereof under the Securities Act pursuant to the registration exemption provided by Rule 144A. The Trustee and the Master Servicer shall cooperate with the Depositor in providing the Rule 144A

information referenced in the preceding sentence, including providing to the
Depositor such information regarding the Certificates, the Mortgage Loans and
other matters regarding the Trust Fund as the Depositor shall reasonably
request to meet its obligation under the preceding sentence. Each Holder of a
Private Certificate desiring to effect such transfer shall, and does hereby
agree to, indemnify the Trustee and the Depositor, the Sellers and the Master
Servicer against any liability that may result if the transfer is not so
exempt or is not made in accordance with such federal and state laws.

     No transfer of an ERISA-Restricted Certificate shall be made unless
the Trustee shall have received either (i) a representation from the
transferee of such Certificate acceptable to and

<div align="center">85</div>

<PAGE>

in form and substance satisfactory to the Trustee (in the event such
Certificate is a Private Certificate, such requirement is satisfied only by
the Trustee's receipt of a representation letter from the transferee
substantially in the form of Exhibit K or Exhibit L, or in the event such
Certificate is a Residual Certificate, such requirement is satisfied only by
the Trustee's receipt of a representation letter from the transferee
substantially in the form of Exhibit I), to the effect that (x) such
transferee is not an employee benefit plan or arrangement subject to Section
406 of ERISA or a plan or arrangement subject to Section 4975 of the Code, or
a person acting on behalf of any such plan or arrangement, or using the assets
of any such plan or arrangement to effect such transfer or (y) in the case of
a Certificate that is an ERISA-Restricted Certificate and that has been the
subject of an ERISA-Qualifying Underwriting, a representation that the
purchaser is an insurance company which is purchasing such Certificates with
funds contained in an "insurance company general account" (as such term is
defined in Section V(e) of Prohibited Transaction Class Exemption 95-60 ("PTCE
95-60")) and that the purchase and holding of such Certificates satisfy the
requirements for exemptive relief under Sections I and III of PTCE 95-60 or
(ii) in the case of any ERISA-Restricted Certificate presented for
registration in the name of an employee benefit plan or arrangement subject to
ERISA, or a plan or arrangement subject to Section 4975 of the Code (or
comparable provisions of any subsequent enactments), or a trustee or any other
person acting on behalf of any such plan or arrangement or using such plan's
or arrangement's assets, an Opinion of Counsel satisfactory to the Trustee,
which Opinion of Counsel shall not be an expense of the Trustee, the Master
Servicer or the Trust Fund, addressed to the Trustee and the Master Servicer,
to the effect that the purchase and holding of such ERISA-Restricted
Certificate will not result in a non-exempt prohibited transaction under
Section 406 of ERISA or Section 4975 of the Code, and will not subject the
Trustee or the Master Servicer to any obligation in addition to those
expressly undertaken in this Agreement or to any liability (such Opinion of
Counsel, a "Benefit Plan Opinion"). For purposes of the preceding sentence,
with respect to an ERISA-Restricted Certificate that is not a Residual
Certificate, in the event the representation letter or Benefit Plan Opinion
referred to in the preceding sentence is not so furnished, one of the
representations in clause (i), as appropriate, shall be deemed to have been
made to the Trustee by the transferee's (including an initial acquiror's)
acceptance of the ERISA-Restricted Certificates. Notwithstanding anything else
to the contrary in this Agreement, any purported transfer of an
ERISA-Restricted Certificate to or on behalf of an employee benefit plan or

arrangement subject to ERISA or to Section 4975 of the Code without the
delivery to the Trustee of a Benefit Plan Opinion satisfactory to the Trustee
as described above shall be void and of no effect.

        To the extent permitted under applicable law (including, but not
limited to, ERISA), the Trustee shall be under no liability to any Person for
any registration of transfer of any ERISA-Restricted Certificate that is in
fact not permitted by this Section 5.02(b) or for making any payments due on
such Certificate to the Holder thereof or taking any other action with respect
to such Holder under the provisions of this Agreement so long as the transfer
was registered by the Trustee in accordance with the foregoing requirements.

        (c) Each Person who has or who acquires any Ownership Interest in a
Residual Certificate shall be deemed by the acceptance or acquisition of such
Ownership Interest to have agreed to be bound by the following provisions, and
the rights of each Person acquiring any Ownership Interest in a Residual
Certificate are expressly subject to the following provisions:

                                     86
<PAGE>

            (i) Each Person holding or acquiring any Ownership Interest in
        a Residual Certificate shall be a Permitted Transferee and shall
        promptly notify the Trustee of any change or impending change in its
        status as a Permitted Transferee.

            (ii) Except in connection with (i) the registration of the Tax
        Matters Person Certificate in the name of the Trustee or (ii) any
        registration in the name of, or transfer of a Residual Certificate to,
        an affiliate of the Depositor (either directly or through a nominee)
        in connection with the initial issuance of the Certificates, no
        Ownership Interest in a Residual Certificate may be registered on the
        Closing Date or thereafter transferred, and the Trustee shall not
        register the Transfer of any Residual Certificate unless, the Trustee
        shall have been furnished with an affidavit (a "Transfer Affidavit")
        of the initial owner or the proposed transferee in the form attached
        hereto as Exhibit I.

            (iii) Each Person holding or acquiring any Ownership Interest
        in a Residual Certificate shall agree (A) to obtain a Transfer
        Affidavit from any other Person to whom such Person attempts to
        Transfer its Ownership Interest in a Residual Certificate, (B) to
        obtain a Transfer Affidavit from any Person for whom such Person is
        acting as nominee, trustee or agent in connection with any Transfer of
        a Residual Certificate and (C) not to Transfer its Ownership Interest
        in a Residual Certificate or to cause the Transfer of an Ownership
        Interest in a Residual Certificate to any other Person if it has
        actual knowledge that such Person is not a Permitted Transferee.

            (iv) Any attempted or purported Transfer of any Ownership
        Interest in a Residual Certificate in violation of the provisions of
        this Section 5.02(c) shall be absolutely null and void and shall vest
        no rights in the purported Transferee. If any purported transferee
        shall become a Holder of a Residual Certificate in violation of the
        provisions of this Section 5.02(c), then the last preceding Permitted
        Transferee shall be restored to all rights as Holder thereof

retroactive to the date of registration of Transfer of such Residual
Certificate. The Trustee shall be under no liability to any Person for
any registration of Transfer of a Residual Certificate that is in fact
not permitted by Section 5.02(b) and this Section 5.02(c) or for
making any payments due on such Certificate to the Holder thereof or
taking any other action with respect to such Holder under the
provisions of this Agreement so long as the Transfer was registered
after receipt of the related Transfer Affidavit and Transferor
Certificate. The Trustee shall be entitled but not obligated to
recover from any Holder of a Residual Certificate that was in fact not
a Permitted Transferee at the time it became a Holder or, at such
subsequent time as it became other than a Permitted Transferee, all
payments made on such Residual Certificate at and after either such
time. Any such payments so recovered by the Trustee shall be paid and
delivered by the Trustee to the last preceding Permitted Transferee of
such Certificate.

        (v) The Depositor shall use its best efforts to make
available, upon receipt of written request from the Trustee, all
information necessary to compute any tax imposed under Section 860E(e)
of the Code as a result of a Transfer of an Ownership Interest in a
Residual Certificate to any Holder who is not a Permitted Transferee.

                                87
<PAGE>

        The restrictions on Transfers of a Residual Certificate set forth in
this Section 5.02(c) shall cease to apply (and the applicable portions of the
legend on a Residual Certificate may be deleted) with respect to Transfers
occurring after delivery to the Trustee of an Opinion of Counsel, which
Opinion of Counsel shall not be an expense of the Trust Fund, the Trustee, the
Master Servicer, or any Seller, to the effect that the elimination of such
restrictions will not cause any REMIC hereunder to fail to qualify as a REMIC
at any time that the Certificates are outstanding or result in the imposition
of any tax on the Trust Fund, a Certificateholder or another Person. Each
Person holding or acquiring any Ownership Interest in a Residual Certificate
hereby consents to any amendment of this Agreement which, based on an Opinion
of Counsel furnished to the Trustee, is reasonably necessary (a) to ensure
that the record ownership of, or any beneficial interest in, a Residual
Certificate is not transferred, directly or indirectly, to a Person that is
not a Permitted Transferee and (b) to provide for a means to compel the
Transfer of a Residual Certificate which is held by a Person that is not a
Permitted Transferee to a Holder that is a Permitted Transferee.

        (d) The preparation and delivery of all certificates and opinions
referred to above in this Section 5.02 in connection with transfer shall be at
the expense of the parties to such transfers.

        (e) Except as provided below, the Book-Entry Certificates shall at all
times remain registered in the name of the Depository or its nominee and at
all times: (i) registration of the Certificates may not be transferred by the
Trustee except to another Depository; (ii) the Depository shall maintain
book-entry records with respect to the Certificate Owners and with respect to
ownership and transfers of such Book-Entry Certificates; (iii) ownership and
transfers of registration of the Book-Entry Certificates on the books of the
Depository shall be governed by applicable rules established by the

Depository; (iv) the Depository may collect its usual and customary fees, charges and expenses from its Depository Participants; (v) the Trustee shall deal with the Depository, Depository Participants and indirect participating firms as representatives of the Certificate Owners of the Book-Entry Certificates for purposes of exercising the rights of holders under this Agreement, and requests and directions for and votes of such representatives shall not be deemed to be inconsistent if they are made with respect to different Certificate Owners; and (vi) the Trustee may rely and shall be fully protected in relying upon information furnished by the Depository with respect to its Depository Participants and furnished by the Depository Participants with respect to indirect participating firms and persons shown on the books of such indirect participating firms as direct or indirect Certificate Owners.

All transfers by Certificate Owners of Book-Entry Certificates shall be made in accordance with the procedures established by the Depository Participant or brokerage firm representing such Certificate Owner. Each Depository Participant shall only transfer Book-Entry Certificates of Certificate Owners it represents or of brokerage firms for which it acts as agent in accordance with the Depository's normal procedures.

If (x) (i) the Depository or the Depositor advises the Trustee in writing that the Depository is no longer willing or able to properly discharge its responsibilities as Depository, and (ii) the Trustee or the Depositor is unable to locate a qualified successor or (y) after the occurrence of an Event of Default, Certificate Owners representing at least 51% of the Certificate Balance of the Book-Entry Certificates together advise the Trustee and the Depository through the Depository Participants in writing that the continuation of a book-entry system

                                    88

<PAGE>

through the Depository is no longer in the best interests of the Certificate Owners, the Trustee shall notify all Certificate Owners, through the Depository, of the occurrence of any such event and of the availability of definitive, fully-registered Certificates (the "Definitive Certificates") to Certificate Owners requesting the same. Upon surrender to the Trustee of the related Class of Certificates by the Depository, accompanied by the instructions from the Depository for registration, the Trustee shall issue the Definitive Certificates. Neither the Master Servicer, the Depositor nor the Trustee shall be liable for any delay in delivery of such instruction and each may conclusively rely on, and shall be protected in relying on, such instructions. The Master Servicer shall provide the Trustee with an adequate inventory of certificates to facilitate the issuance and transfer of Definitive Certificates. Upon the issuance of Definitive Certificates all references in this Agreement to obligations imposed upon or to be performed by the Depository shall be deemed to be imposed upon and performed by the Trustee, to the extent applicable with respect to such Definitive Certificates and the Trustee shall recognize the Holders of the Definitive Certificates as Certificateholders hereunder; provided that the Trustee shall not by virtue of its assumption of such obligations become liable to any party for any act or failure to act of the Depository.

SECTION 5.03. Mutilated, Destroyed, Lost or Stolen Certificates.

If (a) any mutilated Certificate is surrendered to the Trustee, or the

Trustee receives evidence to its satisfaction of the destruction, loss or theft of any Certificate and (b) there is delivered to the Master Servicer and the Trustee such security or indemnity as may be required by them to save each of them harmless, then, in the absence of notice to the Trustee that such Certificate has been acquired by a bona fide purchaser, the Trustee shall execute, countersign and deliver, in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Certificate, a new Certificate of like Class, tenor and Percentage Interest. In connection with the issuance of any new Certificate under this Section 5.03, the Trustee may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Trustee) connected therewith. Any replacement Certificate issued pursuant to this Section 5.03 shall constitute complete and indefeasible evidence of ownership, as if originally issued, whether or not the lost, stolen or destroyed Certificate shall be found at any time.

SECTION 5.04. Persons Deemed Owners.

The Master Servicer, the Trustee and any agent of the Master Servicer or the Trustee may treat the Person in whose name any Certificate is registered as the owner of such Certificate for the purpose of receiving distributions as provided in this Agreement and for all other purposes whatsoever, and neither the Master Servicer, the Trustee nor any agent of the Master Servicer or the Trustee shall be affected by any notice to the contrary.

SECTION 5.05. Access to List of Certificateholders' Names and Addresses.

If three or more Certificateholders and/or Certificate Owners (a) request such information in writing from the Trustee, (b) state that such Certificateholders and/or Certificate Owners desire to communicate with other Certificateholders and/or Certificate Owners with respect to their rights under this Agreement or under the Certificates, and (c) provide a copy of the

89

<PAGE>

communication which such Certificateholders and/or Certificate Owners propose to transmit, or if the Depositor or Master Servicer shall request such information in writing from the Trustee, then the Trustee shall, within ten Business Days after the receipt of such request, (x) provide the Depositor, the Master Servicer or such Certificateholders and/or Certificate Owners at such recipients' expense the most recent list of the Certificateholders of such Trust Fund held by the Trustee, if any, and (y) assist the Depositor, the Master Servicer or such Certificateholders and/or Certificate Owners at such recipients' expense with obtaining from the Depository a list of the related Depository Participants acting on behalf of Certificate Owners of Book Entry Certificates. The Depositor and every Certificateholder and Certificate Owner, by receiving and holding a Certificate or beneficial interest therein, agree that the Trustee shall not be held accountable by reason of the disclosure of any such information as to the list of the Certificateholders and/or Depository Participants hereunder, regardless of the source from which such information was derived.

SECTION 5.06. Maintenance of Office or Agency.

The Trustee will maintain or cause to be maintained at its expense an office or offices or agency or agencies in New York City where Certificates may be surrendered for registration of transfer or exchange. The Trustee initially designates its Corporate Trust Office for such purposes. The Trustee will give prompt written notice to the Certificateholders of any change in such location of any such office or agency.


90

<PAGE>


ARTICLE VI
THE DEPOSITOR AND THE MASTER SERVICER

SECTION 6.01. Respective Liabilities of the Depositor and the Master Servicer.

The Depositor and the Master Servicer shall each be liable in accordance with this Agreement only to the extent of the obligations specifically and respectively imposed upon and undertaken by them in this Agreement.

SECTION 6.02. Merger or Consolidation of the Depositor or the Master Servicer.

The Depositor will keep in full effect its existence, rights and franchises as a corporation under the laws of the United States or under the laws of one of the states thereof and will obtain and preserve its qualification to do business as a foreign corporation in each jurisdiction in which such qualification is or shall be necessary to protect the validity and enforceability of this Agreement, or any of the Mortgage Loans and to perform its duties under this Agreement. The Master Servicer will keep in effect its existence, rights and franchises as a limited partnership under the laws of the United States or under the laws of one of the states thereof and will obtain and preserve its qualification or registration to do business as a foreign partnership in each jurisdiction in which such qualification or registration is or shall be necessary to protect the validity and enforceability of this Agreement or any of the Mortgage Loans and to perform its duties under this Agreement.

Any Person into which the Depositor or the Master Servicer may be merged or consolidated, or any Person resulting from any merger or consolidation to which the Depositor or the Master Servicer shall be a party, or any person succeeding to the business of the Depositor or the Master Servicer, shall be the successor of the Depositor or the Master Servicer, as the case may be, hereunder, without the execution or filing of any paper or any further act on the part of any of the parties hereto, anything in this Agreement to the contrary notwithstanding; provided, however, that the successor or surviving Person to the Master Servicer shall be qualified to service mortgage loans on behalf of, FNMA or FHLMC.

As a condition to the effectiveness of any merger or consolidation, at least 15 calendar days prior to the effective date of any merger or consolidation of the Master Servicer, the Master Servicer shall provide (x) written notice to the Depositor of any successor pursuant to this Section and

(y) in writing and in form and substance reasonably satisfactory to the
Depositor, all information reasonably requested by the Depositor in order to
comply with its reporting obligation under Item 6.02 of Form 8-K with respect
to a replacement Master Servicer.

          SECTION 6.03. Limitation on Liability of the Depositor, the Sellers,
the Master Servicer and Others.

          None of the Depositor, the Master Servicer or any Seller or any of the
directors, officers, employees or agents of the Depositor, the Master Servicer
or any Seller shall be under any liability to the Certificateholders for any
action taken or for refraining from the taking of any action in good faith
pursuant to this Agreement, or for errors in judgment; provided, however, that
this provision shall not protect the Depositor, the Master Servicer, any
Seller or any such Person against any breach of representations or warranties
made by it in this Agreement or

                                        91

<PAGE>

protect the Depositor, the Master Servicer, any Seller or any such Person from
any liability which would otherwise be imposed by reasons of willful
misfeasance, bad faith or gross negligence in the performance of duties or by
reason of reckless disregard of obligations and duties hereunder. The
Depositor, the Master Servicer, each Seller and any director, officer,
employee or agent of the Depositor, the Master Servicer or each Seller may
rely in good faith on any document of any kind prima facie properly executed
and submitted by any Person respecting any matters arising under this
Agreement. The Depositor, the Master Servicer, each Seller and any director,
officer, employee or agent of the Depositor, the Master Servicer, or any
Seller shall be indemnified by the Trust Fund and held harmless against any
loss, liability or expense incurred in connection with any audit, controversy
or judicial proceeding relating to a governmental taxing authority or any
legal action relating to this Agreement or the Certificates, other than any
loss, liability or expense related to any specific Mortgage Loan or Mortgage
Loans (except as any such loss, liability or expense shall be otherwise
reimbursable pursuant to this Agreement) and any loss, liability or expense
incurred by reason of willful misfeasance, bad faith or gross negligence in
the performance of duties hereunder or by reason of reckless disregard of
obligations and duties hereunder. None of the Depositor, the Master Servicer
or any Seller shall be under any obligation to appear in, prosecute or defend
any legal action that is not incidental to its respective duties hereunder and
which in its opinion may involve it in any expense or liability; provided,
however, that any of the Depositor, the Master Servicer or any Seller may in
its discretion undertake any such action that it may deem necessary or
desirable in respect of this Agreement and the rights and duties of the
parties hereto and interests of the Trustee and the Certificateholders
hereunder. In such event, the legal expenses and costs of such action and any
liability resulting therefrom shall be expenses, costs and liabilities of the
Trust Fund, and the Depositor, the Master Servicer and each Seller shall be
entitled to be reimbursed therefor out of the Certificate Account.

          SECTION 6.04. Limitation on Resignation of Master Servicer.

          The Master Servicer shall not resign from the obligations and duties
hereby imposed on it except (a) upon appointment of a successor servicer and

receipt by the Trustee of a letter from each Rating Agency that such a
resignation and appointment will not result in a downgrade or withdrawal of
the rating of any of the Certificates or (b) upon determination that its
duties hereunder are no longer permissible under applicable law. Any such
determination under clause (b) permitting the resignation of the Master
Servicer shall be evidenced by an Opinion of Counsel to such effect delivered
to the Trustee. No such resignation shall become effective until the Trustee
or a successor master servicer shall have assumed the Master Servicer's
responsibilities, duties, liabilities and obligations under this Agreement and
the Depositor shall have received the information described in the following
sentence. As a condition to the effectiveness of any such resignation, at
least 15 calendar days prior to the effective date of any such resignation,
the Master Servicer shall provide (x) written notice to the Depositor of any
successor pursuant to this Section and (y) in writing and in form and
substance reasonably satisfactory to the Depositor, all information reasonably
requested by the Depositor in order to comply with its reporting obligation
under Item 6.02 of Form 8-K with respect to the resignation of the Master
Servicer.


                                   92

<PAGE>



                              ARTICLE VII
                               DEFAULT


        SECTION 7.01. Events of Default.

        "Event of Default," wherever used in this Agreement, means any one of
the following events:

              (i) any failure by the Master Servicer to deposit in the
        Certificate Account or remit to the Trustee any payment required to be
        made under the terms of this Agreement, which failure shall continue
        unremedied for five days after the date upon which written notice of
        such failure shall have been given to the Master Servicer by the
        Trustee or the Depositor or to the Master Servicer and the Trustee by
        the Holders of Certificates having not less than 25% of the Voting
        Rights evidenced by the Certificates; or

              (ii) any failure by the Master Servicer to observe or perform
        in any material respect any other of the covenants or agreements on
        the part of the Master Servicer contained in this Agreement (except
        with respect to a failure related to a Limited Exchange Act Reporting
        Obligation), which failure materially affects the rights of
        Certificateholders, that failure continues unremedied for a period of
        60 days after the date on which written notice of such failure shall
        have been given to the Master Servicer by the Trustee or the
        Depositor, or to the Master Servicer and the Trustee by the Holders of
        Certificates evidencing not less than 25% of the Voting Rights
        evidenced by the Certificates; provided, however, that the sixty day
        cure period shall not apply to the initial delivery of the Mortgage
        File for Delay Delivery Mortgage Loans or the failure to substitute or
        repurchase in lieu of delivery; or

              (iii) a decree or order of a court or agency or supervisory

authority having jurisdiction in the premises for the appointment of a receiver or liquidator in any insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceedings, or for the winding-up or liquidation of its affairs, shall have been entered against the Master Servicer and such decree or order shall have remained in force undischarged or unstayed for a period of 60 consecutive days; or

> (iv) the Master Servicer shall consent to the appointment of a receiver or liquidator in any insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceedings of or relating to the Master Servicer or all or substantially all of the property of the Master Servicer; or

> (v) the Master Servicer shall admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of, or commence a voluntary case under, any applicable insolvency or reorganization statute, make an assignment for the benefit of its creditors, or voluntarily suspend payment of its obligations; or

> (vi) the Master Servicer shall fail to reimburse in full the Trustee within five days of the Master Servicer Advance Date for any Advance made by the Trustee pursuant to Section 4.01(b) together with accrued and unpaid interest.

93

<PAGE>

If (a) an Event of Default described in clauses (i) to (vi) of this Section shall occur, then, and in each and every such case, so long as such Event of Default shall not have been remedied, the Trustee may, or (b) an Event of Default described in clauses (i) to (v) of this Section shall occur, then, and in each and every such case, so long as such Event of Default shall not have been remedied, at the direction of (i) the Holders of Certificates evidencing not less than 66 2/3% of the Voting Rights evidenced by the Certificates, the Trustee shall by notice in writing to the Master Servicer (with a copy to each Rating Agency), terminate all of the rights and obligations of the Master Servicer under this Agreement and in and to the Mortgage Loans and the proceeds thereof, other than its rights as a Certificateholder hereunder.

In addition, if during the period that the Depositor is required to file Exchange Act Reports with respect to the Trust Fund, the Master Servicer shall fail to observe or perform any of the obligations that constitute a Limited Exchange Act Reporting Obligation or the obligations set forth in Section 3.16(a) or Section 11.07(a)(1) and (2), and such failure continues for the lesser of 10 calendar days or such period in which the applicable Exchange Act Report can be filed timely (without taking into account any extensions), so long as such failure shall not have been remedied, the Trustee shall, but only at the direction of the Depositor, terminate all of the rights and obligations of the Master Servicer under this Agreement and in and to the Mortgage Loans and the proceeds thereof, other than its rights as a Certificateholder hereunder. The Depositor shall not be entitled to terminate the rights and obligations of the Master Servicer if a failure of the Master Servicer to identify a Subcontractor "participating in the servicing function"

www.sec.gov/Archives/edgar/data/151...

within the meaning of Item 1122 of Regulation AB was attributable solely to the role or functions of such Subcontractor with respect to mortgage loans other than the Mortgage Loans.

On and after the receipt by the Master Servicer of such written notice, all authority and power of the Master Servicer hereunder, whether with respect to the Mortgage Loans or otherwise, shall pass to and be vested in the Trustee. The Trustee shall thereupon make any Advance which the Master Servicer failed to make subject to Section 4.01 whether or not the obligations of the Master Servicer have been terminated pursuant to this Section. The Trustee is hereby authorized and empowered to execute and deliver, on behalf of the Master Servicer, as attorney-in-fact or otherwise, any and all documents and other instruments, and to do or accomplish all other acts or things necessary or appropriate to effect the purposes of such notice of termination, whether to complete the transfer and endorsement or assignment of the Mortgage Loans and related documents, or otherwise. Unless expressly provided in such written notice, no such termination shall affect any obligation of the Master Servicer to pay amounts owed pursuant to Article VIII. The Master Servicer agrees to cooperate with the Trustee in effecting the termination of the Master Servicer's responsibilities and rights hereunder, including, without limitation, the transfer to the Trustee of all cash amounts which shall at the time be credited to the Certificate Account, or thereafter be received with respect to the Mortgage Loans.

Notwithstanding any termination of the activities of the Master Servicer hereunder, the Master Servicer shall be entitled to receive, out of any late collection of a Scheduled Payment on a Mortgage Loan which was due prior to the notice terminating such Master Servicer's rights and obligations as Master Servicer hereunder and received after such notice, that portion thereof to which such Master Servicer would have been entitled pursuant to Sections 3.08(a)(i) through (viii), and any other amounts payable to such Master Servicer hereunder the entitlement to which arose prior to the termination of its activities under this Agreement.

94

<PAGE>

If the Master Servicer is terminated, the Trustee shall provide the Depositor in writing and in form and substance reasonably satisfactory to the Depositor, all information reasonably requested by the Depositor in order to comply with its reporting obligation under Item 6.02 of Form 8-K with respect to a successor master servicer in the event the Trustee should succeed to the duties of the Master Servicer as set forth herein.

SECTION 7.02. Trustee to Act; Appointment of Successor.

On and after the time the Master Servicer receives a notice of termination pursuant to Section 7.01, the Trustee shall, subject to and to the extent provided in Section 3.04, be the successor to the Master Servicer in its capacity as master servicer under this Agreement and the transactions set forth or provided for in this Agreement and shall be subject to all the responsibilities, duties and liabilities relating thereto placed on the Master Servicer by the terms and provisions of this Agreement and applicable law including the obligation to make Advances pursuant to Section 4.01. As compensation therefor, the Trustee shall be entitled to all funds relating to the Mortgage Loans that the Master Servicer would have been entitled to charge

to the Certificate Account or Distribution Account if the Master Servicer had
continued to act hereunder. Notwithstanding the foregoing, if the Trustee has
become the successor to the Master Servicer in accordance with Section 7.01,
the Trustee may, if it shall be unwilling to so act, or shall, if it is
prohibited by applicable law from making Advances pursuant to Section 4.01 or
if it is otherwise unable to so act, appoint, or petition a court of competent
jurisdiction to appoint, any established mortgage loan servicing institution
the appointment of which does not adversely affect the then current rating of
the Certificates by each Rating Agency as the successor to the Master Servicer
hereunder in the assumption of all or any part of the responsibilities, duties
or liabilities of the Master Servicer hereunder. Any successor to the Master
Servicer shall be an institution which is a FNMA and FHLMC approved
seller/servicer in good standing, which has a net worth of at least
$15,000,000, and which is willing to service the Mortgage Loans and (i)
executes and delivers to the Depositor and the Trustee an agreement accepting
such delegation and assignment, which contains an assumption by such Person of
the rights, powers, duties, responsibilities, obligations and liabilities of
the Master Servicer (other than liabilities of the Master Servicer under
Section 6.03 incurred prior to termination of the Master Servicer under
Section 7.01), with like effect as if originally named as a party to this
Agreement; and provided further that each Rating Agency acknowledges that its
rating of the Certificates in effect immediately prior to such assignment and
delegation will not be qualified or reduced as a result of such assignment and
delegation and (ii) provides to the Depositor in writing fifteen days prior to
the effective date of such appointment and in form and substance reasonably
satisfactory to the Depositor, all information reasonably requested by the
Depositor in order to comply with its reporting obligation under Item 6.02 of
Form 8-K with respect to a replacement master servicer. The Trustee shall
provide written notice to the Depositor of such successor pursuant to this
Section. Pending appointment of a successor to the Master Servicer hereunder,
the Trustee, unless the Trustee is prohibited by law from so acting, shall,
subject to Section 3.04, act in such capacity as hereinabove provided. In
connection with such appointment and assumption, the Trustee may make such
arrangements for the compensation of such successor out of payments on
Mortgage Loans as it and such successor shall agree; provided, however, that
no such compensation shall be in excess of the Master Servicing Fee permitted
to be paid to the Master Servicer hereunder. The Trustee and such successor
shall take such action, consistent with this Agreement, as shall be necessary
to effectuate any such succession. Neither the Trustee nor any

                                      95

<PAGE>

other successor master servicer shall be deemed to be in default hereunder by
reason of any failure to make, or any delay in making, any distribution
hereunder or any portion thereof or any failure to perform, or any delay in
performing, any duties or responsibilities hereunder, in either case caused by
the failure of the Master Servicer to deliver or provide, or any delay in
delivering or providing, any cash, information, documents or records to it.

        Any successor to the Master Servicer as master servicer shall give
notice to the Mortgagors of such change of servicer and shall, during the term
of its service as master servicer maintain in force the policy or policies
that the Master Servicer is required to maintain pursuant to Section 3.09.

In connection with the termination or resignation of the Master Servicer hereunder, either (i) the successor Master Servicer, including the Trustee if the Trustee is acting as successor Master Servicer, shall represent and warrant that it is a member of MERS in good standing and shall agree to comply in all material respects with the rules and procedures of MERS in connection with the servicing of the Mortgage Loans that are registered with MERS, or (ii) the predecessor Master Servicer shall cooperate with the successor Master Servicer either (x) in causing MERS to execute and deliver an assignment of Mortgage in recordable form to transfer the Mortgage from MERS to the Trustee and to execute and deliver such other notices, documents and other instruments as may be necessary or desirable to effect a transfer of such Mortgage Loan or servicing of such Mortgage Loan on the MERS(R) System to the successor Master Servicer or (y) in causing MERS to designate on the MERS(R) System the successor Master Servicer as the servicer of such Mortgage Loan. The predecessor Master Servicer shall file or cause to be filed any such assignment in the appropriate recording office. The successor Master Servicer shall cause such assignment to be delivered to the Trustee promptly upon receipt of the original with evidence of recording thereon or a copy certified by the public recording office in which such assignment was recorded.

SECTION 7.03. Notification to Certificateholders.

(a) Upon any termination of or appointment of a successor to the Master Servicer, the Trustee shall give prompt written notice thereof to Certificateholders and to each Rating Agency.

(b) Within 60 days after the occurrence of any Event of Default, the Trustee shall transmit by mail to all Certificateholders notice of each such Event of Default hereunder known to the Trustee, unless such Event of Default shall have been cured or waived.

96

<PAGE>

ARTICLE VIII
CONCERNING THE TRUSTEE

SECTION 8.01. Duties of Trustee.

The Trustee, prior to the occurrence of an Event of Default and after the curing of all Events of Default that may have occurred, shall undertake to perform such duties and only such duties as are specifically set forth in this Agreement. In case an Event of Default has occurred and remains uncured, the Trustee shall exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

The Trustee, upon receipt of all resolutions, certificates, statements, opinions, reports, documents, orders or other instruments furnished to the Trustee that are specifically required to be furnished pursuant to any provision of this Agreement shall examine them to determine whether they are in the form required by this Agreement; provided, however, that the Trustee shall not be responsible for the accuracy or content of any such resolution, certificate, statement, opinion, report, document, order or other instrument.

No provision of this Agreement shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act or its own willful misconduct; provided, however, that:

(i) unless an Event of Default known to the Trustee shall have occurred and be continuing, the duties and obligations of the Trustee shall be determined solely by the express provisions of this Agreement, the Trustee shall not be liable except for the performance of such duties and obligations as are specifically set forth in this Agreement, no implied covenants or obligations shall be read into this Agreement against the Trustee and the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any certificates or opinions furnished to the Trustee and conforming to the requirements of this Agreement which it believed in good faith to be genuine and to have been duly executed by the proper authorities respecting any matters arising hereunder;

(ii) the Trustee shall not be liable for an error of judgment made in good faith by a Responsible Officer or Responsible Officers of the Trustee, unless it shall be finally proven that the Trustee was negligent in ascertaining the pertinent facts;

(iii) the Trustee shall not be liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with the direction of Holders of Certificates evidencing not less than 25% of the Voting Rights of Certificates relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee under this Agreement; and

(iv) without limiting the provisions of this Section 8.01 or Section 8.02, the Trustee shall be entitled to rely conclusively on the information delivered to it by the

97

<PAGE>

Master Servicer in a Trustee Advance Notice in determining whether it is required to make an Advance under Section 4.01(b), shall have no responsibility to ascertain or confirm any information contained in any Trustee Advance Notice, and shall have no obligation to make any Advance under Section 4.01(b) in the absence of a Trustee Advance Notice or actual knowledge of a Responsible Officer of the Trustee that (A) an Advance was not made by the Master Servicer and (B) such Advance is not a Nonrecoverable Advance.

SECTION 8.02. Certain Matters Affecting the Trustee.

Except as otherwise provided in Section 8.01:

(i) the Trustee may request and rely upon and shall be protected in acting or refraining from acting upon any resolution, Officers' Certificate, certificate of auditors or any other certificate, statement, instrument, opinion, report, notice, request, consent, order, appraisal, bond or other paper or document believed by

it to be genuine and to have been signed or presented by the proper party or parties and the Trustee shall have no responsibility to ascertain or confirm the genuineness of any signature of any such party or parties;

(ii) the Trustee may consult with counsel, financial advisers or accountants of its selection and the advice of any such counsel, financial advisers or accountants and any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by it hereunder in good faith and in accordance with such Opinion of Counsel;

(iii) the Trustee shall not be liable for any action taken, suffered or omitted by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by this Agreement;

(iv) the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond or other paper or document, unless requested in writing so to do by Holders of Certificates evidencing not less than 25% of the Voting Rights allocated to each Class of Certificates;

(v) the Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents, accountants or attorneys;

(vi) the Trustee shall not be required to risk or expend its own funds or otherwise incur any financial liability in the performance of any of its duties or in the exercise of any of its rights or powers hereunder if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not assured to it;

(vii) the Trustee shall not be liable for any loss on any investment of funds pursuant to this Agreement (other than as issuer of the investment security);

98

<PAGE>

(viii) the Trustee shall not be deemed to have knowledge of an Event of Default until a Responsible Officer of the Trustee shall have received written notice thereof; and

(ix) the Trustee shall be under no obligation to exercise any of the trusts, rights or powers vested in it by this Agreement or to institute, conduct or defend any litigation hereunder or in relation hereto at the request, order or direction of any of the Certificateholders, pursuant to the provisions of this Agreement, unless such Certificateholders shall have offered to the Trustee reasonable security or indemnity satisfactory to the Trustee against the costs, expenses and liabilities which may be incurred therein or thereby.

SECTION 8.03.  Trustee Not Liable for Certificates or Mortgage Loans.

The recitals contained in this Agreement and in the Certificates shall be taken as the statements of the Depositor or a Seller, as the case may be, and the Trustee assumes no responsibility for their correctness. The Trustee makes no representations as to the validity or sufficiency of this Agreement or of the Certificates or of any Mortgage Loan or related document or of MERS or the MERS(R) System other than with respect to the Trustee's execution and counter-signature of the Certificates. The Trustee shall not be accountable for the use or application by the Depositor or the Master Servicer of any funds paid to the Depositor or the Master Servicer in respect of the Mortgage Loans or deposited in or withdrawn from the Certificate Account by the Depositor or the Master Servicer.

SECTION 8.04.  Trustee May Own Certificates.

The Trustee in its individual or any other capacity may become the owner or pledgee of Certificates with the same rights as it would have if it were not the Trustee.

SECTION 8.05.  Trustee's Fees and Expenses.

The Trustee, as compensation for its activities hereunder, shall be entitled to withdraw from the Distribution Account on each Distribution Date an amount equal to the Trustee Fee for such Distribution Date. The Trustee and any director, officer, employee or agent of the Trustee shall be indemnified by the Master Servicer and held harmless against any loss, liability or expense (including reasonable attorney's fees) (i) incurred in connection with any claim or legal action relating to (a) this Agreement, (b) the Certificates or (c) in connection with the performance of any of the Trustee's duties hereunder, other than any loss, liability or expense incurred by reason of willful misfeasance, bad faith or negligence in the performance of any of the Trustee's duties hereunder or incurred by reason of any action of the Trustee taken at the direction of the Certificateholders and (ii) resulting from any error in any tax or information return prepared by the Master Servicer. Such indemnity shall survive the termination of this Agreement or the resignation or removal of the Trustee hereunder. Without limiting the foregoing, the Master Servicer covenants and agrees, except as otherwise agreed upon in writing by the Depositor and the Trustee, and except for any such expense, disbursement or advance as may arise from the Trustee's negligence, bad faith or willful misconduct, to pay or reimburse the Trustee, for all reasonable expenses, disbursements and advances incurred or made by the Trustee in accordance with any of the provisions of this Agreement with respect to: (A) the

99

<PAGE>

reasonable compensation and the expenses and disbursements of its counsel not associated with the closing of the issuance of the Certificates, (B) the reasonable compensation, expenses and disbursements of any accountant, engineer or appraiser that is not regularly employed by the Trustee, to the extent that the Trustee must engage such persons to perform acts or services hereunder and (C) printing and engraving expenses in connection with preparing any Definitive Certificates. Except as otherwise provided in this Agreement, the Trustee shall not be entitled to payment or reimbursement for any routine

ongoing expenses incurred by the Trustee in the ordinary course of its duties
as Trustee, Registrar, Tax Matters Person or Paying Agent hereunder or for any
other expenses.

SECTION 8.06. Eligibility Requirements for Trustee.

The Trustee hereunder shall at all times be a corporation or
association organized and doing business under the laws of a state or the
United States of America, authorized under such laws to exercise corporate
trust powers, having a combined capital and surplus of at least $50,000,000,
subject to supervision or examination by federal or state authority and with a
credit rating which would not cause either of the Rating Agencies to reduce or
withdraw their respective then current ratings of the Certificates (or having
provided such security from time to time as is sufficient to avoid such
reduction) as evidenced in writing by each Rating Agency. If such corporation
or association publishes reports of condition at least annually, pursuant to
law or to the requirements of the aforesaid supervising or examining
authority, then for the purposes of this Section 8.06 the combined capital and
surplus of such corporation or association shall be deemed to be its combined
capital and surplus as set forth in its most recent report of condition so
published. In case at any time the Trustee shall cease to be eligible in
accordance with the provisions of this Section 8.06, the Trustee shall resign
immediately in the manner and with the effect specified in Section 8.07. The
entity serving as Trustee may have normal banking and trust relationships with
the Depositor and its affiliates or the Master Servicer and its affiliates;
provided, however, that such entity cannot be an affiliate of the Master
Servicer other than the Trustee in its role as successor to the Master
Servicer.

SECTION 8.07. Resignation and Removal of Trustee.

The Trustee may at any time resign and be discharged from the trusts
hereby created by giving written notice of resignation to the Depositor, the
Master Servicer and each Rating Agency not less than 60 days before the date
specified in such notice when, subject to Section 8.08, such resignation is to
take effect, and acceptance by a successor trustee in accordance with Section
8.08 meeting the qualifications set forth in Section 8.06. If no successor
trustee meeting such qualifications shall have been so appointed and have
accepted appointment within 30 days after the giving of such notice or
resignation, the resigning Trustee may petition any court of competent
jurisdiction for the appointment of a successor trustee.

As a condition to the effectiveness of any such resignation, at least
15 calendar days prior to the effective date of such resignation, the Trustee
shall provide (x) written notice to the Depositor of any successor pursuant to
this Section and (y) in writing and in form and substance reasonably
satisfactory to the Depositor, all information reasonably requested by the
Depositor in order to comply with its reporting obligation under Item 6.02 of
Form 8-K with respect to the resignation of the Trustee.

100

<PAGE>

If at any time (i) the Trustee shall cease to be eligible in
accordance with the provisions of Section 8.06 and shall fail to resign after
written request thereto by the Depositor, (ii) the Trustee shall become

incapable of acting, or shall be adjudged as bankrupt or insolvent, or a
receiver of the Trustee or of its property shall be appointed, or any public
officer shall take charge or control of the Trustee or of its property or
affairs for the purpose of rehabilitation, conservation or liquidation, (iii)
a tax is imposed with respect to the Trust Fund by any state in which the
Trustee or the Trust Fund is located and the imposition of such tax would be
avoided by the appointment of a different trustee, or (iv) during the period
that the Depositor is required to file Exchange Act Reports with respect to
the Trust Fund, the Trustee fails to comply with its obligations under the
last sentence of Section 7.01, the preceding paragraph, Section 8.09 or
Article XI and such failure is not remedied within the lesser of 10 calendar
days or such period in which the applicable Exchange Act Report can be filed
timely (without taking into account any extensions), then, in the case of
clauses (i) through (iii), the Depositor or the Master Servicer, or in the
case of clause (iv), the Depositor, may remove the Trustee and appoint a
successor trustee by written instrument, in triplicate, one copy of which
instrument shall be delivered to the Trustee, one copy of which shall be
delivered to the Master Servicer and one copy to the successor trustee.

     The Holders of Certificates entitled to at least 51% of the Voting
Rights may at any time remove the Trustee and appoint a successor trustee by
written instrument or instruments, in triplicate, signed by such Holders or
their attorneys-in-fact duly authorized, one complete set of which instruments
shall be delivered by the successor Trustee to the Master Servicer, one
complete set to the Trustee so removed, one complete set to the successor so
appointed and one complete set to the Depositor, together with a written
description of the basis for such removal. Notice of any removal of the
Trustee shall be given to each Rating Agency by the successor trustee.

     Any resignation or removal of the Trustee and appointment of a
successor trustee pursuant to any of the provisions of this Section 8.07 shall
become effective upon acceptance of appointment by the successor trustee as
provided in Section 8.08.

     SECTION 8.08. Successor Trustee.

     Any successor trustee appointed as provided in Section 8.07 shall
execute, acknowledge and deliver to the Depositor and to its predecessor
trustee and the Master Servicer an instrument accepting such appointment
hereunder and thereupon the resignation or removal of the predecessor trustee
shall become effective and such successor trustee, without any further act,
deed or conveyance, shall become fully vested with all the rights, powers,
duties and obligations of its predecessor hereunder, with the like effect as
if originally named as trustee in this Agreement. The Depositor, the Master
Servicer and the predecessor trustee shall execute and deliver such
instruments and do such other things as may reasonably be required for more
fully and certainly vesting and confirming in the successor trustee all such
rights, powers, duties, and obligations.

     No successor trustee shall accept appointment as provided in this
Section 8.08 unless at the time of such acceptance such successor trustee
shall be eligible under the provisions of Section 8.06 and its appointment
shall not adversely affect the then current rating of the

                                   101

<PAGE>

Certificates and has provided to the Depositor in writing and in form and
substance reasonably satisfactory to the Depositor, all information reasonably
requested by the Depositor in order to comply with its reporting obligation
under Item 6.02 of Form 8-K with respect to a replacement Trustee.

Upon acceptance of appointment by a successor trustee as provided in
this Section 8.08, the Depositor shall mail notice of the succession of such
trustee hereunder to all Holders of Certificates. If the Depositor fails to
mail such notice within 10 days after acceptance of appointment by the
successor trustee, the successor trustee shall cause such notice to be mailed
at the expense of the Depositor.

SECTION 8.09. Merger or Consolidation of Trustee.

Any corporation into which the Trustee may be merged or converted or
with which it may be consolidated or any corporation resulting from any
merger, conversion or consolidation to which the Trustee shall be a party, or
any corporation succeeding to the business of the Trustee, shall be the
successor of the Trustee hereunder, provided that such corporation shall be
eligible under the provisions of Section 8.06 without the execution or filing
of any paper or further act on the part of any of the parties hereto, anything
in this Agreement to the contrary notwithstanding.

As a condition to the effectiveness of any merger or consolidation, at
least 15 calendar days prior to the effective date of any merger or
consolidation of the Trustee, the Trustee shall provide (x) written notice to
the Depositor of any successor pursuant to this Section and (y) in writing and
in form and substance reasonably satisfactory to the Depositor, all
information reasonably requested by the Depositor in order to comply with its
reporting obligation under Item 6.02 of Form 8-K with respect to a replacement
Trustee.

SECTION 8.10. Appointment of Co-Trustee or Separate Trustee.

Notwithstanding any other provisions of this Agreement, at any time,
for the purpose of meeting any legal requirements of any jurisdiction in which
any part of the Trust Fund or property securing any Mortgage Note may at the
time be located, the Master Servicer and the Trustee acting jointly shall have
the power and shall execute and deliver all instruments to appoint one or more
Persons approved by the Trustee to act as co-trustee or co-trustees jointly
with the Trustee, or separate trustee or separate trustees, of all or any part
of the Trust Fund, and to vest in such Person or Persons, in such capacity and
for the benefit of the Certificateholders, such title to the Trust Fund or any
part thereof, whichever is applicable, and, subject to the other provisions of
this Section 8.10, such powers, duties, obligations, rights and trusts as the
Master Servicer and the Trustee may consider necessary or desirable. If the
Master Servicer shall not have joined in such appointment within 15 days after
the receipt by it of a request to do so, or in the case an Event of Default
shall have occurred and be continuing, the Trustee alone shall have the power
to make such appointment. No co-trustee or separate trustee under this Section
shall be required to meet the terms of eligibility as a successor trustee
under Section 8.06 and no notice to Certificateholders of the appointment of
any co-trustee or separate trustee shall be required under Section 8.08.

102

3/3/2011   Case 3:11-cv-00457-AJB-WVG   Document 87   Filed 11/14/11   Page 195 of 316
www.sec.gov/Archives/edgar/data/...
&lt;PAGE&gt;

Every separate trustee and co-trustee shall, to the extent permitted by law, be appointed and act subject to the following provisions and conditions:

(i) To the extent necessary to effectuate the purposes of this Section 8.10, all rights, powers, duties and obligations conferred or imposed upon the Trustee, except for the obligation of the Trustee under this Agreement to advance funds on behalf of the Master Servicer, shall be conferred or imposed upon and exercised or performed by the Trustee and such separate trustee or co-trustee jointly (it being understood that such separate trustee or co-trustee is not authorized to act separately without the Trustee joining in such act), except to the extent that under any law of any jurisdiction in which any particular act or acts are to be performed (whether as Trustee hereunder or as successor to the Master Servicer hereunder), the Trustee shall be incompetent or unqualified to perform such act or acts, in which event such rights, powers, duties and obligations (including the holding of title to the applicable Trust Fund or any portion thereof in any such jurisdiction) shall be exercised and performed singly by such separate trustee or co-trustee, but solely at the direction of the Trustee;

(ii) No trustee hereunder shall be held personally liable by reason of any act or omission of any other trustee hereunder and such appointment shall not, and shall not be deemed to, constitute any such separate trustee or co-trustee as agent of the Trustee;

(iii) The Trustee may at any time accept the resignation of or remove any separate trustee or co-trustee; and

(iv) The Master Servicer, and not the Trustee, shall be liable for the payment of reasonable compensation, reimbursement and indemnification to any such separate trustee or co-trustee.

Any notice, request or other writing given to the Trustee shall be deemed to have been given to each of the separate trustees and co-trustees, when and as effectively as if given to each of them. Every instrument appointing any separate trustee or co-trustee shall refer to this Agreement and the conditions of this Article VIII. Each separate trustee and co-trustee, upon its acceptance of the trusts conferred, shall be vested with the estates or property specified in its instrument of appointment, either jointly with the Trustee or separately, as may be provided therein, subject to all the provisions of this Agreement, specifically including every provision of this Agreement relating to the conduct of, affecting the liability of, or affording protection to, the Trustee. Every such instrument shall be filed with the Trustee and a copy thereof given to the Master Servicer and the Depositor.

Any separate trustee or co-trustee may, at any time, constitute the Trustee its agent or attorney-in-fact, with full power and authority, to the extent not prohibited by law, to do any lawful act under or in respect of this Agreement on its behalf and in its name. If any separate trustee or co-trustee shall die, become incapable of acting, resign or be removed, all of its estates, properties, rights, remedies and trusts shall vest in and be exercised by the Trustee, to the extent permitted by law, without the appointment of a new or successor trustee.

103

<PAGE>

          SECTION 8.11. Tax Matters.

          It is intended that the assets with respect to which any REMIC
election is to be made, as set forth in the Preliminary Statement, shall
constitute, and that the conduct of matters relating to such assets shall be
such as to qualify such assets as, a "real estate mortgage investment conduit"
as defined in and in accordance with the REMIC Provisions. In furtherance of
such intention, the Trustee covenants and agrees that it shall act as agent
(and the Trustee is hereby appointed to act as agent) on behalf of any such
REMIC and that in such capacity it shall: (a) prepare and file, or cause to be
prepared and filed, in a timely manner, a U.S. Real Estate Mortgage Investment
Conduit Income Tax Return (Form 1066 or any successor form adopted by the
Internal Revenue Service) and prepare and file or cause to be prepared and
filed with the Internal Revenue Service and applicable state or local tax
authorities income tax or information returns for each taxable year with
respect to any such REMIC, containing such information and at the times and in
the manner as may be required by the Code or state or local tax laws,
regulations, or rules, and furnish or cause to be furnished to
Certificateholders the schedules, statements or information at such times and
in such manner as may be required thereby; (b) within thirty days of the
Closing Date, furnish or cause to be furnished to the Internal Revenue
Service, on Forms 8811 or as otherwise may be required by the Code, the name,
title, address, and telephone number of the person that the holders of the
Certificates may contact for tax information relating thereto, together with
such additional information as may be required by such Form, and update such
information at the time or times in the manner required by the Code; (c) make
or cause to be made elections that such assets be treated as a REMIC on the
federal tax return for its first taxable year (and, if necessary, under
applicable state law); (d) prepare and forward, or cause to be prepared and
forwarded, to the Certificateholders and to the Internal Revenue Service and,
if necessary, state tax authorities, all information returns and reports as
and when required to be provided to them in accordance with the REMIC
Provisions, including without limitation, the calculation of any original
issue discount using the Prepayment Assumption; (e) provide information
necessary for the computation of tax imposed on the transfer of a Residual
Certificate to a Person that is not a Permitted Transferee, or an agent
(including a broker, nominee or other middleman) of a Non-Permitted
Transferee, or a pass-through entity in which a Non-Permitted Transferee is
the record holder of an interest (the reasonable cost of computing and
furnishing such information may be charged to the Person liable for such tax);
(f) to the extent that they are under its control conduct matters relating to
such assets at all times that any Certificates are outstanding so as to
maintain the status as a REMIC under the REMIC Provisions; (g) not knowingly
or intentionally take any action or omit to take any action that would cause
the termination of the tax status of any REMIC; (h) pay, from the sources
specified in the last paragraph of this Section 8.11, the amount of any
federal or state tax, including prohibited transaction taxes as described
below, imposed on any such REMIC prior to its termination when and as the same
shall be due and payable (but such obligation shall not prevent the Trustee or
any other appropriate Person from contesting any such tax in appropriate
proceedings and shall not prevent the Trustee from withholding payment of such
tax, if permitted by law, pending the outcome of such proceedings); (i) ensure

that federal, state or local income tax or information returns shall be signed by the Trustee or such other person as may be required to sign such returns by the Code or state or local laws, regulations or rules; (j) maintain records relating to any such REMIC, including but not limited to the income, expenses, assets and liabilities thereof and the fair market value and adjusted basis of the assets determined at such intervals as may be required by the Code, as may be necessary to prepare the foregoing returns,

<div align="center">104</div>

<PAGE>

schedules, statements or information; and (k) as and when necessary and appropriate, represent any such REMIC in any administrative or judicial proceedings relating to an examination or audit by any governmental taxing authority, request an administrative adjustment as to any taxable year of any such REMIC, enter into settlement agreements with any governmental taxing agency, extend any statute of limitations relating to any tax item of any such REMIC, and otherwise act on behalf of any such REMIC in relation to any tax matter or controversy involving it.

     In order to enable the Trustee to perform its duties as set forth in this Agreement, the Depositor shall provide, or cause to be provided, to the Trustee within ten (10) days after the Closing Date all information or data that the Trustee requests in writing and determines to be relevant for tax purposes to the valuations and offering prices of the Certificates, including, without limitation, the price, yield, prepayment assumption and projected cash flows of the Certificates and the Mortgage Loans. Thereafter, the Depositor shall provide to the Trustee promptly upon written request therefor, any such additional information or data that the Trustee may, from time to time, reasonably request in order to enable the Trustee to perform its duties as set forth in this Agreement. The Depositor hereby indemnifies the Trustee for any losses, liabilities, damages, claims or expenses of the Trustee arising from any errors, omissions or miscalculations of the Trustee that result from any failure of the Depositor to provide, or to cause to be provided, accurate information or data to the Trustee on a timely basis.

     In the event that any tax is imposed on "prohibited transactions" of any REMIC as defined in section 860F(a)(2) of the Code, on the "net income from foreclosure property" of such REMIC as defined in section 860G(c) of the Code, on any contribution to any REMIC hereunder after the Startup Day pursuant to section 860G(d) of the Code, or any other tax is imposed, including, without limitation, any minimum tax imposed upon any REMIC pursuant to sections 23153 and 24874 of the California Revenue and Taxation Code, if not paid as otherwise provided for in this Agreement, such tax shall be paid by (i) the Trustee, if any such other tax arises out of or results from a breach by the Trustee of any of its obligations under this Agreement, (ii) the Master Servicer, in the case of any such minimum tax, or if such tax arises out of or results from a breach by the Master Servicer or a Seller of any of their obligations under this Agreement, (iii) any Seller, if any such tax arises out of or results from that Seller's obligation to repurchase a Mortgage Loan pursuant to Section 2.02 or 2.03, or (iv) in all other cases, or in the event that the Trustee, the Master Servicer or any Seller fails to honor its obligations under the preceding clauses (i), (ii) or (iii), any such tax will be paid with amounts otherwise to be distributed to the Certificateholders, as provided in Section 3.08(b).

SECTION 8.12. Monitoring of Significance Percentage.

   With respect to each Distribution Date, the Trustee shall calculate the "significance percentage" (as defined in Item 1115 of Regulation AB) of each derivative instrument, if any, based on the aggregate Class Certificate Balance of the related Classes of Covered Certificates for such derivative instrument and Distribution Date (after all distributions to be made thereon on such Distribution Date) and based on the methodology provided in writing by or on behalf of Countrywide no later than the fifth Business Day preceding such Distribution Date. On each Distribution Date, the Trustee shall provide to Countrywide a written report (which written report may include similar information with respect to other derivative instruments relating to

                              105

<PAGE>

securitization transactions sponsored by Countrywide) specifying the "significance percentage" of each derivative instrument, if any, for that Distribution Date. If the "significance percentage" of any derivative instrument exceeds 7.0% with respect to any Distribution Date, the Trustee shall make a separate notation thereof in the written report described in the preceding sentence. Such written report may contain such assumptions and disclaimers as are deemed necessary and appropriate by the Trustee.

                              106

<PAGE>

                          ARTICLE IX
                          TERMINATION

   SECTION 9.01. Termination upon Liquidation or Purchase of all Mortgage Loans.

   Subject to Section 9.03, the obligations and responsibilities of the Depositor, the Sellers, the Master Servicer and the Trustee created hereby with respect to the Trust Fund shall terminate upon the earlier of (a) the purchase by the Master Servicer of all Mortgage Loans (and REO Properties) remaining in the Trust Fund at the price equal to the sum of (i) 100% of the Stated Principal Balance of each Mortgage Loan plus one month's accrued interest thereon at the applicable Adjusted Mortgage Rate, (ii) the lesser of (x) the appraised value of any REO Property as determined by the higher of two appraisals completed by two independent appraisers selected by the Master Servicer at the expense of the Master Servicer and (y) the Stated Principal Balance of each Mortgage Loan related to any REO Property, and (iii) any remaining unpaid costs and damages incurred by the Trust Fund that arises out of a violation of any predatory or abusive lending law that also constitutes an actual breach of clause (49) on Schedule III-A, in all cases plus accrued and unpaid interest thereon at the applicable Adjusted Mortgage Rate and (b) the later of (i) the maturity or other liquidation (or any Advance with respect thereto) of the last Mortgage Loan remaining in the Trust Fund and the disposition of all REO Property and (ii) the distribution to Certificateholders of all amounts required to be distributed to them pursuant to this Agreement. In no event shall the trusts created hereby continue beyond the earlier of (i) the expiration of 21 years from the death of the survivor of the descendants of Joseph P. Kennedy, the late Ambassador of the United

States to the Court of St. James's, living on the date of this Agreement and (ii) the Latest Possible Maturity Date.

The Master Servicer shall have the right to purchase all Mortgage Loans and REO Properties in the Trust Fund pursuant to clause (a) in the preceding paragraph of this Section 9.01 only on or after the date on which the Pool Stated Principal Balance, at the time of any such repurchase, is less than or equal to ten percent (10%) of the Cut-Off Date Pool Principal Balance.

SECTION 9.02. Final Distribution on the Certificates.

If on any Determination Date, the Master Servicer determines that there are no Outstanding Mortgage Loans and no other funds or assets in the Trust Fund other than the funds in the Certificate Account, the Master Servicer shall direct the Trustee promptly to send a final distribution notice to each Certificateholder. If the Master Servicer elects to terminate the Trust Fund pursuant to clause (a) of Section 9.01, at least 20 days prior to the date notice is to be mailed to the affected Certificateholders, the Master Servicer shall notify the Depositor and the Trustee of the date the Master Servicer intends to terminate the Trust Fund and of the applicable repurchase price of the Mortgage Loans and REO Properties.

Notice of any termination of the Trust Fund, specifying the Distribution Date on which Certificateholders may surrender their Certificates for payment of the final distribution and cancellation, shall be given promptly by the Trustee by letter to Certificateholders mailed not earlier than the 10th day and no later than the 15th day of the month next preceding the month of such final distribution. Any such notice shall specify (a) the Distribution Date upon which final distribution on the Certificates will be made upon presentation and surrender of Certificates at

107

<PAGE>

the office therein designated, (b) the amount of such final distribution, (c) the location of the office or agency at which such presentation and surrender must be made, and (d) that the Record Date otherwise applicable to such Distribution Date is not applicable, distributions being made only upon presentation and surrender of the Certificates at the office therein specified. The Master Servicer will give such notice to each Rating Agency at the time such notice is given to Certificateholders.

In the event such notice is given, the Master Servicer shall cause all funds in the Certificate Account to be remitted to the Trustee for deposit in the Distribution Account on or before the Business Day prior to the applicable Distribution Date in an amount equal to the final distribution in respect of the Certificates. Upon such final deposit with respect to the Trust Fund and the receipt by the Trustee of a Request for Release therefor, the Trustee shall promptly release to the Master Servicer the Mortgage Files for the Mortgage Loans.

Upon presentation and surrender of the Certificates, the Trustee shall cause to be distributed to the Certificateholders of each Class, in each case on the final Distribution Date and in the order set forth in Section 4.02, in proportion to their respective Percentage Interests, with respect to Certificateholders of the same Class, an amount equal to (i) as to each Class

of Regular Certificates, the Certificate Balance thereof plus accrued interest
thereon (or on their Notional Amount, if applicable) in the case of an
interest-bearing Certificate and (ii) as to the Residual Certificates, the
amount, if any, which remains on deposit in the Distribution Account (other
than the amounts retained to meet claims) after application pursuant to clause
(i) above. Notwithstanding the reduction of the Class Certificate Balance of
any Class of Certificates to zero, such Class will be outstanding hereunder
(solely for the purpose of receiving distributions and not for any other
purpose) until the termination of the respective obligations and
responsibilities of the Depositor, each Seller, the Master Servicer and the
Trustee hereunder in accordance with Article IX.

In the event that any affected Certificateholders shall not surrender
Certificates for cancellation within six months after the date specified in
the above mentioned written notice, the Trustee shall give a second written
notice to the remaining Certificateholders to surrender their Certificates for
cancellation and receive the final distribution with respect thereto. If
within six months after the second notice all the applicable Certificates
shall not have been surrendered for cancellation, the Trustee may take
appropriate steps, or may appoint an agent to take appropriate steps, to
contact the remaining Certificateholders concerning surrender of their
Certificates, and the cost thereof shall be paid out of the funds and other
assets which remain a part of the Trust Fund. If within one year after the
second notice all Certificates shall not have been surrendered for
cancellation, the Class A-R Certificateholders shall be entitled to all
unclaimed funds and other assets of the Trust Fund which remain subject to
this Agreement.

SECTION 9.03. Additional Termination Requirements.

(a) In the event the Master Servicer exercises its purchase option as
provided in Section 9.01, the Trust Fund shall be terminated in accordance
with the following additional requirements, unless the Trustee has been
supplied with an Opinion of Counsel, at the expense of the Master Servicer, to
the effect that the failure to comply with the requirements of this Section
9.03 will not (i) result in the imposition of taxes on "prohibited
transactions" on any

108

<PAGE>

REMIC as defined in section 860F of the Code, or (ii) cause any REMIC to fail
to qualify as a REMIC at any time that any Certificates are outstanding:

(1) Within 90 days prior to the final Distribution Date set
forth in the notice given by the Master Servicer under Section 9.02,
the Master Servicer shall prepare and the Trustee, at the expense of
the "tax matters person," shall adopt a plan of complete liquidation
within the meaning of section 860F(a)(4) of the Code which, as
evidenced by an Opinion of Counsel (which opinion shall not be an
expense of the Trustee or the Tax Matters Person), meets the
requirements of a qualified liquidation; and

(2) Within 90 days after the time of adoption of such a plan
of complete liquidation, the Trustee shall sell all of the assets of
the Trust Fund to the Master Servicer for cash in accordance with

Section 9.01.

(b) The Trustee as agent for any REMIC created under this Agreement agrees to adopt and sign such a plan of complete liquidation upon the written request of the Master Servicer, and the receipt of the Opinion of Counsel referred to in Section 9.03(a)(1) and to take such other action in connection therewith as may be reasonably requested by the Master Servicer.

(c) By their acceptance of the Certificates, the Holders thereof hereby authorize the Master Servicer to prepare and the Trustee to adopt and sign a plan of complete liquidation. ARTICLE X

109

<PAGE>

ARTICLE X
MISCELLANEOUS PROVISIONS

SECTION 10.01. Amendment.

This Agreement may be amended from time to time by the Depositor, each Seller, the Master Servicer and the Trustee without the consent of any of the Certificateholders (i) to cure any ambiguity or mistake, (ii) to correct any defective provision in this Agreement or to supplement any provision in this Agreement which may be inconsistent with any other provision in this Agreement, (iii) to conform this Agreement to the Prospectus and Prospectus Supplement provided to investors in connection with the initial offering of the Certificates, (iv) to add to the duties of the Depositor, any Seller or the Master Servicer, (v) to modify, alter, amend, add to or rescind any of the terms or provisions contained in this Agreement to comply with any rules or regulations promulgated by the Securities and Exchange Commission from time to time, (vi) to add any other provisions with respect to matters or questions arising hereunder or (vii) to modify, alter, amend, add to or rescind any of the terms or provisions contained in this Agreement; provided that any action pursuant to clauses (vi) or (vii) above shall not, as evidenced by an Opinion of Counsel (which Opinion of Counsel shall not be an expense of the Trustee or the Trust Fund), adversely affect in any material respect the interests of any Certificateholder; provided, however, that the amendment shall be deemed not to adversely affect in any material respect the interests of the Certificateholders if the Person requesting the amendment obtains a letter from each Rating Agency stating that the amendment would not result in the downgrading or withdrawal of the respective ratings then assigned to the Certificates; it being understood and agreed that any such letter in and of itself will not represent a determination as to the materiality of any such amendment and will represent a determination only as to the credit issues affecting any such rating. Notwithstanding the foregoing, no amendment that significantly changes the permitted activities of the trust created by this Agreement may be made without the consent of a Majority in Interest of each Class of Certificates affected by such amendment. Each party to this Agreement hereby agrees that it will cooperate with each other party in amending this Agreement pursuant to clause (v) above. The Trustee, each Seller, the Depositor and the Master Servicer also may at any time and from time to time amend this Agreement without the consent of the Certificateholders to modify, eliminate or add to any of its provisions to such extent as shall be necessary or helpful to (i) maintain the qualification of any REMIC as a REMIC under the Code, (ii) avoid or minimize the risk of the imposition of any tax on any

REMIC pursuant to the Code that would be a claim at any time prior to the
final redemption of the Certificates or (iii) comply with any other
requirements of the Code, provided that the Trustee has been provided an
Opinion of Counsel, which opinion shall be an expense of the party requesting
such opinion but in any case shall not be an expense of the Trustee or the
Trust Fund, to the effect that such action is necessary or helpful to, as
applicable, (i) maintain such qualification, (ii) avoid or minimize the risk
of the imposition of such a tax or (iii) comply with any such requirements of
the Code.

     This Agreement may also be amended from time to time by the Depositor,
each Seller, the Master Servicer and the Trustee with the consent of the
Holders of a Majority in Interest of each Class of Certificates affected
thereby for the purpose of adding any provisions to or changing in any manner
or eliminating any of the provisions of this Agreement or of modifying

                                      110

<PAGE>

in any manner the rights of the Holders of Certificates; provided, however,
that no such amendment shall (i) reduce in any manner the amount of, or delay
the timing of, payments required to be distributed on any Certificate without
the consent of the Holder of such Certificate, (ii) adversely affect in any
material respect the interests of the Holders of any Class of Certificates in
a manner other than as described in (i), without the consent of the Holders of
Certificates of such Class evidencing, as to such Class, Percentage Interests
aggregating 66-2/3%, or (iii) reduce the aforesaid percentages of Certificates
the Holders of which are required to consent to any such amendment, without
the consent of the Holders of all such Certificates then outstanding.

     Notwithstanding any contrary provision of this Agreement, the Trustee
shall not consent to any amendment to this Agreement unless it shall have
first received an Opinion of Counsel, which opinion shall not be an expense of
the Trustee or the Trust Fund, to the effect that such amendment will not
cause the imposition of any tax on any REMIC or the Certificateholders or
cause any REMIC to fail to qualify as a REMIC at any time that any
Certificates are outstanding.

     Promptly after the execution of any amendment to this Agreement
requiring the consent of Certificateholders, the Trustee shall furnish written
notification of the substance or a copy of such amendment to each
Certificateholder and each Rating Agency.

     It shall not be necessary for the consent of Certificateholders under
this Section to approve the particular form of any proposed amendment, but it
shall be sufficient if such consent shall approve the substance thereof. The
manner of obtaining such consents and of evidencing the authorization of the
execution thereof by Certificateholders shall be subject to such reasonable
regulations as the Trustee may prescribe.

     Nothing in this Agreement shall require the Trustee to enter into an
amendment without receiving an Opinion of Counsel (which Opinion shall not be
an expense of the Trustee or the Trust Fund), satisfactory to the Trustee that
(i) such amendment is permitted and is not prohibited by this Agreement and
that all requirements for amending this Agreement have been complied with; and

(ii) either (A) the amendment does not adversely affect in any material respect the interests of any Certificateholder or (B) the conclusion set forth in the immediately preceding clause (A) is not required to be reached pursuant to this Section 10.01.

SECTION 10.02. Recordation of Agreement; Counterparts.

This Agreement is subject to recordation in all appropriate public offices for real property records in all the counties or other comparable jurisdictions in which any or all of the properties subject to the Mortgages are situated, and in any other appropriate public recording office or elsewhere, such recordation to be effected by the Master Servicer at its expense, but only upon direction by the Trustee accompanied by an Opinion of Counsel to the effect that such recordation materially and beneficially affects the interests of the Certificateholders.

For the purpose of facilitating the recordation of this Agreement as in this Agreement provided and for other purposes, this Agreement may be executed simultaneously in any number of counterparts, each of which counterparts shall be deemed to be an original, and such counterparts shall constitute but one and the same instrument.

111

<PAGE>

SECTION 10.03. Governing Law.

THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE SUBSTANTIVE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED IN THE STATE OF NEW YORK AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HERETO AND THE CERTIFICATEHOLDERS SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

SECTION 10.04. Intention of Parties.

(a) It is the express intent of the parties hereto that the conveyance of the (i) Mortgage Loans by the Sellers to the Depositor and (ii) Trust Fund by the Depositor to the Trustee each be, and be construed as, an absolute sale thereof to the Trustee. It is, further, not the intention of the parties that such conveyances be deemed a pledge thereof. However, in the event that, notwithstanding the intent of the parties, such assets are held to be the property of any Seller or the Depositor, as the case may be, or if for any other reason this Agreement is held or deemed to create a security interest in either such assets, then (i) this Agreement shall be deemed to be a security agreement (within the meaning of the Uniform Commercial Code of the State of New York) with respect to all such assets and security interests and (ii) the conveyances provided for in this Agreement shall be deemed to be an assignment and a grant pursuant to the terms of this Agreement (a) by each Seller to the Depositor or (b) by the Depositor to the Trustee, for the benefit of the Certificateholders, of a security interest in all of the assets that constitute the Trust Fund, whether now owned or hereafter acquired.

Each Seller and the Depositor for the benefit of the Certificateholders shall, to the extent consistent with this Agreement, take such actions as may be necessary to ensure that, if this Agreement were deemed to create a security interest in the Trust Fund, such security interest would

be deemed to be a perfected security interest of first priority under
applicable law and will be maintained as such throughout the term of the
Agreement. The Depositor shall arrange for filing any Uniform Commercial Code
continuation statements in connection with any security interest granted or
assigned to the Trustee for the benefit of the Certificateholders.

> (b) The Depositor hereby represents that:

> > (i) This Agreement creates a valid and continuing security
> > interest (as defined in the Uniform Commercial Code as enacted in the
> > State of New York (the "NY UCC")) in the Mortgage Notes in favor of
> > the Trustee, which security interest is prior to all other liens, and
> > is enforceable as such as against creditors of and purchasers from the
> > Depositor.

> > (ii) The Mortgage Notes constitutes "instruments" within the
> > meaning of the NY UCC.

> > (iii) Immediately prior to the assignment of each Mortgage
> > Loan to the Trustee, the Depositor owns and has good and marketable
> > title to such Mortgage Loan free and clear of any lien, claim or
> > encumbrance of any Person.

<div align="center">112</div>

<PAGE>

> > (iv) The Depositor has received all consents and approvals
> > required by the terms of the Mortgage Loans to the sale of the
> > Mortgage Loans hereunder to the Trustee.

> > (v) All original executed copies of each Mortgage Note that
> > are required to be delivered to the Trustee pursuant to Section 2.01
> > have been delivered to the Trustee.

> > (vi) Other than the security interest granted to the Trustee
> > pursuant to this Agreement, the Depositor has not pledged, assigned,
> > sold, granted a security interest in, or otherwise conveyed any of the
> > Mortgage Loans. The Depositor has not authorized the filing of and is
> > not aware of any financing statements against the Depositor that
> > include a description of collateral covering the Mortgage Loans other
> > than any financing statement relating to the security interest granted
> > to the Trustee hereunder or that has been terminated. The Depositor is
> > not aware of any judgment or tax lien filings against the Depositor.

> (c) The Master Servicer shall take such action as is reasonably
necessary to maintain the perfection and priority of the security interest of
the Trustee in the Mortgage Loans; provided, however, that the obligation to
deliver the Mortgage File to the Trustee pursuant to Section 2.01 shall be
solely the Depositor's obligation and the Master Servicer shall not be
responsible for the safekeeping of the Mortgage Files by the Trustee.

> (d) It is understood and agreed that the representations and
warranties set forth in subsection (b) above shall survive delivery of the
Mortgage Files to the Trustee. Upon discovery by the Depositor or the Trustee
of a breach of any of the foregoing representations and warranties set forth
in subsection (b) above, which breach materially and adversely affects the

interest of the Certificateholders, the party discovering such breach shall give prompt written notice to the others and to each Rating Agency.

SECTION 10.05.  Notices.

(a) The Trustee shall use its best efforts to promptly provide notice to each Rating Agency with respect to each of the following of which it has actual knowledge:

1. Any material change or amendment to this Agreement;

2. The occurrence of any Event of Default that has not been cured;

3. The resignation or termination of the Master Servicer or the Trustee and the appointment of any successor;

4. The repurchase or substitution of Mortgage Loans pursuant to Section 2.03;

5. The final payment to Certificateholders; and

6. Any rating action involving the long-term credit rating of Countrywide, which notice shall be made by first class mail within two Business Days after the Trustee gains actual knowledge of such a rating action.

113

<PAGE>

In addition, the Trustee shall promptly furnish to each Rating Agency copies of the following:

1. Each report to Certificateholders described in Section 4.06;

2. Each annual statement as to compliance described in Section 11.07;

3. Each annual independent public accountants' servicing report described in Section 3.16; and

4. Any notice of a purchase of a Mortgage Loan pursuant to Section 2.02, 2.03 or 3.11.

(b) All directions, demands and notices under this Agreement shall be in writing and shall be deemed to have been duly given when delivered by first class mail, by courier or by facsimile transmission to (a) in the case of the Depositor, CWMBS, Inc., 4500 Park Granada, Calabasas, California 91302, facsimile number: (818) 225-4053, Attention: David A. Spector, (b) in the case of Countrywide, Countrywide Home Loans, Inc., 4500 Park Granada, Calabasas, California 91302, facsimile number: (818) 225-4053, Attention: David A. Spector, or such other address as may be hereafter furnished to the Depositor and the Trustee by Countrywide in writing, (c) in the case of Park Granada, Park Granada LLC, c/o Countrywide Financial Corporation, 4500 Park Granada, Calabasas, California 91302, facsimile number: (818) 225-4041, Attention: David A. Spector or such other address as may be hereafter furnished to the Depositor and the Trustee by Park Granada in writing, (d) in the case of Park Monaco Inc., c/o Countrywide Financial Corporation, 4500 Park Granada,

Calabasas, California 91302, facsimile number: (818) 225-4041, Attention:
David A. Spector or such other address as may be hereafter furnished to the
Depositor and the Trustee by Park Monaco in writing, (e) in the case of Park
Sienna, Park Sienna LLC, c/o Countrywide Financial Corporation, 4500 Park
Granada, Calabasas, California 91302, facsimile number: (818) 225-4041,
Attention: David A. Spector or such other address as may be hereafter
furnished to the Depositor and the Trustee by Park Sienna in writing, (f) in
the case of the Master Servicer, Countrywide Home Loans Servicing LP, 400
Countrywide Way, Simi Valley, California 93065, facsimile number (805)
520-5623, Attention: Mark Wong, or such other address as may be hereafter
furnished to the Depositor and the Trustee by the Master Servicer in writing,
(g) in the case of the Trustee, The Bank of New York, 101 Barclay Street, 8W,
New York, New York 10286, facsimile number: (212) 815-3986, Attention:
Mortgage-Backed Securities Group, CWMBS, Inc. Series 2006-HYB3, or such other
address as the Trustee may hereafter furnish to the Depositor or Master
Servicer and (h) in the case of the Rating Agencies, the address specified
therefor in the definition corresponding to the name of such Rating Agency.
Notices to Certificateholders shall be deemed given when mailed, first class
postage prepaid, to their respective addresses appearing in the Certificate
Register.

        SECTION 10.06. Severability of Provisions.

        If any one or more of the covenants, agreements, provisions or terms
of this Agreement shall be for any reason whatsoever held invalid, then such
covenants, agreements, provisions or terms shall be deemed severable from the
remaining covenants, agreements, provisions or terms of this Agreement and
shall in no way affect the validity or enforceability of the other provisions
of this Agreement or of the Certificates or the rights of the Holders of the
Certificates.


                                   114

<PAGE>

        SECTION 10.07. Assignment.

        Notwithstanding anything to the contrary contained in this Agreement,
except as provided in Section 6.02, this Agreement may not be assigned by the
Master Servicer without the prior written consent of the Trustee and
Depositor.

        SECTION 10.08. Limitation on Rights of Certificateholders.

        The death or incapacity of any Certificateholder shall not operate to
terminate this Agreement or the trust created hereby, nor entitle such
Certificateholder's legal representative or heirs to claim an accounting or to
take any action or commence any proceeding in any court for a petition or
winding up of the trust created by this Agreement, or otherwise affect the
rights, obligations and liabilities of the parties to this Agreement or any of
them.

        No Certificateholder shall have any right to vote (except as provided
in this Agreement) or in any manner otherwise control the operation and
management of the Trust Fund, or the obligations of the parties hereto, nor
shall anything set forth in this Agreement or contained in the terms of the
Certificates be construed so as to constitute the Certificateholders from time

to time as partners or members of an association; nor shall any
Certificateholder be under any liability to any third party by reason of any
action taken by the parties to this Agreement pursuant to any provision of
this Agreement.

        No Certificateholder shall have any right by virtue or by availing
itself of any provisions of this Agreement to institute any suit, action or
proceeding in equity or at law upon or under or with respect to this
Agreement, unless such Holder previously shall have given to the Trustee a
written notice of an Event of Default and of the continuance thereof, as
provided in this Agreement, and unless the Holders of Certificates evidencing
not less than 25% of the Voting Rights evidenced by the Certificates shall
also have made written request to the Trustee to institute such action, suit
or proceeding in its own name as Trustee hereunder and shall have offered to
the Trustee such reasonable indemnity as it may require against the costs,
expenses, and liabilities to be incurred therein or thereby, and the Trustee,
for 60 days after its receipt of such notice, request and offer of indemnity
shall have neglected or refused to institute any such action, suit or
proceeding; it being understood and intended, and being expressly covenanted
by each Certificateholder with every other Certificateholder and the Trustee,
that no one or more Holders of Certificates shall have any right in any manner
whatever by virtue or by availing itself or themselves of any provisions of
this Agreement to affect, disturb or prejudice the rights of the Holders of
any other of the Certificates, or to obtain or seek to obtain priority over or
preference to any other such Holder or to enforce any right under this
Agreement, except in the manner provided in this Agreement and for the common
benefit of all Certificateholders. For the protection and enforcement of the
provisions of this Section 10.08, each and every Certificateholder and the
Trustee shall be entitled to such relief as can be given either at law or in
equity.

        SECTION 10.09. Inspection and Audit Rights.

        The Master Servicer agrees that, on reasonable prior notice, it will
permit and will cause each Subservicer to permit any representative of the
Depositor or the Trustee during the Master

                                   115

<PAGE>


Servicer's normal business hours, to examine all the books of account,
records, reports and other papers of the Master Servicer relating to the
Mortgage Loans, to make copies and extracts therefrom, to cause such books to
be audited by independent certified public accountants selected by the
Depositor or the Trustee and to discuss its affairs, finances and accounts
relating to the Mortgage Loans with its officers, employees and independent
public accountants (and by this provision the Master Servicer hereby
authorizes said accountants to discuss with such representative such affairs,
finances and accounts), all at such reasonable times and as often as may be
reasonably requested. Any out-of-pocket expense incident to the exercise by
the Depositor or the Trustee of any right under this Section 10.09 shall be
borne by the party requesting such inspection; all other such expenses shall
be borne by the Master Servicer or the related Subservicer.

        SECTION 10.10. Certificates Nonassessable and Fully Paid.

It is the intention of the Depositor that Certificateholders shall not be personally liable for obligations of the Trust Fund, that the interests in the Trust Fund represented by the Certificates shall be nonassessable for any reason whatsoever, and that the Certificates, upon due authentication thereof by the Trustee pursuant to this Agreement, are and shall be deemed fully paid.

SECTION 10.11. [Reserved].

SECTION 10.12. Protection of Assets.

(a) Except for transactions and activities entered into in connection with the securitization that is the subject of this Agreement, the Trust Fund created by this Agreement is not authorized and has no power to:

(i) borrow money or issue debt;

(ii) merge with another entity, reorganize, liquidate or sell assets; or

(iii) engage in any business or activities.

(b) Each party to this Agreement agrees that it will not file an involuntary bankruptcy petition against the Trustee or the Trust Fund or initiate any other form of insolvency proceeding until after the Certificates have been paid.

ARTICLE XI
EXCHANGE ACT REPORTING

SECTION 11.01. Filing Obligations.

The Master Servicer, the Trustee and each Seller shall reasonably cooperate with the Depositor in connection with the satisfaction of the Depositor's reporting requirements under the Exchange Act with respect to the Trust Fund. In addition to the information specified below,

116

<PAGE>

if so requested by the Depositor for the purpose of satisfying its reporting obligation under the Exchange Act, the Master Servicer, the Trustee and each Seller shall (and the Master Servicer shall cause each Subservicer to) provide the Depositor with (a) such information which is available to such Person without unreasonable effort or expense and within such timeframe as may be reasonably requested by the Depositor to comply with the Depositor's reporting obligations under the Exchange Act and (b) to the extent such Person is a party (and the Depositor is not a party) to any agreement or amendment required to be filed, copies of such agreement or amendment in EDGAR-compatible form.

SECTION 11.02. Form 10-D Filings.

(a) In accordance with the Exchange Act, the Trustee shall prepare for

filing and file within 15 days after each Distribution Date (subject to
permitted extensions under the Exchange Act) with the Commission with respect
to the Trust Fund, a Form 10-D with copies of the Monthly Report and, to the
extent delivered to the Trustee, no later than 10 days following the
Distribution Date, such other information identified by the Depositor or the
Master Servicer, in writing, to be filed with the Commission (such other
information, the "Additional Designated Information"). If the Depositor or
Master Servicer directs that any Additional Designated Information is to be
filed with any Form 10-D, the Depositor or Master Servicer, as the case may
be, shall specify the Item on Form 10-D to which such information is
responsive and, with respect to any Exhibit to be filed on Form 10-D, the
Exhibit number. Any information to be filed on Form 10-D shall be delivered to
the Trustee in EDGAR-compatible form or as otherwise agreed upon by the
Trustee and the Depositor or the Master Servicer, as the case may be, at the
Depositor's expense, and any necessary conversion to EDGAR-compatible format
will be at the Depositor's expense. At the reasonable request of, and in
accordance with the reasonable directions of, the Depositor or the Master
Servicer, subject to the two preceding sentences, the Trustee shall prepare
for filing and file an amendment to any Form 10-D previously filed with the
Commission with respect to the Trust Fund. The Master Servicer shall sign the
Form 10-D filed on behalf of the Trust Fund.

     (b) No later than each Distribution Date, each of the Master Servicer
and the Trustee shall notify (and the Master Servicer shall cause any
Subservicer to notify) the Depositor and the Master Servicer of any Form 10-D
Disclosure Item, together with a description of any such Form 10-D Disclosure
Item in form and substance reasonably acceptable to the Depositor. In addition
to such information as the Master Servicer and the Trustee are obligated to
provide pursuant to other provisions of this Agreement, if so requested by the
Depositor, each of the Master Servicer and the Trustee shall provide such
information which is available to the Master Servicer and the Trustee, as
applicable, without unreasonable effort or expense regarding the performance
or servicing of the Mortgage Loans (in the case of the Trustee, based on the
information provided by the Master Servicer) as is reasonably required to
facilitate preparation of distribution reports in accordance with Item 1121 of
Regulation AB. Such information shall be provided concurrently with the
delivery of the reports specified in Section 4.06(c) in the case of the Master
Servicer and the Monthly Statement in the case of the Trustee, commencing with
the first such report due not less than five Business Days following such
request.

     (c) The Trustee shall not have any responsibility to file any items
(other than those generated by it) that have not been received in a format
suitable (or readily convertible into a

                                    117

<PAGE>

format suitable) for electronic filing via the EDGAR system and shall not have
any responsibility to convert any such items to such format (other than those
items generated by it or that are readily convertible to such format). The
Trustee shall have no liability to the Certificateholders, the Trust Fund, the
Master Servicer or the Depositor with respect to any failure to properly
prepare or file any of Form 10-D to the extent that such failure is not the
result of any negligence, bad faith or willful misconduct on its part.

SECTION 11.03. Form 8-K Filings.

The Master Servicer shall prepare and file on behalf of the Trust Fund any Form 8-K required by the Exchange Act. Each Form 8-K must be signed by the Master Servicer. Each of the Master Servicer (and the Master Servicer shall cause any Subservicer to promptly notify), and the Trustee shall promptly notify the Depositor and the Master Servicer (if the notifying party is not the Master Servicer), but in no event later than one (1) Business Day after its occurrence, of any Reportable Event of which it has actual knowledge. Each Person shall be deemed to have actual knowledge of any such event to the extent that it relates to such Person or any action or failure to act by such Person. Concurrently with any transfer of Supplemental Mortgage Loans, if any, Countrywide shall notify the Depositor and the Master Servicer, if any material pool characteristic of the actual asset pool at the time of issuance of the Certificates differs by 5% or more (other than as a result of the pool assets converting into cash in accordance with their terms) from the description of the asset pool in the Prospectus Supplement.

SECTION 11.04. Form 10-K Filings.

Prior to March 30th of each year, commencing in 2007 (or such earlier date as may be required by the Exchange Act), the Depositor shall prepare and file on behalf of the Trust Fund a Form 10-K, in form and substance as required by the Exchange Act. A senior officer in charge of the servicing function of the Master Servicer shall sign each Form 10-K filed on behalf of the Trust Fund. Such Form 10-K shall include as exhibits each (i) annual compliance statement described under Section 3.16, (ii) annual report on assessments of compliance with servicing criteria described under Section 11.07 and (iii) accountant's report described under Section 11.07. Each Form 10-K shall also include any Sarbanes-Oxley Certification required to be included therewith, as described in Section 11.05.

If the Item 1119 Parties listed on Exhibit T have changed since the Closing Date, no later than March 1 of each year, the Master Servicer shall provide each of the Master Servicer (and the Master Servicer shall provide any Subservicer) and the Trustee with an updated Exhibit T setting forth the Item 1119 Parties. No later than March 15 of each year, commencing in 2007, the Master Servicer and the Trustee shall notify (and the Master Servicer shall cause any Subservicer to notify) the Depositor and the Master Servicer of any Form 10-K Disclosure Item, together with a description of any such Form 10-K Disclosure Item in form and substance reasonably acceptable to the Depositor. Additionally, each of the Master Servicer and the Trustee shall provide, and shall cause each Reporting Subcontractor retained by the Master Servicer and the Trustee and in the case of the Master Servicer shall cause each Subservicer, to provide, the following information no later than March 15 of each year in which a Form 10-K is required to be filed on behalf of the Trust Fund: (i) if such Person's report on assessment of compliance with servicing criteria described under Section 11.07 or related registered public

118

<PAGE>

accounting firm attestation report described under Section 11.07 identifies any material instance of noncompliance, notification of such instance of noncompliance and (ii) if any such Person's report on assessment of compliance

with servicing criteria or related registered public accounting firm
attestation report is not provided to be filed as an exhibit to such Form
10-K, information detailing the explanation why such report is not included.

     SECTION 11.05. Sarbanes-Oxley Certification.

        Each Form 10-K shall include a certification (the
"Sarbanes-Oxley Certification") required by Rules 13a-14(d) and 15d-14(d)
under the Exchange Act (pursuant to Section 302 of the Sarbanes-Oxley Act of
2002 and the rules and regulations of the Commission promulgated thereunder
(including any interpretations thereof by the Commission's staff)). No later
than March 15 of each year, beginning in 2007, the Master Servicer and the
Trustee shall (unless such person is the Certifying Person), and the Master
Servicer shall cause each Subservicer and each Reporting Subcontractor and the
Trustee shall cause each Reporting Subcontractor to, provide to the Person who
signs the Sarbanes-Oxley Certification (the "Certifying Person") a
certification (each, a "Performance Certification"), in the form attached
hereto as Exhibit R-1 (in the case of a Subservicer or any Reporting
Subcontractor of the Master Servicer or a Subservicer) and Exhibit R-2 (in the
case of the Trustee or any Reporting Subcontractor of the Trustee), on which
the Certifying Person, the entity for which the Certifying Person acts as an
officer, and such entity's officers, directors and Affiliates (collectively
with the Certifying Person, "Certification Parties") can reasonably rely. The
senior officer in charge of the servicing function of the Master Servicer
shall serve as the Certifying Person on behalf of the Trust Fund. Neither the
Master Servicer nor the Depositor will request delivery of a certification
under this clause unless the Depositor is required under the Exchange Act to
file an annual report on Form 10-K with respect to the Trust Fund. In the
event that prior to the filing date of the Form 10-K in March of each year,
the Trustee or the Depositor has actual knowledge of information material to
the Sarbanes-Oxley Certification, the Trustee or the Depositor, as the case
may be, shall promptly notify the Master Servicer and the Depositor. The
respective parties hereto agree to cooperate with all reasonable requests made
by any Certifying Person or Certification Party in connection with such
Person's attempt to conduct any due diligence that such Person reasonably
believes to be appropriate in order to allow it to deliver any Sarbanes-Oxley
Certification or portion thereof with respect to the Trust Fund.

     SECTION 11.06. Form 15 Filing.

        Prior to January 30 of the first year in which the Depositor is
able to do so under applicable law, the Depositor shall file a Form 15
relating to the automatic suspension of reporting in respect of the Trust Fund
under the Exchange Act.

     SECTION 11.07. Report on Assessment of Compliance and Attestation.

     (a) On or before March 15 of each calendar year, commencing in 2007:

       (i) Each of the Master Servicer and the Trustee shall deliver
to the Depositor and the Master Servicer a report (in form and
substance reasonably satisfactory to the Depositor) regarding the
Master Servicer's or the Trustee's, as applicable, assessment of

119

compliance with the Servicing Criteria during the immediately preceding calendar year, as required under Rules 13a-18 and 15d-18 of the Exchange Act and Item 1122 of Regulation AB. Such report shall be signed by an authorized officer of such Person and shall address each of the Servicing Criteria specified on a certification substantially in the form of Exhibit S hereto delivered to the Depositor concurrently with the execution of this Agreement. To the extent any of the Servicing Criteria are not applicable to such Person, with respect to asset-backed securities transactions taken as a whole involving such Person and that are backed by the same asset type backing the Certificates, such report shall include such a statement to that effect. The Depositor and the Master Servicer, and each of their respective officers and directors shall be entitled to rely on upon each such servicing criteria assessment.

(ii) Each of the Master Servicer and the Trustee shall deliver to the Depositor and the Master Servicer a report of a registered public accounting firm reasonably acceptable to the Depositor that attests to, and reports on, the assessment of compliance made by Master Servicer or the Trustee, as applicable, and delivered pursuant to the preceding paragraphs. Such attestation shall be in accordance with Rules 1-02(a)(3) and 2-02(g) of Regulation S-X under the Securities Act and the Exchange Act, including, without limitation that in the event that an overall opinion cannot be expressed, such registered public accounting firm shall state in such report why it was unable to express such an opinion. Such report must be available for general use and not contain restricted use language. To the extent any of the Servicing Criteria are not applicable to such Person, with respect to asset-backed securities transactions taken as a whole involving such Person and that are backed by the same asset type backing the Certificates, such report shall include such a statement to that effect.

(iii) The Master Servicer shall cause each Subservicer and each Reporting Subcontractor to deliver to the Depositor an assessment of compliance and accountant's attestation as and when provided in paragraphs (a) and (b) of this Section 11.07.

(iv) The Trustee shall cause each Reporting Subcontractor to deliver to the Depositor and the Master Servicer an assessment of compliance and accountant's attestation as and when provided in paragraphs (a) and (b) of this Section.

(v) The Master Servicer and the Trustee shall execute (and the Master Servicer shall cause each Subservicer to execute, and the Master Servicer and the Trustee shall cause each Reporting Subcontractor to execute) a reliance certificate to enable the Certification Parties to rely upon each (i) annual compliance statement provided pursuant to Section 3.16, (ii) annual report on assessments of compliance with servicing criteria provided pursuant to this Section 11.07 and (iii) accountant's report provided pursuant to this Section 11.07 and shall include a certification that each such annual compliance statement or report discloses any deficiencies or defaults described to the registered public accountants of such Person to enable such accountants to render the certificates provided for in

this Section 11.07.

(b) In the event the Master Servicer, any Subservicer, the Trustee or Reporting Subcontractor is terminated or resigns during the term of this Agreement, such Person shall

120

<PAGE>

provide documents and information required by this Section 11.07 with respect to the period of time it was subject to this Agreement or provided services with respect to the Trust Fund, the Certificates or the Mortgage Loans.

(c) Each assessment of compliance provided by a Subservicer pursuant to Section 11.07(a)(3) shall address each of the Servicing Criteria specified on a certification substantially in the form of Exhibit S hereto delivered to the Depositor concurrently with the execution of this Agreement or, in the case of a Subservicer subsequently appointed as such, on or prior to the date of such appointment. An assessment of compliance provided by a Subcontractor pursuant to Section 11.07(a)(3) or (4) need not address any elements of the Servicing Criteria other than those specified by the Master Servicer or the Trustee, as applicable, pursuant to Section 11.07(a)(1).

SECTION 11.08. Use of Subservicers and Subcontractors.

(a) The Master Servicer shall cause any Subservicer used by the Master Servicer (or by any Subservicer) for the benefit of the Depositor to comply with the provisions of Section 3.16 and this Article XI to the same extent as if such Subservicer were the Master Servicer (except with respect to the Master Servicer's duties with respect to preparing and filing any Exchange Act Reports or as the Certifying Person). The Master Servicer shall be responsible for obtaining from each Subservicer and delivering to the Depositor any servicer compliance statement required to be delivered by such Subservicer under Section 3.16, any assessment of compliance and attestation required to be delivered by such Subservicer under Section 11.07 and any certification required to be delivered to the Certifying Person under Section 11.05 as and when required to be delivered. As a condition to the succession to any Subservicer as subservicer under this Agreement by any Person (i) into which such Subservicer may be merged or consolidated, or (ii) which may be appointed as a successor to any Subservicer, the Master Servicer shall provide to the Depositor, at least 15 calendar days prior to the effective date of such succession or appointment, (x) written notice to the Depositor of such succession or appointment and (y) in writing and in form and substance reasonably satisfactory to the Depositor, all information reasonably requested by the Depositor in order to comply with its reporting obligation under Item 6.02 of Form 8-K.

(b) It shall not be necessary for the Master Servicer, any Subservicer or the Trustee to seek the consent of the Depositor or any other party hereto to the utilization of any Subcontractor. The Master Servicer or the Trustee, as applicable, shall promptly upon request provide to the Depositor (or any designee of the Depositor, such as the Master Servicer or administrator) a written description (in form and substance satisfactory to the Depositor) of the role and function of each Subcontractor utilized by such Person (or in the case of the Master Servicer, any Subservicer), specifying (i) the identity of each such Subcontractor, (ii) which (if any) of such Subcontractors are

"participating in the servicing function" within the meaning of Item 1122 of
Regulation AB, and (iii) which elements of the Servicing Criteria will be
addressed in assessments of compliance provided by each Subcontractor
identified pursuant to clause (ii) of this paragraph.

         As a condition to the utilization of any Subcontractor
determined to be a Reporting Subcontractor, the Master Servicer or the
Trustee, as applicable, shall cause any such

                              121
<PAGE>

Subcontractor used by such Person (or in the case of the Master Servicer, any
Subservicer) for the benefit of the Depositor to comply with the provisions of
Sections 11.07 and 11.09 of this Agreement to the same extent as if such
Subcontractor were the Master Servicer (except with respect to the Master
Servicer's duties with respect to preparing and filing any Exchange Act
Reports or as the Certifying Person) or the Trustee. The Master Servicer or
the Trustee, as applicable, shall be responsible for obtaining from each
Subcontractor and delivering to the Depositor and the Master Servicer, any
assessment of compliance and attestation required to be delivered by such
Subcontractor under Section 11.05 and Section 11.07, in each case as and when
required to be delivered.

         SECTION 11.09. Amendments.

         In the event the parties to this Agreement desire to further
clarify or amend any provision of this Article XI, this Agreement shall be
amended to reflect the new agreement between the parties covering matters in
this Article XI pursuant to Section 10.01, which amendment shall not require
any Opinion of Counsel or Rating Agency confirmations or the consent of any
Certificateholder. If, during the period that the Depositor is required to
file Exchange Act Reports with respect to the Trust Fund, the Master Servicer
is no longer an Affiliate of the Depositor, the Depositor shall assume the
obligations and responsibilities of the Master Servicer in this Article XI
with respect to the preparation and filing of the Exchange Act Reports and/or
acting as the Certifying Person, if the Depositor has received indemnity from
such successor Master Servicer satisfactory to the Depositor, and such Master
Servicer has agreed to provide a Sarbanes-Oxley Certification to the Depositor
substantially in the form of Exhibit U, and the certifications referred to in
Section 11.07.

                    *    *    *    *    *    *

                              122
<PAGE>

         IN WITNESS WHEREOF, the Depositor, the Trustee, the Sellers and the
Master Servicer have caused their names to be signed hereto by their
respective officers thereunto duly authorized as of the day and year first
above written.

                    CWMBS, INC.,

```
                                 as Depositor


                     By: /s/ Ruben Avilez
                         --------------------
                         Name:  Ruben Avilez
                         Title: Vice President


                     THE BANK OF NEW YORK,
                       as Trustee


                     By: /s/ Cirino Emanuele
                         --------------------
                         Name:  Cirino Emanuele
                         Title: Assistant Vice President



                     COUNTRYWIDE HOME LOANS, INC.,
                       as a Seller


                     By: /s/ Ruben Avilez
                         --------------------
                         Name:  Ruben Avilez
                         Title: Vice President


                     PARK GRANADA LLC,
                       as a Seller


                     By: /s/ Ruben Avilez
                         --------------------
                         Name:  Ruben Avilez
                         Title: Assistant Vice President



                     COUNTRYWIDE HOME LOANS SERVICING LP,
                       as Master Servicer


                     By:  COUNTRYWIDE GP, INC.


                     By: /s/ Ruben Avilez
                         --------------------
                         Name:  Ruben Avilez
                         Title: Vice President



                                    123
   <PAGE>

                     PARK SIENNA LLC,
                       as a Seller
```

```
                    By: /s/ Ruben Avilez
                        --------------------
                        Name:  Ruben Avilez
                        Title: Assistant Vice President


                    PARK MONACO INC.,
                      as a Seller


                    By: /s/ Ruben Avilez
                        --------------------
                        Name:  Ruben Avilez
                        Title: Vice President



                            124
```

<PAGE>

```
                    Acknowledged solely with respect to its obligations
                    under Section 4.01(b)


                    THE BANK OF NEW YORK, in its individual capacity



                    By: /s/ Paul Connolly
                        --------------------
                        Name:  Paul Connolly
                        Title: Vice President



                            125
```

<PAGE>

```
                        SCHEDULE I
                    Mortgage Loan Schedule
                [Delivered at Closing to Trustee]


                           S-I-I
```

<PAGE>

```
                        SCHEDULE II-A

                        CWMBS, Inc.

                Mortgage Pass-Through Certificates

                     Series 2006-HYB3
```

Representations and Warranties of Countrywide
-----------------------------------------------

Countrywide Home Loans, Inc. ("Countrywide") hereby makes the
representations and warranties set forth in this Schedule II-A to the
Depositor, the Master Servicer and the Trustee, as of the Closing Date.
Capitalized terms used but not otherwise defined in this Schedule II-A shall
have the meanings ascribed thereto in the Pooling and Servicing Agreement (the
"Pooling and Servicing Agreement") relating to the above-referenced Series,
among Countrywide, as a seller, Park Granada LLC, as a seller, Park Monaco
Inc., as a seller, Park Sienna LLC, as a seller, CWMBS, Inc., as depositor,
Countrywide Home Loans Servicing LP, as master servicer and The Bank of New
York, as trustee.

        (1) Countrywide is duly organized as a New York
    corporation and is validly existing and in good standing under the
    laws of the State of New York and is duly authorized and qualified to
    transact any and all business contemplated by the Pooling and
    Servicing Agreement to be conducted by Countrywide in any state in
    which a Mortgaged Property is located or is otherwise not required
    under applicable law to effect such qualification and, in any event,
    is in compliance with the doing business laws of any such state, to
    the extent necessary to perform any of its obligations under the
    Pooling and Servicing Agreement in accordance with the terms thereof.

        (2) Countrywide has the full corporate power and
    authority to sell each Countrywide Mortgage Loan, and to execute,
    deliver and perform, and to enter into and consummate the transactions
    contemplated by the Pooling and Servicing Agreement and has duly
    authorized by all necessary corporate action on the part of
    Countrywide the execution, delivery and performance of the Pooling and
    Servicing Agreement; and the Pooling and Servicing Agreement, assuming
    the due authorization, execution and delivery thereof by the other
    parties thereto, constitutes a legal, valid and binding obligation of
    Countrywide, enforceable against Countrywide in accordance with its
    terms, except that (a) the enforceability thereof may be limited by
    bankruptcy, insolvency, moratorium, receivership and other similar
    laws relating to creditors' rights generally and (b) the remedy of
    specific performance and injunctive and other forms of equitable
    relief may be subject to equitable defenses and to the discretion of
    the court before which any proceeding therefor may be brought.

        (3) The execution and delivery of the Pooling and
    Servicing Agreement by Countrywide , the sale of the Countrywide
    Mortgage Loans by Countrywide under the Pooling and Servicing
    Agreement, the consummation of any other of the transactions
    contemplated by the Pooling and Servicing Agreement, and the
    fulfillment of or compliance with the terms thereof are in the
    ordinary course of business of Countrywide

                            S-II-A-1


<PAGE>

and will not (A) result in a material breach of any term or provision
of the charter or by-laws of Countrywide or (B) materially conflict
with, result in a material breach, violation or acceleration of, or
result in a material default under, the terms of any other material
agreement or instrument to which Countrywide is a party or by which it
may be bound, or (C) constitute a material violation of any statute,
order or regulation applicable to Countrywide of any court, regulatory
body, administrative agency or governmental body having jurisdiction
over Countrywide; and Countrywide is not in breach or violation of any
material indenture or other material agreement or instrument, or in
violation of any statute, order or regulation of any court, regulatory
body, administrative agency or governmental body having jurisdiction
over it which breach or violation may materially impair Countrywide's
ability to perform or meet any of its obligations under the Pooling
and Servicing Agreement.

      (4) Countrywide is an approved servicer of conventional
mortgage loans for FNMA or FHLMC and is a mortgagee approved by the
Secretary of Housing and Urban Development pursuant to Sections 203
and 211 of the National Housing Act.

      (5) No litigation is pending or, to the best of
Countrywide's knowledge, threatened, against Countrywide that would
materially and adversely affect the execution, delivery or
enforceability of the Pooling and Servicing Agreement or the ability
of Countrywide to sell the Countrywide Mortgage Loans or to perform
any of its other obligations under the Pooling and Servicing Agreement
in accordance with the terms thereof.

      (6) No consent, approval, authorization or order of any
court or governmental agency or body is required for the execution,
delivery and performance by Countrywide of, or compliance by
Countrywide with, the Pooling and Servicing Agreement or the
consummation of the transactions contemplated thereby, or if any such
consent, approval, authorization or order is required, Countrywide has
obtained the same.

      (7) Countrywide intends to treat the transfer of the
Countrywide Mortgage Loans to the Depositor as a sale of the
Countrywide Mortgage Loans for all tax, accounting and regulatory
purposes.

      (8) Countrywide is a member of MERS in good standing,
and will comply in all material respects with the rules and procedures
of MERS in connection with the servicing of the MERS Mortgage Loans in
the Trust Fund for as long as such Mortgage Loans are registered with
MERS.

<div align="center">S-II-A-2</div>

&lt;PAGE&gt;

<div align="center">SCHEDULE II-B</div>

<div align="center">CWMBS, Inc.</div>

Mortgage Pass-Through Certificates

Series 2006-HYB3

Representations and Warranties of Park Granada
----------------------------------------------

Park Granada LLC ("Park Granada") and Countrywide Home Loans, Inc. ("Countrywide"), each hereby makes the representations and warranties set forth in this Schedule II-B to the Depositor, the Master Servicer and the Trustee, as of the Closing Date. Capitalized terms used but not otherwise defined in this Schedule II-B shall have the meanings ascribed thereto in the Pooling and Servicing Agreement (the "Pooling and Servicing Agreement") relating to the above-referenced Series, among Park Granada, as a seller, Park Monaco Inc., as a seller, Park Sienna LLC, as a seller, Countrywide, as a seller, Countrywide Home Loans Servicing LP, as master servicer, CWMBS, Inc., as depositor, and The Bank of New York, as trustee.

(1) Park Granada is a limited liability company duly formed and validly existing and in good standing under the laws of the State of Delaware.

(2) Park Granada has the full corporate power and authority to sell each Park Granada Mortgage Loan, and to execute, deliver and perform, and to enter into and consummate the transactions contemplated by the Pooling and Servicing Agreement and has duly authorized by all necessary corporate action on the part of Park Granada the execution, delivery and performance of the Pooling and Servicing Agreement; and the Pooling and Servicing Agreement, assuming the due authorization, execution and delivery thereof by the other parties thereto, constitutes a legal, valid and binding obligation of Park Granada, enforceable against Park Granada in accordance with its terms, except that (a) the enforceability thereof may be limited by bankruptcy, insolvency, moratorium, receivership and other similar laws relating to creditors' rights generally and (b) the remedy of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceeding therefor may be brought.

(3) The execution and delivery of the Pooling and Servicing Agreement by Park Granada, the sale of the Park Granada Mortgage Loans by Park Granada under the Pooling and Servicing Agreement, the consummation of any other of the transactions contemplated by the Pooling and Servicing Agreement, and the fulfillment of or compliance with the terms thereof are in the ordinary course of business of Park Granada and will not (A) result in a material breach of any term or provision of the certificate of formation or the limited liability company agreement of Park Granada or (B) materially conflict with, result in a material breach, violation or acceleration of, or result in a material default under, the terms of any other material agreement or instrument to which Park Granada is a party or by which it may be bound, or (C) constitute a material violation of any statute, order or regulation applicable to Park Granada of any court,

S-II-B-1

<PAGE>

regulatory body, administrative agency or governmental body having jurisdiction over Park Granada; and Park Granada is not in breach or violation

of any material indenture or other material agreement or instrument, or in
violation of any statute, order or regulation of any court, regulatory body,
administrative agency or governmental body having jurisdiction over it which
breach or violation may materially impair Park Granada's ability to perform or
meet any of its obligations under the Pooling and Servicing Agreement.

     (4) No litigation is pending or, to the best of Park Granada's
knowledge, threatened, against Park Granada that would materially and
adversely affect the execution, delivery or enforceability of the Pooling and
Servicing Agreement or the ability of Park Granada to sell the Park Granada
Mortgage Loans or to perform any of its other obligations under the Pooling
and Servicing Agreement in accordance with the terms thereof.

     (5) No consent, approval, authorization or order of any court or
governmental agency or body is required for the execution, delivery and
performance by Park Granada of, or compliance by Park Granada with, the
Pooling and Servicing Agreement or the consummation of the transactions
contemplated thereby, or if any such consent, approval, authorization or order
is required, Park Granada has obtained the same.

     (6) Park Granada intends to treat the transfer of the Park Granada
Mortgage Loans to the Depositor as a sale of the Park Granada Mortgage Loans
for all tax, accounting and regulatory purposes.


                              S-II-B-2

<PAGE>


                            SCHEDULE II-C

                             CWMBS, Inc.

                  Mortgage Pass-Through Certificates

                          Series 2006-HYB3

             Representations and Warranties of Park Monaco
             ----------------------------------------------

     Park Monaco Inc. ("Park Monaco") and Countrywide Home Loans, Inc.
("Countrywide"), each hereby makes the representations and warranties set
forth in this Schedule II-C to the Depositor, the Master Servicer and the
Trustee, as of the Closing Date. Capitalized terms used but not otherwise
defined in this Schedule II-C shall have the meanings ascribed thereto in the
Pooling and Servicing Agreement (the "Pooling and Servicing Agreement")
relating to the above-referenced Series, among Park Monaco, as a seller,
Countrywide, as a seller, Park Granada LLC, as a seller, Park Sienna LLC, as a
seller, Countrywide Home Loans Servicing LP, as master servicer, CWMBS, Inc.,
as depositor, and The Bank of New York, as trustee.

     (1) Park Monaco is a corporation duly formed and validly existing and
in good standing under the laws of the State of Delaware.

     (2) Park Monaco has the full corporate power and authority to sell
each Park Monaco Mortgage Loan, and to execute, deliver and perform, and to
enter into and consummate the transactions contemplated by the Pooling and

Servicing Agreement and has duly authorized by all necessary corporate action on the part of Park Monaco the execution, delivery and performance of the Pooling and Servicing Agreement; and the Pooling and Servicing Agreement, assuming the due authorization, execution and delivery thereof by the other parties thereto, constitutes a legal, valid and binding obligation of Park Monaco, enforceable against Park Monaco in accordance with its terms, except that (a) the enforceability thereof may be limited by bankruptcy, insolvency, moratorium, receivership and other similar laws relating to creditors' rights generally and (b) the remedy of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceeding therefor may be brought.

(3) The execution and delivery of the Pooling and Servicing Agreement by Park Monaco, the sale of the Park Monaco Mortgage Loans by Park Monaco under the Pooling and Servicing Agreement, the consummation of any other of the transactions contemplated by the Pooling and Servicing Agreement, and the fulfillment of or compliance with the terms thereof are in the ordinary course of business of Park Monaco and will not (A) result in a material breach of any term or provision of the certificate of incorporation or bylaws of Park Monaco or (B) materially conflict with, result in a material breach, violation or acceleration of, or result in a material default under, the terms of any other material agreement or instrument to which Park Monaco is a party or by which it may be bound, or (C) constitute a material violation of any statute, order or regulation applicable to Park Monaco of any court, regulatory body, administrative agency or governmental body having jurisdiction over Park Monaco; and Park Monaco is not in breach or violation of any material indenture or other material agreement or

S-II-C-1


<PAGE>

instrument, or in violation of any statute, order or regulation of any court, regulatory body, administrative agency or governmental body having jurisdiction over it which breach or violation may materially impair Park Monaco's ability to perform or meet any of its obligations under the Pooling and Servicing Agreement.

(4) No litigation is pending or, to the best of Park Monaco's knowledge, threatened, against Park Monaco that would materially and adversely affect the execution, delivery or enforceability of the Pooling and Servicing Agreement or the ability of Park Monaco to sell the Park Monaco Mortgage Loans or to perform any of its other obligations under the Pooling and Servicing Agreement in accordance with the terms thereof.

(5) No consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by Park Monaco of, or compliance by Park Monaco with, the Pooling and Servicing Agreement or the consummation of the transactions contemplated thereby, or if any such consent, approval, authorization or order is required, Park Monaco has obtained the same.

(6) Park Monaco intends to treat the transfer of the Park Monaco Mortgage Loans to the Depositor as a sale of the Park Monaco Mortgage Loans for all tax, accounting and regulatory purposes.

<PAGE>

SCHEDULE II-D

CWMBS, Inc.

Mortgage Pass-Through Certificates

Series 2006-HYB3

Representations and Warranties of Park Sienna
---------------------------------------------

          Park Sienna LLC ("Park Sienna") and Countrywide Home Loans, Inc.
("Countrywide"), each hereby makes the representations and warranties set
forth in this Schedule II-C to the Depositor, the Master Servicer and the
Trustee, as of the Closing Date. Capitalized terms used but not otherwise
defined in this Schedule II-D shall have the meanings ascribed thereto in the
Pooling and Servicing Agreement (the "Pooling and Servicing Agreement")
relating to the above-referenced Series, among Park Sienna, as a seller, Park
Monaco Inc, as a seller, Park Granada LLC, as a seller, Countrywide, as a
seller, Countrywide Home Loans Servicing LP, as master servicer, CWMBS, Inc.,
as depositor, and The Bank of New York, as trustee.

          (1) Park Sienna is a limited liability company duly formed and validly
existing and in good standing under the laws of the State of Delaware.

          (2) Park Sienna has the full corporate power and authority to sell
each Park Sienna Mortgage Loan, and to execute, deliver and perform, and to
enter into and consummate the transactions contemplated by the Pooling and
Servicing Agreement and has duly authorized by all necessary corporate action
on the part of Park Sienna the execution, delivery and performance of the
Pooling and Servicing Agreement; and the Pooling and Servicing Agreement,
assuming the due authorization, execution and delivery thereof by the other
parties thereto, constitutes a legal, valid and binding obligation of Park
Sienna, enforceable against Park Sienna in accordance with its terms, except
that (a) the enforceability thereof may be limited by bankruptcy, insolvency,
moratorium, receivership and other similar laws relating to creditors' rights
generally and (b) the remedy of specific performance and injunctive and other
forms of equitable relief may be subject to equitable defenses and to the
discretion of the court before which any proceeding therefor may be brought.

          (3) The execution and delivery of the Pooling and Servicing Agreement
by Park Sienna, the sale of the Park Sienna Mortgage Loans by Park Sienna
under the Pooling and Servicing Agreement, the consummation of any other of
the transactions contemplated by the Pooling and Servicing Agreement, and the
fulfillment of or compliance with the terms thereof are in the ordinary course
of business of Park Sienna and will not (A) result in a material breach of any
term or provision of the certificate of formation or the limited liability
company agreement of Park Sienna or (B) materially conflict with, result in a
material breach, violation or acceleration of, or result in a material default
under, the terms of any other material agreement or instrument to which Park
Sienna is a party or by which it may be bound, or (C) constitute a material
violation of any statute, order or regulation applicable to Park Sienna of any
court, regulatory body, administrative agency or governmental body having

jurisdiction over Park Sienna; and Park Sienna is not in breach or violation
of any material indenture or other material agreement or instrument, or in
violation of any statute, order or regulation of any court, regulatory body,


S-II-D-1


<PAGE>


administrative agency or governmental body having jurisdiction over it which
breach or violation may materially impair Park Sienna's ability to perform or
meet any of its obligations under the Pooling and Servicing Agreement.

        (4) No litigation is pending or, to the best of Park Sienna's
knowledge, threatened, against Park Sienna that would materially and adversely
affect the execution, delivery or enforceability of the Pooling and Servicing
Agreement or the ability of Park Sienna to sell the Park Sienna Mortgage Loans
or to perform any of its other obligations under the Pooling and Servicing
Agreement in accordance with the terms thereof.

        (5) No consent, approval, authorization or order of any court or
governmental agency or body is required for the execution, delivery and
performance by Park Sienna of, or compliance by Park Sienna with, the Pooling
and Servicing Agreement or the consummation of the transactions contemplated
thereby, or if any such consent, approval, authorization or order is required,
Park Sienna has obtained the same.

        (6) Park Sienna intends to treat the transfer of the Park Sienna
Mortgage Loans to the Depositor as a sale of the Park Sienna Mortgage Loans
for all tax, accounting and regulatory purposes.


S-II-D-2

<PAGE>


SCHEDULE III-A

CWMBS, Inc.

Mortgage Pass-Through Certificates

Series 2006-HYB3

Representations and Warranties of Countrywide as to all of the Mortgage Loans
--------------------------------------------------------------------------

        Countrywide Home Loans, Inc. ("Countrywide") hereby makes the
representations and warranties set forth in this Schedule III-A to the
Depositor, the Master Servicer and the Trustee, with respect to all of the
Mortgage Loans as of the Closing Date, or if so specified herein, as of the
Cut-off Date. Capitalized terms used but not otherwise defined in this
Schedule III-A shall have the meanings ascribed thereto in the Pooling and
Servicing Agreement (the "Pooling and Servicing Agreement") relating to the
above-referenced Series, among Countrywide, as a seller, Park Granada LLC, as

a seller, Park Monaco Inc., as a seller, Park Sienna LLC, as a seller, Countrywide Home Loans Servicing LP, as master servicer, CWMBS, Inc., as depositor, and The Bank of New York, as trustee.

        (1) The information set forth on Schedule I to the Pooling and Servicing Agreement with respect to each Mortgage Loan is true and correct in all material respects as of the Closing Date.

        (2) As of the Closing Date, all payments due with respect to each Mortgage Loan prior to the Cut-off Date have been made; and as of the Cut-off Date, no Mortgage Loan has been contractually delinquent for 30 or more days more than once during the twelve months prior to the Cut-off Date.

        (3) No Mortgage Loan had a Loan-to-Value Ratio at origination in excess of 100.00%.

        (4) Each Mortgage is a valid and enforceable first lien on the Mortgaged Property subject only to (a) the lien of non delinquent current real property taxes and assessments, (b) covenants, conditions and restrictions, rights of way, easements and other matters of public record as of the date of recording of such Mortgage, such exceptions appearing of record being acceptable to mortgage lending institutions generally or specifically reflected in the appraisal made in connection with the origination of the related Mortgage Loan, and (c) other matters to which like properties are commonly subject which do not materially interfere with the benefits of the security intended to be provided by such Mortgage.

        (5) [Reserved].

        (6) There is no delinquent tax or assessment lien against any Mortgaged Property.

        (7) There is no valid offset, defense or counterclaim to any Mortgage Note or Mortgage, including the obligation of the Mortgagor to pay the unpaid principal of or interest on such Mortgage Note.

        (8) There are no mechanics' liens or claims for work, labor or material affecting any Mortgaged Property which are or may be a lien prior to, or equal with, the lien of such Mortgage,

                                    S-III-A-1


<PAGE>

except those which are insured against by the title insurance policy referred to in item (12) below.

        (9) As of the Closing Date, to the best of Countrywide's knowledge, each Mortgaged Property is free of material damage and in good repair.

        (10) Each Mortgage Loan at origination complied in all material respects with applicable local, state and federal laws, including, without limitation, usury, equal credit opportunity, predatory and abusive lending laws, real estate settlement procedures, truth-in-lending and disclosure laws, and consummation of the transactions contemplated hereby will not involve the

violation of any such laws.

     (11) As of the Closing Date, neither Countrywide nor any prior holder
of any Mortgage has modified the Mortgage in any material respect (except that
a Mortgage Loan may have been modified by a written instrument which has been
recorded or submitted for recordation, if necessary, to protect the interests
of the Certificateholders and the original or a copy of which has been
delivered to the Trustee); satisfied, cancelled or subordinated such Mortgage
in whole or in part; released the related Mortgaged Property in whole or in
part from the lien of such Mortgage; or executed any instrument of release,
cancellation, modification or satisfaction with respect thereto.

     (12) A lender's policy of title insurance together with an adjustable
rate rider and a condominium endorsement and extended coverage endorsement, if
applicable, in an amount at least equal to the Cut-off Date Stated Principal
Balance of each such Mortgage Loan or a commitment (binder) to issue the same
was effective on the date of the origination of each Mortgage Loan, each such
policy is valid and remains in full force and effect, and each such policy was
issued by a title insurer qualified to do business in the jurisdiction where
the Mortgaged Property is located and acceptable to FNMA or FHLMC and is in a
form acceptable to FNMA or FHLMC, which policy insures Countrywide and
successor owners of indebtedness secured by the insured Mortgage, as to the
first priority lien of the Mortgage subject to the exceptions set forth in
paragraph (4) above and against any loss by reason of the invalidity or
unenforceability of the lien resulting from the provisions of the Mortgage
providing for adjustment in the mortgage interest rate and/or monthly payment;
to the best of Countrywide's knowledge, no claims have been made under such
mortgage title insurance policy and no prior holder of the related Mortgage,
including Countrywide, has done, by act or omission, anything which would
impair the coverage of such mortgage title insurance policy.

     (13) Each Mortgage Loan was originated (within the meaning of Section
3(a)(41) of the Securities Exchange Act of 1934, as amended) by an entity that
satisfied at the time of origination the requirements of Section 3(a)(41) of
the Securities Exchange Act of 1934, as amended.

     (14) To the best of Countrywide's knowledge, all of the improvements
which were included for the purpose of determining the Appraised Value of the
Mortgaged Property lie wholly within the boundaries and building restriction
lines of such property, and no improvements on adjoining properties encroach
upon the Mortgaged Property.


                              S-III-A-3


<PAGE>


     (15) To the best of Countrywide's knowledge, no improvement located on
or being part of the Mortgaged Property is in violation of any applicable
zoning law or regulation. To the best of Countrywide's knowledge, all
inspections, licenses and certificates required to be made or issued with
respect to all occupied portions of the Mortgaged Property and, with respect
to the use and occupancy of the same, including but not limited to
certificates of occupancy and fire underwriting certificates, have been made
or obtained from the appropriate authorities, unless the lack thereof would
not have a material adverse effect on the value of such Mortgaged Property,

and the Mortgaged Property is lawfully occupied under applicable law.

(16) Each Mortgage Note and the related Mortgage are genuine, and each is the legal, valid and binding obligation of the maker thereof, enforceable in accordance with its terms and under applicable law. To the best of Countrywide's knowledge, all parties to the Mortgage Note and the Mortgage had legal capacity to execute the Mortgage Note and the Mortgage and each Mortgage Note and Mortgage have been duly and properly executed by such parties.

(17) The proceeds of the Mortgage Loans have been fully disbursed, there is no requirement for future advances thereunder and any and all requirements as to completion of any on-site or off-site improvements and as to disbursements of any escrow funds therefor have been complied with. All costs, fees and expenses incurred in making, or closing or recording the Mortgage Loans were paid.

(18) The related Mortgage contains customary and enforceable provisions which render the rights and remedies of the holder thereof adequate for the realization against the Mortgaged Property of the benefits of the security, including, (i) in the case of a Mortgage designated as a deed of trust, by trustee's sale, and (ii) otherwise by judicial foreclosure.

(19) With respect to each Mortgage constituting a deed of trust, a trustee, duly qualified under applicable law to serve as such, has been properly designated and currently so serves and is named in such Mortgage, and no fees or expenses are or will become payable by the Certificateholders to the trustee under the deed of trust, except in connection with a trustee's sale after default by the Mortgagor.

(20) Each Mortgage Note and each Mortgage is in substantially one of the forms acceptable to FNMA or FHLMC, with such riders as have been acceptable to FNMA or FHLMC, as the case may be.

(21) There exist no deficiencies with respect to escrow deposits and payments, if such are required, for which customary arrangements for repayment thereof have not been made, and no escrow deposits or payments of other charges or payments due Countrywide have been capitalized under the Mortgage or the related Mortgage Note.

(22) The origination, underwriting and collection practices used by Countrywide with respect to each Mortgage Loan have been in all respects legal, prudent and customary in the mortgage lending and servicing business.

(23) There is no pledged account or other security other than real estate securing the Mortgagor's obligations.

S-III-A-3

<PAGE>

(24) No Mortgage Loan has a shared appreciation feature, or other contingent interest feature.

(25) Each Mortgage Loan contains a customary "due on sale" clause.

(26) As of the Closing Date, approximately 0.98%, 5.13%, 9.43% and

11.37%, of the Mortgage Loans in Loan Groups 1, 2, 3 and 4, respectively, by aggregate Stated Principal Balance of the respective Loan Group as of the Cut-off Date, provide for a prepayment charge.

(27) Each Mortgage Loan that had a Loan-to-Value Ratio at origination in excess of 80% is the subject of a Primary Insurance Policy that insures that portion of the principal balance equal to a specified percentage times the sum of the remaining principal balance of the related Mortgage Loan, the accrued interest thereon and the related foreclosure expenses. The specified coverage percentage for mortgage loans with terms to maturity between 25 and 30 years is 12% for Loan-to-Value Ratios between 80.01% and 85.00%, 25% for Loan-to-Value Ratios between 85.01% and 90.00%, 30% for Loan-to-Value Ratios between 90.01% and 95.00% and 35% for Loan-to-Value Ratios between 95.01% and 100%. The specified coverage percentage for mortgage loans with terms to maturity of up to 20 years ranges from 6% to 12% for Loan-to-Value Ratios between 80.01% to 85.00%, from 12% to 20% for Loan-to-Value Ratios between 85.01% to 90.00% and 20% to 25% for Loan-to-Value Ratios between 90.01% to 95.00%. Each such Primary Insurance Policy is issued by a Qualified Insurer. All provisions of any such Primary Insurance Policy have been and are being complied with, any such policy is in full force and effect, and all premiums due thereunder have been paid. Any Mortgage subject to any such Primary Insurance Policy obligates either the Mortgagor or the mortgagee thereunder to maintain such insurance and to pay all premiums and charges in connection therewith, subject, in each case, to the provisions of Section 3.09(b) of the Pooling and Servicing Agreement. The Mortgage Rate for each Mortgage Loan is net of any such insurance premium.

(28) As of the Closing Date, the improvements upon each Mortgaged Property are covered by a valid and existing hazard insurance policy with a generally acceptable carrier that provides for fire and extended coverage and coverage for such other hazards as are customary in the area where the Mortgaged Property is located in an amount which is at least equal to the lesser of (i) the maximum insurable value of the improvements securing such Mortgage Loan or (ii) the greater of (a) the outstanding principal balance of the Mortgage Loan and (b) an amount such that the proceeds of such policy shall be sufficient to prevent the Mortgagor and/or the mortgagee from becoming a co-insurer. If the Mortgaged Property is a condominium unit, it is included under the coverage afforded by a blanket policy for the condominium unit. All such individual insurance policies and all flood policies referred to in item (29) below contain a standard mortgagee clause naming Countrywide or the original mortgagee, and its successors in interest, as mortgagee, and Countrywide has received no notice that any premiums due and payable thereon have not been paid; the Mortgage obligates the Mortgagor thereunder to maintain all such insurance including flood insurance at the Mortgagor's cost and expense, and upon the Mortgagor's failure to do so, authorizes the holder of the Mortgage to obtain and maintain such insurance at the Mortgagor's cost and expense and to seek reimbursement therefor from the Mortgagor.

S-III-A-4

<PAGE>

(29) If the Mortgaged Property is in an area identified in the Federal Register by the Federal Emergency Management Agency as having special flood hazards, a flood insurance policy in a form meeting the requirements of the

current guidelines of the Flood Insurance Administration is in effect with
respect to such Mortgaged Property with a generally acceptable carrier in an
amount representing coverage not less than the least of (A) the original
outstanding principal balance of the Mortgage Loan, (B) the minimum amount
required to compensate for damage or loss on a replacement cost basis, or (C)
the maximum amount of insurance that is available under the Flood Disaster
Protection Act of 1973, as amended.

(30) To the best of Countrywide's knowledge, there is no proceeding
occurring, pending or threatened for the total or partial condemnation of the
Mortgaged Property.

(31) There is no material monetary default existing under any Mortgage
or the related Mortgage Note and, to the best of Countrywide's knowledge,
there is no material event which, with the passage of time or with notice and
the expiration of any grace or cure period, would constitute a default,
breach, violation or event of acceleration under the Mortgage or the related
Mortgage Note; and Countrywide has not waived any default, breach, violation
or event of acceleration.

(32) Each Mortgaged Property is improved by a one- to four-family
residential dwelling including condominium units and dwelling units in PUDs,
which, to the best of Countrywide's knowledge, does not include cooperatives
or mobile homes and does not constitute other than real property under state
law.

(33) Each Mortgage Loan is being master serviced by the Master
Servicer.

(34) Any future advances made prior to the Cut-off Date have been
consolidated with the outstanding principal amount secured by the Mortgage,
and the secured principal amount, as consolidated, bears a single interest
rate and single repayment term reflected on the Mortgage Loan Schedule. The
consolidated principal amount does not exceed the original principal amount of
the Mortgage Loan. The Mortgage Note does not permit or obligate the Master
Servicer to make future advances to the Mortgagor at the option of the
Mortgagor.

(35) All taxes, governmental assessments, insurance premiums, water,
sewer and municipal charges, leasehold payments or ground rents which
previously became due and owing have been paid, or an escrow of funds has been
established in an amount sufficient to pay for every such item which remains
unpaid and which has been assessed, but is not yet due and payable. Except for
(A) payments in the nature of escrow payments, and (B) interest accruing from
the date of the Mortgage Note or date of disbursement of the Mortgage
proceeds, whichever is later, to the day which precedes by one month the Due
Date of the first installment of principal and interest, including without
limitation, taxes and insurance payments, the Master Servicer has not advanced
funds, or induced, solicited or knowingly received any advance of funds by a
party other than the Mortgagor, directly or indirectly, for the payment of any
amount required by the Mortgage.

(36) Each Mortgage Loan was underwritten in all material respects in
accordance with the underwriting guidelines described in the Prospectus
Supplement.

S-III-A-5

<PAGE>

(37) Other than with respect to any Streamlined Documentation Mortgage Loan as to which the loan-to-value ratio of the related Original Mortgage Loan was less than 90% at the time of the origination of such Original Mortgage Loan, prior to the approval of the Mortgage Loan application, an appraisal of the related Mortgaged Property was obtained from a qualified appraiser, duly appointed by the originator, who had no interest, direct or indirect, in the Mortgaged Property or in any loan made on the security thereof, and whose compensation is not affected by the approval or disapproval of the Mortgage Loan; such appraisal is in a form acceptable to FNMA and FHLMC.

(38) None of the Mortgage Loans are graduated payment mortgage loans or growing equity mortgage loans, and none of the Mortgage Loans are subject to a buydown or similar arrangement.

(39) Any leasehold estate securing a Mortgage Loan has a term of not less than five years in excess of the term of the related Mortgage Loan.

(40) The Mortgage Loans were selected from among the outstanding adjustable-rate one- to four-family mortgage loans in the portfolios of the Sellers as the Closing Date as to which the representations and warranties made as to the Mortgage Loans set forth in this Schedule III can be made. Such selection was not made in a manner intended to adversely affect the interests of Certificateholders.

(41) Except for 0 Mortgage Loans, each Mortgage Loan transferred and assigned to the Trustee on the Closing Date has a payment date on or before the Due Date in the month of the first Distribution Date.

(42) With respect to any Mortgage Loan as to which an affidavit has been delivered to the Trustee certifying that the original Mortgage Note is a Lost Mortgage Note, if such Mortgage Loan is subsequently in default, the enforcement of such Mortgage Loan or of the related Mortgage by or on behalf of the Trustee will not be materially adversely affected by the absence of the original Mortgage Note. A "Lost Mortgage Note" is a Mortgage Note the original of which was permanently lost or destroyed and has not been replaced.

(43) The Mortgage Loans, individually and in the aggregate, conform in all material respects to the descriptions thereof in the Prospectus Supplement.

(44) No Mortgage Loan originated on or after October 1, 2002 through March 6, 2003 is governed by the Georgia Fair Lending Act.

(45) None of the Mortgage Loans are "high cost" loans as defined by applicable predatory and abusive lending laws.

(46) None of the Mortgage Loans are covered by the Home Ownership and Equity Protection Act of 1994 ("HOEPA").

(47) No Mortgage Loan is a "High-Cost Home Loan" as defined in the New Jersey Home Ownership Act effective November 27, 2003 (N.J.S.A. 46:10B-22 et seq.).

S-III-A-6

<PAGE>


        (48) No Mortgage Loan is a "High-Cost Home Loan" as defined in the New
Mexico Home Loan Protection Act effective January 1, 2004 (N.M. Stat. Ann.
ss.ss. 58-21a-1 et seq.).

        (49) All of the Mortgage Loans were originated in compliance with all
applicable laws, including, but not limited to, all applicable anti-predatory
and abusive lending laws.

        (50) No Mortgage Loan is a High Cost Loan or Covered Loan, as
applicable, and with respect to the foregoing, the terms "High Cost Loan" and
"Covered Loan" have the meaning assigned to them in the then current Standard
& Poor's LEVELS(R) Version 5.6c Glossary Revised, Appendix E which is attached
hereto as Exhibit O (the "Glossary") where (x) a "High Cost Loan" is each loan
identified in the column "Category under applicable anti-predatory lending
law" of the table entitled "Standard & Poor's High Cost Loan Categorization"
in the Glossary as each such loan is defined in the applicable anti-predatory
lending law of the State or jurisdiction specified in such table and (y) a
"Covered Loan" is each loan identified in the column "Category under
applicable anti-predatory lending law" of the table entitled "Standard &
Poor's High Covered Loan Categorization" in the Glossary as each such loan is
defined in the applicable anti-predatory lending law of the State or
jurisdiction specified in such table.



                            S-III-A-1


<PAGE>


                          SCHEDULE III-B

                            CWMBS, Inc.

                Mortgage Pass-Through Certificates

                        Series 2006-HYB3

      Representations and Warranties of Countrywide as to the Countrywide
        ----------------------------------------------------------------
                            Mortgage Loans
                            --------------

        Countrywide Home Loans, Inc. ("Countrywide") hereby makes the
representations and warranties set forth in this Schedule III-B to the
Depositor, the Master Servicer and the Trustee, with respect to the
Countrywide Mortgage Loans as of the Closing Date, or
if so specified herein, as of the Cut-off Date. Capitalized terms used but not
otherwise defined in this Schedule III-B shall have the meanings ascribed
thereto in the Pooling and Servicing Agreement (the "Pooling and Servicing
Agreement") relating to the above-referenced Series, among Countrywide, as a
seller, Park Granada LLC, as a seller, Park Monaco Inc., as a seller, Park

www.sec.gov/Archives/edgar/data/...

Sienna LLC, as a seller, Countrywide Home Loans Servicing LP, as master servicer, CWMBS, Inc., as depositor, and The Bank of New York, as trustee.

    (1) Immediately prior to the assignment of each Countrywide Mortgage Loan to the Depositor, Countrywide had good title to, and was the sole owner of, such Countrywide Mortgage Loan free and clear of any pledge, lien, encumbrance or security interest and had full right and authority, subject to no interest or participation of, or agreement with, any other party, to sell and assign the same pursuant to the Pooling and Servicing Agreement.


                              S-III-B-1


<PAGE>

                            SCHEDULE III-C

                             CWMBS, Inc.

                  Mortgage Pass-Through Certificates

                          Series 2006-HYB3

          Representations and Warranties of Park Granada as to the
          -------------------------------------------------------
                      Park Granada Mortgage Loans
                      ---------------------------

        Park Granada LLC ("Park Granada") hereby makes the representations and warranties set forth in this Schedule III-C to the Depositor, the Master Servicer and the Trustee, with respect to the Park Granada Mortgage Loans that are Mortgage Loans as of the Closing Date, or if so specified herein, as of the Cut-off Date. Capitalized terms used but not otherwise defined in this Schedule III-C shall have the meanings ascribed thereto in the Pooling and Servicing Agreement (the "Pooling and Servicing Agreement") relating to the above-referenced Series, among Countrywide Home Loans, Inc., as a seller, Park Granada, as a seller, Park Monaco Inc., as a seller, Park Sienna LLC, as a seller, Countrywide Home Loans Servicing LP, as master servicer, CWMBS, Inc., as depositor, and The Bank of New York, as trustee.

    (1) Immediately prior to the assignment of each Park Granada Mortgage Loan to the Depositor, Park Granada had good title to, and was the sole owner of, such Park Granada Mortgage Loan free and clear of any pledge, lien, encumbrance or security interest and had full right and authority, subject to no interest or participation of, or agreement with, any other party, to sell and assign the same pursuant to the Pooling and Servicing Agreement.


                              S-III-C-1


<PAGE>

                            SCHEDULE III-D

CWMBS, Inc.

Mortgage Pass-Through Certificates

Series 2006-HYB3

Representations and Warranties of Park Monaco as to the
-------------------------------------------------------
Park Monaco Mortgage Loans
--------------------------

        Park Monaco Inc. ("Park Monaco") hereby makes the representations and
warranties set forth in this Schedule III-D to the Depositor, the Master
Servicer and the Trustee, with respect to the Park Monaco Mortgage Loans as of
the Closing Date, or if so specified herein, as of the Cut-off Date.
Capitalized terms used but not otherwise defined in this Schedule III-D shall
have the meanings ascribed thereto in the Pooling and Servicing Agreement (the
"Pooling and Servicing Agreement") relating to the above-referenced Series,
among Countrywide Home Loans, Inc., as a seller, Park Monaco, as a seller,
Park Granada LLC, as a seller, Park Sienna LLC, as a seller, Countrywide Home
Loans Servicing LP, as master servicer, CWMBS, Inc., as depositor, and The
Bank of New York, as trustee.

        (1) Immediately prior to the assignment of each Park Monaco Mortgage
Loan to the Depositor, Park Monaco had good title to, and was the sole owner
of, such Park Monaco Mortgage Loan free and clear of any pledge, lien,
encumbrance or security interest and had full right and authority, subject to
no interest or participation of, or agreement with, any other party, to sell
and assign the same pursuant to the Pooling and Servicing Agreement.

S-III-D-1

<PAGE>

SCHEDULE III-E

CWMBS, Inc.

Mortgage Pass-Through Certificates

Series 2006-HYB3

Representations and Warranties of Park Sienna as to the
-------------------------------------------------------
Park Sienna Mortgage Loans
--------------------------

        Park Sienna LLC ("Park Sienna") hereby makes the representations and
warranties set forth in this Schedule III-E to the Depositor, the Master
Servicer and the Trustee, with respect to the Park Sienna Mortgage Loans that
are Mortgage Loans as of the Closing Date, or if so specified herein, as of
the Cut-off Date. Capitalized terms used but not otherwise defined in this
Schedule III-E shall have the meanings ascribed thereto in the Pooling and
Servicing Agreement (the "Pooling and Servicing Agreement") relating to the

above-referenced Series, among Countrywide Home Loans, Inc., as a seller, Park
Sienna, as a seller, Park Monaco Inc., as a seller, Park Granada LLC, as a
seller, Countrywide Home Loans Servicing LP, as master servicer, CWMBS, Inc.,
as depositor, and The Bank of New York, as trustee.

    (1) Immediately prior to the assignment of each Park Sienna Mortgage
Loan to the Depositor, Park Sienna had good title to, and was the sole owner
of, such Park Sienna Mortgage Loan free and clear of any pledge, lien,
encumbrance or security interest and had full right and authority, subject to
no interest or participation of, or agreement with, any other party, to sell
and assign the same pursuant to the Pooling and Servicing Agreement.


                              S-III-E-1


<PAGE>

                             SCHEDULE IV

                             CWMBS, Inc.

                  Mortgage Pass-Through Certificates

                          Series 2006-HYB3

           Representations and Warranties of the Master Servicer
           -------------------------------------------------------

        Countrywide Home Loans Servicing LP ("Countrywide Servicing") hereby
makes the representations and warranties set forth in this Schedule IV to the
Depositor, the Sellers and the Trustee, as of the Closing Date. Capitalized
terms used but not otherwise defined in this Schedule IV shall have the
meanings ascribed thereto in the Pooling and Servicing Agreement (the "Pooling
and Servicing Agreement") relating to the above-referenced Series, among
Countrywide Home Loans, Inc., as a seller, Park Granada LLC, as a seller, Park
Sienna LLC, as a seller, Park Monaco Inc., as a seller, Countrywide Home Loans
Servicing LP, as master servicer, CWMBS, Inc., as depositor, and The Bank of
New York, as trustee.

        (1) Countrywide Servicing is duly organized as a limited partnership
and is validly existing and in good standing under the laws of the State of
Texas and is duly authorized and qualified to transact any and all business
contemplated by the Pooling and Servicing Agreement to be conducted by
Countrywide Servicing in any state in which a Mortgaged Property is located or
is otherwise not required under applicable law to effect such qualification
and, in any event, is in compliance with the doing business laws of any such
state, to the extent necessary to perform any of its obligations under the
Pooling and Servicing Agreement in accordance with the terms thereof.

        (2) Countrywide Servicing has the full partnership power and authority
to service each Mortgage Loan, and to execute, deliver and perform, and to
enter into and consummate the transactions contemplated by the Pooling and
Servicing Agreement and has duly authorized by all necessary partnership
action on the part of Countrywide Servicing the execution, delivery and
performance of the Pooling and Servicing Agreement; and the Pooling and
Servicing Agreement, assuming the due authorization, execution and delivery
thereof by the other parties thereto, constitutes a legal, valid and binding

obligation of Countrywide Servicing, enforceable against Countrywide Servicing in accordance with its terms, except that (a) the enforceability thereof may be limited by bankruptcy, insolvency, moratorium, receivership and other similar laws relating to creditors' rights generally and (b) the remedy of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceeding therefor may be brought.

    (3) The execution and delivery of the Pooling and Servicing Agreement by Countrywide Servicing, the servicing of the Mortgage Loans by Countrywide Servicing under the Pooling and Servicing Agreement, the consummation of any other of the transactions contemplated by the Pooling and Servicing Agreement, and the fulfillment of or compliance with the terms thereof are in the ordinary course of business of Countrywide Servicing and will not (A) result in a material breach of any term or provision of the certificate of limited partnership, partnership agreement or other organizational document of Countrywide Servicing or (B) materially conflict

S-IV-1

<PAGE>

with, result in a material breach, violation or acceleration of, or result in a material default under, the terms of any other material agreement or instrument to which Countrywide Servicing is a party or by which it may be bound, or (C) constitute a material violation of any statute, order or regulation applicable to Countrywide Servicing of any court, regulatory body, administrative agency or governmental body having jurisdiction over Countrywide Servicing; and Countrywide Servicing is not in breach or violation of any material indenture or other material agreement or instrument, or in violation of any statute, order or regulation of any court, regulatory body, administrative agency or governmental body having jurisdiction over it which breach or violation may materially impair the ability of Countrywide Servicing to perform or meet any of its obligations under the Pooling and Servicing Agreement.

    (4) Countrywide Servicing is an approved servicer of conventional mortgage loans for FNMA or FHLMC and is a mortgagee approved by the Secretary of Housing and Urban Development pursuant to sections 203 and 211 of the National Housing Act.

    (5) No litigation is pending or, to the best of Countrywide's Servicing knowledge, threatened, against Countrywide Servicing that would materially and adversely affect the execution, delivery or enforceability of the Pooling and Servicing Agreement or the ability of Countrywide Servicing to service the Mortgage Loans or to perform any of its other obligations under the Pooling and Servicing Agreement in accordance with the terms thereof.

    (6) No consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by Countrywide Servicing of, or compliance by Countrywide Servicing with, the Pooling and Servicing Agreement or the consummation of the transactions contemplated thereby, or if any such consent, approval, authorization or order is required, Countrywide Servicing has obtained the same.

www.sec.gov/Archives/edgar/data/...

(7) Countrywide Servicing is a member of MERS in good standing, and will comply in all material respects with the rules and procedures of MERS in connection with the servicing of the MERS Mortgage Loans for as long as such Mortgage Loans are registered with MERS.


S-IV-2


<PAGE>


SCHEDULE V

Principal Balance Schedules


*[Attached to Prospectus Supplement, if applicable.]


S-V-1


<PAGE>

<TABLE>
<CAPTION>

SCHEDULE VI
Form of Monthly Master Servicer Report
================================================================================
========

LOAN LEVEL REPORTING SYSTEM
--------------------------------------------------------------------------------
--------

DATABASE STRUCTURE
--------------------------------------------------------------------------------
--------

[MONTH, YEAR]
--------------------------------------------------------------------------------
--------

| Field Number | Field Name | Field Type | Field Width | Dec |
|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> |
| 1 | INVNUM | Numeric | 4 | |
| 2 | INVBLK | Numeric | 4 | |
| 3 | INACNU | Character | 8 | |
| 4 | BEGSCH | Numeric | 15 | 2 |

|   | | | | |
|---|---|---|---|---|
| 5 | SCHPRN | Numeric | 13 | 2 |
| 6 | TADPRN | Numeric | 11 | 2 |
| 7 | LIQEPB | Numeric | 11 | 2 |
| 8 | ACTCOD | Numeric | 11 | |
| 9 | ACTDAT | Numeric | 4 | |
| 10 | INTPMT | Numeric | 8 | |
| 11 | PRNPMT | Numeric | 13 | 2 |
| 12 | ENDSCH | Numeric | 13 | 2 |
| 13 | SCHNOT | Numeric | 13 | 2 |
| 14 | SCHPAS | Numeric | 7 | 3 |
| 15 | PRINPT | Numeric | 7 | 3 |
| 16 | PRIBAL | Numeric | 11 | 2 |
| 17 | LPIDTE | Numeric | 13 | 2 |
| 18 | DELPRN | Numeric | 7 | |
| 19 | PPDPRN | Numeric | 11 | 2 |
| 20 | DELPRN | Numeric | 11 | 2 |
| 21 | NXTCHG | Numeric | 8 | |
| 22 | ARMNOT | Numeric | 7 | 3 |
| 23 | ARMPAS | Numeric | 7 | 3 |

```
--------
    24              ARMPMT          Numeric              11              2
-------------------------------------------------------------------------------
--------
    25              ZZTYPE          Character             2
-------------------------------------------------------------------------------
--------
    26              ISSUID          Character             1
-------------------------------------------------------------------------------
--------
    27              KEYNAME         Character             8
-------------------------------------------------------------------------------
--------
TOTAL                                                   240
-------------------------------------------------------------------------------
--------
  Suggested Format:    DBASE file
                       Modem transmission
===============================================================================
========
</TABLE>
```

                                   S-VI-1


<PAGE>
                                 EXHIBIT A

                        [FORM OF SENIOR CERTIFICATE]

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE
DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO ISSUER OR ITS
AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE
ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS
REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO
CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED
REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR
OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER
HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

SOLELY FOR U.S. FEDERAL INCOME TAX PURPOSES, THIS CERTIFICATE IS A "REGULAR
INTEREST" IN A "REAL ESTATE MORTGAGE INVESTMENT CONDUIT," AS THOSE TERMS ARE
DEFINED, RESPECTIVELY, IN SECTIONS 860G AND 860D OF THE INTERNAL REVENUE CODE
OF 1986, AS AMENDED (THE "CODE").

[UNTIL THIS CERTIFICATE HAS BEEN THE SUBJECT OF AN ERISA QUALIFYING
UNDERWRITING, NEITHER THIS CERTIFICATE NOR ANY INTEREST HEREIN MAY BE
TRANSFERRED UNLESS THE TRANSFEREE DELIVERS TO THE TRUSTEE EITHER A
REPRESENTATION LETTER TO THE EFFECT THAT SUCH TRANSFEREE IS NOT AN EMPLOYEE
BENEFIT PLAN SUBJECT TO THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974,
AS AMENDED, OR AN OPINION OF COUNSEL IN ACCORDANCE WITH THE PROVISIONS OF THE
AGREEMENT REFERRED TO HEREIN. SUCH REPRESENTATION SHALL BE DEEMED TO HAVE BEEN
MADE TO THE TRUSTEE BY THE TRANSFEREE'S ACCEPTANCE OF A CERTIFICATE OF THIS
CLASS AND BY A BENEFICIAL OWNER'S ACCEPTANCE OF ITS INTEREST IN A CERTIFICATE
OF THIS CLASS. NOTWITHSTANDING ANYTHING ELSE TO THE CONTRARY HEREIN, UNTIL
THIS CERTIFICATE HAS BEEN THE SUBJECT OF AN ERISA QUALIFYING UNDERWRITING, ANY

www.sec.gov/Archives/edgar/data/...

PURPORTED TRANSFER OF THIS CERTIFICATE TO OR ON BEHALF OF AN EMPLOYEE BENEFIT
PLAN SUBJECT TO ERISA OR TO THE CODE WITHOUT THE OPINION OF COUNSEL
SATISFACTORY TO THE TRUSTEE AS DESCRIBED ABOVE SHALL BE VOID AND OF NO
EFFECT.]

<div align="center">A-1</div>

<PAGE>

| | | |
|---|---|---|
| Certificate No. | : | |
| Cut-off Date | : | |
| First Distribution Date | : | |
| Initial Certificate Balance of this Certificate ("Denomination") | : | $ |
| Initial Certificate Balance of all Certificates of this Class | : | $ |
| CUSIP | : | |
| Interest Rate | : | |
| Maturity Date | : | |

<div align="center">

CWMBS, INC.

Mortgage Pass-Through Certificates, Series 200____-____

Class [ ]

</div>

evidencing a percentage interest in the distributions allocable to the
Certificates of the above-referenced Class with respect to a Trust
Fund consisting primarily of a pool of conventional mortgage loans
(the "Mortgage Loans") secured by first liens on one- to four-family
residential properties

<div align="center">CWMBS, Inc., as Depositor</div>

Principal in respect of this Certificate is distributable monthly as
set forth herein. Accordingly, the Certificate Balance at any time may be less
than the Certificate Balance as set forth herein. This Certificate does not
evidence an obligation of, or an interest in, and is not guaranteed by the
Depositor, the Sellers, the Master Servicer or the Trustee referred to below
or any of their respective affiliates. Neither this Certificate nor the
Mortgage Loans are guaranteed or insured by any governmental agency or
instrumentality.

This certifies that _____ is the registered owner of the Percentage Interest evidenced by this Certificate (obtained by dividing the denomination of this Certificate by the aggregate Initial Certificate Balance of all Certificates of the Class to which this Certificate belongs) in certain monthly distributions with respect to a Trust Fund consisting primarily of the Mortgage


                                A-2

<PAGE>

Loans deposited by CWMBS, Inc. (the "Depositor"). The Trust Fund was created pursuant to a Pooling and Servicing Agreement dated as of the Cut-off Date specified above (the "Agreement") among the Depositor, Countrywide Home Loans, Inc., as a seller ("CHL"), Park Granada LLC, as a seller ("Park Granada"), Park Monaco Inc., as a seller ("Park Monaco"), Park Sienna LLC, as a seller ("Park Sienna"), Countrywide Home Loans Servicing LP, as master servicer (the "Master Servicer") and The Bank of New York, as trustee (the "Trustee"). To the extent not defined herein, the capitalized terms used herein have the meanings assigned in the Agreement. This Certificate is issued under and is subject to the terms, provisions and conditions of the Agreement, to which Agreement the Holder of this Certificate by virtue of the acceptance hereof assents and by which such Holder is bound.

        [Until this certificate has been the subject of an ERISA-Qualifying Underwriting, no transfer of a Certificate of this Class shall be made unless the Trustee shall have received either (i) a representation letter from the transferee of such Certificate, acceptable to and in form and substance satisfactory to the Trustee, to the effect that such transferee is not an employee benefit plan subject to Section 406 of ERISA or a plan subject to Section 4975 of the Code, nor a person acting on behalf of or investing plan assets of any such plan, which representation letter shall not be an expense of the Trustee or the Master Servicer, or (ii) in the case of any such Certificate presented for registration in the name of an employee benefit plan subject to ERISA or Section 4975 of the Code (or comparable provisions of any subsequent enactments), or a trustee of any such plan or any other person acting on behalf of any such plan, an Opinion of Counsel satisfactory to the Trustee and the Master Servicer to the effect that the purchase or holding of such Certificate will not result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code, and will not subject the Trustee or the Master Servicer to any obligation in addition to those undertaken in the Agreement, which Opinion of Counsel shall not be an expense of the Trustee or the Master Servicer. Such representation shall be deemed to have been made to the Trustee by the Transferee's acceptance of a Certificate of this Class and by a beneficial owner's acceptance of its interest in a Certificate of this Class. Notwithstanding anything else to the contrary herein, until such certificate has been the subject of an ERISA-Qualifying Underwriting, any purported transfer of a Certificate of this Class to or on behalf of an employee benefit plan subject to ERISA or to the Code without the opinion of counsel satisfactory to the Trustee as described above shall be void and of no effect.]

        Reference is hereby made to the further provisions of this Certificate set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

        This Certificate shall not be entitled to any benefit under the

www.sec.gov/Archives/edgar/data1...

Agreement or be valid for any purpose unless manually countersigned by an
authorized signatory of the Trustee.

*     *     *

A-3
<PAGE>

        IN WITNESS WHEREOF, the Trustee has caused this Certificate to be duly
executed.

Dated:  _____, 20__

                            THE BANK OF NEW YORK,
                            as Trustee

                            By _____

Countersigned:

By
    _____
        Authorized Signatory of
        THE BANK OF NEW YORK,
        as Trustee

A-4
<PAGE>

EXHIBIT B

[FORM OF SUBORDINATED CERTIFICATE]

[UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE
DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO ISSUER OR ITS
AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE
ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS
REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO
CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED
REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR
OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER
HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.]

SOLELY FOR U.S. FEDERAL INCOME TAX PURPOSES, THIS CERTIFICATE IS A "REGULAR
INTEREST" IN A "REAL ESTATE MORTGAGE INVESTMENT CONDUIT," AS THOSE TERMS ARE
DEFINED, RESPECTIVELY, IN SECTIONS 860G AND 860D OF THE INTERNAL REVENUE CODE
OF 1986, AS AMENDED (THE "CODE").

THIS CERTIFICATE IS SUBORDINATED IN RIGHT OF PAYMENT TO CERTAIN CERTIFICATES

AS DESCRIBED IN THE AGREEMENT REFERRED TO HEREIN.


[THIS CERTIFICATE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS
AMENDED (THE "ACT"). ANY RESALE OR TRANSFER OF THIS CERTIFICATE WITHOUT
REGISTRATION THEREOF UNDER THE ACT MAY ONLY BE MADE IN A TRANSACTION EXEMPTED
FROM THE REGISTRATION REQUIREMENTS OF THE ACT AND IN ACCORDANCE WITH THE
PROVISIONS OF THE AGREEMENT REFERRED TO HEREIN.]


[NEITHER THIS CERTIFICATE NOR ANY INTEREST HEREIN MAY BE TRANSFERRED UNLESS
THE TRANSFEREE DELIVERS TO THE TRUSTEE EITHER A REPRESENTATION LETTER TO THE
EFFECT THAT SUCH TRANSFEREE IS NOT AN EMPLOYEE BENEFIT PLAN SUBJECT TO THE
EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED, OR IF SUCH
CERTIFICATE HAS BEEN THE SUBJECT OF AN ERISA-QUALIFYING UNDERWRITING, A PLAN
SUBJECT TO SECTION 4975 OF THE CODE, OR A PERSON INVESTING ON BEHALF OF OR
WITH PLAN ASSETS OF SUCH A PLAN, OR THAT SUCH TRANSFEREE IS AN INSURANCE
COMPANY WHICH IS PURCHASING CERTIFICATES WITH FUNDS CONTAINED IN AN "INSURANCE
COMPANY GENERAL ACCOUNTS" AS SUCH TERM IS DEFINED IN SECTION V(e) OF
PROHIBITED TRANSACTION CLASS EXEMPTION 95-60 ("PTCE 95-60"), AND THE PURCHASE
AND HOLDING OF SUCH CERTIFICATES ARE COVERED UNDER SECTION I AND III OF PTCE
95-60 OR AN OPINION OF COUNSEL IN


                              B-1

<PAGE>

ACCORDANCE WITH THE PROVISIONS OF THE AGREEMENT REFERRED TO HEREIN.
NOTWITHSTANDING ANYTHING ELSE TO THE CONTRARY HEREIN, ANY PURPORTED TRANSFER
OF THIS CERTIFICATE TO OR ON BEHALF OF AN EMPLOYEE BENEFIT PLAN SUBJECT TO
ERISA OR TO THE CODE WITHOUT THE OPINION OF COUNSEL SATISFACTORY TO THE
TRUSTEE AS DESCRIBED ABOVE SHALL BE VOID AND OF NO EFFECT.]


                              B-2

<PAGE>

Certificate No.:

Cut-off Date                    :

First Distribution Date         :

Initial Certificate Balance
of this Certificate
("Denomination")                :     $

Initial Certificate Balance
of all Certificates of
this Class                      :     $


CUSIP                           :


Interest Rate                   :


Maturity Date                   :

CWMBS, INC.
Mortgage Pass-Through Certificates, Series 200____-____
Class [ ]

evidencing a percentage interest in the distributions allocable to the
Certificates of the above-referenced Class with respect to a Trust
Fund consisting primarily of a pool of conventional mortgage loans
(the "Mortgage Loans") secured by first liens on one- to four-family
residential properties

CWMBS, Inc., as Depositor

Principal in respect of this Certificate is distributable monthly as
set forth herein. Accordingly, the Certificate Balance at any time may be less
than the Certificate Balance as set forth herein. This Certificate does not
evidence an obligation of, or an interest in, and is not guaranteed by the
Depositor, the Sellers, the Master Servicer or the Trustee referred to below
or any of their respective affiliates. Neither this Certificate nor the
Mortgage Loans are guaranteed or insured by any governmental agency or
instrumentality.

This certifies that _____ is the registered owner of the
Percentage Interest evidenced by this Certificate (obtained by dividing the
denomination of this Certificate by the aggregate Initial Certificate Balance
of all Certificates of the Class to which this Certificate

B-3

<PAGE>

belongs) in certain monthly distributions with respect to a Trust Fund
consisting primarily of the Mortgage Loans deposited by CWMBS, Inc. (the
"Depositor"). The Trust Fund was created pursuant to a Pooling and Servicing
Agreement dated as of the Cut-off Date specified above (the "Agreement") among
the Depositor, Countrywide Home Loans, Inc., as a seller ("CHL"), Park Granada
LLC, as a seller ("Park Granada"), Park Monaco Inc., as a seller ("Park
Monaco"), Park Sienna LLC, as a seller ("Park Sienna"), Countrywide Home Loans
Servicing LP, as master servicer (the "Master Servicer") and The Bank of New
York, as trustee (the "Trustee"). To the extent not defined herein, the
capitalized terms used herein have the meanings assigned in the Agreement.
This Certificate is issued under and is subject to the terms, provisions and
conditions of the Agreement, to which Agreement the Holder of this Certificate
by virtue of the acceptance hereof assents and by which such Holder is bound.

[No transfer of a Certificate of this Class shall be made unless such
transfer is made pursuant to an effective registration statement under the
Securities Act and any applicable state securities laws or is exempt from the
registration requirements under said Act and such laws. In the event that a
transfer is to be made in reliance upon an exemption from the Securities Act
and such laws, in order to assure compliance with the Securities Act and such
laws, the Certificateholder desiring to effect such transfer and such
Certificateholder's prospective transferee shall each certify to the Trustee
in writing the facts surrounding the transfer. In the event that such a
transfer is to be made within three years from the date of the initial

issuance of Certificates pursuant hereto, there shall also be delivered (except in the case of a transfer pursuant to Rule 144A of the Securities Act) to the Trustee an Opinion of Counsel that such transfer may be made pursuant to an exemption from the Securities Act and such state securities laws, which Opinion of Counsel shall not be obtained at the expense of the Trustee, the Sellers, the Master Servicer or the Depositor. The Holder hereof desiring to effect such transfer shall, and does hereby agree to, indemnify the Trustee and the Depositor against any liability that may result if the transfer is not so exempt or is not made in accordance with such federal and state laws.]

[No transfer of a Certificate of this Class shall be made unless the Trustee shall have received either (i) a representation letter from the transferee of such Certificate, acceptable to and in form and substance satisfactory to the Trustee, to the effect that such transferee is not an employee benefit plan subject to Section 406 of ERISA or a plan subject to Section 4975 of the Code, nor a person acting on behalf of or investing plan assets of any such plan, which representation letter shall not be an expense of the Trustee or the Master Servicer, (ii) if such certificate has been the subject of an ERISA Qualifying Underwriting and the purchaser is an insurance company, a representation that the purchaser is an insurance company which is purchasing such Certificates with funds contained in an "insurance company general account" (as such term is defined in Section V(e) of Prohibited Transaction Class Exemption 95-60 ("PTCE 95-60")) and that the purchase and holding of such Certificates are covered under Sections I and III of PTCE 95-60, or (iii) in the case of any such Certificate presented for registration in the name of an employee benefit plan subject to ERISA or Section 4975 of the Code (or comparable provisions of any subsequent enactments), or a trustee of any such plan or any other person acting on behalf of any such plan, an Opinion of Counsel satisfactory to the

B-4

<PAGE>

Trustee and the Master Servicer to the effect that the purchase or holding of such Certificate will not result in a prohibited transaction under Section 406 of ERISA or Section 4975 of the Code, will not result in the assets of the Trust Fund being deemed to be "plan assets" and subject to the prohibited transaction provisions of ERISA and the Code and will not subject the Trustee to any obligation in addition to those undertaken in the Agreement, which Opinion of Counsel shall not be an expense of the Trustee or the Master Servicer. Notwithstanding anything else to the contrary herein, any purported transfer of a Certificate of this Class to or on behalf of an employee benefit plan subject to ERISA or to the Code without the opinion of counsel satisfactory to the Trustee as described above shall be void and of no effect.]

Reference is hereby made to the further provisions of this Certificate set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

This Certificate shall not be entitled to any benefit under the Agreement or be valid for any purpose unless manually countersigned by an authorized signatory of the Trustee.

* * *

                                    B-5
<PAGE>


        IN WITNESS WHEREOF, the Trustee has caused this Certificate to be duly
executed.

Dated: _____, 20___


                                THE BANK OF NEW YORK,
                                as Trustee


                        By _____


Countersigned:

By _____
        Authorized Signatory of
        THE BANK OF NEW YORK,
        as Trustee


                                    B-6
<PAGE>

                            EXHIBIT C

                    [FORM OF CLASS A-R CERTIFICATE]

SOLELY FOR U.S. FEDERAL INCOME TAX PURPOSES, THIS CERTIFICATE IS A "RESIDUAL
INTEREST" IN A "REAL ESTATE MORTGAGE INVESTMENT CONDUIT," AS THOSE TERMS ARE
DEFINED, RESPECTIVELY, IN SECTIONS 860G AND 860D OF THE INTERNAL REVENUE CODE
OF 1986, AS AMENDED (THE "CODE").

NEITHER THIS CERTIFICATE NOR ANY INTEREST HEREIN MAY BE TRANSFERRED UNLESS THE
PROPOSED TRANSFEREE DELIVERS TO THE TRUSTEE A TRANSFER AFFIDAVIT IN ACCORDANCE
WITH THE PROVISIONS OF THE AGREEMENT REFERRED TO HEREIN.

NEITHER THIS CERTIFICATE NOR ANY INTEREST HEREIN MAY BE TRANSFERRED UNLESS THE
TRANSFEREE DELIVERS TO THE TRUSTEE EITHER A REPRESENTATION LETTER TO THE
EFFECT THAT SUCH TRANSFEREE IS NOT AN EMPLOYEE BENEFIT PLAN SUBJECT TO THE
EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED, OR A PLAN SUBJECT
TO SECTION 4975 OF THE CODE, OR A PERSON INVESTING ON BEHALF OF OR WITH PLAN
ASSETS OF SUCH A PLAN, OR THAT SUCH TRANSFEREE IS AN INSURANCE COMPANY WHICH
IS PURCHASING CERTIFICATES WITH FUNDS CONTAINED IN AN "INSURANCE COMPANY
GENERAL ACCOUNTS" AS SUCH TERM IS DEFINED IN SECTION V(e) OF PROHIBITED
TRANSACTION CLASS EXEMPTION 95-60 ("PTCE 95-60"), AND THE PURCHASE AND HOLDING
OF SUCH CERTIFICATES ARE COVERED UNDER SECTION I AND III OF PTCE 95-60 OR AN
OPINION OF COUNSEL IN ACCORDANCE WITH THE PROVISIONS OF THE AGREEMENT REFERRED
TO HEREIN. NOTWITHSTANDING ANYTHING ELSE TO THE CONTRARY HEREIN, ANY PURPORTED
TRANSFER OF THIS CERTIFICATE TO OR ON BEHALF OF AN EMPLOYEE BENEFIT PLAN

SUBJECT TO ERISA OR TO THE CODE WITHOUT THE OPINION OF COUNSEL SATISFACTORY TO
THE TRUSTEE AS DESCRIBED ABOVE SHALL BE VOID AND OF NO EFFECT.

[THIS CERTIFICATE REPRESENTS THE "TAX MATTERS PERSON RESIDUAL INTEREST" ISSUED
UNDER THE POOLING AND SERVICING AGREEMENT REFERRED TO BELOW AND MAY NOT BE
TRANSFERRED TO ANY PERSON EXCEPT IN CONNECTION WITH THE ASSUMPTION BY THE
TRANSFEREE OF THE DUTIES OF THE SERVICER UNDER SUCH AGREEMENT.]

C-1

<PAGE>

Certificate No.                        :

Cut-off Date                           :

First Distribution Date                :

Initial Certificate Balance
of this Certificate
("Denomination")                       :          $

Initial Certificate Balance
of all Certificates of
this Class                             :          $

CUSIP                                  :

Interest Rate                          :

Maturity Date                          :

CWMBS, INC.
Mortgage Pass-Through Certificates, Series 200____-____
Class A-R

evidencing the distributions allocable to the Class A-R Certificates
with respect to a Trust Fund consisting primarily of a pool of
conventional mortgage loans (the "Mortgage Loans") secured by first
liens on one- to four-family residential properties

CWMBS, Inc., as Depositor

Principal in respect of this Certificate is distributable monthly as
set forth herein. Accordingly, the Certificate Balance at any time may be less
than the Certificate Balance as set forth herein. This Certificate does not
evidence an obligation of, or an interest in, and is not guaranteed by the
Depositor, the Sellers, the Master Servicer or the Trustee referred to below
or any of their respective affiliates. Neither this Certificate nor the
Mortgage Loans are guaranteed or insured by any governmental agency or
instrumentality.

This certifies that _____ is the registered owner of the
Percentage Interest (obtained by dividing the Denomination of this Certificate
by the aggregate Initial Certificate Balance of all Certificates of the Class
to which this Certificate belongs) in certain monthly distributions with
respect to a Trust Fund consisting of the Mortgage Loans deposited by CWMBS,
Inc. (the

<center>C-2</center>

<PAGE>

"Depositor"). The Trust Fund was created pursuant to a Pooling and Servicing
Agreement dated as of the Cut-off Date specified above (the "Agreement") among
the Depositor, Countrywide Home Loans, Inc., as a seller ("CHL"), Park Granada
LLC, as a seller ("Park Granada"), Park Monaco Inc., as a seller ("Park
Monaco"), Park Sienna LLC, as a seller ("Park Sienna"), Countrywide Home Loans
Servicing LP, as master servicer (the "Master Servicer") and The Bank of New
York, as trustee (the "Trustee"). To the extent not defined herein, the
capitalized terms used herein have the meanings assigned in the Agreement.
This Certificate is issued under and is subject to the terms, provisions and
conditions of the Agreement, to which Agreement the Holder of this Certificate
by virtue of the acceptance hereof assents and by which such Holder is bound.

Any distribution of the proceeds of any remaining assets of the Trust
Fund will be made only upon presentment and surrender of this Class A-R
Certificate at the Corporate Trust Office or the office or agency maintained
by the Trustee in New York, New York.

No transfer of a Class A-R Certificate shall be made unless the
Trustee shall have received either (i) a representation letter from the
transferee of such Certificate, acceptable to and in form and substance
satisfactory to the Trustee, to the effect that such transferee is not an
employee benefit plan subject to Section 406 of ERISA or a plan subject to
Section 4975 of the Code, nor a person acting on behalf of or investing plan
assets of any such plan, which representation letter shall not be an expense
of the Trustee or the Master Servicer, (ii) or that such Transferee is an
insurance company which is purchasing such Certificates with funds contained
in an "insurance company general account" (as such term is defined in Section
V(e) of Prohibited Transaction Class Exemption 95-60 ("PTCE 95-60")) and that
the purchase and holding of such Certificates are covered under Sections I and
III of PTCE 95-60 or (iii) an Opinion of Counsel satisfactory to the Trustee
and the Master Servicer to the effect that the purchase or holding of such
Class A-R Certificate will not result in a non-exempt prohibited transaction
under Section 406 of ERISA or Section 4975 of the Code and will not subject
the Trustee or the Master Servicer to any obligation in addition to those
undertaken in this Agreement, which Opinion of Counsel shall not be an expense
of the Trustee or the Master Servicer. Notwithstanding anything else to the
contrary herein, any purported transfer of a Class A-R Certificate to or on
behalf of an employee benefit plan subject to ERISA or to the Code without the
opinion of counsel satisfactory to the Trustee as described above shall be
void and of no effect.

Each Holder of this Class A-R Certificate will be deemed to have
agreed to be bound by the restrictions of the Agreement, including but not
limited to the restrictions that (i) each person holding or acquiring any
Ownership Interest in this Class A-R Certificate must be a Permitted

Transferee, (ii) no Ownership Interest in this Class A-R Certificate may be transferred without delivery to the Trustee of (a) a transfer affidavit of the proposed transferee and (b) a transfer certificate of the transferor, each of such documents to be in the form described in the Agreement, (iii) each person holding or acquiring any Ownership Interest in this Class A-R Certificate must agree to require a transfer affidavit and to deliver a transfer certificate to the Trustee as required pursuant to the Agreement, (iv) each person holding or acquiring an

                                    C-3
<PAGE>

Ownership Interest in this Class A-R Certificate must agree not to transfer an Ownership Interest in this Class A-R Certificate if it has actual knowledge that the proposed transferee is not a Permitted Transferee and (v) any attempted or purported transfer of any Ownership Interest in this Class A-R Certificate in violation of such restrictions will be absolutely null and void and will vest no rights in the purported transferee.

        Reference is hereby made to the further provisions of this Certificate set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

        This Certificate shall not be entitled to any benefit under the Agreement or be valid for any purpose unless manually countersigned by an authorized signatory of the Trustee.

                            *     *     *

                                    C-4
<PAGE>

        IN WITNESS WHEREOF, the Trustee has caused this Certificate to be duly executed.

Dated:  _____, 20__

                            THE BANK OF NEW YORK,
                            as Trustee


                            By _____

Countersigned:

By _____
        Authorized Signatory of
        THE BANK OF NEW YORK,
        as Trustee

                                    C-5

EXHIBIT D

[FORM OF NOTIONAL AMOUNT CERTIFICATE]

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE
DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO ISSUER OR ITS
AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE
ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS
REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO
CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED
REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR
OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER
HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

THIS CERTIFICATE HAS NO PRINCIPAL BALANCE AND IS NOT ENTITLED TO ANY
DISTRIBUTION IN RESPECT OF PRINCIPAL.

SOLELY FOR U.S. FEDERAL INCOME TAX PURPOSES, THIS CERTIFICATE IS A "REGULAR
INTEREST" IN A "REAL ESTATE MORTGAGE INVESTMENT CONDUIT," AS THOSE TERMS ARE
DEFINED, RESPECTIVELY, IN SECTIONS 860G AND 860D OF THE INTERNAL REVENUE CODE
OF 1986, AS AMENDED (THE "CODE").

[UNTIL THIS CERTIFICATE HAS BEEN THE SUBJECT OF AN ERISA QUALIFYING
UNDERWRITING, NEITHER THIS CERTIFICATE NOR ANY INTEREST HEREIN MAY BE
TRANSFERRED UNLESS THE TRANSFEREE DELIVERS TO THE TRUSTEE EITHER A
REPRESENTATION LETTER TO THE EFFECT THAT SUCH TRANSFEREE IS NOT AN EMPLOYEE
BENEFIT PLAN SUBJECT TO THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974,
AS AMENDED, OR AN OPINION OF COUNSEL IN ACCORDANCE WITH THE PROVISIONS OF THE
AGREEMENT REFERRED TO HEREIN. SUCH REPRESENTATION SHALL BE DEEMED TO HAVE BEEN
MADE TO THE TRUSTEE BY THE TRANSFEREE'S ACCEPTANCE OF A CERTIFICATE OF THIS
CLASS AND BY A BENEFICIAL OWNER'S ACCEPTANCE OF ITS INTEREST IN A CERTIFICATE
OF THIS CLASS. NOTWITHSTANDING ANYTHING ELSE TO THE CONTRARY HEREIN, UNTIL
THIS CERTIFICATE HAS BEEN THE SUBJECT OF AN ERISA QUALIFYING UNDERWRITING, ANY
PURPORTED TRANSFER OF THIS CERTIFICATE TO OR ON BEHALF OF AN EMPLOYEE BENEFIT
PLAN SUBJECT TO ERISA OR TO THE CODE WITHOUT THE OPINION OF COUNSEL
SATISFACTORY TO THE TRUSTEE AS DESCRIBED ABOVE SHALL BE VOID AND OF NO
EFFECT.]

D-1

<PAGE>

Certificate No.                     :

Cut-off Date                        :

First Distribution Date             :

Initial Notional Amount
of this Certificate
("Denomination")                    :        $

Initial Notional Amount

```
of all Certificates
of this Class                     :        $


CUSIP                             :



Interest Rate                     :        Interest Only


Maturity Date                     :
```

                          CWMBS, INC.
          Mortgage Pass-Through Certificates, Series 200____-____
                          Class [ ]

          evidencing a percentage interest in the distributions allocable to the
          Certificates of the above-referenced Class with respect to a Trust
          Fund consisting primarily of a pool of conventional mortgage loans
          (the "Mortgage Loans") secured by first liens on one- to four-family
          residential properties

                    CWMBS, Inc., as Depositor


          The Notional Amount of this certificate at any time, may be less than
the Notional Amount as set forth herein. This Certificate does not evidence an
obligation of, or an interest in, and is not guaranteed by the Depositor, the
Sellers, the Master Servicer or the Trustee referred to below or any of their
respective affiliates. Neither this Certificate nor the Mortgage Loans are
guaranteed or insured by any governmental agency or instrumentality.

          This certifies that _____ is the registered owner of the
Percentage Interest evidenced by this Certificate (obtained by dividing the
denomination of this Certificate by the aggregate Initial Notional Amount of
all Certificates of the Class to which this Certificate belongs) in certain
monthly distributions with respect to a Trust Fund consisting primarily of the
Mortgage Loans deposited by CWMBS, Inc. (the "Depositor"). The Trust Fund was
created

                              D-2
<PAGE>


pursuant to a Pooling and Servicing Agreement dated as of the Cut-off
Date specified above (the "Agreement") among the Depositor, Countrywide Home
Loans, Inc., as a seller ("CHL"), Park Granada LLC, as a seller ("Park
Granada"), Park Monaco Inc., as a seller ("Park Monaco"), Park Sienna LLC, as
a seller ("Park Sienna"), Countrywide Home Loans Servicing LP, as master
servicer (the "Master Servicer") and The Bank of New York, as trustee (the
"Trustee"). To the extent not defined herein, the capitalized terms used
herein have the meanings assigned in the Agreement. This Certificate is issued
under and is subject to the terms, provisions and conditions of the Agreement,
to which Agreement the Holder of this Certificate by virtue of the acceptance
hereof assents and by which such Holder is bound.

[Until this certificate has been the subject of an ERISA-Qualifying Underwriting, no transfer of a Certificate of this Class shall be made unless the Trustee shall have received either (i) a representation letter from the transferee of such Certificate, acceptable to and in form and substance satisfactory to the Trustee, to the effect that such transferee is not an employee benefit plan subject to Section 406 of ERISA or a plan subject to Section 4975 of the Code, nor a person acting on behalf of or investing plan assets of any such plan, which representation letter shall not be an expense of the Trustee or the Master Servicer, or (ii) in the case of any such Certificate presented for registration in the name of an employee benefit plan subject to ERISA or Section 4975 of the Code (or comparable provisions of any subsequent enactments), or a trustee of any such plan or any other person acting on behalf of any such plan, an Opinion of Counsel satisfactory to the Trustee and the Master Servicer to the effect that the purchase or holding of such Certificate will not result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code, and will not subject the Trustee or the Master Servicer to any obligation in addition to those undertaken in the Agreement, which Opinion of Counsel shall not be an expense of the Trustee or the Master Servicer. Such representation shall be deemed to have been made to the Trustee by the Transferee's acceptance of a Certificate of this Class and by a beneficial owner's acceptance of its interest in a Certificate of this Class. Notwithstanding anything else to the contrary herein, until such certificate has been the subject of an ERISA-Qualifying Underwriting, any purported transfer of a Certificate of this Class to or on behalf of an employee benefit plan subject to ERISA or to the Code without the opinion of counsel satisfactory to the Trustee as described above shall be void and of no effect.]

Reference is hereby made to the further provisions of this Certificate set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

This Certificate shall not be entitled to any benefit under the Agreement or be valid for any purpose unless manually countersigned by an authorized signatory of the Trustee.

*  *  *

D-3
<PAGE>

IN WITNESS WHEREOF, the Trustee has caused this Certificate to be duly executed.

Dated: _____, 20__

THE BANK OF NEW YORK,
as Trustee

By _____

Countersigned:

```
By _____
        Authorized Signatory of
        THE BANK OF NEW YORK,
        as Trustee
```

<div align="center">D-4</div>

&lt;PAGE&gt;

<div align="center">EXHIBIT E</div>

<div align="center">[FORM OF REVERSE OF CERTIFICATES]</div>

<div align="center">CWMBS, INC.<br/>Mortgage Pass-Through Certificates</div>

This Certificate is one of a duly authorized issue of Certificates designated as CWMBS, Inc. Mortgage Pass-Through Certificates, of the Series specified on the face hereof (herein collectively called the "Certificates"), and representing a beneficial ownership interest in the Trust Fund created by the Agreement.

The Certificateholder, by its acceptance of this Certificate, agrees that it will look solely to the funds on deposit in the Distribution Account for payment hereunder and that the Trustee is not liable to the Certificateholders for any amount payable under this Certificate or the Agreement or, except as expressly provided in the Agreement, subject to any liability under the Agreement.

This Certificate does not purport to summarize the Agreement and reference is made to the Agreement for the interests, rights and limitations of rights, benefits, obligations and duties evidenced thereby, and the rights, duties and immunities of the Trustee.

Pursuant to the terms of the Agreement, a distribution will be made on the Business Day immediately following the Master Servicer Remittance Date (the "Distribution Date"), commencing on the first Distribution Date specified on the face hereof, to the Person in whose name this Certificate is registered at the close of business on the applicable Record Date in an amount equal to the product of the Percentage Interest evidenced by this Certificate and the amount required to be distributed to Holders of Certificates of the Class to which this Certificate belongs on such Distribution Date pursuant to the Agreement.

Distributions on this Certificate shall be made by wire transfer of immediately available funds to the account of the Holder hereof at a bank or other entity having appropriate facilities therefor, if such Certificateholder shall have so notified the Trustee in writing at least five Business Days prior to the related Record Date and such Certificateholder shall satisfy the conditions to receive such form of payment set forth in the Agreement, or, if not, by check mailed by first class mail to the address of such Certificateholder appearing in the Certificate Register. The final distribution on each Certificate will be made in like manner, but only upon presentment and surrender of such Certificate at the Corporate Trust Office or such other location specified in the notice to Certificateholders of such

final distribution.

The Agreement permits, with certain exceptions therein provided, the amendment thereof and the modification of the rights and obligations of the Trustee and the rights of the Certificateholders under the Agreement at any time by the Depositor, the Master Servicer and the Trustee with the consent of the Holders of Certificates affected by such amendment evidencing the requisite Percentage Interest, as provided in the Agreement. Any such consent by the Holder


                                E-1

<PAGE>

of this Certificate shall be conclusive and binding on such Holder and upon all future Holders of this Certificate and of any Certificate issued upon the transfer hereof or in exchange therefor or in lieu hereof whether or not notation of such consent is made upon this Certificate. The Agreement also permits the amendment thereof, in certain limited circumstances, without the consent of the Holders of any of the Certificates.

As provided in the Agreement and subject to certain limitations therein set forth, the transfer of this Certificate is registrable in the Certificate Register of the Trustee upon surrender of this Certificate for registration of transfer at the Corporate Trust Office or the office or agency maintained by the Trustee in New York, New York, accompanied by a written instrument of transfer in form satisfactory to the Trustee and the Certificate Registrar duly executed by the holder hereof or such holder's attorney duly authorized in writing, and thereupon one or more new Certificates of the same Class in authorized denominations and evidencing the same aggregate Percentage Interest in the Trust Fund will be issued to the designated transferee or transferees.

The Certificates are issuable only as registered Certificates without coupons in denominations specified in the Agreement. As provided in the Agreement and subject to certain limitations therein set forth, Certificates are exchangeable for new Certificates of the same Class in authorized denominations and evidencing the same aggregate Percentage Interest, as requested by the Holder surrendering the same.

No service charge will be made for any such registration of transfer or exchange, but the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

The Depositor, the Master Servicer, the Sellers and the Trustee and any agent of the Depositor or the Trustee may treat the Person in whose name this Certificate is registered as the owner hereof for all purposes, and neither the Depositor, the Trustee, nor any such agent shall be affected by any notice to the contrary.

On any Distribution Date on which the Pool Stated Principal Balance is less than or equal to 10% of the Cut-off Date Pool Principal Balance, the Master Servicer will have the option to repurchase, in whole, from the Trust Fund all remaining Mortgage Loans and all property acquired in respect of the Mortgage Loans at a purchase price determined as provided in the Agreement. In the event that no such optional termination occurs, the obligations and responsibilities created by the Agreement will terminate upon the later of the

www.sec.gov/Archives/edgar/data/...

maturity or other liquidation (or any advance with respect thereto) of the last Mortgage Loan remaining in the Trust Fund or the disposition of all property in respect thereof and the distribution to Certificateholders of all amounts required to be distributed pursuant to the Agreement. In no event, however, will the trust created by the Agreement continue beyond the expiration of 21 years from the death of the last survivor of the descendants living at the date of the Agreement of a certain person named in the Agreement.

E-2

<PAGE>

     Any term used herein that is defined in the Agreement shall have the meaning assigned in the Agreement, and nothing herein shall be deemed inconsistent with that meaning. To the extent that any term or provision of this Certificate conflicts with or is in any way inconsistent with any term or provision of the Agreement, the Agreement shall govern.

E-3

<PAGE>

ASSIGNMENT

FOR VALUE RECEIVED, the undersigned hereby sell(s), assign(s) and transfer(s) unto _____
_____
_____
(Please print or typewrite name and address including postal zip code of assignee)

the Percentage Interest evidenced by the within Certificate and hereby authorizes the transfer of registration of such Percentage Interest to assignee on the Certificate Register of the Trust Fund.

     I (We) further direct the Trustee to issue a new Certificate of a like denomination and Class, to the above named assignee and deliver such Certificate to the following address:

_____

Dated: _____

                              _____
                              Signature by or on behalf of assignor

DISTRIBUTION INSTRUCTIONS

     The assignee should include the following for purposes of distribution:

          Distributions shall be made, by wire transfer or otherwise, in
immediately available funds to, _____
_____
_____,
for the account of _____,
account number _____ mailed by check,to _____.
Applicable statements should be mailed to _____.

          This information is provided by _____,
the assignee named above, or _____,
as its agent.


                               E-4
<PAGE>


STATE OF                    )
                            )  ss.:
COUNTY OF                   )


          On the ____day of _____, 20__ before me, a notary public in
and for said State, personally appeared _____,
known to me who, being by me duly sworn, did depose and say that he executed
the foregoing instrument.


                              _____
                                     Notary Public


                    [Notarial Seal]


                               E-5
<PAGE>

                            EXHIBIT F

           FORM OF INITIAL CERTIFICATION OF TRUSTEE


                            [date]


[Depositor]

[Master Servicer]

[Countrywide]

_____
_____


        Re:    Pooling and Servicing Agreement among
              CWMBS, Inc., as Depositor, Countrywide
              Home Loans, Inc. ("Countrywide"), as a
              Seller, Park Granada LLC, as a Seller,
              Park Monaco Inc., as a Seller, Park Sienna
              LLC, as a Seller, Countrywide Home Loans
              Servicing LP, as Master Servicer, and The
              Bank of New York, as Trustee,
              Mortgage Pass-Through Certificates, Series 200_-_
              ------------------------------------------------

Gentlemen:

     In accordance with Section 2.02 of the above-captioned Pooling and
Servicing Agreement (the "Pooling and Servicing Agreement"), the undersigned,
as Trustee, hereby certifies that, as to each Mortgage Loan listed in the
Mortgage Loan Schedule (other than any Delay Delivery Mortgage Loan paid in
full or any Mortgage Loan listed on the attached schedule) it has received:

     (i) (a) the original Mortgage Note endorsed as provided in the
following form: "Pay to the order of _____, without recourse" or (b) with
respect to any Lost Mortgage Note, a lost note affidavit from Countrywide
stating that the original Mortgage Note was lost or destroyed; and

     (ii) a duly executed assignment of the Mortgage (which may be included
in a blanket assignment or assignments).

     Based on its review and examination and only as to the foregoing
documents, such documents appear regular on their face and related to such
Mortgage Loan.; provided, however,


                           F-1
<PAGE>


that it has received no assignment with respect to any Mortgage for which the
related Mortgaged Property is located in the Commonwealth of Puerto Rico.

     The Trustee has made no independent examination of any documents
contained in each Mortgage File beyond the review specifically required in the
Pooling and Servicing Agreement. The Trustee makes no representations as to:
(i) the validity, legality, sufficiency, enforceability or genuineness of any
of the documents contained in each Mortgage File of any of the Mortgage Loans
identified on the Mortgage Loan Schedule, or (ii) the collectability,
insurability, effectiveness or suitability of any such Mortgage Loan.

     Capitalized words and phrases used herein shall have the respective
meanings assigned to them in the Pooling and Servicing Agreement.

                 THE BANK OF NEW YORK,
                 as Trustee

```
                                        By:
                                            -----------------------------------
                                        Name:
                                        Title:



                                        F-2
<PAGE>

                                 EXHIBIT G

                        FORM OF DELAY DELIVERY CERTIFICATION


                                    [date]


[Depositor]

[Master Servicer]

[Countrywide]


_____
_____


              Re:   Pooling and Servicing Agreement among CWMBS,
                    Inc., as Depositor, Countrywide Home Loans,
                    Inc., as a Seller ("Countrywide"), Park Granada
                    LLC, as a Seller, Park Monaco Inc., as a Seller,
                    Park Sienna LLC, as a Seller, Countrywide Home
                    Loans Servicing LP, as Master Servicer, and The
                    Bank of New York, as Trustee,
                    Mortgage Pass-Through Certificates, Series 200_-_
                    -----------------------------------------------
Gentlemen:

        Reference is made to the Initial Certification of Trustee relating to
the above-referenced series, with the schedule of exceptions attached thereto
(the "Schedule A"), delivered by the undersigned, as Trustee, on the Closing
Date in accordance with Section 2.02 of the above-captioned Pooling and
Servicing Agreement (the "Pooling and Servicing Agreement"). The undersigned
hereby certifies that, as to each Delay Delivery Mortgage Loan listed on
Schedule A attached hereto (other than any Mortgage Loan paid in full or
listed on Schedule B attached hereto) it has received:

              (i)   the original Mortgage Note, endorsed by Countrywide or the
                    originator of such Mortgage Loan, without recourse in the
                    following form: "Pay to the order of _____ without
                    recourse", with all intervening endorsements that show a
                    complete chain of endorsement from the originator to
                    Countrywide, or, if the original Mortgage Note has been lost
                    or destroyed and not replaced, an original lost note affidavit
                    from Countrywide, stating that the original Mortgage Note was
```

lost or destroyed, together with a copy of the related Mortgage Note;

     (ii)     in the case of each Mortgage Loan that is not a MERS Mortgage Loan, the original recorded Mortgage, [and in the case of each Mortgage Loan that is a MERS Mortgage Loan, the original Mortgage, noting thereon the presence of the MIN of the Mortgage Loan and language indicating that the Mortgage Loan is a MOM Loan if the Mortgage Loan is a MOM Loan, with evidence of recording

<div align="center">G-1</div>

&lt;PAGE&gt;

     indicated thereon, or a copy of the Mortgage certified by the public recording office in which such Mortgage has been recorded];

     (iii)     in the case of each Mortgage Loan that is not a MERS Mortgage Loan, a duly executed assignment of the Mortgage to "The Bank of New York, as trustee under the Pooling and Servicing Agreement dated as of [month] 1, 2005, without recourse", or, in the case of each Mortgage Loan with respect to property located in the State of California that is not a MERS Mortgage Loan, a duly executed assignment of the Mortgage in blank (each such assignment, when duly and validly completed, to be in recordable form and sufficient to effect the assignment of and transfer to the assignee thereof, under the Mortgage to which such assignment relates);

     (iv)     the original recorded assignment or assignments of the Mortgage together with all interim recorded assignments of such Mortgage [(noting the presence of a MIN in the case of each MERS Mortgage Loan)];

     (v)     the original or copies of each assumption, modification, written assurance or substitution agreement, if any, with evidence of recording thereon if recordation thereof is permissible under applicable law; and

     (vi)     the original or duplicate original lender's title policy or a printout of the electronic equivalent and all riders thereto or, in the event such original title policy has not been received from the insurer, any one of an original title binder, an original preliminary title report or an original title commitment, or a copy thereof certified by the title company, with the original policy of title insurance to be delivered within one year of the Closing Date.

     In the event that in connection with any Mortgage Loan that is not a MERS Mortgage Loan Countrywide cannot deliver the original recorded Mortgage or all interim recorded assignments of the Mortgage satisfying the requirements of clause (ii), (iii) or (iv), as applicable, the Trustee has received, in lieu thereof, a true and complete copy of such Mortgage and/or such assignment or assignments of the Mortgage, as applicable, each certified by Countrywide, the applicable title company, escrow agent or attorney, or the

originator of such Mortgage Loan, as the case may be, to be a true and complete copy of the original Mortgage or assignment of Mortgage submitted for recording.

Based on its review and examination and only as to the foregoing documents, (i) such documents appear regular on their face and related to such Mortgage Loan, and (ii) the information set forth in items (i), (iv), (v), (vi), (viii), (xi) and (xiv) of the definition of the "Mortgage Loan Schedule" in Article I of the Pooling and Servicing Agreement accurately reflects information set forth in the Mortgage File.

The Trustee has made no independent examination of any documents contained in each Mortgage File beyond the review specifically required in the above-referenced Pooling and Servicing Agreement. The Trustee makes no representations as to: (i) the validity, legality, sufficiency, enforceability or genuineness of any of the documents contained in each Mortgage

G-2

<PAGE>

File of any of the Mortgage Loans identified on the [Mortgage Loan Schedule][Loan Number and Borrower Identification Mortgage Loan Schedule] or (ii) the collectibility, insurability, effectiveness or suitability of any such Mortgage Loan.

Capitalized words and phrases used herein shall have the respective meanings assigned to them in the Pooling and Servicing Agreement.

THE BANK OF NEW YORK,
  as Trustee

By: _____
Name:
Title:

G-3

<PAGE>

EXHIBIT H

FORM OF FINAL CERTIFICATION OF TRUSTEE

[date]

[Depositor]

[Master Servicer]

[Countrywide]

_____
_____

     Re:     Pooling and Servicing Agreement among CWMBS, Inc., as
             Depositor, Countrywide Home Loans, Inc., as Seller
             ("Countrywide"), Park Granada LLC, as a Seller, Park
             Monaco Inc., as a Seller, Park Sienna LLC, as a Seller,
             Countrywide Home Loans Servicing LP, as Master
             Servicer, and The Bank of New York, as Trustee,
             Mortgage Pass-Through Certificates, Series 200_-_
             ------------------------------------------------

Gentlemen:

     In accordance with Section 2.02 of the above-captioned Pooling and
Servicing Agreement (the "Pooling and Servicing Agreement"), the undersigned,
as Trustee, hereby certifies that as to each Mortgage Loan listed in the
Mortgage Loan Schedule (other than any Mortgage Loan paid in full or listed on
the attached Document Exception Report) it has received:

     (i)     the original Mortgage Note, endorsed by Countrywide or the
             originator of such Mortgage Loan, without recourse in the
             following form: "Pay to the order of _____ without
             recourse", with all intervening endorsements that show a
             complete chain of endorsement from the originator to
             Countrywide, or, if the original Mortgage Note has been lost
             or destroyed and not replaced, an original lost note affidavit
             from Countrywide, stating that the original Mortgage Note was
             lost or destroyed, together with a copy of the related
             Mortgage Note;

     (ii)    in the case of each Mortgage Loan that is not a MERS Mortgage
             Loan, the original recorded Mortgage, [and in the case of each
             Mortgage Loan that is a MERS Mortgage Loan, the original
             Mortgage, noting thereon the presence of the MIN of the
             Mortgage Loan and language indicating that the Mortgage Loan
             is a MOM Loan if the Mortgage Loan is a MOM Loan, with
             evidence of recording

                                   H-1
<PAGE>

             indicated thereon, or a copy of the Mortgage certified by the
             public recording office in which such Mortgage has been
             recorded];

     (iii)   in the case of each Mortgage Loan that is not a MERS Mortgage
             Loan, a duly executed assignment of the Mortgage to "The Bank
             of New York, as trustee under the Pooling and Servicing
             Agreement dated as of [month] 1, 2005, without recourse", or,
             in the case of each Mortgage Loan with respect to property
             located in the State of California that is not a MERS Mortgage
             Loan, a duly executed assignment of the Mortgage in blank
             (each such assignment, when duly and validly completed, to be
             in recordable form and sufficient to effect the assignment of

and transfer to the assignee thereof, under the Mortgage to which such assignment relates);

(iv)    the original recorded assignment or assignments of the Mortgage together with all interim recorded assignments of such Mortgage [(noting the presence of a MIN in the case of each Mortgage Loan that is a MERS Mortgage Loan)];

(v)     the original or copies of each assumption, modification, written assurance or substitution agreement, if any, with evidence of recording thereon if recordation thereof is permissible under applicable law; and

(vi)    the original or duplicate original lender's title policy or a printout of the electronic equivalent and all riders thereto or, in the event such original title policy has not been received from the insurer, any one of an original title binder, an original preliminary title report or an original title commitment, or a copy thereof certified by the title company, with the original policy of title insurance to be delivered within one year of the Closing Date.

    In the event that in connection with any Mortgage Loan that is not a MERS Mortgage Loan Countrywide cannot deliver the original recorded Mortgage or all interim recorded assignments of the Mortgage satisfying the requirements of clause (ii), (iii) or (iv), as applicable, the Trustee has received, in lieu thereof, a true and complete copy of such Mortgage and/or such assignment or assignments of the Mortgage, as applicable, each certified by Countrywide, the applicable title company, escrow agent or attorney, or the originator of such Mortgage Loan, as the case may be, to be a true and complete copy of the original Mortgage or assignment of Mortgage submitted for recording.

    Based on its review and examination and only as to the foregoing documents, (i) such documents appear regular on their face and related to such Mortgage Loan, and (ii) the information set forth in items (i), (iv), (v), (vi), (viii), (xi) and (xiv) of the definition of the "Mortgage Loan Schedule" in Article I of the Pooling and Servicing Agreement accurately reflects information set forth in the Mortgage File.

    The Trustee has made no independent examination of any documents contained in each Mortgage File beyond the review specifically required in the above-referenced Pooling and

                                    H-2
<PAGE>

Servicing Agreement. The Trustee makes no representations as to: (i) the validity, legality, sufficiency, enforceability or genuineness of any of the documents contained in each Mortgage File of any of the Mortgage Loans identified on the [Mortgage Loan Schedule][Loan Number and Borrower Identification Mortgage Loan Schedule] or (ii) the collectibility, insurability, effectiveness or suitability of any such Mortgage Loan.

    Capitalized words and phrases used herein shall have the respective meanings assigned to them in the Pooling and Servicing Agreement.

```
                                      THE BANK OF NEW YORK,
                                        as Trustee


                                      By: _____
                                      Name:
                                      Title:


                             H-3
<PAGE>



                        EXHIBIT I

                     TRANSFER AFFIDAVIT

                        CWMBS, Inc.
              Mortgage Pass-Through Certificates
                       Series 200_-_


STATE OF                    )
                            ) ss.:
COUNTY OF                   )
```

        The undersigned, being first duly sworn, deposes and says as follows:

        1. The undersigned is an officer of _____, the
proposed Transferee of an Ownership Interest in a Class A-R Certificate (the
"Certificate") issued pursuant to the Pooling and Servicing Agreement (the
"Agreement"), relating to the above-referenced Series, by and among CWMBS,
Inc., as depositor (the "Depositor"), Countrywide Home Loans, Inc. (the
"Company"), as a seller, one or more special purpose entities established by
Countrywide Financial Corporation or one of its subsidiaries, as a seller (and
together with the Company, the "Sellers"), Countrywide Home Loans Servicing
LP, as Master Servicer and The Bank of New York, as Trustee. Capitalized terms
used, but not defined herein or in Exhibit 1 hereto, shall have the meanings
ascribed to such terms in the Agreement. The Transferee has authorized the
undersigned to make this affidavit on behalf of the Transferee.

        2. The Transferee is not an employee benefit plan that is subject to
Title I of ERISA or to section 4975 of the Internal Revenue Code of 1986, nor
is it acting on behalf of or with plan assets of any such plan. The Transferee
is, as of the date hereof, and will be, as of the date of the Transfer, a
Permitted Transferee. The Transferee will endeavor to remain a Permitted
Transferee for so long as it retains its Ownership Interest in the
Certificate. The Transferee is acquiring its Ownership Interest in the
Certificate for its own account.

        3. The Transferee has been advised of, and understands that (i) a tax
will be imposed on Transfers of the Certificate to Persons that are not
Permitted Transferees; (ii) such tax will be imposed on the transferor, or, if
such Transfer is through an agent (which includes a broker, nominee or

middleman) for a Person that is not a Permitted Transferee, on the agent; and
(iii) the Person otherwise liable for the tax shall be relieved of liability
for the tax if the subsequent Transferee furnished to such Person an affidavit
that such subsequent Transferee is a Permitted Transferee and, at the time of
Transfer, such Person does not have actual knowledge that the affidavit is
false.

    4. The Transferee has been advised of, and understands that a tax will
be imposed on a "pass-through entity" holding the Certificate if at any time
during the taxable year of the pass-through entity a Person that is not a
Permitted Transferee is the record holder of an interest in such entity. The
Transferee understands that such tax will not be imposed for any period with
respect to which the record holder furnishes to the pass-through entity an
affidavit that such record holder is a Permitted Transferee and the
pass-through entity does not have actual

<div align="center">I-1</div>

&lt;PAGE&gt;

knowledge that such affidavit is false. (For this purpose, a "pass-through
entity" includes a regulated investment company, a real estate investment
trust or common trust fund, a partnership, trust or estate, and certain
cooperatives and, except as may be provided in Treasury Regulations, persons
holding interests in pass-through entities as a nominee for another Person.)

    5. The Transferee has reviewed the provisions of Section 5.02(c) of
the Agreement (attached hereto as Exhibit 2 and incorporated herein by
reference) and understands the legal consequences of the acquisition of an
Ownership Interest in the Certificate including, without limitation, the
restrictions on subsequent Transfers and the provisions regarding voiding the
Transfer and mandatory sales. The Transferee expressly agrees to be bound by
and to abide by the provisions of Section 5.02(c) of the Agreement and the
restrictions noted on the face of the Certificate. The Transferee understands
and agrees that any breach of any of the representations included herein shall
render the Transfer to the Transferee contemplated hereby null and void.

    6. The Transferee agrees to require a Transfer Affidavit from any
Person to whom the Transferee attempts to Transfer its Ownership Interest in
the Certificate, and in connection with any Transfer by a Person for whom the
Transferee is acting as nominee, trustee or agent, and the Transferee will not
Transfer its Ownership Interest or cause any Ownership Interest to be
Transferred to any Person that the Transferee knows is not a Permitted
Transferee. In connection with any such Transfer by the Transferee, the
Transferee agrees to deliver to the Trustee a certificate substantially in the
form set forth as Exhibit J-1 to the Agreement (a "Transferor Certificate") to
the effect that such Transferee has no actual knowledge that the Person to
which the Transfer is to be made is not a Permitted Transferee.

    7. The Transferee does not have the intention to impede the assessment
or collection of any tax legally required to be paid with respect to the Class
A-R Certificates.

    8. The Transferee's taxpayer identification number is _____.

    9. The Transferee is a U.S. Person as defined in Code section
7701(a)(30) and, unless the Transferor (or any subsequent transferor)

expressly waives such requirement, will not cause income from the Certificate
to be attributable to a foreign permanent establishment or fixed base (within
the meaning of an applicable income tax treaty) of the Transferee or another
U.S. taxpayer.

   10. The Transferee is aware that the Class A-R Certificates may be
"noneconomic residual interests" within the meaning of proposed Treasury
regulations promulgated pursuant to the Code and that the transferor of a
noneconomic residual interest will remain liable for any taxes due with
respect to the income on such residual interest, unless no significant purpose
of the transfer was to impede the assessment or collection of tax. In
addition, as the Holder of a noneconomic residual interest, the Transferee may
incur tax liabilities in excess of any cash flows generated by the interest
and the Transferee hereby represents that it intends to pay taxes associated
with holding the residual interest as they become due.

   11. The Transferee has provided financial statements or other
financial information requested by the Transferor in connection with the
transfer of the Certificate to


                                   I-2

<PAGE>

permit the Transferor to assess the financial capability of the Transferee to
pay such taxes. The Transferee historically has paid its debts as they have
come due and intends to pay its debts as they come due in the future.

   12. Unless the Transferor (or any subsequent transferor) expressly
waives such requirement, the Transferee (and any subsequent transferee)
certifies (or will certify), respectively, that the transfer satisfies either
the "Asset Test" imposed by Treasury Regulation ss. 1.860E-1(c)(5) or the
"Formula Test" imposed by Treasury Regulation ss. 1.860E-1(c)(7).

                              *    *    *


                                   I-3

<PAGE>

        IN WITNESS WHEREOF, the Transferee has caused this instrument to be
executed on its behalf by its duly authorized officer, this ___ day of
_____, 20__.


                              _____
                              PRINT NAME OF TRANSFEREE


                         By: _____
                              Name:
                              Title:

Personally appeared before me the above-named _____,
known or proved to me to be the same person who executed the foregoing
instrument and to be the _____ of the Transferee, and
acknowledged that he executed the same as his free act and deed and the free
act and deed of the Transferee.

Subscribed and sworn before me this _____ day of _____, 20__.


_____
NOTARY PUBLIC

My Commission expires the ___
day of _____, 20__.



I-4
<PAGE>

WAIVER OF REQUIREMENT THAT TRANSFEREE CERTIFIES TRANSFER OF
CERTIFICATE SATISFIES CERTAIN REGULATORY "SAFE HARBORS"

The Transferor hereby waives the requirement that the Transferee
certify that the transfer of the Certificate satisfies either the "Asset Test"
imposed by Treasury Regulation ss. 1.860E-1(c)(5) or the "Formula Test"
imposed by Treasury Regulation ss. 1.860E-1(c)(7).


PRINT NAME OF TRANSFEREE


By: _____
    Name:
    Title:



I-5
<PAGE>

EXHIBIT 1

Certain Definitions

"Asset Test": A transfer satisfies the Asset Test if: (i) At the time
of the transfer, and at the close of each of the transferee's two fiscal years
preceding the transferee's fiscal year of transfer, the transferee's gross
assets for financial reporting purposes exceed $100 million and its net assets
for financial reporting purposes exceed $10 million. The gross assets and net
assets of a transferee do not include any obligation of any "related person"
or any other asset if a principal purpose for holding or acquiring the other

asset is to permit the transferee to satisfy such monetary conditions; (ii)
The transferee must be an "eligible corporation" and must agree in writing
that any subsequent transfer of the interest will be to another eligible
corporation in a transaction that satisfies paragraphs 9 through 11 of this
Transfer Affidavit and the Asset Test. A transfer fails to meet the Asset Test
if the transferor knows, or has reason to know, that the transferee will not
honor the restrictions on subsequent transfers of the Certificate; and (iii) A
reasonable person would not conclude, based on the facts and circumstances
known to the transferor on or before the date of the transfer, that the taxes
associated with the Certificate will not be paid. The consideration given to
the transferee to acquire the Certificate is only one factor to be considered,
but the transferor will be deemed to know that the transferee cannot or will
not pay if the amount of consideration is so low compared to the liabilities
assumed that a reasonable person would conclude that the taxes associated with
holding the Certificate will not be paid. For purposes of applying the Asset
Test, (i) an "eligible corporation" means any domestic C corporation (as
defined in section 1361(a)(2) of the Code) other than (A) a corporation which
is exempt from, or is not subject to, tax under section 11 of the Code, (B) an
entity described in section 851(a) or 856(a) of the Code, (C) A REMIC, or (D)
an organization to which part I of subchapter T of chapter 1 of subtitle A of
the Code applies; (ii) a "related person" is any person that (A) bears a
relationship to the transferee enumerated in section 267(b) or 707(b)(1) of
the Code, using "20 percent" instead of "50 percent" where it appears under
the provisions, or (B) is under common control (within the meaning of section
52(a) and (b)) with the transferee.


     "Formula Test": A transfer satisfies the formula test if the present
value of the anticipated tax liabilities associated with holding the
Certificate does not exceed the sum of (i) the present value of any
consideration given to the transferee to acquire the Certificate; (ii) the
present value of the expected future distributions on the Certificate; and
(iii) the present value of the anticipated tax savings associated with holding
the Certificate as the issuing REMIC generates losses. For purposes of
applying the Formula Test: (i) The transferee is assumed to pay tax at a rate
equal to the highest rate of tax specified in section 11(b)(1) of the Code. If
the transferee has been subject to the alternative minimum tax under section
55 of the Code in the preceding two years and will compute its taxable income
in the current taxable year using the alternative minimum tax rate, then the
tax rate specified in section 55(b)(1)(B) of the Code may be used in lieu of
the highest rate specified in section 11(b)(1) of the Code; (ii) The transfer
must satisfy paragraph 9 of the Transfer Affidavit; and (iii) Present values
are computed using a


                                    I-6

<PAGE>


discount rate equal to the Federal short-term rate prescribed by section
1274(d) of the Code for the month of the transfer and the compounding period
used by the taxpayer.


     "Ownership Interest": As to any Certificate, any ownership interest in
such Certificate, including any interest in such Certificate as the Holder

thereof and any other interest therein, whether direct or indirect, legal or beneficial.

"Permitted Transferee": Any person other than (i) the United States, any State or political subdivision thereof, or any agency or instrumentality of any of the foregoing, (ii) a foreign government, International Organization or any agency or instrumentality of either of the foregoing, (iii) an organization (except certain farmers' cooperatives described in section 521 of the Code) that is exempt from tax imposed by Chapter 1 of the Code (including the tax imposed by section 511 of the Code on unrelated business taxable income) on any excess inclusions (as defined in section 860E(c)(1) of the Code) with respect to any Class A-R Certificate, (iv) rural electric and telephone cooperatives described in section 1381(a)(2)(C) of the Code, (v) an "electing large partnership" as defined in section 775 of the Code, (vi) a Person that is not a citizen or resident of the United States, a corporation, partnership, or other entity (treated as a corporation or a partnership for federal income tax purposes) created or organized in or under the laws of the United States, any state thereof or the District of Columbia, or an estate whose income from sources without the United States is includible in gross income for United States federal income tax purposes regardless of its connection with the conduct of a trade or business within the United States, or a trust if a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States persons have authority to control all substantial decisions of the trustor unless such Person has furnished the transferor and the Trustee with a duly completed Internal Revenue Service Form W-8ECI, and (vii) any other Person so designated by the Trustee based upon an Opinion of Counsel that the Transfer of an Ownership Interest in a Class A-R Certificate to such Person may cause any REMIC formed under the Agreement to fail to qualify as a REMIC at any time that any Certificates are Outstanding. The terms "United States," "State" and "International Organization" shall have the meanings set forth in section 7701 of the Code or successor provisions. A corporation will not be treated as an instrumentality of the United States or of any State or political subdivision thereof for these purposes if all of its activities are subject to tax and, with the exception of the Federal Home Loan Mortgage Corporation, a majority of its board of directors is not selected by such government unit.

"Person": Any individual, corporation, limited liability company, partnership, joint venture, bank, joint stock company, trust (including any beneficiary thereof), unincorporated organization or government or any agency or political subdivision thereof.

"Transfer": Any direct or indirect transfer or sale of any Ownership Interest in a Certificate, including the acquisition of a Certificate by the Depositor.

                                    I-7

<PAGE>

"Transferee": Any Person who is acquiring by Transfer any Ownership Interest in a Certificate.

                                    I-8

EXHIBIT 2

Section 5.02(c) of the Agreement

(c) Each Person who has or who acquires any Ownership Interest in a
Class A-R Certificate shall be deemed by the acceptance or acquisition of such
Ownership Interest to have agreed to be bound by the following provisions, and
the rights of each Person acquiring any Ownership Interest in a Class A-R
Certificate are expressly subject to the following provisions:

(1) Each Person holding or acquiring any Ownership Interest in a Class
A-R Certificate shall be a Permitted Transferee and shall promptly notify
the Trustee of any change or impending change in its status as a Permitted
Transferee.

(2) Except in connection with (i) the registration of the Tax Matters
Person Certificate in the name of the Trustee or (ii) any registration in
the name of, or transfer of a Class A-R Certificate to, an affiliate of
the Depositor (either directly or through a nominee) on or about the
Closing Date, no Ownership Interest in a Class A-R Certificate may be
registered on the Closing Date or thereafter transferred, and the Trustee
shall not register the Transfer of any Class A-R Certificate unless, the
Trustee shall have been furnished with an affidavit (a "Transfer
Affidavit") of the initial owner or the proposed transferee in the form
attached hereto as Exhibit I.

(3) Each Person holding or acquiring any Ownership Interest in a Class
A-R Certificate shall agree (A) to obtain a Transfer Affidavit from any
other Person to whom such Person attempts to Transfer its Ownership
Interest in a Class A-R Certificate, (B) to obtain a Transfer Affidavit
from any Person for whom such Person is acting as nominee, trustee or
agent in connection with any Transfer of a Class A-R Certificate and (C)
not to Transfer its Ownership Interest in a Class A-R Certificate, or to
cause the Transfer of an Ownership Interest in a Class A-R Certificate to
any other Person, if it has actual knowledge that such Person is not a
Permitted Transferee.

(4) Any attempted or purported Transfer of any Ownership Interest in a
Class A-R Certificate in violation of the provisions of this Section
5.02(c) shall be absolutely null and void and shall vest no rights in the
purported Transferee. If any purported transferee shall become a Holder of
a Class A-R Certificate in violation of the provisions of this Section
5.02(c), then the last preceding Permitted Transferee shall be restored to
all rights as Holder thereof retroactive to the date of registration of
Transfer of such Class A-R Certificate. The Trustee shall be under no
liability to any Person for any registration of Transfer of a Class A-R
Certificate that is in fact not permitted by Section 5.02(b) and this
Section 5.02(c) or for making any payments due on such Certificate to the
Holder thereof or taking any other action with respect to such Holder
under the provisions of this Agreement so long as the Transfer was
registered after receipt of the related Transfer Affidavit and Transferor
Certificate. The Trustee shall be entitled but not obligated to recover
from any Holder of a Class A-R Certificate that was in fact not a
Permitted Transferee at the time it became a Holder or, at such subsequent
time as it became other

I-9

<PAGE>

than a Permitted Transferee, all payments made on such Class A-R
Certificate at and after either such time. Any such payments so recovered
by the Trustee shall be paid and delivered by the Trustee to the last
preceding Permitted Transferee of such Certificate.

(5) The Depositor shall use its best efforts to make available, upon
receipt of written request from the Trustee, all information necessary to
compute any tax imposed under section 860E(e) of the Code as a result of a
Transfer of an Ownership Interest in a Class A-R Certificate to any Holder
who is not a Permitted Transferee.

The restrictions on Transfers of a Class A-R Certificate set forth in
this section 5.02(c) shall cease to apply (and the applicable portions of the
legend on a Class A-R Certificate may be deleted) with respect to Transfers
occurring after delivery to the Trustee of an Opinion of Counsel, which
Opinion of Counsel shall not be an expense of the Trustee, the Sellers or the
Master Servicer, to the effect that the elimination of such restrictions will
not cause any constituent REMIC of any REMIC formed hereunder to fail to
qualify as a REMIC at any time that the Certificates are outstanding or result
in the imposition of any tax on the Trust Fund, a Certificateholder or another
Person. Each Person holding or acquiring any ownership Interest in a Class A-R
Certificate hereby consents to any amendment of this Agreement that, based on
an Opinion of Counsel furnished to the Trustee, is reasonably necessary (a) to
ensure that the record ownership of, or any beneficial interest in, a Class
A-R Certificate is not transferred, directly or indirectly, to a Person that
is not a Permitted Transferee and (b) to provide for a means to compel the
Transfer of a Class A-R Certificate that is held by a Person that is not a
Permitted Transferee to a Holder that is a Permitted Transferee.

I-10

<PAGE>

EXHIBIT J-1

FORM OF TRANSFEROR CERTIFICATE
(RESIDUAL)

---------------------
Date

CWMBS, Inc.
4500 Park Granada
Calabasas, California  91302
Attention:  David A. Spector

The Bank of New York

101 Barclay Street - 8W
New York, New York 10286

Attention:  Mortgage-Backed Securities Group
            Series 200_-_
            Re:      CWMBS, Inc. Mortgage Pass-Through Certificates,
            Series 200_-_, Class
            -----------------------------------------------


Ladies and Gentlemen:

        In connection with our disposition of the above Certificates we
certify that to the extent we are disposing of a Class A-R Certificate, we
have no knowledge the Transferee is not a Permitted Transferee.

                                Very truly yours,


                                _____
                                Print Name of Transferor


                                By: _____
                                    Authorized Officer


                        J-1-1

<PAGE>

                        EXHIBIT J-2


                FORM OF TRANSFEROR CERTIFICATE
                        (PRIVATE)


                                ---------------------
                                Date


CWMBS, Inc.
4500 Park Granada
Calabasas, California  91302
Attention:  David A. Spector

The Bank of New York
101 Barclay Street - 8W
New York, New York 10286

Attention:  Mortgage-Backed Securities Group
            Series 200_-_
            Re:      CWMBS, Inc. Mortgage Pass-Through Certificates,
            Series 200_-_, Class
            -------------------------------------------

Ladies and Gentlemen:

      In connection with our disposition of the above Certificates we certify that (a) we understand that the Certificates have not been registered under the Securities Act of 1933, as amended (the "Act"), and are being disposed by us in a transaction that is exempt from the registration requirements of the Act, (b) we have not offered or sold any Certificates to, or solicited offers to buy any Certificates from, any person, or otherwise approached or negotiated with any person with respect thereto, in a manner that would be deemed, or taken any other action which would result in, a violation of Section 5 of the Act.

                Very truly yours,


                _____
                Print Name of Transferor


                By: _____
                    Authorized Officer


             J-2-1


<PAGE>

             EXHIBIT K

      FORM OF INVESTMENT LETTER (NON-RULE 144A)


                  ------------------------
                  Date


CWMBS, Inc.
4500 Park Granada
Calabasas, California  91302
Attention:  David A. Spector

The Bank of New York
101 Barclay Street - 8W
New York, New York 10286

Attention:  Mortgage-Backed Securities Group
          Series 200_-_


      Re:  CWMBS, Inc. Mortgage Pass-Through Certificates,
           Series 200_-_, Class
           ---------------------------------------------

Ladies and Gentlemen:

       In connection with our acquisition of the above Certificates we
certify that (a) we understand that the Certificates are not being registered
under the Securities Act of 1933, as amended (the "Act"), or any state
securities laws and are being transferred to us in a transaction that is
exempt from the registration requirements of the Act and any such laws, (b) we
are an "accredited investor," as defined in Regulation D under the Act, and
have such knowledge and experience in financial and business matters that we
are capable of evaluating the merits and risks of investments in the
Certificates, (c) we have had the opportunity to ask questions of and receive
answers from the Depositor concerning the purchase of the Certificates and all
matters relating thereto or any additional information deemed necessary to our
decision to purchase the Certificates, (d) either (i) we are not an employee
benefit plan that is subject to the Employee Retirement Income Security Act of
1974, as amended, or a plan or arrangement that is subject to Section 4975 of
the Internal Revenue Code of 1986, as amended, nor are we acting on behalf of
any such plan or arrangement, nor are we using the assets of any such plan or
arrangement to effect such acquisition or (ii) if the Certificates have been
the subject of an ERISA-Qualifying Underwriting and we are an insurance
company, we are an insurance company which is purchasing such Certificates
with funds contained in an "insurance company general account" (as such term
is defined in Section V(e) of Prohibited Transaction Class Exemption 95-60
("PTCE 95-60")) and the purchase and holding of such Certificates are covered
under Sections I

K-1

<PAGE>

and III of PTCE 95-60, (e) we are acquiring the Certificates for investment
for our own account and not with a view to any distribution of such
Certificates (but without prejudice to our right at all times to sell or
otherwise dispose of the Certificates in accordance with clause (g) below),
(f) we have not offered or sold any Certificates to, or solicited offers to
buy any Certificates from, any person, or otherwise approached or negotiated
with any person with respect thereto, or taken any other action which would
result in a violation of Section 5 of the Act, and (g) we will not sell,
transfer or otherwise dispose of any Certificates unless (1) such sale,
transfer or other disposition is made pursuant to an effective registration
statement under the Act or is exempt from such registration requirements, and
if requested, we will at our expense provide an opinion of counsel
satisfactory to the addressees of this Certificate that such sale, transfer or
other disposition may be made pursuant to an exemption from the Act, (2) the
purchaser or transferee of such Certificate has executed and delivered to you
a certificate to substantially the same effect as this certificate, and (3)
the purchaser or transferee has otherwise complied with any conditions for
transfer set forth in the Pooling and Servicing Agreement.

                          Very truly yours,

                         _____

                         Print Name of Transferee

```
                                        By: _____
                                        Authorized Officer



                              K-2
<PAGE>

                          EXHIBIT L

                   FORM OF RULE 144A LETTER


                                        ----------------------
                                        Date


CWMBS, Inc.
4500 Park Granada
Calabasas, California  91302
Attention:  David A. Spector

The Bank of New York
101 Barclay Street - 8W
New York, New York 10286

Attention:  Mortgage-Backed Securities Group
            Series 200_-_

        Re:   CWMBS, Inc. Mortgage Pass-Through Certificates,
              Series 200_-_, Class
              -------------------------------------------

Ladies and Gentlemen:

        In connection with our acquisition of the above Certificates we
certify that (a) we understand that the Certificates are not being registered
under the Securities Act of 1933, as amended (the "Act"), or any state
securities laws and are being transferred to us in a transaction that is
exempt from the registration requirements of the Act and any such laws, (b) we
have such knowledge and experience in financial and business matters that we
are capable of evaluating the merits and risks of investments in the
Certificates, (c) we have had the opportunity to ask questions of and receive
answers from the Depositor concerning the purchase of the Certificates and all
matters relating thereto or any additional information deemed necessary to our
decision to purchase the Certificates, (d) either (i) we are not an employee
benefit plan that is subject to the Employee Retirement Income Security Act of
1974, as amended, or a plan or arrangement that is subject to Section 4975 of
the Internal Revenue Code of 1986, as amended, nor are we acting on behalf of
any such plan or arrangement, nor are we using the assets of any such plan or
arrangement to effect such acquisition or (ii) if the Certificates have been
the subject of an ERISA-Qualifying Underwriting and we are an insurance
company, we are an insurance company which is purchasing such Certificates
with funds contained in an "insurance company general account" (as such term
is defined in Section V(e) of Prohibited Transaction Class Exemption 95-60
```

("PTCE 95-60")) and the purchase and holding of such Certificates are covered under Sections I and III of PTCE 95-60, (e) we have not, nor has anyone acting on our

                                    L-1
<PAGE>

behalf offered, transferred, pledged, sold or otherwise disposed of the Certificates, any interest in the Certificates or any other similar security to, or solicited any offer to buy or accept a transfer, pledge or other disposition of the Certificates, any interest in the Certificates or any other similar security from, or otherwise approached or negotiated with respect to the Certificates, any interest in the Certificates or any other similar security with, any person in any manner, or made any general solicitation by means of general advertising or in any other manner, or taken any other action, that would constitute a distribution of the Certificates under the Securities Act or that would render the disposition of the Certificates a violation of Section 5 of the Securities Act or require registration pursuant thereto, nor will act, nor has authorized or will authorize any person to act, in such manner with respect to the Certificates, (f) we are a "qualified institutional buyer" as that term is defined in Rule 144A under the Securities Act and have completed either of the forms of certification to that effect attached hereto as Annex 1 or Annex 2. We are aware that the sale to us is being made in reliance on Rule 144A. We are acquiring the Certificates for our own account or for resale pursuant to Rule 144A and further, understand that such Certificates may be resold, pledged or transferred only (i) to a person reasonably believed to be a qualified institutional buyer that purchases for its own account or for the account of a qualified institutional buyer to whom notice is given that the resale, pledge or transfer is being made in reliance on Rule 144A, or (ii) pursuant to another exemption from registration under the Securities Act.

                              Very truly yours,

                              _____
                              Print Name of Transferee


                              By: _____
                                  Authorized Officer


                                    L-2
<PAGE>

                                        ANNEX 1 TO EXHIBIT L


        QUALIFIED INSTITUTIONAL BUYER STATUS UNDER SEC RULE 144A
        -------------------------------------------------------

[For Transferees Other Than Registered Investment Companies]

        The undersigned (the "Buyer") hereby certifies as follows to the parties listed in the Rule 144A Transferee Certificate to which this certification relates with respect to the Certificates described therein:

        1. As indicated below, the undersigned is the President, Chief Financial Officer, Senior Vice President or other executive officer of the Buyer.

        2. In connection with purchases by the Buyer, the Buyer is a "qualified institutional buyer" as that term is defined in Rule 144A under the Securities Act of 1933, as amended ("Rule 144A") because (i) the Buyer owned and/or invested on a discretionary basis either at least $100,000 in securities or, if Buyer is a dealer, Buyer must own and/or invest on a discretionary basis at least $10,000,000 in securities (except for the excluded securities referred to below) as of the end of the Buyer's most recent fiscal year (such amount being calculated in accordance with Rule 144A and (ii) the Buyer satisfies the criteria in the category marked below.

    ____    Corporation, etc. The Buyer is a corporation (other than a bank, savings and loan association or similar institution), Massachusetts or similar business trust, partnership, or charitable organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended.

    ____    Bank. The Buyer (a) is a national bank or banking institution organized under the laws of any State, territory or the District of Columbia, the business of which is substantially confined to banking and is supervised by the State or territorial banking commission or similar official or is a foreign bank or equivalent institution, and (b) has an audited net worth of at least $25,000,000 as demonstrated in its latest annual financial statements, a copy of which is attached hereto.

    ____    Savings and Loan. The Buyer (a) is a savings and loan association, building and loan association, cooperative bank, homestead association or similar institution, which is supervised and examined by a State or Federal authority having supervision over any such institutions or is a foreign savings and loan association or equivalent institution and (b) has an audited net worth of at least $25,000,000 as demonstrated in its latest annual financial statements, a copy of which is attached hereto.

<div align="center">L-3</div>

&lt;PAGE&gt;

    ____    Broker-dealer. The Buyer is a dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934.

    ____    Insurance Company. The Buyer is an insurance company whose primary and predominant business activity is the writing of insurance or the reinsuring of risks underwritten by insurance

companies and which is subject to supervision by the insurance commissioner or a similar official or agency of a State, territory or the District of Columbia.

____    State or Local Plan. The Buyer is a plan established and maintained by a State, its political subdivisions, or any agency or instrumentality of the State or its political subdivisions, for the benefit of its employees.

____    ERISA Plan. The Buyer is an employee benefit plan within the meaning of Title I of the Employee Retirement Income Security Act of 1974.

____    Investment Advisor. The Buyer is an investment advisor registered under the Investment Advisors Act of 1940.

____    Small Business Investment Company. Buyer is a small business investment company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958.

____    Business Development Company. Buyer is a business development company as defined in Section 202(a)(22) of the Investment Advisors Act of 1940.

3. The term "securities" as used herein does not include (i) securities of issuers that are affiliated with the Buyer, (ii) securities that are part of an unsold allotment to or subscription by the Buyer, if the Buyer is a dealer, (iii) securities issued or guaranteed by the U.S. or any instrumentality thereof, (iv) bank deposit notes and certificates of deposit, (v) loan participations, (vi) repurchase agreements, (vii) securities owned but subject to a repurchase agreement and (viii) currency, interest rate and commodity swaps.

4. For purposes of determining the aggregate amount of securities owned and/or invested on a discretionary basis by the Buyer, the Buyer used the cost of such securities to the Buyer and did not include any of the securities referred to in the preceding paragraph, except (i) where the Buyer reports its securities holdings in its financial statements on the basis of their market value, and (ii) no current information with respect to the cost of those securities has been published. If clause (ii) in the preceding sentence applies, the securities may be valued at market. Further, in determining such aggregate amount, the Buyer may have included securities owned by subsidiaries of the Buyer, but only if such subsidiaries are consolidated with the Buyer in its financial statements prepared in accordance with generally accepted accounting principles and if the investments of such subsidiaries are managed under the Buyer's direction. However, such securities were not included if the Buyer is a majority-owned, consolidated subsidiary of

L-4

<PAGE>

another enterprise and the Buyer is not itself a reporting company under the Securities Exchange Act of 1934, as amended.

5. The Buyer acknowledges that it is familiar with Rule 144A and understands that the seller to it and other parties related to the Certificates are relying and will continue to rely on the statements made herein because one or more sales to the Buyer may be in reliance on Rule 144A.

6. Until the date of purchase of the Rule 144A Securities, the Buyer will notify each of the parties to which this certification is made of any changes in the information and conclusions herein. Until such notice is given, the Buyer's purchase of the Certificates will constitute a reaffirmation of this certification as of the date of such purchase. In addition, if the Buyer is a bank or savings and loan is provided above, the Buyer agrees that it will furnish to such parties updated annual financial statements promptly after they become available.

_____
Print Name of Buyer

By: _____
Name:
Title:

Date: _____

L-5

<PAGE>

ANNEX 2 TO EXHIBIT L
--------------------

QUALIFIED INSTITUTIONAL BUYER STATUS UNDER SEC RULE 144A
-------------------------------------------------------

[For Transferees That are Registered Investment Companies]

The undersigned (the "Buyer") hereby certifies as follows to the parties listed in the Rule 144A Transferee Certificate to which this certification relates with respect to the Certificates described therein:

1. As indicated below, the undersigned is the President, Chief Financial Officer or Senior Vice President of the Buyer or, if the Buyer is a "qualified institutional buyer" as that term is defined in Rule 144A under the Securities Act of 1933, as amended ("Rule 144A") because Buyer is part of a Family of Investment Companies (as defined below), is such an officer of the Adviser.

2. In connection with purchases by Buyer, the Buyer is a "qualified institutional buyer" as defined in SEC Rule 144A because (i) the Buyer is an investment company registered under the Investment Company Act of 1940, as amended and (ii) as marked below, the Buyer alone, or the Buyer's Family of Investment Companies, owned at least $100,000,000 in securities (other than the excluded securities referred to below) as of the end of the Buyer's most recent fiscal year. For purposes of determining the amount of securities owned

by the Buyer or the Buyer's Family of Investment Companies, the cost of such
securities was used, except (i) where the Buyer or the Buyer's Family of
Investment Companies reports its securities holdings in its financial
statements on the basis of their market value, and (ii) no current information
with respect to the cost of those securities has been published. If clause
(ii) in the preceding sentence applies, the securities may be valued at
market.

    ____   The Buyer owned $_____ in securities (other than the excluded
securities referred to below) as of the end of the Buyer's
most recent fiscal year (such amount being calculated in
accordance with Rule 144A).

    ____   The Buyer is part of a Family of Investment Companies which
owned in the aggregate $_____ in securities (other than the
excluded securities referred to below) as of the end of the
Buyer's most recent fiscal year (such amount being calculated
in accordance with Rule 144A).

3. The term "Family of Investment Companies" as used herein means two
or more registered investment companies (or series thereof) that have the same
investment adviser or investment advisers that are affiliated (by virtue of
being majority owned subsidiaries of the same parent or because one investment
adviser is a majority owned subsidiary of the other).

               L-6

<PAGE>

4. The term "securities" as used herein does not include (i)
securities of issuers that are affiliated with the Buyer or are part of the
Buyer's Family of Investment Companies, (ii) securities issued or guaranteed
by the U.S. or any instrumentality thereof, (iii) bank deposit notes and
certificates of deposit, (iv) loan participations, (v) repurchase agreements,
(vi) securities owned but subject to a repurchase agreement and (vii)
currency, interest rate and commodity swaps.

5. The Buyer is familiar with Rule 144A and understands that the
parties listed in the Rule 144A Transferee Certificate to which this
certification relates are relying and will continue to rely on the statements
made herein because one or more sales to the Buyer will be in reliance on Rule
144A. In addition, the Buyer will only purchase for the Buyer's own account.

6. Until the date of purchase of the Certificates, the undersigned
will notify the parties listed in the Rule 144A Transferee Certificate to
which this certification relates of any changes in the information and
conclusions herein. Until such notice is given, the Buyer's purchase of the
Certificates will constitute a reaffirmation of this certification by the
undersigned as of the date of such purchase.

            _____
            Print Name of Buyer or Adviser

            By: _____
            Name:
            Title:

```
                              IF AN ADVISER:


                              _____
                                      Print Name of Buyer



                              Date: _____




                                     L-7
<PAGE>



                              EXHIBIT M

                           REQUEST FOR RELEASE
                              (for Trustee)

CWMBS, Inc.
Mortgage Pass-Through Certificates
Series 200_-_

Loan Information

         Name of Mortgagor:     _____

         Servicer Loan No.:     _____

Trustee

         Name:                  _____

         Address:               _____

                                _____

                                _____

         Trustee
         Mortgage File No.:      _____
```

        The undersigned Master Servicer hereby acknowledges that it has received from The Bank of New York, as Trustee for the Holders of Mortgage Pass-Through Certificates, of the above-referenced Series, the documents referred to below (the "Documents"). All capitalized terms not otherwise defined in this Request for Release shall have the meanings given them in the Pooling and Servicing Agreement (the "Pooling and Servicing Agreement") relating to the above-referenced Series among the Trustee, Countrywide Home Loans, Inc., as a Seller, Park Granada LLC, as a Seller, Park Monaco Inc., as a Seller, Park Sienna LLC, as a Seller, Countrywide Home Loans Servicing LP, as Master Servicer and CWMBS, Inc., as Depositor.

( ) Mortgage Note dated _____, 20__, in the original principal sum

of $_____, made by _____, payable to, or
endorsed to the order of, the Trustee.

( ) Mortgage recorded on _____ as instrument no.
_____ in the County Recorder's Office of the County of
_____, State of _____ in
book/reel/docket _____ of official records at
page/image _____.


                                    M-1
<PAGE>

( ) Deed of Trust recorded on _____ as instrument no.
_____ in the County Recorder's Office of the County of
_____, State of _____ in
book/reel/docket _____ of official records at
page/image _____.

( ) Assignment of Mortgage or Deed of Trust to the Trustee, recorded on
_____ as instrument no. _____ in the County
Recorder's Office of the County of _____, State of
_____ in book/reel/docket _____ of official
records at page/image

( ) Other documents, including any amendments, assignments or other
assumptions of the Mortgage Note or Mortgage.


    (   ) _____

    (   ) _____

    (   ) _____

    (   ) _____

    The undersigned Master Servicer hereby acknowledges and agrees as
follows:

    (1) The Master Servicer shall hold and retain possession of the
Documents in trust for the benefit of the Trustee, solely for the purposes
provided in the Agreement.

    (2) The Master Servicer shall not cause or knowingly permit the
Documents to become subject to, or encumbered by, any claim, liens,
security interest, charges, writs of attachment or other impositions nor
shall the Servicer assert or seek to assert any claims or rights of setoff
to or against the Documents or any proceeds thereof.

    (3) The Master Servicer shall return each and every Document
previously requested from the Mortgage File to the Trustee when the need
therefor no longer exists, unless the Mortgage Loan relating to the
Documents has been liquidated and the proceeds thereof have been remitted
to the Certificate Account and except as expressly provided in the
Agreement.

    (4) The Documents and any proceeds thereof, including any proceeds of

proceeds, coming into the possession or control of the Master Servicer
shall at all times be earmarked for the account of the Trustee, and the
Master Servicer shall keep the Documents and any proceeds separate and
distinct from all other property in the Master Servicer's possession,
custody or control.

<div align="center">M-2</div>

&lt;PAGE&gt;

<div align="center">COUNTRYWIDE HOME LOANS<br>SERVICING LP</div>

By
        ---------------------------------------

Its
        ---------------------------------------

Date:_____, 20___

<div align="center">M-3</div>

&lt;PAGE&gt;

<div align="center">EXHIBIT N

REQUEST FOR RELEASE OF DOCUMENTS</div>

To: The Bank of New York                Attn:  Mortgage Custody
                                           Services

     Re: The Pooling & Servicing Agreement dated [month] 1, 2005, among
         Countrywide Home Loans, Inc., as a Seller, Park Granada LLC, as a
         Seller, Park Monaco Inc., as a Seller, Park Sienna LLC, as a Seller,
         Countrywide Home Loans Servicing LP, as Master Servicer, CWMBS,
         Inc. and The Bank of New York, as Trustee
         -----------------------------------------------------------------

Ladies and Gentlemen:

       In connection with the administration of the Mortgage Loans held by
you as Trustee for CWMBS, Inc., we request the release of the Mortgage Loan
File for the Mortgage Loan(s) described below, for the reason indicated.

FT Account #:                                   Pool #:

Mortgagor's Name, Address and Zip Code:

Mortgage Loan Number:

Reason for Requesting Documents (check one)

      1.  Mortgage Loan paid in full (Countrywide Home Loans, Inc. hereby certifies that all amounts have been received).

      2.  Mortgage Loan Liquidated (Countrywide Home Loans, Inc. hereby certifies that all proceeds of foreclosure, insurance, or other liquidation have been finally received).

      3.  Mortgage Loan in Foreclosure.

      4.  Other (explain):

      If item 1 or 2 above is checked, and if all or part of the Mortgage File was previously released to us, please release to us our previous receipt on file with you, as well as any additional documents in your possession relating to the above-specified Mortgage Loan. If item 3 or 4 is checked, upon return of all of the above documents to you as Trustee, please acknowledge your receipt by signing in the space indicated below, and returning this form.

<div align="center">N-1</div>

<PAGE>

COUNTRYWIDE HOME LOANS, INC.
4500 Park Granada
Calabasas, California  91302


By:
   ---------------------------------------
Name:
   ---------------------------------------
Title:
   ---------------------------------------
Date:
   ---------------------------------------


TRUSTEE CONSENT TO RELEASE AND
ACKNOWLEDGEMENT OF RECEIPT


By:
   ---------------------------------------
Name:
   ---------------------------------------
Title:
   ---------------------------------------
Date:
   ---------------------------------------

<div align="center">N-2</div>

EXHIBIT O

STANDARD & POOR'S LEVELS(R) VERSION 5.6c GLOSSARY REVISED, APPENDIX E

APPENDIX E - Standard & Poor's Predatory Lending Categories
----------------------------------------------------------

        Standard & Poor's has categorized loans governed by anti-predatory
lending laws in the Jurisdictions listed below into three categories based
upon a combination of factors that include (a) the risk exposure associated
with the assignee liability and (b) the tests and thresholds set forth in
those laws. Note that certain loans classified by the relevant statute as
Covered are included in Standard & Poor's High Cost Loan Category because they
included thresholds and tests that are typical of what is generally considered
High Cost by the industry.

<TABLE>
<CAPTION>
Standard & Poor's High Cost Loan Categorization
-----------------------------------------------
--------------------------------------------------------------------------------
----------------

Category under
                                                                          ---
-----------

Applicable Anti-
                                                                          ----
-------------
     State/Jurisdiction          Name of Anti-Predatory Lending
Predatory Lending
     ------------------          ------------------------------          ----
-------------
                                      Law/Effective Date
Law
                                      ------------------
---
--------------------------------------------------------------------------------
----------------
<S>                              <C>
<C>
Arkansas                         Arkansas Home Loan Protection Act, Ark.
High Cost Home Loan
                                 Code Ann. ss.ss. 23-53-101 et seq.

                                 Effective July 16, 2003
--------------------------------------------------------------------------------
----------------
Cleveland Heights, OH            Ordinance No. 72-2003 (PSH), Mun. Code ss.ss.
Covered Loan
                                 757.01 et seq.

                                 Effective June 2, 2003

--------------------------------------------------------------------------------
----------------

| | |
|---|---|
| Colorado Covered Loan | Consumer Equity Protection, Colo. Stat. Ann. ss.ss. 5-3.5-101 et seq. |
| | Effective for covered loans offered or entered into on or after January 1, 2003. Other provisions of the Act took effect on June 7, 2002 |

--------------------------------------------------------------------------------
----------------

| | | |
|---|---|---|
| Connecticut Cost Home Loan | Connecticut Abusive Home Loan Lending Practices Act, Conn. Gen. Stat ss.ss. 36a-746 et seq. | High |
| | Effective October 1, 2001 | |

--------------------------------------------------------------------------------
----------------

| | |
|---|---|
| District of Columbia Covered Loan | Home Loan Protection Act, D.C. Code ss.ss. 26-1151.01 et seq. |
| | Effective for loans closed on or after January 28, 2003 |

--------------------------------------------------------------------------------
----------------

O-1

<PAGE>
Standard & Poor's High Cost Loan Categorization
-------------------------------------------------------

--------------------------------------------------------------------------------
----------------

Category under
                                                                        ---
-----------

Applicable Anti-
                                                                        ----
-------------
    State/Jurisdiction          Name of Anti-Predatory Lending
Predatory Lending
    ------------------          ------------------------------          ----
-------------
                                     Law/Effective Date
Law
                                -------------------
---
--------------------------------------------------------------------------------
----------------

| | | |
|---|---|---|
| Florida Cost Home Loan | Fair Lending Act, Fla. Stat. Ann. ss.ss. 494.0078 et seq. | High |

```
                          Effective October 2, 2002
-------------------------------------------------------------------------
-----------------
Georgia (Oct. 1, 2002 -   Georgia Fair Lending Act, Ga. Code          High
Cost Home Loan
Mar. 6, 2003)             Ann. ss.ss. 7-6A-1 et seq.

                          Effective October 1, 2002 - March 6, 2003
-------------------------------------------------------------------------
-----------------
Georgia as amended (Mar.  Georgia Fair Lending Act, Ga. Code          High
Cost Home Loan
7, 2003 - current)        Ann. ss.ss. 7-6A-1 et seq.

                          Effective for loans closed on or after
                          March 7, 2003
-------------------------------------------------------------------------
-----------------
HOEPA Section 32          Home Ownership and Equity Protection        High
Cost Loan
                          Act of 1994, 15 U.S.C. ss. 1639, 12
                          C.F.R. ss.ss. 226.32 and 226.34

                          Effective October 1, 1995, amendments
                          October 1, 2002
-------------------------------------------------------------------------
-----------------
Illinois                  High Risk Home Loan Act, Ill. Comp.         High
Risk Home Loan
                          Stat. tit. 815, ss.ss. 137/5 et seq.

                          Effective January 1, 2004 (prior to this
                          date, regulations under Residential
                          Mortgage License Act effective from May
                          14, 2001)
-------------------------------------------------------------------------
-----------------
Kansas                    Consumer Credit Code, Kan. Stat. Ann.       High
Loan to Value
                          ss.ss. 16a-1-101 et seq.
Consumer Loan (id. ss.
                                                                      16a-
3-207) and;
                          Sections 16a-1-301 and 16a-3-207            ----
------------------
                          became effective April 14, 1999;           High
APR Consumer Loan
                          Section 16a-3-308a became effective July    (id.
ss. 16a-3-308a)
                          1, 1999
-------------------------------------------------------------------------
-----------------
Kentucky                  2003 KY H.B. 287 - High Cost Home Loan      High
Cost Home Loan
                          Act, Ky. Rev. Stat. ss.ss. 360.100 et seq.
```

Effective June 24, 2003

```
-------------------------------------------------------------------------------
----------------
```

O-2

```
<PAGE>
```
Standard & Poor's High Cost Loan Categorization
```
----------------------------------------------
-------------------------------------------------------------------------------
----------------
```

Category under
                                                                    ---
```
-----------
```

Applicable Anti-
                                                                    ----
```
-------------
```
     State/Jurisdiction          Name of Anti-Predatory Lending
Predatory Lending
```
     ------------------          -----------------------------      ----
-------------
```
                                 Law/Effective Date
Law
                                 ------------------
---
```
-------------------------------------------------------------------------------
----------------
```
Maine                            Truth in Lending, Me. Rev. Stat. tit. 9     High
Rate High Fee
                                 A, ss.ss. 8-101 et seq.
Mortgage

                                 Effective September 29, 1995 and as
                                 amended from time to time
```
-------------------------------------------------------------------------------
----------------
```
Massachusetts                    Part 40 and Part 32, 209 C.M.R. ss.ss.     High
Cost Home Loan
                                 32.00 et seq. and 209 C.M.R. ss.ss. 40.01
                                 et seq.

                                 Effective March 22, 2001 and amended
                                 from time to time
```
-------------------------------------------------------------------------------
----------------
```
Nevada                           Assembly Bill No. 284, Nev. Rev. Stat.     Home
Loan
                                 ss.ss. 598D.010 et seq.

                                 Effective October 1, 2003
```
-------------------------------------------------------------------------------
----------------
```
New Jersey                       New Jersey Home Ownership Security Act of   High
Cost Home Loan
                                 2002, N.J. Rev. Stat. ss.ss. 46:10B  22 et

```
                               seq.

                               Effective for loans closed on or after
                               November 27, 2003
-------------------------------------------------------------------------------
----------------
New Mexico                     Home Loan Protection Act, N.M. Rev. Stat.      High
Cost Home Loan
                               ss.ss. 58-21A-1 et seq.

                               Effective as of January 1, 2004; Revised
                               as of February 26, 2004
-------------------------------------------------------------------------------
----------------
New York                       N.Y. Banking Law Article 6-l                  High
Cost Home Loan

                               Effective for applications made on or
                               after April 1, 2003
-------------------------------------------------------------------------------
----------------
North Carolina                 Restrictions and Limitations on High Cost     High
Cost Home Loan
                               Home Loans, N.C. Gen. Stat. ss.ss. 24-1.1E et
                               seq.

                               Effective July 1, 2000; amended October
                               1, 2003 (adding open-end lines of credit)
-------------------------------------------------------------------------------
----------------
Ohio                           H.B. 386 (codified in various sections of
Covered Loan
                               the Ohio Code), Ohio Rev. Code Ann.
-------------------------------------------------------------------------------
----------------

                                   O-3


<PAGE>
Standard & Poor's High Cost Loan Categorization
------------------------------------------------
-------------------------------------------------------------------------------
----------------

Category under
                                                                             -----
---------

Applicable Anti-
                                                                            ------
-----------
      State/Jurisdiction       Name of Anti-Predatory Lending
Predatory Lending
      ------------------        ------------------------------              ------
-----------
                                  Law/Effective Date
```

```
                              ------------------
---
-----------------------------------------------------------------------------
----------------
                              ss.ss. 1349.25 et seq.

                              Effective May 24, 2002
-----------------------------------------------------------------------------
----------------
Oklahoma                      Consumer Credit Code (codified in various
Subsection 10 Mortgage
                              sections of Title 14A)

                              Effective July 1, 2000; amended effective
                              January 1, 2004
-----------------------------------------------------------------------------
----------------
South Carolina                South Carolina High Cost and Consumer      High
Cost Home Loan
                              Home Loans Act, S.C. Code
                              Ann. ss.ss. 37-23-10 et seq.

                              Effective for loans taken on or after
                              January 1, 2004
-----------------------------------------------------------------------------
----------------
 West Virginia                West Virginia Residential Mortgage         West
Virginia Mortgage
                              Lender, Broker and Servicer Act, W. Va.     Loan
Act Loan
                              Code Ann. ss.ss. 31-17-1 et seq.

                              Effective June 5, 2002
-----------------------------------------------------------------------------
----------------

Standard & Poor's Covered Loan Categorization
---------------------------------------------
-----------------------------------------------------------------------------
----------------

Category under
                                                                         -----

---------

Applicable Anti-
                                                                         ------

-----------
     State/Jurisdiction       Name of Anti-Predatory Lending
Predatory Lending
     ------------------        -----------------------------            ------
-----------
                                    Law/Effective Date
Law
                              ------------------
---
```

```
--------------------------------------------------------------------------------
----------------
Georgia (Oct. 1, 2002 -      Georgia Fair Lending Act, Ga. Code
Covered Loan
Mar. 6, 2003)                Ann. ss.ss. 7-6A-1 et seq.

                             Effective October 1, 2002 - March 6, 2003
--------------------------------------------------------------------------------
----------------
New Jersey                   New Jersey Home Ownership Security Act of
Covered Home Loan
                             2002, N.J. Rev. Stat. ss.ss. 46:10B
                             22 et seq. Effective November 27, 2003 -
                             July 5, 2004
--------------------------------------------------------------------------------
----------------

Standard & Poor's Home Loan Categorization
-------------------------------------------
--------------------------------------------------------------------------------
----------------
```

                                    O-4

    <PAGE>

```
--------------------------------------------------------------------------------
----------------

Category under
                                                                          -----
----------

Applicable Anti-
                                                                          ------
-----------
    State/Jurisdiction        Name of Anti-Predatory Lending
Predatory Lending
    ------------------        ------------------------------            ------
-----------
                                   Law/Effective Date
Law
                                   ------------------
---
--------------------------------------------------------------------------------
----------------
Georgia (Oct. 1, 2002 -      Georgia Fair Lending Act, Ga. Code Ann. ss.ss.   Home
Loan
Mar. 6, 2003)                7-6A-1 et seq.

                             Effective October 1, 2002 - March 6, 2003
--------------------------------------------------------------------------------
----------------
New Jersey                   New Jersey Home Ownership Security            Home
Loan
                             Act of 2002, N.J. Rev. Stat. ss.ss. 46:10B 22
                             et seq.
```

```
                              Effective for loans closed on or after
                              November 27, 2003
--------------------------------------------------------------------------------
----------------
New Mexico                    Home Loan Protection Act, N.M. Rev.Stat.        Home
Loan
                              ss.ss. 58-21A-1 et seq.

                              Effective as of January 1, 2004; Revised
                              as of February 26, 2004
--------------------------------------------------------------------------------
----------------
North Carolina                Restrictions and Limitations on High Cost
Consumer Home Loan
                              Home Loans, N.C. Gen. Stat. ss.ss. 24-1.1E et
                              seq.

                              Effective July 1, 2000; amended October 1, 2003
                              (adding open-end lines of credit)
--------------------------------------------------------------------------------
----------------
South Carolina                South Carolina High Cost and Consumer Home
Consumer Home Loan
                              Loans Act, S.C. Code
                              Ann. ss.ss. 37-23-10 et seq.

                              Effective for loans taken on or after
                              January 1, 2004
--------------------------------------------------------------------------------
----------------
</TABLE>


                                      O-5
<PAGE>



                                  EXHIBIT P

                                 [RESERVED]




                                     P-1
   <PAGE>



                                  EXHIBIT Q


                                MONTHLY REPORT
```

&lt;PAGE&gt;

EXHIBIT R-1

FORM OF PERFORMANCE CERTIFICATION
(Subservicer)

Re:     The Pooling and Servicing Agreement dated as of [_____]
        (the "Pooling and Servicing Agreement") among CWMBS, Inc., as
        Depositor, Countrywide Home Loans, Inc., as a Seller, Park
        Monaco Inc., as a Seller, Park Sienna LLC, as a Seller,
        Countrywide Home Loans Servicing LP, as Master Servicer, the
        undersigned, as Trustee and [Subservicing Agreement] dated as
        of [ ] (the "Agreement")

        I, _____, the _____ of
[NAME OF COMPANY] (the "Company"), certify to the Depositor and the Master
Servicer, and their officers, with the knowledge and intent that they will
rely upon this certification, that:

        (1) I have reviewed the servicer compliance statement of the
Company provided in accordance with Item 1123 of Regulation AB (the
"Compliance Statement"), the report on assessment of the Company's
compliance with the servicing criteria set forth in Item 1122(d) of
Regulation AB (the "Servicing Criteria"), provided in accordance with
Rules 13a-18 and 15d-18 under Securities Exchange Act of 1934, as
amended (the "Exchange Act") and Item 1122 of Regulation AB (the
"Servicing Assessment"), the registered public accounting firm's
attestation report provided in accordance with Rules 13a-18 and 15d-18
under the Exchange Act and Section 1122(b) of Regulation AB (the
"Attestation Report"), all servicing reports, officer's certificates
and other information relating to the servicing of the Mortgage Loans
by the Company during 200[ ] that were delivered by the Company to the
Depositor, the Master Servicer or the Trustee pursuant to the
Agreement (collectively, the "Company Servicing Information");

        (2) Based on my knowledge, the Company Servicing Information,
taken as a whole, does not contain any untrue statement of a material
fact or omit to state a material fact necessary to make the statements
made, in the light of the circumstances under which such statements
were made, not misleading with respect to the period of time covered
by the Company Servicing Information;

        (3) Based on my knowledge, all of the Company Servicing
Information required to be provided by the Company under the Agreement
has been provided to the Depositor, the Master Servicer or the
Trustee, as applicable;

        (4) I am responsible for reviewing the activities performed by
the Company as a servicer under the Agreement, and based on my
knowledge and the compliance review conducted in preparing the
Compliance Statement and except as disclosed in the Compliance
Statement, the Servicing Assessment or the Attestation Report, the
Company has fulfilled its obligations under the Agreement in all

material respects; and

R-1-1

<PAGE>

          (5) The Compliance Statement required to be delivered by the
Company pursuant to the Agreement, and the Servicing Assessment and
Attestation Report required to be provided by the Company and by any
Subservicer or Subcontractor pursuant to the Agreement, have been
provided to the Master Servicer. Any material instances of
noncompliance described in such reports have been disclosed to the
Master Servicer. Any material instance of noncompliance with the
Servicing Criteria has been disclosed in such reports.


                         Date:  _____


                         By:  _____
                         Name:
                         Title:


                         R-1-2

<PAGE>

                    EXHIBIT R-2

          FORM OF PERFORMANCE CERTIFICATION
                    (Trustee)

     Re:     The Pooling and Servicing Agreement dated as of [_____],
             (the "Pooling and Servicing Agreement") among CWMBS, Inc., as
             Depositor, Countrywide Home Loans, Inc., as a Seller, Park
             Monaco Inc., as a Seller, Park Sienna LLC, as a Seller,
             Countrywide Home Loans Servicing LP, as Master Servicer, the
             undersigned, as Trustee

     I, _____, the _____ of
[NAME OF COMPANY] (the "Company"), certify to the Depositor and the Master
Servicer, and their officers, with the knowledge and intent that they will
rely upon this certification, that:

          (1) I have reviewed the report on assessment of the Company's
          compliance with the servicing criteria set forth in Item 1122(d) of
          Regulation AB (the "Servicing Criteria"), provided in accordance with
          Rules 13a-18 and 15d-18 under Securities Exchange Act of 1934, as
          amended (the "Exchange Act") and Item 1122 of Regulation AB (the
          "Servicing Assessment"), the registered public accounting firm's
          attestation report provided in accordance with Rules 13a-18 and 15d-18
          under the Exchange Act and Section 1122(b) of Regulation AB (the

"Attestation Report"), [all reports on Form 10-D containing statements
to certificateholders filed in respect of the period included in the
year covered by the annual report of the Trust Fund] (collectively,
the "Distribution Date Statements");

   (2) Assuming the accuracy and completeness of the information
delivered to the Company by the Master Servicer as provided in the
Pooling and Servicing Agreement and subject to paragraph (4) below,
the distribution information determined by the Company and set forth
in the Distribution Date Statements contained in all Form 10-D's
included in the year covered by the annual report of such Trust on
Form 10-K for the calendar year 200[ ], is complete and does not
contain any material misstatement of fact as of the last day of the
period covered by such annual report;

   (3) Based solely on the information delivered to the Company by
the Master Servicer as provided in the Pooling and Servicing
Agreement, (i) the distribution information required under the Pooling
and Servicing Agreement to be contained in the Trust Fund's
Distribution Date Statements and (ii) the servicing information
required to be provided by the Master Servicer to the trustee for
inclusion in the Trust Fund's Distribution Date Statements, to the
extent received by the Trustee from the Master Servicer in accordance
with the Pooling and Servicing Agreement, is included in such
Distribution Date Statements;

   (4) The Company is not certifying as to the accuracy,
completeness or correctness of the information which it received from
the Master Servicer and did not

                          R-2-1


<PAGE>

   independently verify or confirm the accuracy, completeness or
correctness of the information provided by the Master Servicer;

   (5) I am responsible for reviewing the activities performed by
the Company as a person "performing a servicing function" under the
Pooling and Servicing Agreement, and based on my knowledge and the
compliance review conducted in preparing the Servicing Assessment and
except as disclosed in the Servicing Assessment or the Attestation
Report, the Company has fulfilled its obligations under the Pooling
and Servicing Agreement; and

   (6) The Servicing Assessment and Attestation Report required to
be provided by the Company and by Subcontractor pursuant to the
Pooling and Servicing Agreement, have been provided to the Master
Servicer and the Depositor. Any material instances of noncompliance
described in such reports have been disclosed to the Master Servicer
and the Depositor. Any material instance of noncompliance with the
Servicing Criteria has been disclosed in such reports.

                  Date: _____

```
                          By:  _____
                          Name:
                          Title:


                                   R-2-2

<PAGE>


                                EXHIBIT S

                                FORM OF
                SERVICING CRITERIA TO BE ADDRESSED IN
                  ASSESSMENT OF COMPLIANCE STATEMENT

            The assessment of compliance to be delivered by [the Master
Servicer] [Trustee] [Name of Subservicer] shall address, at a minimum, the
criteria identified as below as "Applicable Servicing Criteria":

<TABLE>
<CAPTION>
-----------------------------------------------------------------------------
-------------------

Applicable
                          Servicing Criteria
Servicing Criteria
-----------------------------------------------------------------------------
-------------------
   Reference                            Criteria
-----------------------------------------------------------------------------
-------------------
<S>                    <C>
<C>
                       General Servicing Considerations


-----------------
-------------------
1122(d)(1)(i)      Policies and procedures are instituted to monitor any
                   performance or other triggers and events of default in
                   accordance with the transaction agreements.
-----------------
-------------------
1122(d)(1)(ii)     If any material servicing activities are outsourced to third
                   parties, policies and procedures are instituted to monitor
                   the third party's performance and compliance with such
                   servicing activities.
-----------------
-------------------
1122(d)(1)(iii)    Any requirements in the transaction agreements to maintain a
                   back-up servicer for the mortgage loans are maintained.
-----------------
```

```
------------------
------------------
1122(d)(1)(iv)     A fidelity bond and errors and omissions policy is in effect
                   on the party participating in the servicing function
                   throughout the reporting period in the amount of coverage
                   required by and otherwise in accordance with the terms of
                   the transaction agreements.
------------------
------------------

                        Cash Collection and Administration
------------------
------------------
1122(d)(2)(i)      Payments on mortgage loans are deposited into the
                   appropriate custodial bank accounts and related bank
                   clearing accounts no more than two business days following
                   receipt, or such other number of days specified in the
                   transaction agreements.
------------------
------------------
1122(d)(2)(ii)     Disbursements made via wire transfer on behalf of an obligor
                   or to an investor are made only by authorized personnel.
------------------
------------------
1122(d)(2)(iii)    Advances of funds or guarantees regarding collections, cash
                   flows or distributions, and any interest or other fees
                   charged for such advances, are made, reviewed and approved
                   as specified in the transaction agreements.
------------------
------------------
                   The related accounts for the transaction, such as cash
                   reserve accounts or accounts established as a form of
                   overcollateralization, are separately maintained (e.g., with
                   respect to commingling of cash) as set
1122(d)(2)(iv)     forth in the transaction agreements.
------------------
------------------
1122(d)(2)(v)      Each custodial account is maintained at a federally insured
                   depository institution as set forth in the transaction
                   agreements. For purposes of this criterion, "federally
                   insured depository institution" with respect to a foreign
                   financial institution means a foreign financial institution
                   that meets the requirements of Rule 13k-1(b)(1) of the
                   Securities Exchange Act.
------------------
------------------
1122(d)(2)(vi)     Unissued checks are safeguarded so as to prevent
                   unauthorized access.
------------------
------------------




                                  S-1


<PAGE>
--------------------------------------------------------------------------------
--------------------


Applicable
```

Servicing Criteria

Servicing Criteria

------------------------------------------------------------------------------------
--------------------

| Reference | Criteria |

------------------------------------------------------------------------------------
--------------------

1122(d)(2)(vii)     Reconciliations are prepared on a monthly basis for all
                    asset-backed securities related bank accounts, including
                    custodial accounts and related bank clearing accounts. These
                    reconciliations are (A) mathematically accurate; (B)
                    prepared within 30 calendar days after the bank statement
                    cutoff date, or such other number of days specified in the
                    transaction agreements; (C) reviewed and approved by someone
                    other than the person who prepared the reconciliation; and
                    (D) contain explanations for reconciling items. These
                    reconciling items are resolved within 90 calendar days of
                    their original identification, or such other number of days
                    specified in the transaction agreements.

------------------
------------------

Investor Remittances and Reporting

------------------
------------------

1122(d)(3)(i)       Reports to investors, including those to be filed with the
                    Commission, are maintained in accordance with the
                    transaction agreements and applicable Commission
                    requirements. Specifically, such reports (A) are prepared in
                    accordance with timeframes and other terms set forth in the
                    transaction agreements; (B) provide information calculated
                    in accordance with the terms specified in the transaction
                    agreements; (C) are filed with the Commission as required by
                    its rules and regulations; and (D) agree with investors' or
                    the trustee's records as to the total unpaid principal
                    balance and number of mortgage loans serviced by the
                    Servicer.

------------------
------------------

1122(d)(3)(ii)      Amounts due to investors are allocated and remitted in
                    accordance with timeframes, distribution priority and other
                    terms set forth in the transaction agreements.

------------------
------------------

                    Disbursements made to an investor are posted within two
                    business days to the Servicer's investor records, or such
                    other number of days specified in the
1122(d)(3)(iii)     transaction agreements.

------------------
------------------

                    Amounts remitted to investors per the investor reports agree
                    with cancelled checks, or other form of payment,
1122(d)(3)(iv)      or custodial bank statements.

------------------
------------------

Pool Asset Administration

------------------
------------------

1122(d)(4)(i)      Collateral or security on mortgage loans is maintained as
                   required by the transaction agreements or related mortgage
                   loan documents.

-----------------
-----------------
                   Mortgage loan and related documents are safeguarded as
1122(d)(4)(ii)     required by the transaction agreements.

-----------------
-----------------
1122(d)(4)(iii)    Any additions, removals or substitutions to the asset pool
                   are made, reviewed and approved in accordance with any
                   conditions or requirements in the transaction agreements.

-----------------
-----------------
1122(d)(4)(iv)     Payments on mortgage loans, including any payoffs, made in
                   accordance with the related mortgage loan documents are
                   posted to the Servicer's obligor records maintained no more
                   than two business days after receipt, or such other number
                   of days specified in the transaction agreements, and
                   allocated to principal, interest or other items (e.g.,
                   escrow) in accordance with the related mortgage loan
                   documents.

-----------------
-----------------
1122(d)(4)(v)      The Servicer's records regarding the mortgage loans agree
                   with the Servicer's records with respect to an obligor's
                   unpaid principal balance.

-----------------
-----------------
1122(d)(4)(vi)     Changes with respect to the terms or status of an obligor's
                   mortgage loans (e.g., loan modifications or re-agings) are
                   made, reviewed and approved by authorized personnel in
                   accordance with the transaction agreements and related pool
                   asset documents.

-----------------
-----------------


                                      S-2


--------------------------------------------------------------------------------
-------------------


Applicable
                           Servicing Criteria
Servicing Criteria
--------------------------------------------------------------------------------
-------------------
    Reference                               Criteria
--------------------------------------------------------------------------------
-------------------
1122(d)(4)(vii)    Loss mitigation or recovery actions (e.g., forbearance
                   plans, modifications and deeds in lieu of foreclosure,
                   foreclosures and repossessions, as applicable) are
                   initiated, conducted and concluded in accordance with the
                   timeframes or other requirements established by the
                   transaction agreements.

-----------------

------------------
------------------

1122(d)(4)(viii)    Records documenting collection efforts are maintained during
                    the period a mortgage loan is delinquent in accordance with
                    the transaction agreements. Such records are maintained on
                    at least a monthly basis, or such other period specified in
                    the transaction agreements, and describe the entity's
                    activities in monitoring delinquent mortgage loans
                    including, for example, phone calls, letters and payment
                    rescheduling plans in cases where delinquency is deemed
                    temporary (e.g., illness or unemployment).

------------------
------------------

1122(d)(4)(ix)      Adjustments to interest rates or rates of return for
                    mortgage loans with variable rates are computed based on the
                    related mortgage loan documents.

------------------
------------------

1122(d)(4)(x)       Regarding any funds held in trust for an obligor (such as
                    escrow accounts): (A) such funds are analyzed, in accordance
                    with the obligor's mortgage loan documents, on at least an
                    annual basis, or such other period specified in the
                    transaction agreements; (B) interest on such funds is paid,
                    or credited, to obligors in accordance with applicable
                    mortgage loan documents and state laws; and (C) such funds
                    are returned to the obligor within 30 calendar days of full
                    repayment of the related mortgage loans, or such other
                    number of days specified in the transaction agreements.

------------------
------------------

1122(d)(4)(xi)      Payments made on behalf of an obligor (such as tax or
                    insurance payments) are made on or before the related
                    penalty or expiration dates, as indicated on the appropriate
                    bills or notices for such payments, provided that such
                    support has been received by the servicer at least 30
                    calendar days prior to these dates, or such other number of
                    days specified in the transaction agreements.

------------------
------------------

1122(d)(4)(xii)     Any late payment penalties in connection with any payment to
                    be made on behalf of an obligor are paid from the servicer's
                    funds and not charged to the obligor, unless the late
                    payment was due to the obligor's error or omission.

------------------
------------------

                    Disbursements made on behalf of an obligor are posted within
                    two business days to the obligor's records maintained by the
                    servicer, or such other number of
1122(d)(4)(xiii)    days specified in the transaction agreements.

------------------
------------------

1122(d)(4)(xiv)     Delinquencies, charge-offs and uncollectible accounts are
                    recognized and recorded in accordance with the transaction
                    agreements.

------------------
------------------

                    Any external enhancement or other support, identified in
                    Item 1114(a)(1) through (3) or Item 1115 of Regulation AB,

```
                        is maintained as set forth in the
1122(d)(4)(xv)    transaction agreements.
------------------
------------------
--------------------------------------------------------------------------------
------------------
</TABLE>



                        [NAME OF MASTER SERVICER] [NAME OF TRUSTEE] [NAME
                        OF SUBSERVICER]


                        Date: _____


                              S-3

<PAGE>

                        By: _____
                        Name:
                        Title:


                              S-4

<PAGE>

                        EXHIBIT T

              [FORM OF] LIST OF ITEM 1119 PARTIES


                  MORTGAGE PASS-THROUGH CERTIFICATES,
                          Series 200_-___

                              [Date]

--------------------------------------------------------------------------------
Party                         Contact Information
--------------------------------------------------------------------------------
--------------------------------------------------------------------------------
--------------------------------------------------------------------------------
--------------------------------------------------------------------------------
--------------------------------------------------------------------------------
--------------------------------------------------------------------------------
--------------------------------------------------------------------------------
--------------------------------------------------------------------------------
--------------------------------------------------------------------------------
--------------------------------------------------------------------------------


                              T-1
```

<PAGE>

EXHIBIT U

FORM OF SARBANES-OXLEY CERTIFICATION
(Replacement of Master Servicer)

Re:    CWMBS, Inc. Mortgage Pass-Through Certificates Series 2006-HYB1
       --------------------------------------------------------------

        The undersigned Servicer hereby certifies to the Depositor and its
officers, directors and Affiliates (collectively, the "Certification Parties")
as follows, with the knowledge and intent that the Certification Parties will
rely on this Certification in connection with the certification concerning the
Trust Fund to be signed by an officer of the Depositor and submitted to the
Securities and Exchange Commission pursuant to the Sarbanes-Oxley Act of 2002:

        1. I have reviewed the servicer compliance statement of the Master
Servicer provided in accordance with Item 1123 of Regulation AB (the
"Compliance Statement"), the report on assessment of the Servicer's compliance
with the servicing criteria set forth in Item 1122(d) of Regulation AB (the
"Servicing Criteria"), provided in accordance with Rules 13a-18 and 15d-18
under Securities Exchange Act of 1934, as amended (the "Exchange Act") and
Item 1122 of Regulation AB (the "Servicing Assessment"), the registered public
accounting firm's attestation report provided in accordance with Rules 13a-18
and 15d-18 under the Exchange Act and Section 1122(b) of Regulation AB (the
"Attestation Report"), and all servicing reports, officer's certificates and
other information relating to the servicing of the Mortgage Loans by the
Master Servicer during 200[ ] that were delivered by the Master Servicer to
the Trustee pursuant to the Agreement (collectively, the "Servicing
Information");

        2. Based on my knowledge, the Servicing Information, taken as a whole,
does not contain any untrue statement of a material fact or omit to state a
material fact necessary to make the statements made, in the light of the
circumstances under which such statements were made, not misleading with
respect to the period of time covered by the Servicing Information;

        3. Based on my knowledge, all of the Servicing Information required to
be provided by the Master Servicer under the Agreement has been provided to
the Depositor or the Trustee, as applicable;

        4. I am responsible for reviewing the activities performed by the
Master Servicer as servicer under the Servicing Agreement (the "Pooling and
Servicing Agreement") relating to the above-referenced Series, among
Countrywide Home Loans, Inc., as a seller, Park Granada LLC, as a seller, Park
Sienna LLC, as a seller, Park Monaco Inc., as a seller, [ ], as master
servicer, CWMBS, Inc., as depositor, and The Bank of New York, as trustee, and
based on my knowledge and the compliance review conducted in preparing the
Compliance Statement and except as disclosed in the Compliance Statement, the
Pooling and Servicing Assessment or the

U-1

<PAGE>

Attestation Report, the Master Servicer has fulfilled its obligations under
the Agreement in all material respects; and

        5. The Compliance Statement required to be delivered by the Master
Servicer pursuant to the Pooling and Agreement, and the Servicing Assessment
and Attestation Report required to be provided by the Master Servicer and by
any Subservicer or Reporting Subcontractor pursuant to the Agreement, have
been provided to the Depositor. Any material instances of noncompliance
described in such reports have been disclosed to the Depositor. Any material
instance of noncompliance with the Servicing Criteria has been disclosed in
such reports.

                            [MASTER SERVICER]

                            By:_____
                                Name:
                                Title:
                            Date:  _____

</TEXT>
</DOCUMENT>

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "8"

THE ADVOCATES' LAW FIRM, LLP
www.theadvocateslaw.com

**FIRST AMENDED COMPLAINT**

The various Michelle I. Miller signatures.  The final signature is the signature in utilized in Exhibit

4 in this case.

| | |
|---|---|
|  | Image from First document of Exhibit 9 |
|  | Image from Second document of Exhibit 9 |
|  | Image from Third document of Exhibit 9 |
|  | Image from Fourth document of Exhibit 9 |
|  | Image from Fifth document of Exhibit 9 |
|  | Image from Sixth document of Exhibit 9 |
|  | Image from Seventh document of Exhibit 9 |
|  | Image from Eighth document of Exhibit 9 |

| | | Image from Ninth document of Exhibit 9 |
|---|---|---|
| _(signature)_ (Seal) MICHELLE I. MILLER | MICHELLE I. MILLER COMM. #1836833 Notary Public - California Los Angeles County My Comm. Expires Feb. 16, 2013 | |
| <span style="color:red">Miller signature in this case below.</span> | | |
| ure _(signature)_ (Seal) MICHELLE I. MILLER | MICHELLE I. MILLER COMM. #1836833 Notary Public - California Los Angeles County My Comm. Expires Feb. 15, 2013 | Image from Tenth document of Exhibit 9 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

THE ADVOCATES' LAW FIRM, LLP
www.theadvocateslaw.com

# EXHIBIT "9"

**FIRST AMENDED COMPLAINT**

**FILED**

MAR 04 2009

~~W. C. Logan~~ COUNTY CLERK

~~E.A. Peluariño~~ DEPUTY

Michelle I Miller
22931 Austin St
Woodland Hills. CA. 91364

*Attached Power of Attorney*



03/04/2009

*20096304884*



## Merchants Bonding Company

2100 FLEUR DRIVE • DES MOINES, IOWA 50321-1158
(877) 349-6598 • (877) 349-6590 FAX

### NOTARY PUBLIC BOND

| | |
|---|---|
| Bond No | NRI-CA7046 |
| Premium | $38.00 |

**KNOW ALL PERSONS BY THESE PRESENTS**

That we _____ MICHELLE I MILLER _____, as Principal, and MERCHANTS BONDING COMPANY (MUTUAL), a corporation duly licensed to do business in the State of California, as Surety, are held and firmly bound unto the State of California, in the sum of Fifteen Thousand ($15,000) Dollars, lawful money of the United States of America, to be paid to the said State of California, or its assigns, for which payment, well and truly to be made, we bind ourselves and our legal representatives, jointly and severally, firmly by these presents

THE CONDITION OF THE ABOVE OBLIGATION IS SUCH, That whereas, the Principal was on the ___16th___ day of _____ February _____, 20 09, duly appointed a Notary Public in the State of California for the term of four years from the date of his/her commission

NOW THEREFORE, if the Principal shall well, truly and faithfully perform all official duties required of him/her by law, and all such additional duties as may hereafter be imposed on him/her as such officer by any law of the State of California, then the above obligation to be void, otherwise to remain in full force and effect

Any proceeding under this bond may be instituted in any court of competent jurisdiction in the State of California

Signed and dated this ___25th___ day of _____ February _____ 2009

By _Michelle I Miller_
MICHELLE I MILLER                    Principal

**MERCHANTS BONDING COMPANY (MUTUAL)**

(Executed under penalty of perjury
as provided in C C P 995-630b)

STATE OF ___IOWA___

County of ___Polk___

By _Grif Shoemaker_
Grif Shoemaker            Attorney-In-Fact

### CERTIFICATE OF ACKNOWLEDGMENT

On ___02/25/2009___ before me, ___Traci Klein Shoemaker___, Notary Public, personally appeared ___Grif Shoemaker___ who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct

WITNESS my hand and official seal

TRACI KLEIN SHOEMAKER
Commission Number 711129
My Commission Expires
July 8, 2010

_Traci Klein Shoemaker_
Traci Klein Shoemaker        Notary Public

NEO 0601 CA (12/07)

RECORDING REQUESTED BY AND MAIL TO :
NAME  *Michelle L. Miller*
STREET *23321 Mulholland Dr #344*
CITY *Woodland Hills, CA. 91367*

# FILED

AUG 2 6 2010

DEAN C. LOGAN, COUNTY CLERK

_____ DEPUTY

Alda M. Zeitounian

*20101195957*

08/26/2010

## MERCHANTS
### BONDING COMPANY

**NOTARY PUBLIC BOND**

2100 FLEUR DRIVE • DES MOINES, IOWA 50321-1158
(877) 349-8558 • (877) 349-8590 FAX

Bond No. __NRJ-CA7046__
Premium __$38.00__

**KNOW ALL PERSONS BY THESE PRESENTS:**

That we _____ M. I. MILLER _____, as Principal, and MERCHANTS BONDING COMPANY (MUTUAL), a corporation duly licensed to do business in the State of California, as Surety, are held and firmly bound unto the State of California, in the sum of Fifteen Thousand ($15,000) Dollars, lawful money of the United States of America, to be paid to the said State of California, or its assigns, for which payment, well and truly to be made, we bind ourselves and our legal representatives, jointly and severally, firmly by these presents.

THE CONDITION OF THE ABOVE OBLIGATION IS SUCH, That whereas, the Principal was on the __16th__ day of _____ February _____, 20 09 , duly appointed a Notary Public in the State of California for the term of four years from the date of his/her commission.

NOW THEREFORE, if the Principal shall well, truly and faithfully perform all official duties required of him/her by law, and all such additional duties as may hereafter be imposed on him/her as such officer by any law of the State of California, then the above obligation to be void, otherwise to remain in full force and effect.

Any proceeding under this bond may be instituted in any court of competent jurisdiction in the State of California.

Signed and dated this __17th__ day of _____ August _____ 2010

By _M. I. Miller_ _____ Principal
M. I. MILLER

**MERCHANTS BONDING COMPANY (MUTUAL)**

By _____ Attorney-In-Fact
Grif Shoemaker

(Executed under penalty of perjury
as provided in C.C.P. 995-630b)

STATE OF __IOWA__
County of __POLK__

**CERTIFICATE OF ACKNOWLEDGMENT**

On __08/17/2010__ before me, __Shirley Barkley__, Notary Public, personally appeared __Grif Shoemaker__ who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.
I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.
WITNESS my hand and official seal.

**SHIRLEY BARKLEY**
Commission Number 745647
My Commission Expires
March 1, 2016

_Shirley Barkley_
Shirley Barkley      Notary Public

NEO 0601-0002 CA (2/10)          Do not stamp seal below this line.

POWER OF ATTORNEY ATTACHED

LAND

RECORDING REQUESTED BY:
RECONTRUST COMPANY
AND WHEN RECORDED MAIL DOCUMENT
AND TAX STATEMENTS TO:
RECONTRUST COMPANY
1800 Tapo Canyon Rd., CA6-914-01-94
SIMI VALLEY, CA  93063



TS No. 09-0138469

09-c-413113

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## CORPORATION ASSIGNMENT OF DEED OF TRUST/MORTGAGE

FOR VALUE RECEIVED, THE UNDERSIGNED HEREBY GRANTS, ASSIGNS AND TRANSFER TO:

**U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR GSR 2006-7F**

ALL BENEFICIAL INTEREST UNDER THAT CERTAIN DEED OF TRUST DATED 05/05/2006, EXECUTED BY:
SHAHIN B AMIRI, AND SIGALIT AMIRI, HUSBAND AND WIFE AS COMMUNITY PROPERTY WITH RIGHTS
OF SURVIVORSHIP, TRUSTOR: TO RECONTRUST COMPANY, N.A., TRUSTEE AND RECORDED AS
INSTRUMENT NO. 06 1043954 ON 05/11/2006, OF OFFICIAL RECORDS IN THE COUNTY RECORDER'S OFFICE
OF LOS ANGELES COUNTY, IN THE STATE OF CALIFORNIA.

DESCRIBING THE LAND THEREIN:  AS MORE FULLY DESCRIBED IN SAID DEED OF TRUST

TOGETHER WITH THE NOTE OR NOTES THEREIN DESCRIBED OR REFERRED TO, THE MONEY DUE AND
TO BECOME DUE THEREON WITH INTEREST, AND ALL RIGHTS ACCRUED OR TO ACCRUE UNDER SAID
DEED OF TRUST/MORTGAGE.

DATED: September 11, 2009

May 21, 2010

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.

BY: _____
Randolyn Logan, Assistant Secretary

State of: **CALIFORNIA**                )
County of: **VENTURA**                )
On  MAY 2 1 2010  before me, MICHELLE I. MILLER              , notary public, personally appeared
RANDOLYN LOGAN                                    , who proved to me on the basis of satisfactory evidence to be the
person(s) whose name(s) is/are subscribed to within instrument and acknowledged to me that he/she/they executed the same in
his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon
behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.
WITNESS my hand and official seal.

Signature _____ (Seal)
MICHELLE I. MILLER

MICHELLE I. MILLER
COMM. #1836833
Notary Public - California
Los Angeles County
My Comm. Expires Feb. 15, 2013

EXHIBIT B

Form asgnmnt (01/09)
3B

RECORDER MEMO: This COPY is NOT an OFFICIAL RECORD.

LandSafe National Default
RECORDING REQUESTED BY:
RECONTRUST COMPANY
AND WHEN RECORDED MAIL TO:
RECONTRUST COMPANY
1800 Tapo Canyon Rd., CA6-914-01-94
SIMI VALLEY, CA 93063

Forward Tax Statements to Address listed above



*20100663508*
09/24/2010

SPACE ABOVE THIS LINE FOR RECORDER'S USE

Signature of Declarant or Agent determining tax. Firm Name
SoCal _____ Jean Dip

TS No. 09-0108626
Title Order No. 09-8-311471

## TRUSTEE'S DEED UPON SALE

APN# 2701-063-254          TRANSFER TAX: $ 0

The Grantee herein was the beneficiary
The amount of the unpaid debt was $ 511,126.93
The amount paid by the Grantee was $ 348,750.00
The property is in the city of NORTHRIDGE, County of LOS ANGELES

RECONTRUST COMPANY, N.A., as the duly appointed Trustee (or successor Trustee or substituted Trustee), under a Deed of Trust referred to below, and herein called "Trustee", does hereby grant without covenant or warranty to:

     U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR GSR 2006-9F

herein called Grantee, the following described real property situated in LOS ANGELES County, California:

SEE ATTACHED LEGAL DESCRIPTION          SEE Schedule A

This conveyance is made pursuant to the powers conferred upon Trustee by the Deed of Trust executed by ROBERT J BEKKER, AND CARRIE F BEKKER, HUSBAND AND WIFE AS JOINT TENANTS, as Trustor, recorded on 08/02/2006, Instrument Number 06 1706612 ( or Book , Page ) Official Records in the Office of the County Recorder of LOS ANGELES County.

All requirements of law regarding the recording and mailing of copies of the Notice of Default and Election to Sell, and the recording, mailing, posting, and publication of the Notice of Trustee's Sale have been complied with.

*Form trsteedeed (01/09)*

RECORDER MEMO: This COPY is NOT an OFFICIAL RECORD.

RECORDER MEMO: This COPY is NOT an OFFICIAL RECORD.

3

TS No. 09-0108626

Title Order No. 09-8-311471

*NO BIDDERS - REVERTED TO NEO*

Trustee, in compliance with said Notice of Trustee's Sale and in exercise of its power under said Deed of Trust sold said real property at public auction on 06/16/2010. Grantee, being highest bidder at said sale became the purchaser of said property for the amount bid, which amount was $ 348,750.00.

DATE:   June 16, 2010                    RECONTRUST COMPANY, N.A.

BY: _____
    Flor Valerio, Assistant Secretary

State of California          }
County of Ventura            }

On **JUN 2 2 2010** _____ before me, **MICHELLE L. MILLER** _____, notary public, personally appeared **FLOR VALERIO** _____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct. WITNESS my hand and official seal.

Signature _____ (Seal)
        **MICHELLE L. MILLER**

MICHELLE L. MILLER
COMM. #1836833
Notary Public - California
Los Angeles County
My Comm. Expires Feb. 15, 2013

Form trsteedeed (01/09)

RECORDER MEMO: This COPY IS NOT an OFFICIAL RECORD.

**CERTIFICATION COPY-LINE-ITEM-ENTRY IN THE SEQUENTIAL JOURNAL**

State of : California

County of _Los Angeles_

On this the _____ _5th_ _____, day of ____ _December_ ____, 200 _11_ ,

I the undersigned Notary Public in and for the State of California, do hereby certify the

attached document to be an accurate reproduction of a Notary journal entry

of _Corporate Assignment_
  _of Deed of Trust_ , is a true and correct photocopy made from a page
<span style="font-size:small">(Name or Description of Original Document)</span>

in my Official Sequential Journal of notarial acts.

M. I. MILLER
COMM. #1836833
Notary Public - California
Los Angeles County
My Comm. Expires Feb. 15, 2013

_____
    (Signature of Notary Public)

**Place Notary Seal Above**

**LANDSAFE TITLE**

RECORDING REQUESTED BY:
RECONTRUST COMPANY
AND WHEN RECORDED MAIL DOCUMENT
AND TAX STATEMENTS TO:
RECONTRUST COMPANY
1800 Tapo Canyon Rd., CA6-914-01-94
SIMI VALLEY, CA 93063

ATTN: Joselyn Casillas
TS No. 09-0132227

09-8-391503



## SUBSTITUTION OF TRUSTEE AND ASSIGNMENT OF DEED OF TRUST

The undersigned MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., (hereinafter referred to as Beneficiary) is the Beneficiary of that certain Deed of Trust dated 12/22/2005, executed by ANDREW HORVATH, A SINGLE MAN, Trustor, to CTC REAL ESTATE SERVICE, as Trustee, and recorded as Instrument No. 06 0091822 on 01/13/2006, of Official Records in the County Recorder's Office of LOS ANGELES County, California. NOW THEREFORE, Beneficiary hereby substitutes RECONTRUST COMPANY, N.A., WHOSE ADDRESS IS:1800 Tapo Canyon Rd., CA6-914-01-94, SIMI VALLEY, CA 93063 , as Trustee under said Deed of Trust herein referred to, in the place and stead of and with all rights, title, powers, and interest of the former trustee described above.

FOR VALUE RECEIVED, the undersigned hereby grants, assigns, conveys and transfers to U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE, FOR HARBORVIEW 2006-1 TRUST FUND, , all beneficial interest under that certain Deed of Trust described above. Said described land: "As more fully described in the above referenced Deed of Trust." Together with the note or notes therein described or referred to, the money due and to become due thereon with the interest, and all rights accrued or to accrue under said Deed of Trust.

DATED: April 29, 2010                    MORTGAGE ELECTRONIC REGISTRATION
                                         SYSTEMS, INC.

State of: **CALIFORNIA**            )BY: _____
County of: **VENTURA**              )     Gary Nord, Assistant Secretary

On APR 2 9 2010 before me, **MICHELLE I. MILLER**, notary public, personally appeared **GARY NORD**, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____  (Seal)
Notary Public's Signature

**MICHELLE I. MILLER**

MICHELLE I. MILLER
COMM. #1836833
Notary Public · California
Los Angeles County
My Comm. Expires Feb. 15, 2013

*Form subasgnmnt (01/09)*

**LANDSAFE TITLE**

RECORDING REQUESTED BY:
RECONTRUST COMPANY
AND WHEN RECORDED MAIL DOCUMENT
AND TAX STATEMENTS TO:
RECONTRUST COMPANY
1800 Tapo Canyon Rd., SV2-202
SIMI VALLEY, CA 93063

ATTN: Joselyn Casillas
TS No. 08-0079855

TSG # 08-5-296259

## SUBSTITUTION OF TRUSTEE AND ASSIGNMENT OF DEED OF TRUST

The undersigned MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., (hereinafter referred to as Beneficiary) is the Beneficiary of that certain Deed of Trust dated 03/07/2006, executed by ROSA RAMIREZ AND IVAN RAMIREZ, WIFE AND HUSBAND AS JOINT TENANTS, Trustor, to ALLIANCE TITLE, as Trustee, and recorded as Instrument No. 06 0575248 on 03/17/2006, of Official Records in the County Recorder's Office of LOS ANGELES County, California. NOW THEREFORE, Beneficiary hereby substitutes RECONTRUST COMPANY, N.A., WHOSE ADDRESS IS:1800 Tapo Canyon Rd., SV2-202, SIMI VALLEY, CA 93063 , as Trustee under said Deed of Trust herein referred to, in the place and stead of and with all rights, title, powers, and interest of the former trustee described above.

FOR VALUE RECEIVED, the undersigned hereby grants, assigns, conveys and transfers to U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR J.P. MORGAN MORTGAGE ACQUISITION TRUST 2006-CW2 all beneficial interest under that certain Deed of Trust described above. Said described land: "As more fully described in the above referenced Deed of Trust." Together with the note or notes therein described or referred to, the money due and to become due thereon with the interest, and all rights accrued or to accrue under said Deed of Trust.

DATED: June 07, 2010

State of: **CALIFORNIA**          )

County of: **VENTURA**          )

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.

BY:

Kevin Rudolph, Assistant Secretary

On **JUN 0 7 2010** before me, **MICHELLE I. MILLER**, notary public, personally appeared **KEVIN RUDOLPH**, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)
Notary Public's Signature     **MICHELLE I. MILLER**

MICHELLE I. MILLER
COMM. #1836833
Notary Public - California
Los Angeles County
My Comm. Expires Feb. 15, 2013

*Form subassgnmnt (01/09)*

**LandSafe Default**

RECORDING REQUESTED BY:
RECONTRUST COMPANY
AND WHEN RECORDED MAIL DOCUMENT
AND TAX STATEMENTS TO:
RECONTRUST COMPANY
1757 TAPO CANYON ROAD, SVW-88
SIMI VALLEY, CA 93063

05/19/2010

*20100680699*

ATTN: Joselyn Casillas
TS No. 09-0029093

## SUBSTITUTION OF TRUSTEE AND ASSIGNMENT OF DEED OF TRUST

The undersigned MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., (hereinafter referred to as Beneficiary) is the Beneficiary of that certain Deed of Trust dated 05/16/2005, executed by CELENIA CRUZ, A SINGLE WOMAN, Trustor, to RECONTRUST COMPANY, N.A., as Trustee, and recorded as Instrument No. 05 1231180 on 05/26/2005, of Official Records in the County Recorder's Office of LOS ANGELES County, California. NOW THEREFORE, Beneficiary hereby substitutes RECONTRUST COMPANY, N.A., WHOSE ADDRESS IS:1757 TAPO CANYON ROAD, SVW-88, SIMI VALLEY, CA 93063 , as Trustee under said Deed of Trust herein referred to, in the place and stead of and with all rights, title, powers, and interest of the former trustee described above.

FOR VALUE RECEIVED, the undersigned hereby grants, assigns, conveys and transfers to U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE, FOR THE BENEFIT OF HARBORVIEW 2005-10 TRUST FUND all beneficial interest under that certain Deed of Trust described above. Said described land: "As more fully described in the above referenced Deed of Trust." Together with the note or notes therein described or referred to, the money due and to become due thereon with the interest, and all rights accrued or to accrue under said Deed of Trust.

DATED: May 14, 2010

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.

BY: _____
Kevin Rudolph, Assistant Secretary

State of: __CALIFORNIA__ )
County of: __VENTURA__ )

On MAY 14 2010 before me, __MICHELLE I. MILLER__, notary public, personally appeared __KEVIN RUDOLPH__, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)
Notary Public's Signature
MICHELLE I. MILLER

MICHELLE I. MILLER
COMM. #1836893
Notary Public · California
Los Angeles County
My Comm. Expires Feb. 18, 2013

Form subassignmnt (01/09)

**LANDSAFE TITLE**

RECORDING REQUESTED BY:

RECONTRUST COMPANY

AND WHEN RECORDED MAIL DOCUMENT

AND TAX STATEMENTS TO:

RECONTRUST COMPANY
1800 Tapo Canyon Rd., CA6-914-01-94
SIMI VALLEY, CA  93063



TS No. 09-0138027

09.8.409842

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## CORPORATION ASSIGNMENT OF DEED OF TRUST/MORTGAGE

FOR VALUE RECEIVED, THE UNDERSIGNED HEREBY GRANTS, ASSIGNS AND TRANSFER TO:

U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR THE LXS 2006-18N TRUST FUND

ALL BENEFICIAL INTEREST UNDER THAT CERTAIN DEED OF TRUST DATED 08/09/2006, EXECUTED BY: LORETTA M NORRIS, TRUSTEE OF THE LORETTA M. NORRIS 2000 TRUST, TRUSTOR: TO RECONTRUST COMPANY, N.A. TRUSTEE AND RECORDED AS INSTRUMENT NO. 06 1921199 ON 08/29/2006, OF OFFICIAL RECORDS IN THE COUNTY RECORDER'S OFFICE OF LOS ANGELES COUNTY, IN THE STATE OF CALIFORNIA.

DESCRIBING THE LAND THEREIN:  AS MORE FULLY DESCRIBED IN SAID DEED OF TRUST

TOGETHER WITH THE NOTE OR NOTES THEREIN DESCRIBED OR REFERRED TO, THE MONEY DUE AND TO BECOME DUE THEREON WITH INTEREST, AND ALL RIGHTS ACCRUED OR TO ACCRUE UNDER SAID DEED OF TRUST/MORTGAGE.

DATED: September 10, 2009          MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.

May 3, 2010

State of: CA                    )    BY:
County of: VENTURA              )         LETICIA QUINTANA    , Assistant Secretary

On  MAY 1 0 2010    before me,  MICHELLE I. MILLER     , notary public, personally appeared
LETICIA QUINTANA              , who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the Instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct. WITNESS my hand and official seal.

Signature _____ (Seal)

MICHELLE I. MILLER

MICHELLE I. MILLER
COMM. #1836833
Notary Public - California
Los Angeles County
My Comm. Expires Feb. 16, 2013

Form asgnmrt (01/09)

CERTIFICATE OF SERVICE

I, MARIO VALENZUELA, declare that I am, and was that the time of service of the papers herein referred to, over the age of 18 years, and not a party to this action; and I am employed in the County of Kern, California, within which county the subject forms of service identified below occurred. My business address is 4900 California Avenue, Tower B, Second Floor, Bakersfield, California 93309-7080.

On the date of execution of this Certificate of Service identified below, I served a true copy of the following document in the form indicated:

**FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT, TEMPORARY RESTRAINING ORDER,  INJUNCTIVE RELIEF, AND MONETARY DAMAGES**

By electronically using the CM/ECF system, which sent electronic notification of such filing to all other parties appearing on the docket sheet; and / or by First Class Mail and / or by facsimile on the following parties, as indicated:

| | |
|---|---|
| Benjamin David Spohn, bspohn@reedsmith.com, jbeach@reedsmith.com<br>*Attorney for Defendants*<br>BANK OF AMERICA N.A. for itself and as successor for COUNTRYWIDE BANK, N.A.; COUNTRYWIDE HOME LOANS, INC.; BAC HOME LOANS SERVICING, LP; AMERICA'S WHOLESALE LENDER; MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.; and RECONTRUST COMPANY, N.A.,<br><br>**BY ECF/CM** | CHL MORTGAGE PASS-THROUGH TRUST 2006-HYB3 MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-HYB3<br>In care of Trustee<br>The Bank of New York Mellon<br>One Wall Street,<br>New York, New York 10005-2500<br><br>**BY FIRST CLASS MAIL** |

THE ADVOCATES' LAW FIRM, LLP
www.theadvocateslaw.com

1  CWMBS, INC.
   C T Corporation System
2  818 West 7th Street
   Second Floor
3  Los Angeles, CA 90017

4  **BY FIRST CLASS MAIL**

5

6

7      I declare under penalty of perjury under the laws of the United States that the

8  foregoing is true and correct.

9      Executed on November 14, 2011, at Bakersfield, California.

10

11

12  _____

13      Mario Valenzuela

**FIRST AMENDED COMPLAINT**